1   ROBBINS GELLER RUDMAN
     & DOWD LLP
2   DENNIS J. HERMAN (220163)
     Post Montgomery Center
3   One Montgomery Street, Suite 1800
     San Francisco, CA  94104
4   Telephone:  415/288-4545
     415/288-4534 (fax)
5   shawnw@rgrdlaw.com
     dherman@rgrdlaw.com
6        – and –
     SAMUEL H. RUDMAN
7   MARIO ALBA JR.
     58 South Service Road, Suite 200
8   Melville, NY  11747
     Telephone:  631/367-7100
9   631/367-1173 (fax)
     srudman@rgrdlaw.com
10  malba@rgrdlaw.com

11  Attorneys for Plaintiff

12  [Additional counsel appear on signature page.]

13                    UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15  DESAI KUSHAL VIKRAMKUMAR, Individually and on Behalf of All Others 16  Similarly Situated, | )  Case No. )  )  <u>CLASS ACTION</u> |
| 17                              Plaintiff, | )  )  COMPLAINT FOR VIOLATIONS OF THE )  FEDERAL SECURITIES LAWS |
| 18       vs. | )  ) |
| 19  NIMBLE STORAGE, INC., SURESH VASUDEVAN and ANUP V. SINGH, 20 | )  )  ) |
| 21                             Defendants. | )  )  <u>DEMAND FOR JURY TRIAL</u> |

22

23

24

25

26

27

28

Plaintiff (defined below) has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Nimble Storage, Inc. ("Nimble Storage" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Nimble Storage between May 27, 2015 and November 19, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

3.      Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District and the Company is headquartered in this District.

4.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

5.      In connection with the acts alleged in this Complaint, defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Desai Kushal Vikramkumar, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Nimble Storage during the Class Period and has been damaged thereby.

1    7.    Defendant Nimble Storage provides flash-optimized storage platforms.

2    8.    (a)    Defendant Suresh Vasudevan ("Vasudevan") is, and was at all relevant times,

3    the Company's Chairman, Chief Executive Officer, and President.

4    (b)    Defendant Anup V. Singh ("Singh") is, and was at all relevant times, the

5    Company's Chief Financial Officer.

6    (c)    Defendants Vasudevan and Singh are collectively referred to herein as the

7    "Individual Defendants."

8    9.    Because of the Individual Defendants' positions with the Company, they had access

9    to the adverse undisclosed information about the Company's business, operations, operational

10    trends, financial statements, markets and present and future business prospects via access to internal

11    corporate documents (including the Company's operating plans, budgets and forecasts and reports of

12    actual operations compared thereto), conversations and connections with other corporate officers and

13    employees, attendance at management and board of directors meetings and committees thereof and

14    via reports and other information provided to them in connection therewith.

15    10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes

16    and to presume that the false, misleading and incomplete information conveyed in the Company's

17    public filings, press releases and other publications as alleged herein are the collective actions of the

18    narrowly defined group of defendants.  Each of the above officers of Nimble Storage, by virtue of

19    their high-level positions with the Company, directly participated in the management of the

20    Company, was directly involved in the day-to-day operations of the Company at the highest levels

21    and was privy to confidential proprietary information concerning the Company and its business,

22    operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants

23    were involved in drafting, producing, reviewing and/or disseminating the false and misleading

24    statements and information alleged herein, were aware, or recklessly disregarded, that the false and

25    misleading statements were being issued regarding the Company, and approved or ratified these

26    statements, in violation of the federal securities laws.

27    11.    As officers and controlling persons of a publicly-held company whose shares were,

28    and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the

1   New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws,

2   the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

3   with respect to the Company's financial condition and performance, growth, operations, financial

4   statements, business, markets, management, earnings and present and future business prospects, and

5   to correct any previously-issued statements that had become materially misleading or untrue, so that

6   the market price of Nimble Storage publicly-traded shares would be based upon truthful and accurate

7   information. The Individual Defendants' misrepresentations and omissions during the Class Period

8   violated these specific requirements and obligations.

9   12.   The Individual Defendants participated in the drafting, preparation, and/or approval

10  of the various public and shareholder and investor reports and other communications complained of

11  herein and were aware of, or recklessly disregarded, the misstatements contained therein and

12  omissions therefrom, and were aware of their materially false and misleading nature. Because of

13  their board membership and/or executive and managerial positions with Nimble Storage, each of the

14  Individual Defendants had access to the adverse undisclosed information about Nimble Storage's

15  business prospects and financial condition and performance as particularized herein and knew (or

16  recklessly disregarded) that these adverse facts rendered the positive representations made by or

17  about Nimble Storage and its business issued or adopted by the Company materially false and

18  misleading.

19  13.   The Individual Defendants, because of their positions of control and authority as

20  officers and/or directors of the Company, were able to and did control the content of the various SEC

21  filings, press releases and other public statements pertaining to the Company during the Class

22  Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

23  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

24  their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

25  responsible for the accuracy of the public reports and releases detailed herein and is therefore

26  primarily liable for the representations contained therein.

27  14.   Each of the defendants is liable as a participant in a fraudulent scheme and course of

28  business that operated as a fraud or deceit on purchasers of Nimble Storage common stock by

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            - 3 -

1   disseminating materially false and misleading statements and/or concealing material adverse facts.

2   The scheme: (i) deceived the investing public regarding Nimble Storage's business, operations,

3   management and the intrinsic value of Nimble Storage common stock; (ii) enabled certain Company

4   insiders to collectively sell 1,121,494 shares of their personally-held Nimble Storage common stock

5   for gross proceeds in excess of $31.4 million; and (iii) caused plaintiff and other members of the

6   Class to purchase Nimble Storage common stock at artificially inflated prices.

7                                **CLASS ACTION ALLEGATIONS**

8            15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

9   Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

10  stock of Nimble Storage during the Class Period and who were damaged thereby (the "Class").

11  Excluded from the Class are defendants and their families, the officers and directors of the

12  Company, at all relevant times, members of their immediate families and their legal representatives,

13  heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

14           16.    The members of the Class are so numerous that joinder of all members is

15  impracticable.  Throughout the Class Period, Nimble Storage common stock was actively traded on

16  the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can

17  only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, if not

18  thousands of members in the proposed Class.  Record owners and other members of the Class may

19  be identified from records maintained by Nimble Storage or its transfer agent and may be notified of

20  the pendency of this action by mail, using the form of notice similar to that customarily used in

21  securities class actions.

22           17.    Plaintiff's claims are typical of the claims of the members of the Class as all members

23  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law

24  complained of herein.

25           18.    Plaintiff will fairly and adequately protect the interests of the members of the Class

26  and has retained counsel competent and experienced in class action and securities litigation.

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 4 -

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Nimble Storage;

(c)     whether the price of Nimble Storage common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

21.     Defendant Nimble Storage describes itself as "redefining the storage market with its Adaptive Flash platform.  Nimble's flash storage solutions enable the consolidation of all workloads and eliminate storage silos by providing enterprises with significant improvements in application performance and storage capacity.  At the same time, Nimble delivers superior data protection, while simplifying business operations and lowering costs."

22.     The Company concentrates on three main areas in terms of sales and marketing investments: (i) U.S. Commercial, which are mid-sized customers who have traditionally been the core of Nimble Storage's sales; (ii) Large Enterprises; and (iii) International.

23.     The Company's CS210 and CS215 products, which supports the iSCSI (Internet Small Computer System Interface) storage protocol, were designed for small to medium-sized IT organizations or remote offices.  In October 2014, the Company introduced its Fibre Channel

products, which include the CS300, CS500, and CS700.  The Company's Fibre Channel products were designed to compete for the business of large enterprises who require products that support this technology.

24.     By at least the start of the Class Period, Nimble Storage was being negatively impacted by intense competition from well-entrenched, large competitors who were slashing prices in order to maintain market share.  Nimble Storage had made a conscious decision to focus its sales and marketing efforts towards the Large Enterprises market and to reduce sales efforts in the U.S. Commercial market.  As a result of this change in sales strategy and the intense price competition, Nimble Storage lost sales in both sales channels.

25.     The Class Period commences on May 27, 2015.  On May 26, 2015, after the close of the markets, Nimble Storage issued a press release announcing its financial results for the fiscal first quarter of 2016, the period ending April 30, 2015.  For the quarter, the Company reported total revenue of $71.3 million, non-GAAP gross margin of 67.6%, a non-GAAP operating loss of $7.9M or negative 11% of revenue, and a GAAP net loss of $29.0 million, or $0.38 per basic and diluted share.  Defendant Vasudevan, commenting on the results, stated, in pertinent part, as follows:

> As enterprises aim to consolidate storage infrastructure to contain cost and complexity, while still delivering tailored service levels for hundreds of business-enabling applications, we believe that we stand alone in our ability to address the broadest spectrum of requirements among next-generation flash-optimized storage platforms. Our Q1 results serve as evidence of our continued momentum. During the quarter, we added 542 new customers, more than doubled our bookings from enterprise and service provider customers, and achieved record bookings contribution from current customers expanding their Nimble installations.

26.     Defendant Singh added, in pertinent part, as follows:

> Revenue grew 53% from prior year at record high non-GAAP gross margins which remained industry leading at 67.6%.  Operating margins improved to negative 11% compared to negative 22% in Q1 last year, and **we are confident and remain on track to achieve non-GAAP operating income break-even by the end of the current fiscal year.**  [Emphasis added.]

27.     Following the press release, on May 26, 2015, Nimble held a conference call with analysts and investors to discuss the Company's earnings and operations.  With regard to customer acquisitions, defendant Vasudevan, stated, in pertinent part:

> During Q1, we maintained our momentum of driving new customer acquisitions as we added 542 new customers, to end with an installed base of 5,521 customers. Our

channel relationships have been key to our ability to add new customers.  In the US, our channel programs have been focused on enablement of existing partners, even as we continue to focus on partner recruitment in international markets.  This is yielding strong results as the number of new customers we added where our channel partners are playing the lead role reached record levels during Q1.

A key highlight of Q1 is the strong momentum that we saw with large deals.  Bookings from deals over $100,000 grew at 142% compared to Q1 last year.  And bookings from deals over $250,000 more than quadrupled compared to Q1 of last year.

A major driver of the growth in large deals is the momentum we are seeing in penetrating large enterprises.  Our bookings from the enterprise segment more than doubled during Q1 on a year-over-year basis, with dozens of significant enterprise wins.

\*       \*       \*

As anticipated, our Fibre Channel product is helping to drive our enterprise adoption as it is breaking down barriers to adoption within large enterprises. And it's driving much larger deal sizes on average.  During Q1, Fibre Channel accounted for 14% of our total bookings.

28.     With regard to the Company's guidance for the fiscal second quarter of 2016, defendant Singh stated, in pertinent part, as follows:

We are pleased with the progress we're making in our business model, and our strategy is to continue to drive strong growth in the top line along with improved leverage in the bottom line. ***We remain on track to achieve our goal of breakeven non-GAAP operating income at the end of FY16***.  [Emphasis added.]

29.     In response to a questions regarding the Company's sales strategy, defendant Vasudevan stated, in pertinent part, as follows:

Katy, I would say the top priorities for Denis are no different than the top priorities that we as an organization have been executing to.  It's really threefold, the first one being drive growth in large enterprise and cloud service providers as a component of our total business.

Second, even as we do that, make sure that we are continuing to drive customer acquisition at a rapid pace by leveraging our channel partners.  And third is continue to grow our international footprint.

What comes in to help our growth if we do these three things well is the fact that the loyalty that we see within our customer base drives up overall growth from existing customers.  So, it's really very simple.  That's what we have been executing to.

\*       \*       \*

AARON RAKERS, ANALYST, STIFEL NICOLAUS: Yes, thanks for taking the questions and congratulations on the quarter.  I want to go back to Brian's question.  Last quarter you talked about 83 customers deploying Fibre Channel, I think 70% of

which were new.  I think when you had launched the Fibre Channel product you talked about a 4X expansion in your addressable market opportunity.

What I'm hearing now it seems like we shouldn't necessarily look at it that way.  It seems like the protocol isn't as important.  And I'm just trying to understand, back to Brian's question, is if you look at 14% as a proxy of revenue it would look like your iSCSI revenue growth has slowed a bit.

I just want to be a little bit more clear.  Is that -- we shouldn't care as much about the protocol?  Or is it all about sales capacity and these guys are focused on Fibre Channel today?  I'm just trying to understand the context of that a little bit better.

SURESH VASUDEVAN: Sure.  No, absolutely.  Let me start by saying when I said the protocol is not a fundamental part of the conversation, if we didn't have Fibre Channel it would be the reason why we did not win many of our enterprise deals.  So in that sense, Fibre Channel absolutely expanded our TAM.  It's absolutely helping us land major enterprise wins.  It's helping us land larger deals that we otherwise would not have won.

Even this quarter more than 70% of our Fibre Channel customers were new to Nimble customers.  So, that part remains very much true: the protocol is extremely important in that without it we cannot sell to our customers.

Having the protocol itself is not enough to win.  It goes back to the fundamentals of our platform and our value proposition.  That's what we win on the strength of once we have the protocol.

Now, the second part of your question was how should we think about Fibre Channel and relative to iSCSI.  I'll go back to what I said which is, given a certain number of sales reps, the way to think about Fibre Channel is they are now able to work on larger deals than they would have been able to do with iSCSI alone, and the win rates are higher.  So, given a fixed number of sales reps, the number of deals they can do is slightly larger and the size of the deals is larger.  And that's what's driving our growth.

But to think that all the Fibre Channel deals are on top of all of the other deals that they would have otherwise done, would be a [faulty].  So, the way to think about it is it's allowing us to get more productive and it's allowing us to keep investing in sales capacity such that the more reps we have the more we are able to drive bookings, if you will.

AARON RAKERS: So, put another way, there's opportunities in iSCSI that aren't necessarily being fulfilled because they're focused on Fibre Channel.

SURESH VASUDEVAN: That's right.  The way to think about it is there are opportunities in iSCSI that are not being able to be fulfilled, there are opportunities in Fibre Channel that we won't get to until we keep adding sales capacity over time.  And the way we think about sales capacity, every quarter we add a certain number of sales reps, but we only add so many such that we can still drive operating leverage and drive growth over time rather than short-term growth by just overloading on the number of sales reps we have on our books, if you will.

30.     On August 25, 2015, after the close of the markets, Nimble Storage issued a press release announcing its financial results for the fiscal second quarter of 2016, the period ending July

31, 2015.  For the quarter, the Company reported total revenue of $80.1 million, non-GAAP gross margin of 67.8%, a non-GAAP operating loss of $7.2 million or negative 9% of revenue, and a GAAP net loss of $30.1 million, or $0.38 per basic and diluted share.  Defendant Vasudevan, commenting on the results, stated, in pertinent part, as follows:

> As the storage industry continues to experience disruption from architectural shifts, our core belief that only the Adaptive Flash Platform can consolidate and dynamically optimize every enterprise application running across the data center remains our guiding principle.  Q2 provided clear evidence of our continuing momentum.  We added 690 new customers, a new quarterly record, delivered a broad range of enterprise-grade capabilities with Nimble OS 2.3, and were recognized with two prestigious awards, an industry award for the most innovative flash memory technology and an IT professional innovation leader award for hybrid HDD/SSD arrays.

31.    Defendant Singh added, in pertinent part, as follows:

> Q2 was another quarter of strong financial execution.  Our industry leading gross margins reached another record high at 67.8%.  We continued to drive improvement in our operating leverage, as operating margins improved by 11 percentage points compared to Q2 FY2015, while generating record cash flow from operations which was 19% of revenue this quarter.

32.    With regard to the Company's outlook for the fiscal third quarter of 2016, the Company stated, in pertinent part, as follows:

> Nimble Storage provides guidance based on current market conditions and expectations.  For the third quarter of fiscal 2016, Nimble Storage expects:
>
> - Total revenue in the range of $86.0 to $88.0 million
>
> - Non-GAAP operating loss in the range of $5.0 to $6.0 million
>
> - Non-GAAP net loss per basic and diluted share in the range of $0.08 to $0.09 based on weighted average shares outstanding of approximately 80.0 million

33.    Following the press release, on August 25, 2015, Nimble Storage held a conference call with analysts and investors to discuss the earnings release and the Company's operations.  With regard to customer acquisitions, defendant Vasudevan, stated, in pertinent part:

> We added 690 customers during Q2, a record pace of customer acquisition compared to any previous quarter.  We now have over 6,200 customers within our install base.  Our channel continues to play a stellar role in helping us drive customer acquisition.  We have over 1,000 unique channel sales reps that close deals during Q2.  This channel leverage helps drive overall leverage in our business model.
>
> The enhancements that we have made to our platform over the last 18 months are translating into continued strong enterprise momentum.  During Q2, the number of

deals we closed over $100,000 reached an all-time high. Our bookings over the last 12 months within the global 5,000 and the cloud service provider segment compared to the previous 12-month period were up by more than 80% in each segment. In just the global 500, we now have 70 customers as part of our install base. Fibre Channel remains a key contributor to our enterprise momentum.

\*   \*   \*

Our focus on customer acquisition stems from a belief that as customers continue to experience data growth, that will in turn translate into sustained growth over many years for us so long as we can demonstrate very high customer satisfaction. This is where InfoSight remains unmatched and drives repeat deployments. On a trailing 12-month basis, repeat bookings accounted for 46% of our total bookings as we continue to see a consistent pattern of repeat purchases within our customer base.

34.     With regard to the Company's guidance for the fiscal third quarter of 2016, defendant Singh stated, in pertinent part, as follows:

Moving on to guidance for Q3. In Q3, we expect our revenue to be in the range of $86 million to $88 million and operating losses between $5 million and $6 million. This translates into a non-GAAP loss of $0.08 to $0.09 per share, which is based on approximately 80 million shares outstanding. We remain on track to achieve our goal of breakeven in non-GAAP operating income at the end of FY16.

35.     In reaction to these announcements, on August 26, 2015, the price of Nimble Storage common stock rose $2.89 per share, or 12%, to close at $26.72 per share, on heavy trading volume.

36.     The statements referenced above in ¶¶25-34 were each materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     that the Company had made a decision to focus its sales efforts on the Large Enterprises sales channel and to reduce the amount of sales resources directed towards the U.S. Commercial market. At the same time, large well-capitalized competitors started slashing prices in order to maintain market share. As a result, Nimble Storage's sales to large enterprises were lower than expected and would be declining further as price competition worsened;

(b)     that sales to the U.S. Commercial market were declining as a result of the Company's decision to focus on the Large Enterprises sales channel;

(c)     that the Company's gross margins would be adversely effected by increased discounting of the Company's products; and

1         (d)     as a result of the foregoing, defendants lacked a reasonable basis for their

2   positive statements about the Company's financial performance and outlook during the Class Period.

3         37.    On November 19, 2015, after the close of the markets, Nimble Storage issued a press

4   release announcing its financial results for the fiscal third quarter of 2016, the period ending October

5   31, 2015. For the quarter, the Company reported total revenue of $80.7 million, non-GAAP gross

6   margin of 66.9%, a non-GAAP operating loss of $10.8 million or negative 13% of revenue, and a

7   GAAP net loss of $28.6 million, or $0.36 per basic and diluted share. Defendant Vasudevan,

8   commenting on the disappointing fiscal third quarter results, stated, in pertinent part, as follows:

9   We have been executing a strategy of augmenting our customer base of mid-sized
10  enterprises by focusing on expanding our presence in the large enterprise segment,
    while simultaneously aiming to achieve non-GAAP breakeven operating income in
    Q4FY16. Our Q3FY16 results fell short of our expectations for two reasons. First,
11  we believe while we are acquiring large enterprise customers at a strong pace, our
    enterprise investments are taking longer to become fully productive. Second, we
12  believe the shift in investment from commercial to enterprise business impacted our
    commercial revenue growth more than we anticipated. We continue to strongly
13  believe that the market opportunity associated with the shift from disk-centric
    architectures to flash-centric architectures is significant, and that our Adaptive Flash
14  platform offers the broadest and most differentiated approach to leveraging flash
    storage in the modern data center.
15
          38.    Defendant Singh added, in pertinent part, as follows:
16
17  We plan to make some key investments to drive growth that will constrain short-term
    profitability. We believe our planned investments will improve revenue growth as
    well as operating leverage over time. We expect that it will take several quarters to
18  realize the impact of these investments and have factored that into our guidance for
    Q4FY16.
19
          39.    With regard to the Company's outlook for the fiscal fourth quarter of 2016, the
20
    Company stated, in pertinent part, as follows:
21
22  Nimble Storage provides guidance based on current market conditions and
    expectations. For the fourth quarter of fiscal 2016, Nimble Storage expects:

23  •     Total revenue in the range of $87.0 to $90.0 million

24  •     Non-GAAP operating loss in the range of $8.0 to $10.0 million

25  •     Non-GAAP net loss per basic and diluted share in the range of $0.11 to $0.13 based
26          on weighted average shares outstanding of approximately 81.0 million

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 11 -

40.     Following the press release, on November 19, 2015, the Company held a conference call with analysts and investors.  With regard to the Company's disappointing fiscal third quarter of 2016 results, defendant Vasudevan, stated, in pertinent part:

> Although our Q3 FY16 revenue grew 37% compared to Q3 FY15 and we executed well on many operational dimensions, our Q3 FY16 results fell short of our expectations.
>
> We have been executing a strategy of augmenting our traditional customer base of mid-sized enterprises by focusing on large enterprises.  At the same time, as we make this transformation, we have also been focused on achieving non-GAAP breakeven operating income in Q4 FY16 by balancing topline growth versus investments in the business.
>
> Given the backdrop of a storage market that is extremely competitive, where storage vendors are investing heavily to defend market share, we now believe that this approach of constraining investments at the same time that we diversify our customer base may have impacted our growth.  Specifically, there are two developments during the quarter with that we believe impacted us.
>
> First, our investments in building out large enterprise customer base is making solid progress, but these investments are taking longer to get fully productive.  Second, given an overall investment envelope, we shifted investments from our commercial segment to the large enterprise segment.  This decreased investment affected areas such as the number of commercial teams and inside sales teams, demand generation programs, and channel incentives.  We believe that this decreased investment led to slower growth than we would have seen, had we maintained our previous pace of investment.
>
> *       *       *
>
> There are really three changes that impacted us.  One is, when we look at a mix of teams that we have brought on board, over half of the teams in the last four quarters have been non-commercial teams, named account teams.  So number of sales teams we are adding is lower in the commercial segment than traditionally has been true.  That is the first thing.
>
> The second one, which has even a more short-term impact, is we have a lot of marketing programs, channel programs, aimed at opportunity generation, and these are fairly short-cycle opportunity generation.  Typically a 75 to 90 day cycle in which they convert, and so we pulled investments from both marketing and channel, or shifted investments toward larger enterprise wins rather than commercial wins.  Both of those are the investments that we intend to go back and add again in our business model.
>
> *       *       *
>
> Marketing with inside sales, that's one.  And the third one is channel programs.  So, we have about half of our opportunities are marketing sourced, another half of our opportunities are channel sourced.
>
> *       *       *

AARON RAKERS: Okay, and final question for me. On the enterprise productivity, I'm just curious, where do we stand on the productivity curve, maybe relative to what you would have thought of maybe coming out of the July quarter? And as you bring on these new named account teams, just remind us again how long it takes us to see them ramp to that kind of targeted productivity?

SURESH VASUDEVAN: Yes, so I think we have not actually giving you specifics on the past. Let me just say, what we have said in the past is typically our commercial teams, Aaron, take around four quarters before they are on the same curve as our mature teams. Enterprise teams, we had said were slightly longer than that.

What we're now seeing is that full productivity of our enterprise teams is perhaps four quarters longer than our commercial teams, and that's really how we are seeing this. It takes about a couple of years before enterprise teams yield the kind of full productivity that we are looking for.

41.     With regard to the Company's guidance for the fiscal fourth quarter of 2016, defendant Singh stated, in pertinent part, as follows:

Moving on to guidance and our thoughts for Q4. Over the past year, we have been performing a balancing act of growing our base of mid-sized enterprises, as well as increasing our focus on the large enterprise segment. At the same time, we have also been focused in getting to breakeven and non-GAAP operating income in Q4 through the balancing of topline growth with investments in the business.

***We now believe this strategy of threading the investment needle at a time when the storage industry is competitive as it is may have impacted our growth. We are making some key changes that we believe will drive higher growth in the future. However, there will be some time before these benefits are realized.***

We have accounted for these factors that caused a slowing of growth during Q3 in setting our expectations for Q4. In Q4, we expect our revenue to be in the range of $87 million to $90 million, and operating losses between $8 million and $10 million. This translates into a non-GAAP loss of $0.11 to $0.13 a share, which is based upon approximately 81 million shares outstanding.  [Emphasis added.]

42.     In response to a question regarding the Company's goal of achieving breakeven in non-GAAP operating income at the end of fiscal year 2016, defendant Singh stated, in pertinent part, as follows:

JOHN ROY, ANALYST, UBS: Hi, it's John Roy, in for Steve.  Quickly, on your profitability.  Obviously it's not going to come next quarter. Do you have any type of color you can give us on when it might be?  Also, Anup, are you still saying a 3x to 4x advantage in pricing even though -- with the discounting?

ANUP SINGH: So, John, this is Anup.  On the question of getting to profitability. The way we think about it is, the investments we have talked with the first half of the year for next year is going to lead to a decrease in leverage, as compared to margins of this year.  So if you compare first half to first half, you'll see a decrease in leverage.

We expect, however, the investment that we're making, that Suresh articulated, will have an impact starting the second half of next year, and *therefore we should get back to showing an improvement in leverage in the model in the second half of next year, as compared to the second half of this year. Apart from that, at this stage, we are not offering up any guidance in terms of the long term sort of breakeven or the path profitability.* [Emphasis added.]

43.     In reaction to these announcements, on November 20, 2015, the price of Nimble Storage common stock fell $10.34 per share, or 51%, to close at $10.05 per share, on heavy trading volume.

44.     The market for Nimble Storage common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Nimble Storage common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Nimble Storage common stock relying upon the integrity of the market price of Nimble Storage common stock and market information relating to Nimble Storage, and have been damaged thereby.

45.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Nimble Storage common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

46.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Nimble Storage's business, products and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nimble Storage and its business, products and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of

the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

47.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Nimble Storage, their control over, and/or receipt and/or modification of Nimble Storage's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nimble Storage, participated in the fraudulent scheme alleged herein.

48.     Defendants were further motivated to engage in this fraudulent course of conduct in order to enable certain Company insiders to collectively sell 1,121,494 shares of their personally-held Nimble Storage common stock for gross proceeds in excess of $31.4 million:

| Insider | Title | Date | Shares | Price | Proceeds |
|---------|-------|------|--------|-------|----------|
| Kennelly, Jerome M | Director | 01-Jun-2015 | 5,000 | $25.88 | $129,400 |
| | | 02-Jun-2015 | 2,662 | $25.46 | $67,775 |
| | | 11-Jun-2015 | 2,662 | $29.50 | $78,529 |
| | | 01-Sep-2015 | 5,000 | $26.49 | $132,450 |
| | | | 15,324 | | $408,154 |
| | | | | | |
| Leary, Daniel T | Officer | 16-Jun-2015 | 93,000 | $30.90 | $2,873,700 |
| | | 18-Jun-2015 | 4,400 | $30.34 | $133,496 |
| | | 18-Jun-2015 | 8,700 | $31.03 | $269,961 |
| | | 18-Jun-2015 | 15,300 | $30.32 | $463,896 |
| | | 18-Jun-2015 | 2,600 | $31.03 | $80,678 |
| | | 20-Jul-2015 | 2,800 | $28.42 | $79,576 |
| | | 20-Jul-2015 | 900 | $28.39 | $25,551 |
| | | 20-Jul-2015 | 6,100 | $27.50 | $167,750 |
| | | 20-Jul-2015 | 21,200 | $27.51 | $583,212 |
| | | 18-Aug-2015 | 7,000 | $26.33 | $184,310 |
| | | 18-Aug-2015 | 24,000 | $26.32 | $631,680 |
| | | 03-Sep-2015 | 3,544 | $25.34 | $89,805 |
| | | 09-Sep-2015 | 395 | $25.54 | $10,088 |

| | | | | | |
|---|---|---|---|---|---|
| | | 11-Sep-2015 | 7,267 | $25.13 | $182,620 |
| | | 11-Sep-2015 | 10,212 | $25.13 | $256,628 |
| | | 25-Sep-2015 | 9,900 | $24.37 | $241,263 |
| | | 25-Sep-2015 | 100 | $24.98 | $2,498 |
| | | 19-Oct-2015 | 5,000 | $22.63 | $113,150 |
| | | 19-Oct-2015 | 10,000 | $22.64 | $226,400 |
| | | | 232,418 | | $6,616,262 |
| | | | | | |
| Li, Ping | Director | 16-Jun-2015 | 3,700 | $31.19 | $115,403 |
| | | 16-Jun-2015 | 22,300 | $30.65 | $683,495 |
| | | 01-Sep-2015 | 26,000 | $26.42 | $686,920 |
| | | | 52,000 | | $1,485,818 |
| | | | | | |
| Maheshwari, Umesh | Chief Technology Officer | 27-May-2015 | 1,600 | $26.21 | $41,936 |
| | | 27-May-2015 | 4,400 | $25.65 | $112,860 |
| | | 27-May-2015 | 400 | $26.41 | $10,564 |
| | | 27-May-2015 | 1,600 | $25.68 | $41,088 |
| | | 28-May-2015 | 6,000 | $26.17 | $157,020 |
| | | 28-May-2015 | 2,000 | $26.17 | $52,340 |
| | | 03-Jun-2015 | 6,000 | $26.22 | $157,320 |
| | | 03-Jun-2015 | 2,000 | $26.21 | $52,420 |
| | | 04-Jun-2015 | 6,000 | $26.69 | $160,140 |
| | | 04-Jun-2015 | 2,000 | $26.69 | $53,380 |
| | | 10-Jun-2015 | 2,000 | $29.47 | $58,940 |
| | | 10-Jun-2015 | 6,000 | $29.46 | $176,760 |
| | | 11-Jun-2015 | 2,000 | $29.06 | $58,120 |
| | | 11-Jun-2015 | 6,000 | $29.05 | $174,300 |
| | | 17-Jun-2015 | 200 | $32.08 | $6,416 |
| | | 17-Jun-2015 | 2,000 | $31.65 | $63,300 |
| | | 17-Jun-2015 | 5,800 | $31.64 | $183,512 |
| | | 18-Jun-2015 | 3,800 | $30.32 | $115,216 |
| | | 18-Jun-2015 | 2,200 | $31.04 | $68,288 |
| | | 18-Jun-2015 | 1,200 | $30.28 | $36,336 |
| | | 18-Jun-2015 | 800 | $31.03 | $24,824 |
| | | 24-Jun-2015 | 6,000 | $30.09 | $180,540 |
| | | 24-Jun-2015 | 2,000 | $30.10 | $60,200 |
| | | 25-Jun-2015 | 2,000 | $30.18 | $60,360 |
| | | 25-Jun-2015 | 6,000 | $30.19 | $181,140 |
| | | 01-Jul-2015 | 2,000 | $27.89 | $55,780 |
| | | 01-Jul-2015 | 6,000 | $27.90 | $167,400 |
| | | 02-Jul-2015 | 2,000 | $27.54 | $55,080 |
| | | 02-Jul-2015 | 6,000 | $27.56 | $165,360 |
| | | 08-Jul-2015 | 400 | $27.15 | $10,860 |
| | | 08-Jul-2015 | 100 | $27.08 | $2,708 |
| | | 15-Jul-2015 | 100 | $27.00 | $2,700 |
| | | 15-Jul-2015 | 200 | $27.01 | $5,402 |
| | | 16-Jul-2015 | 7,800 | $27.12 | $211,536 |
| | | 16-Jul-2015 | 23,400 | $27.13 | $634,842 |

| | | | | | |
|---|---|---|---|---|---|
| | | 22-Jul-2015 | 6,000 | $27.84 | $167,040 |
| | | 22-Jul-2015 | 2,000 | $27.86 | $55,720 |
| | | 23-Jul-2015 | 6,000 | $28.47 | $170,820 |
| | | 23-Jul-2015 | 2,000 | $28.47 | $56,940 |
| | | 29-Jul-2015 | 100 | $27.00 | $2,700 |
| | | 29-Jul-2015 | 300 | $27.34 | $8,202 |
| | | 30-Jul-2015 | 11,700 | $27.04 | $316,368 |
| | | 30-Jul-2015 | 3,900 | $27.04 | $105,456 |
| | | 05-Aug-2015 | 6,000 | $27.24 | $163,440 |
| | | 05-Aug-2015 | 2,000 | $27.22 | $54,440 |
| | | 06-Aug-2015 | 800 | $27.21 | $21,768 |
| | | 06-Aug-2015 | 2,400 | $27.21 | $65,304 |
| | | 26-Aug-2015 | 300 | $27.03 | $8,109 |
| | | 26-Aug-2015 | 300 | $27.04 | $8,112 |
| | | 03-Sep-2015 | 1,649 | $24.65 | $40,648 |
| | | 11-Sep-2015 | 9,520 | $25.14 | $239,333 |
| | | | 182,969 | | $5,083,388 |
| Mehta, Varun | Officer and Director | 03-Jun-2015 | 7,693 | $25.64 | $197,249 |
| | | 09-Jun-2015 | 66,130 | $29.00 | $1,917,770 |
| | | 10-Jun-2015 | 84,616 | $29.00 | $2,453,864 |
| | | 10-Jun-2015 | 253,846 | $29.00 | $7,361,534 |
| | | 10-Jun-2015 | 18,486 | $29.00 | $536,094 |
| | | 08-Jul-2015 | 4,166 | $26.54 | $110,566 |
| | | 22-Jul-2015 | 4,167 | $27.81 | $115,884 |
| | | 23-Jul-2015 | 2,800 | $29.00 | $81,200 |
| | | 07-Aug-2015 | 4,167 | $26.22 | $109,259 |
| | | 21-Aug-2015 | 2,600 | $25.05 | $65,130 |
| | | 24-Aug-2015 | 100 | $25.00 | $2,500 |
| | | 26-Aug-2015 | 300 | $25.34 | $7,602 |
| | | 26-Aug-2015 | 1,166 | $26.42 | $30,806 |
| | | 03-Sep-2015 | 1,610 | $25.19 | $40,556 |
| | | 08-Sep-2015 | 4,167 | $25.51 | $106,300 |
| | | 11-Sep-2015 | 9,476 | $24.85 | $235,479 |
| | | | 465,490 | | $13,371,792 |
| Singh, Anup | Chief Financial Officer | 01-Jun-2015 | 5,000 | $25.59 | $127,950 |
| | | 15-Jun-2015 | 2,291 | $30.00 | $68,730 |
| | | 15-Jun-2015 | 2,709 | $30.00 | $81,270 |
| | | 01-Jul-2015 | 5,000 | $28.21 | $141,050 |
| | | 03-Aug-2015 | 5,000 | $27.03 | $135,150 |
| | | 01-Sep-2015 | 5,000 | $26.57 | $132,850 |
| | | 03-Sep-2015 | 803 | $25.31 | $20,324 |
| | | 09-Sep-2015 | 731 | $25.50 | $18,641 |
| | | 11-Sep-2015 | 6,118 | $24.84 | $151,971 |
| | | 01-Oct-2015 | 5,000 | $22.35 | $111,750 |
| | | | 37,652 | | $989,686 |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| | | | | | |
|---|---|---|---|---|---|
| Vasudevan, Suresh | Chief Executive Officer | 01-Jul-2015 | 32,600 | $27.90 | $909,540 |
| | | 02-Jul-2015 | 17,400 | $27.57 | $479,718 |
| | | 03-Sep-2015 | 10,651 | $25.32 | $269,683 |
| | | 03-Sep-2015 | 100 | $25.60 | $2,560 |
| | | 03-Sep-2015 | 22,049 | $24.93 | $549,682 |
| | | 04-Sep-2015 | 27,851 | $24.42 | $680,121 |
| | | 11-Sep-2015 | 9,428 | $25.07 | $236,360 |
| | | 11-Sep-2015 | 4,168 | $24.96 | $104,033 |
| | | 14-Sep-2015 | 7,900 | $25.38 | $200,502 |
| | | 01-Oct-2015 | 3,494 | $22.38 | $78,196 |
| | | | 135,641 | | $3,510,395 |
| | | | | | |
| | | Total: | 1,121,494 | | $31,465,493 |

## LOSS CAUSATION

49.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nimble Storage common stock and operated as a fraud or deceit on Class Period purchasers of Nimble Storage common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Nimble Storage common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

50.     As a result of their purchases of Nimble Storage common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Nimble Storage common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $31.60 per share on June 17, 2015.

51.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Nimble Storage's business, products and operations.  When the truth about the Company was revealed to the market, the price of Nimble Storage common stock fell significantly. This decline removed the inflation from the price of Nimble Storage common stock, causing real economic loss to investors who had purchased Nimble Storage common stock during the Class Period.

52.     The decline in the price of Nimble Storage common stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Nimble Storage common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

53.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Nimble Storage common stock and the subsequent significant decline in the value of Nimble Storage common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

54.     At all relevant times, the market for Nimble Storage common stock was an efficient market for the following reasons, among others:

(a)     Nimble Storage common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Nimble Storage filed periodic public reports with the SEC and the NYSE;

(c)     Nimble Storage regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Nimble Storage was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

55.     As a result of the foregoing, the market for Nimble Storage common stock promptly digested current information regarding Nimble Storage from all publicly available sources and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                     - 19 -

1  reflected such information in the prices of the common stock.  Under these circumstances, all

2  purchasers of Nimble Storage common stock during the Class Period suffered similar injury through

3  their purchase of Nimble Storage common stock at artificially inflated prices and a presumption of

4  reliance applies.

5                                                     **COUNT I**

6                **Violation of §10(b) of the Exchange Act**
               **and Rule 10b-5 Promulgated Thereunder**
7                    **Against All Defendants**

8         56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set

9  forth herein.

10        57.     During the Class Period, defendants disseminated or approved the materially false

11  and misleading statements specified above, which they knew or deliberately disregarded were

12  misleading in that they contained misrepresentations and failed to disclose material facts necessary

13  in order to make the statements made, in light of the circumstances under which they were made, not

14  misleading.

15        58.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

16  statements of material fact and/or omitted to state material facts necessary to make the statements not

17  misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

18  and deceit upon the purchasers of the Company's common stock during the Class Period.

19        59.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

20  the market, they paid artificially inflated prices for Nimble Storage common stock.  Plaintiff and the

21  Class would not have purchased Nimble Storage common stock at the prices they paid, or at all, if

22  they had been aware that the market prices had been artificially and falsely inflated by defendants'

23  misleading statements.

24        60.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

25  the other members of the Class suffered damages in connection with their purchases of Nimble

26  Storage common stock during the Class Period.

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 20 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT II**

**Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Nimble Storage within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Nimble Storage, and their ownership of Nimble Storage stock, the Individual Defendants had the power and authority to cause Nimble Storage to engage in the wrongful conduct complained of herein.

63.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Granting such other and further relief as the Court deems just and proper.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 21 -

1

**JURY DEMAND**

2
    Plaintiff hereby demands a trial by jury.

3
DATED:  December 17, 2015

4

                            ROBBINS GELLER RUDMAN
                                 &DOWD LLP
                            DENNIS J. HERMAN

5

6
                                     *s/ Dennis J. Herman*

7
                                 DENNIS J. HERMAN

8
                            Post Montgomery Center
                            One Montgomery Street, Suite 1800

9
                            San Francisco, CA  94104
                            Telephone:  415/288-4545

10
                            415/288-4534 (fax)

11
                            ROBBINS GELLER RUDMAN
                                 &DOWD LLP

12
                            SAMUEL H. RUDMAN
                          MARIO ALBA JR.

13
                            58 S Service Road, Suite 200
                            Melville, NY  11747

14
                            Telephone:  631/367-7100
                            631/367-1173 (fax)

15
                            HOLZER & HOLZER, LLC

16
                            COREY D. HOLZER
                          MARSHALL P. DEES

17
                            1200 Ashwood Parkway, Suite 410
                          Atlanta, GA  30338

18
                            Telephone:  770/392-0090
                          770/392-0029 (fax)

19
                            Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28