**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Guillaume Buell (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
cvillegas@labaton.com
gbuell@labaton.com

*Lead Counsel for the Class*

**BERMAN DEVALERIO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
One California Street, Suite 900
San Francisco, CA 94111
Tel. (415) 433-3200
Fax (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE NIMBLE STORAGE, INC. SECURITIES LITIGATION | CASE NO. 4:15-cv-05803-YGR<br><br>**CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**LEAVE TO FILE GRANTED JULY 15, 2016**<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. Defendants ..... 10

IV. CONTROL PERSON ALLEGATIONS ..... 12

V. SUBSTANTIVE ALLEGATIONS ..... 14

A. Nimble Business Overview ..... 14

B. Nimble's Products ..... 16

C. Nimble's Growth Story ..... 19

D. Nimble's Core Business Was Its Commercial Segment ..... 22

E. Nimble's Venture Into the Enterprise Market ..... 23

F. Defendants Repeatedly Emphasized That Nimble's Total Addressable Market Was Nearly $20 Billion ..... 24

G. Throughout the Class Period, Nimble Was Pursuing "Breakeven" or Profitability For the First Time ..... 25

H. Throughout the Class Period, Defendants Told the Market Nimble Was Carefully Making Balanced and Increasing Investments Across Its Entire Business as a Means to Breakeven ..... 27

I. Nimble Consistently Met Revenue Targets With Remarkable Precision ..... 28

J. Throughout the Class Period, Defendants Had Access to Sophisticated Internal Analyses and Metrics Concerning Sales ..... 30

K. Unbeknownst to the Market, Defendants Were (1) Secretly Capping Investments in Sales and Marketing While Diverting Sales and Marketing Resources to the Enterprise Segment of the Business, and (2) Misleading the Market as to Nimble's Penetration of the Enterprise Segment ..... 42

1. Defendants Were Secretly Capping Investments in Sales and Marketing While Shifting Limited Resources from Commercial to Enterprise ..... 43

2. Nimble Was Not Penetrating the Enterprise Market Because Its Products Did Not Meet Prospective Enterprise Clients' Needs ..... 45

3. Nimble Relabeled Commercial Accounts as Enterprise Accounts to Make it Seem as if Enterprise was Growing ........ 49

L. Nimble Tells the Market That it is Shifting Resources Somewhat But Continues to Mislead the Market as to (1) the Investment Cap, (2) the Failure to Penetrate Enterprise, and (3) the Degree to Which These Issues are Affecting Nimble's Growth ........ 50

M. Nimble is Forced to Come Clean About the Investment Cap, the Degree of Resource Shift, Enterprise Weakness, and the Consequent Effects on the Company ........ 51

VI. POST CLASS-PERIOD ADMISSIONS ........ 53

A. December 2, 2015 – Credit Suisse Technology Conference ........ 53

B. December 8, 2015 – Raymond James Technology Conference ........ 55

C. December 9, 2015 – Barclays Global Technology Conference ........ 56

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS THERETO ........ 57

A. November 25, 2014 – Q3 2015 Earnings Call ........ 57

B. December 2, 2014 – Credit Suisse Technology Conference ........ 58

C. December 8, 2014 – Raymond James Systems Conference ........ 59

D. December 9, 2014 – Barclays Global Tech Conference ........ 61

E. January 14, 2015 – Needham Growth Conference ........ 63

F. PARTIAL CORRECTIVE DISCLOSURE – February 26, 2015 – Q4 2015 Earnings Call – The Truth Partially Emerges But Defendants Continue to Mislead the Market ........ 64

G. March 4, 2015 – Morgan Stanley Technology, Media & Telecom Conference ........ 68

H. April 2, 2015 – Nimble FY 2015 Form 10-K ........ 69

I. May 26, 2015 – Q1 2016 Earnings Call ........ 70

J. June 9, 2015 – William Blair Conference ........ 73

K. August 25, 2015 – Q2 2016 Earnings Call ........ 74

L. September 22, 2015 – Meeting With Wells Fargo Securities ........ 77

VIII. FINAL CORRECTIVE DISCLOSURE – THE TRUTH IS REVEALED ...................... 78

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ........ 83

A. Individual Defendants' Trading ........ 83

1. The Individual Defendants' Class Period Sales of Nimble Stock Generated Highly Abnormal Profits........ 84

2. The Individual Defendants Entered Into, Amended, and Traded Pursuant To Rule 10b5-1 Trading Plans in a Highly Suspicious and Coordinated Manner ........ 90

3. Two Individual Defendants Sold Stock Outside Rule 10b5-1 Trading Plans in a Highly Suspicious Manner ........ 93

4. The Individual Defendants Each Sold Stock Near the End of The Class Period in a Highly Suspicious and Coordinated Manner........ 94

5. The Individual Defendants Have Significantly Curtailed Their Sale of Nimble Stock Since Their Full Disclosure of the Truth and the Collapse of Nimble's Stock........ 94

X. CLASS ACTION ALLEGATIONS ........ 95

XI. LOSS CAUSATION........ 97

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........ 98

XIII. NO SAFE HARBOR ........ 100

A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking ........ 100

B. Several False and Misleading Statements are Not Properly Identified as "Forward-Looking"........ 101

C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........ 101

D. Defendants Knew that the Risks They Warned of Had Already Come to Pass ........ 102

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 102

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Vasudevan and Singh ........ 104

XIV. PRAYER FOR RELIEF ........ 105

XV. JURY DEMAND ........ 106

Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Nimble Storage, Inc. ("Nimble" or the "Company") and Suresh Vasudevan, Anup Singh, Varun Mehta, and Dan Leary (collectively, the "Individual Defendants," described more fully below) (together with Nimble, the "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Nimble and the Individual Defendants; (ii) research reports issued by financial analysts concerning Nimble's business; (iii) reports filed publicly by Nimble with the Securities and Exchange Commission (the "SEC"); (iv) an investigation conducted by and through Lead Plaintiff's attorneys, which included interviews of numerous former employees of Nimble and others with knowledge on a confidential basis; (v) internal Nimble documents obtained through this investigation which show, *inter alia*, the type of information regarding sales available to the Defendants during the Class Period; (vi) news articles, media reports, and other publications concerning the storage technology industry and markets; and (vii) other publicly available information and data concerning Nimble, its securities, and the markets therefor. Lead Plaintiff also retained an insider trading expert to analyze the Individual Defendants' trading in Nimble stock during the Class Period and a Control Period (defined below). Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from November 25, 2014 through November 19, 2015, inclusive (the "Class Period"), purchased the publicly traded common stock of Nimble and/or exchange-traded options on such common stock, and were damaged thereby (the

"Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nimble during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nimble's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

2. Nimble is a company that sells data storage products. Data storage is computer hardware that stores large amounts of electronic information and data. Nimble also sells software and services related to its storage products. An important part of the Company's business is selling additional products, software, and services to existing customers.

3. Nimble is a small company that grew quickly. Between its fiscal year ending January 31, 2011 and its fiscal year ending January 31, 2015, Nimble's annual revenues increased exponentially from $1.6 million to over $227 million, growing over 13,000% in just five years. In December 2013, Nimble became a public company.

4. Nimble's booming growth was attributable to its ability to meet the storage needs of a niche group of small-to-midsize customers, which Nimble referred to as its "commercial" segment. Nimble's products were well suited to the commercial segment. Due to their size, these customers preferred to use storage products that melded both older "disk drive" technology with newer "flash" technology in one storage product. At the beginning and end of the Class Period, the commercial segment accounted for approximately 81% of Nimble's customers.

5. While Nimble's revenue skyrocketed, the Company was also working hard to become profitable. Since its IPO in 2013, the Company had consistently posted a net operating loss. However, due to Nimble's incredible growth and success in the commercial segment, its operating loss as a percentage of total revenue decreased every year from a whopping -47% for the fiscal year ending January 31, 2013 to -17% in 2015. At the beginning of the Class Period, during an earnings call on November 25, 2014, the Company's CFO Anup Singh told the

market that Nimble expected to breakeven in terms of its operating income by January 2016. Analysts were excited about this announcement as it signaled that Nimble was poised for even more growth and profitability.

6. At the start of the Class Period, Nimble's CEO Vasudevan also told the market that Nimble was launching a new storage product called Fibre Channel. Fibre Channel was developed by Nimble to appeal to a customer base comprised of large companies (as opposed to the small to mid-size customers in the commercial segment), and was intended to bring in larger customers with larger deals. Fibre Channel was a modification to Nimble's existing line of products. Nimble called these sought after large customers the "enterprise" segment, and told the market that Fibre Channel would finally allow Nimble to meaningfully compete with its larger competitors for enterprise deals.

7. Nimble also touted the "enormous" market opportunity that Fibre Channel would bring to the Company, adding that the total addressable market ("TAM") opportunity would increase four-fold, from $5 billion to approximately $20 billion just based on the introduction of Fibre Channel to Nimble's product mix and the increase of enterprise customers to Nimble's customer mix. At the start of the Class Period, Vasudevan told the market that "the market opportunity [for Fibre Channel] is enormous" and that Nimble was "executing well against that opportunity."

8. Analysts were excited about Fibre Channel and the growth potential that it would bring to Nimble. After the earnings call on November 25, 2014, Sterne Agee commented on December 3, 2014 that "the new support of Fibre Channel (FC) environments … should increase the company's addressable market from roughly $5 billion to $18 billion (management estimate)." Oppenheimer wrote on November 26, 2014 that a "key component" of its "positive opinion and investment thesis on Nimble" included "its already large $2.9 billion … addressable market, which we expect will more than triple once FC (Fibre Channel) solutions are introduced." On December 3, 2014, Sterne Agee wrote that "meetings with CEO Vasudevan and CFO Singh left us more confident in the company's ability to penetrate larger

accounts following the release of Fibre Channel support that should provide incremental revenue opportunities starting in 2Q 2016 [which was in two quarters].”

9. Analysts continued to focus on Nimble’s growth story and Nimble’s expansion of its market opportunity due to Fibre Channel. During a December 8, 2014 conference, a Raymond James analyst asked a question about Nimble’s revenue growth going forward. Dan Leary, the Vice President of Worldwide Marketing, said Nimble was focused on “mak[ing] investments in a balanced way” and that Nimble was “***not making trade-offs on investments that might yield an[] even shorter term growth in revenue in the short run***.” This conveyed to the market that Nimble was not trading investment in its commercial segment, which had a shorter sales cycle, in order to build the enterprise segment, which had a longer sales cycle.

10. However, unbeknownst to the market, Nimble was actively making the very “trade-offs” on its investments it was publicly disavowing. As former Nimble employees and Defendants themselves later confirm, at the beginning of the Class Period, Defendants consciously embarked on a strategy to dramatically shift the Company’s investment of sales and marketing resources from its tried and true commercial segment to the newly launched, and as-yet unproven enterprise segment. Moreover, instead of simply increasing investments across the board so that both commercial and enterprise could grow and thrive in tandem, Defendants, in their haste to breakeven by the fourth quarter of fiscal year 2016 (*i.e.*, by January 2016), capped overall sales and marketing investments as a percentage of revenue. This meant that the investments made in the enterprise segment were pulling back investments that would have historically gone into the commercial segment, the latter representing over 80% of Nimble’s customers. As a result of Defendants’ decision, the commercial segment suffered from a lack of resources to maintain its growth trajectory.

11. Further compounding the problem, Defendants’ star new enterprise product, Fibre Channel, was falling flat. From the initial launch of Fibre Channel, Nimble was failing to gain traction with enterprise customers. The problem was that Nimble’s products, including those with Fibre Channel, simply did not have the features or functionalities that enterprise customers needed or sought.

12. Nimble's storage products (including Fibre Channel) function by combining older technology on a spinning disk drive with newer "flash" technology in one unit. While this configuration is ideal for smaller commercial customers, larger and more sophisticated enterprise customers were seeking the newest technology which operated on an "all-flash" (no disk drive) array, along with many other features and functionalities that Nimble's products lacked. One of those important products, an all-flash array, was not launched by Nimble until well after the Class Period ended.

13. Former Nimble employees confirm that as early as December 2014, just one month into the Class Period, sales representatives told Vasudevan that enterprise customers were still not receptive to Nimble's products, including those with Fibre Channel. So while the Company was minimally able to gain some small traction on smaller deals with enterprise clients, it could not meaningfully gain traction with enterprise customers because Nimble's products lacked the necessary features and functionalities enterprise customers wanted. In order to conceal that the enterprise segment was not growing as quickly as Defendants had hoped, Defendants actually ***renamed*** commercial accounts as enterprise accounts so it would appear that the enterprise segment was growing. Moreover, a former Nimble employee confirmed that the commercial pipeline was drying up in his territory as early as 1Q 2015. At least one internal Nimble document confirms that lead generation was suffering as early as February 2015.

14. On February 26, 2015, Nimble announced its quarterly earnings for the fourth quarter of fiscal year 2015. On the earnings call that day, in a partial revelation of the truth, Defendants told the market for the first time that a greater share of sales and marketing investments were going towards the enterprise segment rather than the commercial segment as had been done in the past. Vasudevan conceded that Nimble itself "consciously" chose to divert resources from commercial to enterprise, that the practice had been ongoing for the past two quarters, and that the Company expected the diversion of resources to continue for the next several quarters. Defendants also admitted that contrary to Leary's representation to the market, their choice to "trade off" investments did have an impact on short term growth in the form of

lower than expected guidance for the following quarter. As a result of the partial revelation of the truth, Nimble's stock price declined nearly 8% that day on unusually heavy volume.

15. While the market was surprised that short term growth was being affected by a shift of investments to enterprise, it did not understand the degree to which the Company had shifted resources to enterprise. Moreover, the market did not understand that the sales and marketing budget had been capped as a percentage of revenue and that there was now a limited pool of resources that was being diverted to enterprise. To the contrary, one analyst commented that Nimble was going to "***add*** more sales teams to ensure balance between Fibre Channel and iSCSI wins" (*i.e.*, between enterprise and commercial wins). In addition, the market did not understand that this diversion of limited resources would pose a risk to the future growth of the Company. Defendants also continued to tout that they expected Nimble to breakeven by the end of the year and reiterated that "absolutely, the Company is on track for breakeven in Q4."

16. While the Company met analysts' earnings expectations for 4Q 2015, the Company issued guidance for 1Q 2016 that failed to top analyst consensus, and which at least one analyst called "weak." Recognizing for the first time that more resources were being dedicated to enterprise, analysts attributed this weakness to the extension of time for the "new" sales and marketing investments (enterprise) to ramp to full productivity. Piper Jaffray noted a few weeks later on March 30, 2015 that the weak guidance was partly responsible for pressure on the stock, but they too continued to be fooled by Defendants regarding Nimble's prospects and fundamentals.

17. Indeed, the fact that the Company continued to guide that it would breakeven by the end of the year signaled to the market that any effect from a shift of resources would be short lived and that the Company was continuing to dedicate sufficient resources to grow both parts of the business. Finally, the market had no idea that Nimble's star enterprise product, Fibre Channel, was not gaining traction because of the lack of product features necessary for enterprise clients, and that Defendants were concealing these facts by simply calling commercial accounts enterprise accounts, and thus making it seem as if enterprise accounts were growing.

18. Defendants' growth story was reaffirmed to the market throughout the Class Period as Defendants continued to tout the strength of Nimble's business, and that the Company would breakeven by the fourth quarter of fiscal year 2016. By May 26, 2015, Defendants announced that Nimble had exceeded the weak guidance issued for 1Q 2016 and issued strong guidance for 2Q 2016 of $77 to $79 million. On August 25, 2015, the Company announced that it had exceeded 2Q 2016 guidance and issued guidance of $86 to $88 million for 3Q 2016, continuing to dispel any concern over the first quarter's results. Defendants also continued to tout the growth and health of Fibre Channel (enterprise) and the commercial segment, while failing to tell the market that Nimble's now limited sales and marketing investments were largely being diverted to enterprise, and that the commercial business which had traditionally provided the Company with growth was being neglected. Analysts took the Company's cue. On August 26, 2015, Wells Fargo wrote that its "Outperform rating is predicated on Nimble Storage's growth opportunity from [among other things] … continued growth in its SMB [*i.e.*, commercial] market [and] the market expansion opportunity in large enterprise driven, in part, by new products."

19. During the Class Period, the Individual Defendants not only misled investors about the material shift of limited resources to the flailing enterprise segment and the resulting neglect of the commercial business, but they also took advantage of the artificially increased stock price. The Individual Defendants engaged in highly suspicious and coordinated Class Period-trading of their Nimble stocks pocketing millions of dollars in well-timed stock sales. Notably, all of the Individual Defendants either entered into or amended 10(b)5-1 trading plans during the Class Period to allow them to make trades while in possession of material, non-public information about Nimble.

20. Defendants' neglect of the commercial segment could only go on for so long while the enterprise segment was falling flat. On November 19, 2015, Defendants' deception finally caught up with them. For the first time in the history of the Company's public reporting, it missed guidance – and in a devastating way. Nimble shocked the market when it announced revenue for 3Q 2016 of $80.7 million, a huge guidance miss of $5.3-$7.3 million from guidance

of $86 to $88 million. The Company's stock dropped from $20.39 per share to $10.05 per share, a more than 50% drop on heavy volume of more than 16 million shares, ***more than seventeen times*** the average number of shares traded daily during the Class Period (approximately 892,045 shares).

21. Defendants finally admitted that they had capped investments in an effort to breakeven while materially shifting investments to the enterprise segment from the commercial segment. This toxic combination is what cost the Company its growth. They also admitted that not having an all-flash array had an impact on enterprise deals as well. Vasudevan later explained that a whopping 45% of the sales and marketing investments were directed at enterprise, despite the fact that enterprise accounted for less than one-fifth of the Company's customers.

22. Analysts were shocked by the revelations on November 19, 2015. Wunderlich Securities wrote on November 20, 2015 that Nimble "missed F3Q16 without warning and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." It concluded that Nimble was "**Off track.** Management lost the execution recipe, focusing on large accounts and the now-revised F4Q16 profitability goal" (emphasis in original). Wunderlich continued: "management feels the company underinvested in smaller/commercial account channels." On November 19, 2015, another analyst firm, Oppenheimer, downgraded its stock rating of Nimble, noting that Nimble reported poor results blaming in part "collateral damage to its commercial customer base from the enterprise shift. We're stepping to the sidelines reflecting (1) the need for greater sales investment and an unknown execution time-frame required to drive stronger growth in both enterprise/commercial...."

23. The media also commented on the effect of the lack of features in products geared for the enterprise segment, including Nimble's arrays with Fibre Channel. Fibre Channel was not enough for Nimble to meaningfully penetrate the enterprise market, whose customers wanted an all-flash array and several other features Nimble's arrays lacked. For

example, a November 20, 2015 article in The Register (an internet publication focusing on IT) entitled *Shares tumble at flash-disk array maker Nimble: Time to crack open the all-flash?* commented on the lack of all-flash array stating: "trying to penetrate mainstream storage incumbent's large enterprise customer bases with a hot hybrid [disk drive and flash] box isn't enough; it needs a hot all-flash box, and it doesn't have one."

## II. JURISDICTION AND VENUE

24. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

25. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

26. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Nimble has operations in this district and division, including its principal place of business at 211 River Oaks Parkway, San Jose, California.

27. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

28. On March 28, 2016, this Court appointed Arkansas Teacher to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 69).

29. Arkansas Teacher is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related

employees in the State of Arkansas. Arkansas Teacher was established by Act 266 of 1937, as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system. Arkansas Teacher has more than $15 billion in net assets held in trust for pension benefits. As of June 30, 2015, Arkansas Teacher has 335 participating employers and more than 126,000 individual members. As set forth in its PSLRA certification previously filed with the Court (ECF No. 21-1), Arkansas Teacher purchased Nimble common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein. Arkansas Teacher also purchased additional shares of Nimble common stock in the newly-expanded Class Period, and a revised PSLRA certification including this additional trading is attached hereto as Exhibit A.

**B. Defendants**

30. Nimble is a Delaware corporation with principal executive offices at 211 River Oaks Parkway, San Jose, California. Nimble was incorporated in November 2007, and shipped its first products in August 2010. The Company had its initial public offering ("IPO") on December 13, 2013. As of January 31, 2015 Nimble had approximately 838 employees worldwide. Throughout the Class Period, Nimble common stock traded actively on the New York Stock Exchange ("NYSE") under the ticker symbol "NMBL." During the Class Period, there were approximately 74 million to 80 million shares of NMBL common stock outstanding.

31. Nimble's fiscal year ends on January 31 of each year. Its 2015 Fiscal Year ended on January 31, 2015, and its 2015 fiscal Q1, Q2, Q3, and Q4 ended on April 30, 2014, July 31, 2014, October 31, 2014, and January 31, 2015, respectively. Nimble's 2016 Fiscal Year ended on January 31, 2016, and its 2016 fiscal Q1, Q2, Q3, and Q4 ended on April 30, 2015, July 31, 2015, October 31, 2015, and January 31, 2016, respectively:

| **Nimble FY Period** | **Gregorian Calendar End Date** |
|---|---|
| **FY 2015**[1] | **January 31, 2015** |
| Q1 2015[2] | April 30, 2014 |
| Q2 2015[3] | July 31, 2014 |
| Q3 2015[4] | October 31, 2014 |
| Q4 2015[1] | January 31, 2015 |
| | |
| **FY 2016**[5] | **January 31, 2016** |
| Q1 2016[6] | April 30, 2015 |
| Q2 2016[7] | July 31, 2015 |
| Q3 2016[8] | October 31, 2015 |
| Q4 2016[5] | January 31, 2016 |

[1] Source: SEC Form 8-K, dated February 26, 2015
[2] Source: SEC Form 8-K, dated May 29, 2014
[3] Source: SEC Form 8-K, dated August 26, 2014
[4] Source: SEC Form 8-K, dated November 25, 2014
[5] Source: SEC Form 8-K, dated March 3, 2016
[6] Source: SEC Form 8-K, dated May 26, 2015
[7] Source: SEC Form 8-K, dated August 25, 2015
[8] Source: SEC Form 8-K, dated November 19, 2015

32. Suresh Vasudevan ("Vasudevan") is, and was at all relevant times, Nimble's Chief Executive Officer ("CEO"). Vasudevan has been Nimble's CEO since March 2011, a member of Nimble's Board of Directors since September 2009, and the Chairman of Nimble's Board of Directors since September 2013. Prior to joining Nimble, Vasudevan was the Chief Operating Officer of Omneon Video Networks, Inc., a provider of storage and networking equipment for the broadcast industry. From 1999 to 2008, Vasudevan held various positions at NetApp, Inc., a provider of integrated data storage solutions, including time as Senior Vice President. NetApp is one of Nimble's primary competitors. Vasudevan was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Vasudevan made materially false and misleading statements/omissions in Nimble's quarterly conference calls, SEC filings, industry events, and events for analysts, investors, and the media.

33. Anup Singh ("Singh") is, and was at all relevant times, Nimble's Chief Financial Officer ("CFO"). Singh has been Nimble's CFO since November 2011. Singh was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Singh

made materially false and misleading statements/omissions in Nimble's quarterly conference calls, SEC filings, industry events, and events for analysts, investors, and the media.

34. Varun Mehta ("Mehta") is, and was at all relevant times, Nimble's Vice President of Engineering. Mehta has been Nimble's Vice President of Engineering since March 2011, and was Nimble's founding CEO from November 2007 to March 2011. Mehta has been a member of Nimble's Board of Directors since November 2007. Mehta was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Mehta made materially false and misleading statements/omissions at events and meetings with analysts.

35. Dan Leary ("Leary") is, and has been since October 2015, Nimble's Vice President, Corporate Development, Solutions and Alliances. From May 2008 to October 2015, Leary was Nimble's Vice President, Marketing. Leary was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Leary made materially false and misleading statements/omissions at analyst events.

36. For purposes of this Complaint, "Individual Defendants" refers to Defendants Vasudevan, Singh, Mehta, and Leary. The Individual Defendants together with Nimble are the "Defendants."

## IV. CONTROL PERSON ALLEGATIONS

37. Vasudevan and Singh, by virtue of their high-level positions at Nimble, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

38. According to several Confidential Witnesses Vasudevan was an intimately involved CEO, who, for example, was very closely involved in all aspects of the Company's operation. *See, e.g.*, *infra* ¶¶118, 121.

39. On January 9, 2015, for example, Vasudevan sent an email to an "all" email group at Nimble indicating that, on an interim basis, the sales operations would report directly to him. In the email, Vasudevan announced that "Eric Mann [the head of sales] will be leaving Nimble, and we will be starting a formal search process for a new leader to lead the sales organization." He continued that Nimble has "launched the search for a sales leader and all of Eric's reports will report to me for now." In describing Mann's role, that he would assume on an interim basis, Vasudevan wrote that:

> To really fulfill his role, Eric needed to integrate deeply and engage cross-functionally with other functions. This would have required him to spend a substantial amount of his time in San Jose, in additional to traveling to all of the sales regions – a degree of travel that he was not prepared for.

40. Nimble did not hire a permanent replacement for Mann until May 5, 2015, nearly four months later, when Nimble announced that it hired Denis Murphy as the new Vice President of Worldwide Sales.

41. Vasudevan and Singh, as senior executive officers, and Vasudevan as a director, of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Nimble's publicly-traded common stock would be based on accurate information. Vasudevan and Singh each violated these requirements and obligations during the Class Period.

42. Vasudevan and Singh, because of their positions of control and authority as senior executive officers of Nimble, and Vasudevan as a Nimble director, were able to and did control the content of the SEC filings, press releases, and other public statements issued by Nimble during the Class Period. Each was provided with copies of the statements made in SEC filings at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. They also signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 in Nimble's Annual Report on Form 10-K filed in the middle of the Class Period on April 2, 2015, which (as detailed herein) also contained false and misleading statements and omissions of material fact. Accordingly, Defendants Vasudevan and Singh are responsible for the accuracy of the public statements detailed herein.

43. Vasudevan and Singh, because of their positions of control and authority as senior executive officers of Nimble, and Vasudevan as a Nimble director, had access to the adverse undisclosed information about Nimble's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Nimble management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Nimble materially false and misleading.

44. Vasudevan and Singh are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nimble common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nimble's products, business, operations, and management, and the intrinsic value of Nimble's common stock and options; and (ii) caused Lead Plaintiff and members of the Class to purchase Nimble common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Nimble Business Overview[1]

45. Nimble is a company that sells hybrid storage products. Nimble's hybrid storage products are data storage systems called "storage arrays" that can store between 8 and 640 terabytes of data. One terabyte is equal to 1,000 gigabytes. By way of example, Apple's iPhone 6S can store up to 128 gigabytes of data. The storage arrays are small boxes that measure

[1] This discussion of Nimble's business, products, and customers is limited to the Class Period, unless otherwise noted. After the Class Period, Nimble may have, and may be, offering new products and/or services and its business and customers may be different.

approximately 17.2 inches wide, 26.5 inches deep, and 5.2 inches high; they weigh approximately 55 to 76 pounds and visually look somewhat like a cable television set-box:




Source: SEC Form 10-K, dated April 2, 2015, at 7.

46. Each storage system is configured based on how fast a system (called "IOPS," which stands for Input/Output Operations Per Second, pronounced "eye-ops") the customer needs, and how much storage capacity the customer requires. Nimble's hybrid storage is different from legacy storage in various respects. First, prior to Nimble's products, storage products tended to be composed of hardware that on the inside had a spinning "disk" that stored data. (This was also common to many of the home and office computers built in the last few decades; the spinning disk was one of the sources of the "whirring" sound computers emitted when thinking.) Flash storage, on the other hand, works with and can (depending on the model) eschew the spinning disk in favor of different "solid state" components. Nimble's products are a hybrid combination of the two. They consist of both disk and flash components, which Nimble markets as a unique hybrid solution for customers.

47. Nimble's products are considerably smaller in physical size than traditional disk-centered storage. Nimble's hybrid flash storage system can require one-third to one-tenth the physical footprint of legacy disk storage products.

48. The storage systems and associated software markets together accounted for approximately $40 billion in annual revenues during the Class Period. Nimble's main competitors during the Class Period included Dell, Inc., EMC Corporation, Hewlett-Packard Company, Pure Storage, and NetApp, Inc.

49. Nimble's sales organization is responsible for acquiring new customers, maintaining customer relationships, and overall market development. The sales organization

also manages Nimble's relationship with its "channel partners" – third parties that work with Nimble to sell Nimble's products to end customers. Channel partners accounted for 89%, 92%, and 98% of Nimble's total revenue in the fiscal years ended January 31, 2013, 2014 and 2015.

50. Nimble sells to end customers across many different industries as well as internationally. Its customers include organizations in the educational, financial services, healthcare, and manufacturing sectors, federal, state and local government, and cloud-based service providers. Nimble's customer base includes small and mid-sized customers, large global enterprises and cloud-based service providers. Nimble's most important business is selling to small and mid-sized customers, which it defines as its "commercial" business and makes up approximately 81% of Nimble's customer base. Defendants have admitted that the commercial segment was its "core" business. *See, e.g.*, *infra* ¶176. The remaining 19% of Nimble's customers are made up of federal government organizations, enterprises, and others.

51. An important part of Nimble's business was from inside sales to existing customers, which Nimble termed its "land and expand" model. Nimble noted in its Annual Report on April 2, 2015 that such sales were more than 40% of the dollar amounts of orders received in fiscal year 2015:

> Our installed base of over 4,970 end-customers as of January 31, 2015 provides us a strong foundation in which to drive incremental sales through our "land and expand" model. In the years ended January 31, 2013, 2014 and 2015, approximately 25%, 34% and 41% of the dollar amounts of orders received were from existing end-customers.

52. A significant difference between commercial and enterprise customers is the length of the sales cycles in acquiring them as customers. During the Class Period, Vasudevan told the market that the sales cycle for mid-size customers (*i.e.*, commercial) was approximately 75-90 days, and that the sales cycle for enterprise customers can be four to six months.

**B. Nimble's Products**

53. Nimble's principal products and services are bundled together and sold to customers as an "Adaptive Flash platform." This platform includes two components: a "flash-optimized file system" (called the "Cache Accelerated Sequential Layout File System")

contained in each storage array, and proprietary Nimble software called “InfoSight,” which is sold to customers along with the storage arrays on a subscription basis. InfoSight is a reporting tool that allows customers to track their data storage usage and needs.

54. Nimble sells a line of five different storage arrays. The CS210 and CS215 arrays are intended for and principally marketed to smaller and medium-sized organizations. These arrays typically support data, software, and programs such as Microsoft applications, including email servers. The CS300, CS500, and CS700 arrays are designed for larger-scale deployments at enterprise-type customers. They support larger-scale programs and more intensive workloads. Each of Nimble’s arrays’ capacity and performance can be expanded using expansion shelves. These expansion shelves permit the arrays to handle larger amounts of data and perform more efficiently.

55. Nimble’s storage arrays support two types of “storage protocols” for its customers to choose from: iSCSI and Fibre Channel. A storage protocol facilitates the transfer of data between different networks and computers, and is how Nimble’s end customers’ systems communicate data to the storage arrays. All of Nimble’s storage arrays support iSCSI, which is typically used by smaller and medium-sized organizations. iSCSI (pronounced “eye-scuzzy”) stands for “Internet Small Computer System Interface.”

56. Nimble’s CS300, CS500, and CS700 arrays also support a protocol called Fibre Channel. Fibre Channel-support was built into these arrays in order to help attract enterprise clients to Nimble’s arrays. It was launched in late 2014.

57. Although Nimble can and does sell Fibre Channel and iSCSI products to both commercial and enterprise clients, they are designed for and sold to principally different segments. Therefore, when Defendants refer to customers of Fibre Channel products in public statements, they are principally referring to enterprise clients, and when Defendants refer to iSCSI customers, they are principally referring to commercial clients.

58. On November 25, 2014, during Nimble’s 3Q 2015 earnings call with analysts, Vasudevan linked Fibre Channel with the enterprise market while discussing the potential for larger deals with the release of Fibre Channel:

> **The second factor that helped this quarter is the set of investments we've made to get into larger enterprises.** As we put enterprise teams in place, as our base of large enterprises is growing, and as they come back to do more with us, they tend to drive larger deals as well. So both of those have been in play this quarter.
>
> **Fibre Channel is a factor that we expect will continue to help that trend.** Already as I mentioned, we've seen beta customers translate into customer deployments. And while it's early days, I do believe that the deal sizes, as a result of Fibre Channel, will tend to be larger than our historical average. That's already evidenced in what we've seen thus far.

59. The market understood this meaningful distinction. For example, on November 25, 2014, during Nimble's 3Q 2015 earnings call, Needham & Company analyst Rich Kugele commented that "Traditionally Fibre Channel has been a little bit more higher-end enterprise, more performance focused." Vasudevan confirmed that Kugele's characterization was correct.

60. Wells Fargo also noted on November 25, 2014 that its "Investment Thesis" for Nimble was based in part on "the market expansion opportunity in large enterprise driven, in part, by new products" including Fibre Channel.

61. On November 26, 2014, Piper Jaffray wrote that "[t]he target customers for [Fibre Channel] arrays are enterprises within the Global 1000-5000," *i.e.*, enterprise clients.

62. On December 3, 2014, Sterne Agee wrote "FC [Fibre Channel] support should greatly expand its opportunities in larger enterprises...."

63. Nimble also sells proprietary software called InfoSight that allows its customers to proactively manage and support their storage infrastructure "from the cloud," *i.e.*, from any location (including a remote location that is not necessarily on-site). The storage arrays and the InfoSight software, together, allow Nimble's customers to predict, manage, and deliver the data storage needs of their organization.

64. On February 23, 2016, several months after the Class Period ended, Nimble announced the release of its first-ever line of all-flash arrays, which included a line of four arrays called the AF3000, AF5000, AF7000, and AF9000. Among other things, one of the chief

differences between the all-flash arrays and Nimble's hybrid arrays is that the all-flash array completely eschews disk-based components.

**C. Nimble's Growth Story**

65. Nimble was founded in 2007 and went public with an initial public offering on December 12, 2013.[2] Nimble has grown exponentially and in the past five years it has increased its annual revenues from approximately $1.6 million in FY 2011 to over $227 million in FY 2015:

| | Year Ended January 31, | | | | |
|---|---|---|---|---|---|
| | **2015** | **2014** | **2013** | **2012** | **2011** |
| | (in thousands) | | | | |
| **Revenue:** | | | | | |
| **Product** | $ 198,129 | $ 112,812 | $ 49,765 | $ 13,113 | $ 1,632 |
| **Support and service** | 29,544 | 12,921 | 4,075 | 900 | 49 |
| **Total revenue** | 227,673 | 125,733 | 53,840 | 14,013 | 1,681 |

Source: SEC Form 10-K, dated April 2, 2015, at 39.

66. Nimble has also dramatically increased its customer base in the last five years, growing from approximately 40 customers as of January 31, 2011 to more than 4,970 by January 31, 2015:

| Fiscal Year Ending | End-Customers |
|---|---|
| January 31, 2011 | 40 |
| January 31, 2012 | 270 |
| January 31, 2013 | 1,090 |
| January 31, 2014 | 2,640 |
| January 31, 2015 | 4,970 |

Source: SEC Form 10-K, dated April 2, 2015, at 2.

67. Although Nimble does not provide the breakdown of customers by segment in its public filings, the Company did confirm early in the Class Period and immediately after that the vast majority of its customers were commercial. On December 2, 2014, Vasudevan stated at a Credit Suisse conference that approximately 3,500 of Nimble's roughly 4,300 customers (81%)

[2] Nimble is an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, and thus is not required to conform to GAAP when providing financial information to the market.

were mid-size (commercial) clients. On December 9, 2015, Vasudevan stated at a Barclays conference that 5,500 of Nimble's 6,800 customers (again, 81%) were mid-size (commercial) clients.

68. Nimble has also considerably increased its employee base in order to develop and grow its customer base. For example, from January 31, 2011 to January 31, 2015, its headcount increased from 47 to 838 employees:

| Date | Headcount |
|---|---|
| January 31, 2011[1] | 47 |
| January 31, 2012[1] | 147 |
| July 31, 2013[3] | 464 |
| January 31, 2014[2] | 592 |
| January 31, 2015[1] | 838 |

[1] Source: SEC Form 10-K, dated April 2, 2015.
[2] Source: SEC Form 10-K, dated April 17, 2014.
[3] Source: SEC Form S-1, dated October 18, 2013.

69. In its Annual Report on Form 10-K issued during the Class period, on April 2, 2015, Nimble told the market it would continue to expand its headcount across all markets:

> **Our sales organization is responsible for customer acquisition, maintaining customer relationships, and overall market development**, which includes the management of the relationships with our channel partners, working with our channel partners in winning and supporting end-customers, and acting as the liaison between the end-customers and the marketing and product development organizations. **We expect to continue to grow our sales headcount across all markets and expand our presence into countries where we currently do not have sales presence.**

70. Analysts recognized Nimble as a growth story. For example, the Maxim Group issued a report on November 20, 2014, just before the start of the Class Period, noting that Nimble was "a high growth company" in the context of discussing its sales productivity. At the December 8, 2014 Raymond James Systems, Semiconductors, Software & Supply Chain Conference (the "Raymond James Conference"), Raymond James analyst Brian Alexander remarked to Leary how Nimble was a growth company: "You just reported your October quarter. You are on track to grow I think about 80% for this fiscal year ending January." Leary

agreed, saying "It was a strong quarter for us. We grew $59 million for the quarter on the top end. As you said, very strong growth from a year-over-year perspective."

71. At the December 2, 2014 Credit Suisse Technology Conference soon after the start of the Class Period, Vasudevan was asked by a Credit Suisse analyst how Nimble will capitalize on the $18 billion market opportunity before it and what made Nimble unique in the market. Vasudevan responded by talking about the history of the industry and then pivoted to Nimble, stating that Nimble's products are "truly a broad platform" and that "we think we have a multi-year growth opportunity, rather than a short-term spurt."

72. At the December 8, 2014 Raymond James Conference, Leary was asked how Nimble was going to expand its market opportunity. After commenting on how Nimble would invest "in a balanced way," Leary connected the importance of "balanced" investments by stating that "we are looking at a multiyear view of how we continue that very rapid growth" Nimble had been experiencing.

73. At the January 14, 2015 Needham Growth Conference, analyst Rich Kugele kicked off Nimble's presentation by saying that Nimble is "one of the leading hybrid array companies in storage" and noted its "extreme growth."

74. On February 26, 2015, during Nimble's 4Q 2015 earnings call, Vasudevan stated that Nimble looked ahead to the coming fiscal year, as it sees "an opportunity to drive sustained growth over multiple years, while simultaneously demonstrating operating leverage in our business model." Vasudevan replicated his comment again during Nimble's 3Q 2015 earnings call on May 26, 2015, noting that he "see[s] an opportunity to drive sustained growth over multiple years while simultaneously demonstrating operating leverage in [Nimble's] business model."

75. At the June 9, 2015 William Blair Annual Growth Stock Conference, Mehta stated that "we've been able to sustain our growth ramp based on our customer acquisition machine."

76. And on August 25, 2015, during the 2Q 2016 earnings call with analysts, Vasudevan once again told the market that Nimble "see[s] an opportunity to drive sustained

growth over multiple years, while simultaneously demonstrating operating leverage in our business model."

**D. Nimble's Core Business Was Its Commercial Segment**

77. Since the Company's inception, and throughout the Class Period, commercial clients were Nimble's primary and most reliable customer base. Growth in commercial clients was an easily predictable metric based on the amount of investment the Company put into its sales operation for commercial. During the Class Period, the commercial segment made up approximately 80% of the Company's clients, and that number did not change.

78. Throughout the Class Period, Nimble acknowledged that commercial clients were its core source of revenue and its "classic" source of business. At a December 2, 2014 Credit Suisse conference, Vasudevan discussed Nimble's "four fundamental growth drivers that we stay focused on," and the first one that he mentioned was "acquiring new customers in the territory based mid-size enterprise market."

79. At a Raymond James conference on December 8, 2014, Leary also described the Company's intense focus on commercial. An analyst asked Leary to discuss "how you think about growth coming from new versus existing." Leary's response emphasized the "several thousand . . . midmarket accounts" Nimble currently had, and that "worldwide there are tens of thousands of those accounts and so there is a huge opportunity for us to grow that customer base [referring to commercial] very, very substantially. We will continue to do that and part of the way we get there is continue to do investments in our indirect and our channel strategy."

80. On May 26, 2015, while announcing results for 1Q 2016, Vasudevan stated that "we are continuing to drive customer acquisition at a rapid pace by leveraging our channel partners," *i.e.*, a source of major investment by Nimble for the growth of its commercial clientele.

81. At a June 9, 2015 William Blair conference, Mehta spent time discussing Nimble's ongoing "attack" on mid-market clients from its earliest days, noting that the Company "started out attacking the mid-market" because it "is a really nice, attractive market for a start-up to attack." Commenting that "it turned out to be a very successful way to go,"

Mehta stated that "we've been able to sustain our growth ramp based on our customer acquisition machine."

82. On August 25, 2015, Vasudevan noted that "[g]enerally speaking in any given quarter, for us there are three main areas that we can concentrate our sales and marketing investments." Vasudevan once again emphasized the importance of commercial by discussing it first. "One tends to be in the US commercial. This is mid-sized customers that we've always done well at. This is where we started several years back." Only after did he discuss large enterprises and international clients.

**E. Nimble's Venture Into the Enterprise Market**

83. At the beginning of the Class Period, Nimble had a small number of larger "enterprise" clients. These included, for example, Fortune 1000 or Global 5000 companies. Enterprise clients were still a new growth area for Nimble; even by the end of the Class Period, Nimble stated that Fibre Channel bookings only represented about 23% of Nimble's bookings and less than 20% of the total number of Nimble's customers.

84. Analysts recognized that Nimble barely cracked into the enterprise segment. For example, FBN Securities wrote on May 27, 2015 that while "NMBL continues to gain share in th[e storage] market, . . . there is still ample room left for it to penetrate. Moreover, **the company has barely scratched the surface in the enterprise"** market.

85. Defendants told the market that Fibre Channel would be an important part of Nimble's growth trajectory into enterprise. On the first day of the Class Period, November 25, 2014, Vasudevan announced the successful launch of the Fibre Channel product, which was meant to be a leading product in pursuing enterprise clients. Vasudevan told the market that Nimble was making investments "to get into larger enterprises. As we put enterprise teams in place, as our base of large enterprises is growing, and as they come back to do more with us, they tend to drive larger deals as well." Later in that same call, Vasudevan explained why Nimble launched the Fibre Channel line of storage arrays in order to more aggressively target large enterprise clients: "Fibre Channel is roughly 3 times the size of iSCSI and that's why we talk about a quadrupling of the market opportunity."

86. On December 3, 2014, Sterne Agee wrote that "FC [Fibre Channel] support should greatly expand [Nimble's] opportunities in larger enterprises."

87. During a December 8, 2014 conference hosted by Raymond James, Leary reiterated that entering the Fibre Channel product world "represents a huge, new incremental addressable market opportunity for us.... [I]t probably quadruples our addressable market in the broadest sense from the iSCSI-only market that we were serving before."

88. On June 9, 2015, during the middle of the Class Period, Mehta noted that "fiber channel is actually a good proxy for the enterprise [segment], because that's where it is entrenched."

89. Vasudevan also directly connected Fibre Channel sales to large enterprise penetration during a December 9, 2014 analyst conference:

> Another way of looking at it, ***fiber channel was often the reason that even when a large enterprise liked a lot of what we do from a platform standpoint, it was a barrier to being deployed.*** Two out of three large enterprise engagements, fiber channel was the barrier to being deployed, ***that barrier has gone away***.

**F. Defendants Repeatedly Emphasized That Nimble's Total Addressable Market Was Nearly $20 Billion**

90. Nimble's Total Addressable Market, also known as its "TAM," is a measure of the amount of business it could capture. Throughout the Class Period, Defendants told the market that, with the introduction of Fibre Channel as a means to attract enterprise clients, Nimble's TAM was approximately $20 billion. Given that Nimble's revenues in FY 2015 totaled $227 million, it still had a huge opportunity in front of it, most of which was supposedly enterprise.

91. While speaking at Nimble's 3Q 2015 earnings call on November 25, 2014, Singh remarked that:

> When I think about our own TAM, in the past, we've characterized our TAM as somewhere in the $18 billion to $20 billion range. And our served market, which is the (inaudible) served market **prior to Fibre Channel as being in the $5 billion range.** And we still maintain exactly that, which is it's gone from $5 billion to $20 billion.

92. On December 8, 2014, at the Raymond James analyst conference, Leary stated that "we are excited that we just now quadrupled our TAM with the introduction of fiber channel and obviously that has opened up a huge swath of the market."

93. The next day, on December 9, 2014 at a Barclays Global Technology Conference, Vasudevan reiterated the opportunity enterprise and Fibre Channel presented:

> So, it's just quadrupling of our TAM, just five or six product lines that we compete against account for over $13 billion that now are entirely available to us because of the fiber channel introduction. Our TAM is, we think, somewhere in the $18 billion to $20 billion range. So, the market opportunity substantially expanded.

### G. Throughout the Class Period, Nimble Was Pursuing "Breakeven" or Profitability For the First Time

94. Since its founding, Nimble had not been profitable from an earnings standpoint, but it was moving toward breakeven. In its April 2, 2015 Annual Report on Form 10-K for the fiscal year ending January 31, 2015, Nimble provided the following chart tracking what it called "Key Business Metrics" giving an overall snapshot of the Company's growth trajectory. For example, its operating loss as a percentage of total revenue has declined year over year, evidencing that the Company was apparently growing and on its way to breakeven and eventual profitability:

**Key Business Metrics**

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Total revenue | $ 227,673 | $ 125,733 | $ 53,840 |
| Year-over-year percentage increase | 81 % | 134 % | 284 % |
| Gross margin | 65.3 % | 64.8 % | 62.0 % |
| Deferred revenue, current and non-current | 74,446 | 33,509 | 10,896 |
| Net cash provided by (used in) operating activities | 5,376 | (6,742 ) | (18,754 ) |
| Non-GAAP Net Loss | (41,779 ) | (33,974 ) | (25,253 ) |
| Non-GAAP Operating Loss | (39,010 ) | (33,420 ) | (25,160 ) |
| **Non-GAAP Operating Loss as a percentage of total revenue** | **-17 %** | **-27 %** | **-47 %** |
| Adjusted EBITDA | (32,328 ) | (29,393 ) | (24,068 ) |

Source: Nimble Storage, Inc., Annual Report (Form 10-K) (Apr. 2, 2015), at 42.

95. This chart shows that if the Company could maintain its rapid growth rate throughout the Class Period (as Defendants were telling the market Nimble was), Nimble's

revenues would overtake its expenses and lead to breakeven or profitability. So, while Nimble's non-GAAP operating loss increased, its non-GAAP Operating Loss as a percentage of total revenue had decreased from 47% in 2013 to 17% in 2015.

96. Throughout the Class Period, Defendants stated that they were targeting breakeven or profitability by the end of FY 2016 (*i.e.*, by January 31, 2016). On December 2, 2014, at the Credit Suisse Technology Conference, Vasudevan stated that "we picked Q4 of next year and we said we're going to breakeven in that timeframe from a non-GAAP operating income perspective. What drove that was a philosophy that sort of growth – we have a large TAM [total addressable market], we have massive differentiation."

97. On December 8, 2014, Leary attended the Raymond James Systems Conference, where he told the market that "we are going to be operating from a non-GAAP perspective breakeven by the end of next year."

98. On December 9, 2014, Singh attended the Barclays Global Technology Conference, and stated that:

> [G]oing year-over-year we're improving our leverage and then we've established the milestone or **breakeven as a Company in non-GAAP operating income in Q4 of next year and breakeven on a cash flow basis even sooner than that**. So as you look ahead to next year, we're making our progress **and we're confident in being able to achieve that**.

99. On February 26, 2015, during Nimble's 4Q 2015 earnings call with analysts, Singh reiterated that "absolutely, the Company is on track for breakeven in Q4."

100. On March 11, 2015, Piper Jaffray analyst Andy Nowinski asked Singh at a Piper Jaffray conference if there was "anything" "that could potentially derail that timeline" of fiscal 4Q for breakeven. Singh responded, "in the absence of a major external shock the answer would be no."

101. On May 26, 2015, during Nimble's 1Q 2016 earnings call with analysts, Singh once again repeated that "we are absolutely on track to make our investments and on track to breakeven at the end of the year."

102. On August 25, 2015, during Nimble's 2Q 2016 earnings call with analysts, Singh for the third time repeated that "absolutely, in the OpEx that you saw this quarter, we would expect that trend to continue, even as we stay on track for breakeven in Q4."

**H. Throughout the Class Period, Defendants Told the Market Nimble Was Carefully Making Balanced and Increasing Investments Across Its Entire Business as a Means to Breakeven**

103. Whenever Defendants discussed the mix of investments Nimble was making across its business segments during the Class Period, they painted the picture of a company that was carefully investing in a balanced manner across all of its segments, including commercial and enterprise.

104. On December 8, 2014, while speaking at a Raymond James System conference, Leary represented that Nimble has "always looked at our investments as a couple of things. One is we want to make investments in a balanced way so that we can continue to grow the top line very aggressively, but do it in a way where we are going to get continued improvements in operating leverage." Leary emphasized that "***we are not making trade-offs on investments that might yield and [sic] even shorter-term growth in revenue in the short run.*** We want to balance those investments out, some of which can take many quarters to pay off...."

105. The very next day, on December 9, 2014, Singh spoke at a Barclays technology conference and told the market that "in terms of the near-term strategy, if you look at the approach that we've taken so far, it's been strong investments for growth and obviously we've seen that show up from a topline standpoint." He emphasized that "the investments that we have made so far and we intend to continue to make is going to drive sustainable growth for us as a Company over a long period of time."

106. On January 14, 2015, Vasudevan told the market at a Needham conference that:

> [W]e've talked about our goal as **driving growth on the one hand in a balanced manner** that also delivers profitability over time and we also have seen a very strong track record of consistently driving operating income leverage over time and that's a trajectory that you'll continue to see from us. Year over year operating income will continue to improve every quarter as we head towards breakeven.

107. When Nimble provided its results for 4Q 2015 on February 26, 2015, Vasudevan proclaimed on an earnings call with analysts that "we see an opportunity to drive sustained growth over multiple years, while simultaneously demonstrating operating leverage in our business model." Singh reiterated this picture of a balanced focus, stating that "we are investing in the business because our view is we can drive sustainable strong growth in our business this year as well as in future years after this."

108. On April 2, 2015, Nimble released its Annual Report on Form 10-K for the fiscal year ending January 31, 2015. Nimble reassured the market it was focused on ***expanding*** its sales force with "additional teams" across Nimble's segments, not just to enterprise:

> **Our focus is on acquiring mid-sized enterprises**, large global enterprises and cloud service providers as customers, spanning a broad spectrum of industries and geographies. **We will continue to expand our sales organization with additional teams focused on sales into territories, sales to named enterprises, government sales, and teams supporting our channel partners**.

109. During Nimble's August 25, 2015 conference call with analysts to discuss the Company's 2Q 2016 results, Vasudevan again emphasized that "we remain disciplined in our business model and committed to generating cash flow while driving rapid growth." Asked a range of questions regarding Nimble's breakeven target, Vasudevan noted that "really important to us is the ability to drive sustained growth over many years." Commenting on the "three main areas that we can concentrate our sales and marketing investments," Vasudevan listed first "US commercial," the "mid-sized customers that we've always done well at. This is where we started several years back." He then listed enterprise and international clients as the second and third areas after commercial.

## I. Nimble Consistently Met Revenue Targets With Remarkable Precision

110. Leading up to the Class Period, Nimble consistently exceeded the top range of the guidance it issued to the market every quarter. Revenue increased by several million dollars each quarter prior to and during the Class Period:

| **Fiscal Quarter** | **Guidance (Revenue)** | **Actual Results (Revenue)** | **Revenue Increase Q/Q** |
|---|---|---|---|
| Prior to Class Period | | | |
| Q4 2014 | no guidance - IPO | $41.7 million[1] | -- |
| Q1 2015 | $42 to $44 million[2] | $46.5 million[2] | $4.8 million |
| Q2 2015 | $49 to $51 million[2] | $53.8 million[3] | $7.3 million |
| Class Period | | | |
| Q3 2015 | $56 to $58 million[3] | $59.1 million[4] | $5.3 million |
| Q4 2015 | $65 to $67 million[4] | $68.3 million[5] | $9.2 million |
| Q1 2016 | $68 to $70 million[5] | $71.3 million[6] | $3 million |
| Q2 2016 | $77 to $79 million[6] | $80.1 million[7] | $8.8 million |

[1] Source: SEC Form 8-K, dated February 27, 2014
[2] Source: SEC Form 8-K, dated May 29, 2014
[3] Source: SEC Form 8-K, dated August 26, 2014
[4] Source: SEC Form 8-K, dated November 25, 2014
[5] Source: SEC Form 8-K, dated February 26, 2015
[6] Source: SEC Form 8-K, dated May 26, 2015
[7] Source: SEC Form 8-K, dated August 25, 2015

111. The market came to rely on Nimble's ability to consistently provide such accurate guidance. For example, on November 26, 2014, William Blair commented on the 3Q 2015 results as "another beat-and-raise ... with revenue coming in roughly $1.3 million above the Street target" which was in line with the Company's own guidance for the quarter.

112. On February 27, 2015, William Blair similarly commented on the 4Q 2015 results, noting that "Nimble delivered a solid close to the year, with revenue of $68 million ... topping the consensus by nearly $2 million."

113. On May 28, 2015, Macquarie Capital (USA) issued a report in light of the 1Q 2016 results headlined "Solid beat-and-raise reinforces confidence in positioning" and noting that the Company "reported 1QFY16 earnings that beat consensus expectations...." William Blair also noted on May 27, 2015 the "solid beat-and-raise quarter highlighted by continued large enterprise and service provider penetration."

114. On August 26, 2015, Jefferies reported in light of the 2Q 2016 results "Another Boring Beat" and commented that "Nimble again posted a FQ2 (Jul) beat and guided up FQ3

(Oct) revenues." William Blair also commented on August 26, 2015 on the fact that "Nimble delivered another top-line beat-and-raise...."

### J. Throughout the Class Period, Defendants Had Access to Sophisticated Internal Analyses and Metrics Concerning Sales

115. Nimble's ability to meet and beat street expectations was based on its sophisticated sales and accounting process. Several former employees confirm that Nimble had access to highly sophisticated tools, and programs, which conducted both historical analyses and highly accurate predictive analyses.

116. Confidential Witness 1 ("CW 1") was employed by Nimble from 2010 to March 2015 and served as Vice President of West Coast Sales.[3] Throughout his tenure, he reported to the Vice President of Worldwide Sales who in turn reported to Vasudevan. CW 1 stated that Nimble as a whole was very metrics driven. According to CW 1, Nimble conducted a lot of forecasting and predictive analysis using Salesforce, which is a cloud computing company, and a system called Cloud 9 to perform more extensive predictive analyses. According to CW 1, Nimble would use Cloud 9 to take each deal Nimble was working on and analyze it by "close rate" or "close-ability." CW 1 explained that one of the features that Cloud 9 had was the ability to take seasonal effects out of the equation in order to get more precise forecasts. CW 1 further explained that Cloud 9 also calculated, for each individual sales person, historical data for each customer broken down by industry in order to get even more precise close rates. CW 1 recounted that he would use Cloud 9 to forecast three quarters into the future, and it would predict close to the exact number of sales that were achieved. CW 1 stated that Cloud 9's forecasts were "very accurate." CW 1 further noted that the reports could be broken down by region and territory, and that he, Vasudevan, and other senior level executives received daily Cloud 9 reports.

117. CW 1 further stated that the accuracy of Nimble's forecasts should not have been affected by the push to focus on enterprise customers instead of commercial because Cloud 9 took into account historical or predictive analysis regardless of whether the customers were

[3] All Confidential Witnesses will be described in the masculine to protect their identities.

enterprise or commercial. CW 1 also stated that Nimble already had historical data during the Class Period reflecting that enterprise deals take longer to close than commercial.

118. CW 1 further noted that Vasudevan used the Company's predictive analysis software and reviewed Cloud 9 reports from his office. CW 1 stated that Vasudevan ran a very metrics-driven operation. CW 1 also noted that Vasudevan was very involved in almost every aspect of the Company. CW 1 recalled Vasudevan often calling him and Vice President of Worldwide Sales Mike Munoz to discuss channel and pipeline metrics; if certain numbers were down, they would show up as red in reports.

119. Confidential Witness 2 ("CW 2") was employed by Nimble from 2013 through January 2015 and worked as a Marketing Manager for Product and Solutions Marketing. CW 2 also stated that although 60% of deals traditionally close in the last month of a quarter, that it was clear to everyone at Nimble ***prior*** to the last month of each quarter what deals would and would not close by looking at where they were in the sales cycles in Nimble's systems.

120. Confidential Witness 3 ("CW 3") worked for Nimble from February 2012 to March 2016. At the start of the Class Period, he was an Individual Contributor/Sales Representative, and in October 2015 he was promoted to Regional Director of Sales in Southern California. CW 3 reported to Tim Maggs, VP of West, who reported to Mark Parrinello, VP of North America Sales. CW 3 was responsible for both commercial and enterprise accounts in his territory, had some of Nimble's largest accounts, and was one of the top Sales Representatives. CW 3 was also responsible for training new hires, which included visiting headquarters at least every 60 days. CW 3 stated that Nimble's sales leadership emphasized and "lived by" Cloud 9. CW 3 noted that Vasudevan worked directly with Senior Sales Operation Analyst Jonathan Aragon with respect to projections and Cloud 9 reports.

121. Confidential Witness 4 ("CW 4") was employed by Nimble from July 2012 to February 2015 as a Sales Engineer. His responsibilities included visiting accounts and prospective accounts with Nimble sales representatives to learn the clients' data storage needs and explain Nimble's technology to them. He worked primarily in northern Texas near the Dallas/Fort Worth area. CW 4 reported to the Sales Engineer Manager for South Central U.S.,

Derek Williams. His portfolio included both commercial and enterprise accounts. CW 4 described the end-of-quarter projections provided by Salesforce and Cloud 9 as "scary" accurate, and that Cloud 9's "modeling was unbelievably accurate." CW 4 provided additional details regarding how Cloud 9 worked. CW 4 explained that sales personnel were consistently required to update information in Salesforce on each of their sales opportunities in the pipeline. CW 4 further explained that based on the tandem of constantly updated information in Salesforce and Cloud 9's algorithms, a very accurate picture for the end of each quarter was presented. CW 4 described Vasudevan and Singh as being "intimately involved in the daily functions of the business" during his tenure.

122. Confidential Witness 5 ("CW 5") worked as a Senior Systems Engineer (or Senior Sales Engineer) for Nimble from December 2014 to February 2016. His responsibilities included visiting commercial accounts (and prospective accounts) with Nimble sales representatives to learn the clients' data storage needs and explain Nimble's technology to them. His territory was in Nimble's Mid-Atlantic region and included Washington D.C., Maryland, and northern Virginia. CW 5 reported to Director of Systems Engineering Herman Lisman and later in his tenure to Manager of Systems Engineering Keith Younger. Lisman reported to Vice President of Systems Engineering Randy Hopkins.

123. CW 5 participated in weekly regional forecast conference calls and in–person regional Quarterly Business Reviews ("QBRs"). CW 5 stated that the regional conference calls were usually chaired by the Director of Sales in Mid Atlantic. District managers, Vice President-East Mike Wallerstedt, and Vice President of North American Sales Mark Parrinello participated in the QBRs. CW 5 explained that during the QBRs, the teams reviewed information that was in Salesforce. CW 5 also noted that "pipeline" opportunities (sales opportunities not near closing, but still opportunities); "upside" (sales that had a 25% chance of closing during the quarter); "strong-upside" (sales that had a 50% chance of closing during the quarter); and "commit" (sales that had an almost 100% chance of closing during the quarter) were discussed during QBRs. CW 5 continued that after the regional QBRs, Parrinello, Wallerstedt, and district managers would fly to Nimble's headquarters in California and have

their own QBR with senior executives (including Vasudevan) to update them in person about the regional QBRs.

124. CW 5 recalled that he provided updated pipeline, upside, strong-upside, and commit projections on the weekly regional conference calls as well. CW 5 also noted that if a deal was lost, the sales team would indicate the reason why in Salesforce. CW 5 explained that updated sales information was discussed during the weekly regional forecast calls. CW 5 believed that the consistently updated Salesforce information gave Nimble the ability to project by the end of the first month of a quarter whether or not quarterly goals would be met.

125. Confidential Witness 6 ("CW 6") was employed as a Sales Operations Analyst at Nimble from June 2013 to November 2015, and as a Senior Sales Operations Analyst from November 2015 to May 2016. CW 6's responsibilities included systems set up and execution of tools. CW 6 reported to Senior Manager of Sales Operations Elizabeth "Liz" Luu, who reported to Adam Gerlinger, Senior Director of Worldwide Sales Operations. CW 6 confirmed that Cloud 9 provided Nimble executives with insight into Nimble's future sales prospects. CW 6 further confirmed that Vasudevan received regular Cloud 9 reports. CW 6 was aware of his receipt of Cloud 9 reports because he was in Sales Operations and knew that every sales manager as well as Vasudevan were getting Cloud 9 reports.

126. Confidential Witness 7 ("CW 7") was employed from September 2013 to April 2015 as a Nimble Channel Manager. CW 7's responsibilities included recruiting, working with, and supporting channel distributors and resellers, and supporting Nimble regional sales teams in identifying and developing new customers. CW 7 reported to Senior Director of North American Sales Keith Macove, who reported to Vice President of Global Channel Sales Kristin Carnes, who reported to Vice President of Sales Mike Munoz, who reported to Vasudevan.[4] CW 7 confirmed that Nimble's use of Salesforce and Cloud 9 to project sales and provide accurate visibility into the Company's pipeline was excellent. CW 7 also stated that the further

[4] CW 7 initially reported directly to Carnes, but Macove was added as a layer in between he and Carnes when Macove joined Nimble.

Cloud 9's projections went up the chain of command at Nimble, the more accurate the numbers and the visibility into the metrics got—to the point of being "scary good."

127. CW 7 also confirmed that quarterly projections were discussed in detail at QBRs in his region chaired by the District Sales Managers, with Area Vice President Keegan Riley in attendance. CW 7 noted that area QBRs would take place in person or via teleconference, and they would recap and roll-up the area's sales projections. CW 7 stated that Riley flew to Nimble's corporate headquarters in San Jose and discussed the area's roll-ups and projections with Vasudevan, Singh, and other senior executives. CW 7 confirmed that he was told by Director of Sales for the southern United States Jeff Heinberg that the regional roll-ups went to Vasudevan.

128. CW 7 described Vasudevan as a very involved CEO from a sales operating perspective. CW 7 recalled that sales representatives would arrange for Vasudevan to meet with clients when he visited their region, which he described as highly unusual for the CEO of a publicly traded company. CW 7 specifically recalled as an example one of Nimble's Account Executives in Houston arranging for Vasudevan to visit with one of his accounts.

129. The remarkable detail and visibility available to Defendants via Cloud 9 is explained by the amount of information Cloud 9 processed on a daily basis. Based on an internal Nimble Cloud 9 "Daily Forecast Report" from November 2, 2015, Defendants had access to an extremely detailed and sophisticated range of data regarding the business.

130. The Daily Forecast Report issued to sales representatives was in the form of a Microsoft Excel spreadsheet and included seven different worksheets of information. The Daily Forecast Report included two worksheets that contain projections and forecasts. These are titled "Projected Bookings" and "Forecast Metrics." The Daily Forecast Report also included five worksheets with historical information, titled (1) "Discount & Margin Analysis," (2) "Sales QBR Metrics (per Rep)," (3) "Channel QBR Metrics (per Rep)," (4) "QBR Worksheet (per Rep)," and (5) "Bookings Distribution."

131. The Daily Forecast Report uses several acronyms which refer to the following terms:

STLQ = Same Time Last Quarter

LQ = Last Quarter

EOQ = End of Quarter

NQ = Next Quarter

ASP = Average Sale Price

132. The first worksheet was titled "Projected Bookings." This worksheet indicates that the "report is designed to provide Sales Managers a bookings estimate for the current quarter according to historical close rates." The worksheet included estimates for "Projected Bookings" with four different "Pipeline Categories," including "Open Pipeline," "Open Weighted Pipeline," "Open Adv Stage Pipeline," and "Bookings," as well as an "Average." The worksheet included ***three quarters*** of estimates for each pipeline category, as well as averages. The worksheet also includes a range of "Metrics" under the "Projected Bookings." These metrics include 24 rows of data regarding bookings for each quarter:

| **Projected Bookings Calculations** |
|---|
| **Metrics** |
| STLQ Bookings |
| LQ EOQ Bookings |
| STLQ Bookings Remaining |
| |
| STLQ Open Pipeline |
| STLQ Open Pipeline to Bookings Conv Rate |
| CQ Open Pipeline |
| Estimate Bookings from CQ Open Pipeline |
| CQ Bookings |
| Est Total CQ Bookings |
| |
| STLQ Open Weighted Pipeline |
| STLQ Open Weighted Pipeline to Bookings Conv Rate |
| CQ Open Weighted Pipeline |
| Estimate Bookings from CQ Open Weighted Pipeline |
| CQ Bookings |
| Est Total CQ Bookings |
| |
| STLQ Open Adv Stage Pipeline |
| STLQ Open Adv Stage Pipeline to Bookings Conv Rate |
| CQ Open Adv Stage Pipeline |
| Estimate Bookings from CQ Open Adv Stage Pipeline |
| CQ Bookings |
| Est Total CQ Bookings |
| |
| STLQ Bookings Conv % |
| CQ Bookings |
| Est Total CQ Bookings |

133. The second worksheet in the Daily Forecast Report is titled "Forecast Metrics." It indicates that: "This report is designed to provide Sales Managers a quick way to review key current quarter performance metrics including QoQ [quarter over quarter] and YoY [year over year] growth rates." It included nine different metrics set forth in the following tables:

| Current Qtr Forecast Metrics |
| --- |
| CQ Pipeline |
| CQ Weighted Pipeline |
| CQ Adv Stage Pipeline |
| CQ Bookings |
| |
| CQ SFC Pipeline |
| CQ SFC Upside |
| CQ SFC Expected |
| CQ SFC Won |
| SFC Won + Expected |

| Next Qtr Forecast Metrics |
| --- |
| NQ Pipeline |
| NQ Weighted Pipeline |
| NQ Adv Stage Pipeline |
| |
| NQ SFC Pipeline |
| NQ SFC Upside |
| NQ SFC Expected |

| Current Qtr Opp Generation (S2+) |
| --- |
| New S2+ Opps Generated |
| New Customer Opps Generated |
| Existing Customer Opps Generated |
| |
| CQ New S2+ Opps Created |
| CQ ISR Meetings Approved (S2+) |
| CQ Chan Meetings Approved (S2+) |
| CQ Field Meetings Approved (S2+) |
| |
| CQ New Pipeline Generated (S2+) |
| CQ CH Pipeline Generated (S2+) |
| CQ ISR Pipeline Generated (S2+) |
| CQ Field Pipeline Generated (S2+) |

| **Total Pipeline Metrics (All Qtrs)** |
|---|
| Total Pipeline |
| Total Weighted Pipeline |
| Total Adv Stage Pipeline |
| Total Bookings |
| |
| Total Open Opps |
| Total Open Opps >100K |
| Total Open Opps >250K |

| **Current Quarter Channel Metrics** |
|---|
| CQ Chan Regs Approved (S1+) |
| CQ Chan Meetings Approved (S2+) |
| CQ Chan Assoc Pipeline |
| CQ Chan Init Pipeline |
| CQ Chan Assoc Bookings |
| CQ Chan Init Bookings |

| **Current Qtr Sales Development** |
|---|
| CQ ISR Meetings Scheduled (S1+) |
| CQ ISR Meetings Approved (S2+) |
| CQ ISR Sourced Pipeline |
| CQ ISR Bookings |

| **Current Qtr Bookings By Deal Type** |
|---|
| CQ Bookings New Business |
| CQ Bookings Repeat Business |
| CQ Bookings Support Renewals |
| CQ Bookings NFR |
| CQ Bookings Other |
| Total |

| **Current Qtr Deal Count By Deal Type** |
|---|
| CQ Unit Count New Business |
| CQ Unit Count Repeat Business |
| CQ Unit Count Support Renewals |
| CQ Unit Count NFR |
| CQ Unit Count Other |
| Total |

| **Current Qtr ASP By Deal Type** |
|---|
| CQ ASP New Business |
| CQ ASP Repeat Business |
| CQ ASP Support Renewals |
| CQ ASP NFR |
| CQ ASP Other |
| Total |

134. The third worksheet in the Daily Forecast Report is titled the "Discount & Margin Analysis." It states: "This report is designed to provide Sales Managers margin data for deals booked in the current quarter." It includes four metrics: (1) "CQ Discount & Margin Analysis - Controller & Capacity"; (2) "CQ Discount & Margin Analysis – Controller"; (3) "CQ Discount & Margin Analysis - Customer Type"; and (4) "CQ Discount & Margin Analysis - Deal Size Segment." This worksheet includes a link to the "VP Dashboard Margin Report."

135. The fourth worksheet in the Daily Forecast Report is titled "Sales QBR Metrics (per Rep)." It includes detailed metrics for each individual sales representative, including "Current Quarter Sales Performance Metrics," "Current Quarter Sales Pipeline Metrics," and "Aggregate Pipeline Metrics." Within the "Current Quarter Sales Performance Metrics," the report provides ten subcategories of data, including (1) "CQ Net New Opportunities Generated (Channel, Inside, Field, Etc)"; (2) "CQ Inside Sales Set S2+ Opportunities"; (3) "CQ New Logo Count"; (4) "CQ Average Discount Levels (Hardware Only)"; (5) "CQ Average Sales Cycle (N&R)"; (6) "CQ 100K+ Deals (Open)"; (7) "CQ 100K+ Deals (Wins)"; (8) "CQ 250K+ Deals (Open)"; (9) "CQ 250K+ Deals (Wins)"; and (10) "CQ % of Wins Involving Pilots." Within the "Current Quarter Sales Pipeline Metrics," the report provides metrics regarding (1) "CQ Pipeline (Includes Bookings)"; (2) "CQ Weighted Pipeline (Includes Bookings)"; (3) "CQ Adv Stage Pipeline (Includes Bookings)"; (4) "CQ Bookings"; and (5) a "CQ Margin Analysis." Within the "Aggregate Pipeline Metrics," the report provides information regarding the "Total Pipeline (Excludes Bookings)"; "Total Weighted Pipeline (Excludes Bookings)"; "Total Adv Stage Pipeline (Excludes Bookings)"; "Total 100K+ Pipeline (Excludes Bookings)"; and "Total 250K+ Pipeline (Excludes Bookings)." The report sets forth detailed metrics for each of these categories for each individual sales representative.

136. The fifth worksheet within the Daily Forecast Report is titled "Channel QBR Metrics (per Rep)." It includes ***eighteen different sets*** of metrics for each individual sales representative, including metrics related to bookings, pipeline generated, opportunities generated, and channel registration. It included updated numbers as of the date of the Report.

137. The sixth worksheet within the Daily Forecast Report is titled "QBR Worksheet (per Rep)." It states: "This report is designed to provide sales managers a quick way to review trends in their business across prior quarters including QoQ and YoY growth rates." It includes a range of 22 "QBR Metrics," along with hundreds of rows of granular metrics broken down by individual sales representative. It includes metrics going back ***seven quarters***. The 22 QBR Metrics included:

| **QBR Metrics** |
|---|
| Total Bookings |
| New Business Bookings |
| Repeat Business Bookings |
| Support Renewal Bookings |
| Other Bookings |
| |
| Channel Initiated Bookings |
| Channel Associated Bookings |
| Direct Bookings |
| |
| New Customer Deal Count |
| New Customer Avg Sales Cycle |
| New Customer Avg Deal Size |
| New Customer % of Deals w/ Pilots |
| New Customer # of 100K+ Deals |
| |
| Repeat Customer Deal Count |
| Repeat Customer Avg Sales Cycle |
| Repeat Customer Avg Deal Size |
| Repeat Customer % of Deals w/ Pilots |
| Repeat Customer # of 100K+ Deals |
| |
| Total S2+ Opportunity Count |
| New ISR Set S2+ Opportunity Count |
| New Field Set S2+ Opportunity Count |
| New Channel Set S2+ Opportunity Count |

138. The seventh worksheet within the Daily Forecast Report is titled "Bookings Distribution." It states: "This report is designed to allow Sales Managers to review monthly bookings distributions from previous quarter. Bookings data for the previous 8 quarters are shown below." It includes eight quarters of metrics, broken down by each individual sales representative, by month.

139. As these metrics indicate, Defendants had access to historical analyses that provided month-by-month granular details about the Company for each individual sales representative. The Company also generated forecasts and projections ***three quarters into the future*** within the same Daily Forecast Report that generates eight quarters of historical data.

140. The Individual Defendants also spoke publicly about their focus on metrics and their visibility into Nimble's pipeline and predictive capabilities. On November 25, 2014, while speaking at Nimble's 3Q 2015 earnings call with analysts, Vasudevan summarized the Company's accomplishments that quarter by stating that "we've demonstrated a strong track work for execution, which continued during the third quarter." Later on that same call, Vasudevan spoke about Nimble's ability to predict future growth:

> So we feel very good about both the pace of new customer acquisition in the mid-sized enterprise segment, as well as the fact that we are growing our base in large enterprises and cloud service providers, and **we have a predictable manner in which they come back to do more with us. All of which we can predict very well and look ahead and see how that translates into growth for our business model.**

141. Vasudevan also provided color about the predictability Nimble had with its business, in response to an analyst question regarding visibility:

> On your question around predictability of the business going forward, the way I would characterize it is there are two rhythms and they are separate. On mid-si[z]ed enterprises, the repeat purchase propensity of that base has remained steady as we look back. **And really what drives our growth in that segment, and it is been a very predictable way in which we've given growth in that segment**, is channel leverage, the number of territories that we have sales teams deployed in, and all of that have been things that have worked well for us.

142. During the December 2, 2014 Credit Suisse Technology Conference, Vasudevan reiterated the visibility Nimble has into its customers' propensity to purchase additional products once they make an initial purchase:

> The fourth one, which operates against all of these, **every time we land a new customer, there is a very predictable pattern of how they come back to do more with us.** And so, repeat bookings in storage are always significant. We have seen a faster pace of repeat deployments as you can see from our pace of repeat bookings and ratio of existing customer versus new customer bookings.

143. At a December 8, 2014 analyst conference hosted by Raymond James, Leary noted how Nimble looks closely at new business initiated by channel partners, in response to a question regarding what percentage of sales comes from channel partners:

> **Unidentified Audience Member**
>
> What percent of your sales [is in your] channel?
>
> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> We are virtually 100%. We are 99% about indirect today. The other metrics that we really look at there are how much of our business is what we call channel initiated business brought to us by our partners, and how much is channeled associated, which is how much we are bringing to them as a result of our sales and marketing efforts. They run approximately -- it varies a little bit quarter by quarter -- but almost 50/50 across those two as a mix.

144. During Nimble's May 26, 2015 earnings call for 1Q 2016, Singh also admitted that Defendants closely monitored the work done by Nimble's channel partners, the third parties that Nimble relies on for the majority of its sales:

> **A metric that we track really closely** are deals that our partners are leading. So, basically doing all of the lifting to close those deals. And in Q1 for example, as a share of all of our business, the metric there was actually at an all-time high in terms of deals that came from the partners.

### K. Unbeknownst to the Market, Defendants Were (1) Secretly Capping Investments in Sales and Marketing While Diverting Sales and Marketing Resources to the Enterprise Segment of the Business, and (2) Misleading the Market as to Nimble's Penetration of the Enterprise Segment

145. Throughout the Class Period, Defendants painted the picture of a balanced company that was humming on all cylinders, while finally penetrating into the much sought-

after enterprise market. Defendants omitted to tell the market material facts that undermined this rosy portrayal. First, Defendants secretly capped Nimble's investments in sales and marketing as a percentage of total revenues. This was done in order to keep Nimble's bottom line of expenses as low as possible in order to try and breakeven by the fourth quarter of 2016. Second, Defendants shifted the now-limited sales and marketing resources from the Company's core segment, commercial, over to the much smaller enterprise segment. Finally, compounding this shift of limited resources, the enterprise segment was simply not growing in the way Defendants touted because the product offering lacked features that enterprises customers wanted. This caused the enterprise segment to fall flat. In order to hide this lack of growth in enterprise, Defendants relabeled commercial accounts as enterprise accounts.

### 1. Defendants Were Secretly Capping Investments in Sales and Marketing While Shifting Limited Resources from Commercial to Enterprise

146. During the Class Period, instead of growing investments in sales and marketing, Defendants ***capped*** Nimble's total sales and marketing spend as a percentage of revenue but did not tell the market until after the Class Period of any such cap. *See infra* ¶¶260-70. During the four fiscal quarters before the Class Period and the four fiscal quarters that comprise the Class Period, overall investments in sales and marketing as a percentage of total revenues stayed about the same (decreasing slightly)—information that was not available to the market during the Class Period:

| Fiscal Period | Sales & Marketing Expenses | Revenue | S&M Expenses as % of Revenue |
|---|---|---|---|
| Four Quarters Prior to Class Period (4Q14 to 3Q15)[5] | $126.612 million | $201.124 million | 62.95% |
| Four Quarters During Class Period (4Q15 to 3Q16)[6] | $182.896 million | $300.393 million | 60.89% |

[5] Source: SEC Form 8-Ks, dated February 27, 2014, May 29, 2014, August 26, 2014, and November 25, 2014.

[6] Source: SEC Form 8-Ks, dated February 26, 2015, May 26, 2015, August 25, 2015, and November 19, 2015.

147. Sales and marketing expenses **vis-à-vis** total revenues are an important metric because the Company itself measured important metrics as a percentage of total revenue. For example, as part of its pursuit of breakeven, Nimble provided its non-GAAP operating loss **as a percentage of total revenue** in its chart of "Key Business Metrics" listed in its 10-K. *See, e.g.*, *supra* ¶¶94-96.

148. At the same time, Nimble was shifting roughly half of its now-restricted investments in sales and marketing to the enterprise segment of the Company, despite the fact that those customers accounted for a small part of the Company's bookings and client base. *See infra* ¶¶186-93; 260-70. This was a massive shift in resources, especially given that the commercial segment accounted for over 80% of its customers throughout the Class Period and had historically provided the Company with its predictable, growing revenue stream. Defendants admitted they "consciously" embarked on this shift in resources because they had promised the market that Nimble would "breakeven" by the end of Fiscal Year 2016, *i.e.*, around January 2016.

149. According to CW 2, during the Class Period, while also focusing its investments on enterprise sales, Nimble did not increase the head count in its marketing department in 2014 or 2015 to accommodate Nimble's focus on enterprise. CW 2 stated that Nimble began to focus on enterprise in 2014, and that commercial had "always been [Nimble's] bread and butter." CW 2 reiterated that there was a lack of investment in growing Nimble internally in order to accommodate the needs of enterprise.

150. CW 1 confirmed that, in order to break-even, Nimble had to tighten its belt by hiring less and marketing less. CW 1 stated that this slowed down the Company's momentum, which was not good for a "hyper-growth" company such as Nimble. According to CW 1, Nimble slowed down its hiring and field marketing when it announced it would breakeven in four quarters, which was approximately in late 2014. CW 1 further stated that if Nimble had not shifted focus to enterprise (which had a longer lead cycle), it would not have been neglecting its commercial business and would have continued to grow. CW 1 noted that instead of growing the commercial team, Nimble was only hiring enterprise personnel.

151. CW 5 noted that Nimble was diverting resources from commercial to enterprise, which caused his territory's commercial pipeline to be weak during his entire tenure with Nimble, and that it was drying up in the first quarter of 2015. CW 5 also noted that commercial sales were weak because of a lack of investment in marketing. CW 5 stated that enterprise sales were not successful because Nimble's products did not have the features that enterprise clients wanted. CW 5 further stated that colleagues in the New York, Atlanta, Pennsylvania, and New Jersey region also explained to him that they had difficulty penetrating the enterprise market throughout CW 5's tenure.

152. An internal Company document also supports that by at least February 2015, lead generation was suffering. On February 13, 2015, Mark Parrinello, Nimble's Vice President of North American Sales, sent an email to the "Sales.NA" email group noting that the Company's lead generation was "way down." Parrinello, according to a Nimble press release on September 30, 2014, reported directly to Eric Mann, the former head of Worldwide Sales.[7] Accordingly, he reported directly to Vasudevan at the time he sent this email:

> Folks, I have looked over the numbers and have seen tons of data. It appears that our lead gen is way down. Some of you say its marketing. Some of you say its channel. Some say inside sales. Probably all of the above and we have a deep dive meeting next week to drill down and come up with some ideas and answers.

**2. Nimble Was Not Penetrating the Enterprise Market Because Its Products Did Not Meet Prospective Enterprise Clients' Needs**

153. According to former employees of Nimble, as discussed herein, as early as December 2014, soon after the launch of Fibre Channel, Nimble's sales staff was reporting to senior management, including Vasudevan, that enterprise clients were simply not interested in Nimble's products. In particular, Nimble's products lacked so many features and functionalities that were crucial to enterprise clients and that were standard in Nimble's competitors' products, including a different storage device called an all-flash array. In order to hide that enterprise was not going as well as expected, Defendants started relabeling commercial clients as enterprise

[7] As discussed *infra* at ¶¶39-40, Mann left Nimble in January 2015 and his direct reports reported on an interim basis directly to Vasudevan.

clients, making it seem that enterprise customers and bookings were growing when, in fact, Nimble was just borrowing commercial clients and calling them enterprise.

154. CW 5 stated that Nimble had a hard time competing for enterprise business because the Company's hybrid product was not offering what enterprise clients wanted or needed. CW 5 described Fibre Channel as having "limited features" and "missing functions" when it was first introduced in 2014 and throughout the Class Period. CW 5 explained that these missing functions included (i) an all-flash array; (ii) more than two "ports" in the hybrid array; (iii) the ability for the storage array to "deduplicate"; (iv) CIFS/NFS functionality; and the ability to have both iSCSI and Fibre Channel functionality in one area (also known as redundancy). CW 5 noted that an all-flash array was important to many enterprise clients because it offered a level of capacity and performance that the hybrid arrays could not match. CW 5 stated that the "deduplication" feature was important and was a "major point" in many Requests For Proposals ("RFPs") received from prospective enterprise clients. CW 5 explained that deduplication takes blocks of data and only writes it one time. CW 5 further explained that, for example, if the word "the" appears in a document numerous times, deduplication places a marker where the "the" is used until needed, and places the word back in the document when it is recalled from storage. According to CW 5, Nimble's product could compress the storage space being used, but deduplication saved more space and was more efficient, which was what enterprise clients generally wanted.

155. CW 5 also stated that enterprise clients needed storage arrays with four Fibre Channel ports, but that the Nimble arrays that contained four ports were too expensive compared to the all-flash arrays offered by Nimble's competitors.

156. CW 5 further indicated that the Nimble arrays marketed to enterprise clients did not offer CIFS and NFS functionality, which were standard features in Nimble's competitors' all-flash arrays. CW 5 described the CIFS/NFS functionality that many large enterprise clients required as an access protocol used by computers, servers, and storage arrays to link shared files together. CW 5 stated that because Nimble's arrays were missing this protocol, prospective clients would have to install additional protocols on their servers or computers in order to link

certain shared files together. CW 5 noted that this was another reason most prospective enterprise clients rejected Nimble's products throughout the Class Period.

157. CW 5 further stated that it was common for the RFPs from large enterprise clients to require these missing functions, meaning that Nimble often "could not even get a seat at the table." According to CW 5, when Nimble lost deals because the products lacked certain features, the reasons for the lost deal would be indicated in Sales Force.

158. CW 5 stated that during engineering sessions and kickoffs, Vasudevan would ask for feedback from the field and engineering representatives on how to improve the Company's chance of closing deals, and the responses were that Nimble needed to add features such as deduplication, redundancy, CIFS, and NFS.

159. CW 5 stated that prospective enterprise clients Fannie Mae, Capital One, T Rowe Price, and the University of Maryland Medical Systems walked away from Nimble during the Class Period.

160. CW 7 also confirmed that, during Company-wide web conferences that occurred quarterly, Nimble sales and systems personnel asked when features enterprise clients desired, including deduplication, redundancy, and NFS/CIFS would be available. CW 7 stated that Defendants Vasudevan and Singh, Vice President of North American Sales Mark Parrinello, and Vice President of Product Development Ajay Singh attended these web conferences. CW 7 stated that sales representatives were telling Nimble senior executives that they needed all-flash features and the afore-mentioned features in order to compete. According to CW 7, Vice President of Product Development Ajay Singh, who he believed reported to Vasudevan, would typically respond to the sales teams' questions about the missing features that customers required. CW 7 stated that Ajay Singh's response to such questions would include what was and was not on the roadmap, and to focus on selling what Nimble currently offered.

161. CW 7 also stated that RFPs for potential enterprise deals included requirements including deduplication, redundancy, and CIFS/NFS, which Nimble could not meet. CW 7 confirmed that these features were still lacking by the time he left Nimble in April 2015.

162. CW 1 stated that Nimble knew in 2014 that it did not have the product to attract enterprise customers. CW 1 recalled that Nimble's hybrid arrays lacked features including deduplication, CIFS, NFS, and redundancy that prevented Nimble from even getting a seat at many enterprise RFPs. CW 1 also noted that Nimble did not offer "metro clusters," which was something its competitors offered and which also negatively impacted Nimble's ability to compete on RFPs. CW 1 described metro clusters as having arrays for customers in two different areas, so that if one array stops working most of the information will be transferred to a second array. CW 1 also stated these were why the Company lost out on many of the enterprise RFPs that it participated in. CW 1 recalled that "we all had conversations with the CEO [Vasudevan]" about these missing features, "and we all acknowledged it."

163. CW 1 further stated that there were a lot of arguments and disagreements between the field (sales) teams and executive management regarding the push to enterprise and whether Nimble had the right product offering to attract enterprise clients. According to CW 1, this was a constant battle beginning in late 2014 at Nimble led by Vasudevan, who CW 1 further described as a very controlling CEO.

164. Confidential Witness 8 ("CW 8") was a Sales Representative in Nimble's San Francisco region from May 2014 to January 2016. CW 8 initially reported to Matt Jacobs (former Sales Director), who reported to CW 1, who reported to Mike Munoz (former Vice President of North America). CW 8 explained that Nimble was having difficulty getting true enterprise customers to buy its products, because Nimble was missing an all-flash array, which was a piece that enterprise customers were "really gravitating towards." CW 8 stated that Nimble's lack of an all-flash array product kept Nimble out of "a chunk of the market" of enterprise customers, and that he had trouble penetrating a lot of enterprise customers because of this issue. CW 8 also confirmed that deduplication was a feature that Nimble lacked. CW 8 recounted that there were a number of enterprise opportunities that Nimble knew about but that it was "not invited to the party" because Nimble did not have the storage device that enterprise customers were looking for. CW 8 noted that from the feedback he got from his customers, they wanted an all-flash array and the missing features.

**3. Nimble Relabeled Commercial Accounts as Enterprise Accounts to Make it Seem as if Enterprise was Growing**

165. Despite Fibre Channel, the Company was not truly piercing the enterprise segment as the market was led to believe. Although Defendants frequently touted new enterprise customers, and an incremental increase in sales to large enterprises, they were in reality not making meaningful headway in the enterprise market. The Company hid this by relabeling commercial accounts as enterprise accounts.

166. CW 5 stated that, throughout the Class Period in his region, Nimble was relabeling small and medium-sized commercial accounts as "enterprise" accounts. CW 5 detailed that this was usually done by assigning commercial accounts to an enterprise sales representative and then including that commercial account in the enterprise sales representatives' enterprise sales results.

167. CW 3 confirmed that Nimble was relabeling commercial accounts as enterprise accounts. He explained that this practice began in his region at least in August 2015 and continued throughout his tenure at Nimble (which ended in March of 2016) in order to make enterprise sales look like they were doing better than they actually were. CW 3 reiterated that this practice was systematic throughout the Company. CW 3 recalled conversations with Vice President of West Sales Tim Maggs in which Maggs said Nimble would be "doing this everywhere."

168. CW 8 also confirmed that Nimble was relabeling a lot of commercial customers as enterprise. CW 8 explained that twenty of his accounts were relabeled and given to new enterprise representatives that Nimble was hiring. CW 8 said one example was a customer in Arizona called Prosper Lending, which was taken from him, relabeled as enterprise, and given to an enterprise representative. CW 8 believed that no other vendor would consider Prosper Lending to be an enterprise account. CW 8 stated that the reason for the relabeling was because Nimble did not have a lot of enterprise customers. CW 8 also stated that Nimble relabeled accounts in order to make it look like the new enterprise sales representatives had enough to sell and that Nimble's enterprise business was thriving.

### L. Nimble Tells the Market That it is Shifting Resources Somewhat But Continues to Mislead the Market as to (1) the Investment Cap, (2) the Failure to Penetrate Enterprise, and (3) the Degree to Which These Issues are Affecting Nimble's Growth

169. On February 26, 2015, during a conference call with analysts to discuss Nimble's results for the fourth quarter of fiscal year 2015, in a partial corrective disclosure, Defendants revealed part of the truth about the shift in investments. First, Nimble announced guidance for the first quarter of fiscal year 2016 that included possible revenue growth between zero and two million dollars, for a total quarterly revenue between $68 and $70 million. This was disappointing considering Nimble's story was of a hyper-growth company.

170. Vasudevan explained:

> [O]ver the last couple of quarters and over the next couple of quarters, ***a greater share of the investment is going towards enterprise and major account teams, rather than simply going down to commercial teams.*** <u>**And we're making that choice consciously**</u>. To some degree that impacts our short-term growth rate, but in the longer-term sense we think that's the right way to make sure we have multiple years of consistent high growth, rather than just short-term boost in growth, if you will.

171. On this news, the stock dropped 8% on heavy volume. But Defendants continued to mislead the market regarding the ***extent*** of Nimble's shift in focus and resources, never advising about the cap in investments and the extent of the shift away from commercial, leading investors to believe that the Company was going to continue to invest in sales and marketing in a way that would allow the Company to drive "sustainable, strong growth in revenue" while also staying "on track for breakeven in Q4" of fiscal year 2016. In other words, the market believed that going forward, the Company would invest in the commercial segment to drive sustainable growth as well as enterprise to drive long term growth.

172. Analysts reacted to Defendants' partial disclosure of the truth, but also continued to be misled by Defendants. For example, Maxim Group commented on February 27, 2015 that Nimble's sales productivity metrics' "weakening is more likely a result of an extension of time for new S&M [sales and marketing] investments to ramp to full productivity from 6 to 9 months to 9 to 12 months."

173. Wunderlich Securities also noted on February 27, 2015 that "the Nimble sales force [is] shifting to the higher priced products. Management aims to add more sales teams to ensure balance between Fibre Channel and iSCSI wins." But at the same time, as evidence of the market's complete unawareness of Defendants' scheme to cap investments as a percentage of revenue during the Class Period in order to reach breakeven or profitability, Wunderlich Securities also noted that Nimble "appears on track for the year-end profitability target, ***but in the meantime plans to invest more than we expected***."

174. In addition, Defendants did not tell the market that enterprise clients were rejecting Nimble's products because it did not have an all-flash array and lacked other important features, as was in fact the case. To the contrary, Vasudevan led the market to believe Nimble's products were competing well in the all-flash workload market:

> In many ways Fibre Channel was a key step to getting into the enterprise, a fairly major move for us in terms of expanding TAM. As I look at the next two years, without being specific, much of our roadmap enhancements are around the area of how do we continue to have the ability to serve all-flash workloads at one extreme, all disk workloads at another extreme, so spanning the entire gamut of what an enterprise might want to deploy for any workload is really one broad area.

### M. Nimble is Forced to Come Clean About the Investment Cap, the Degree of Resource Shift, Enterprise Weakness, and the Consequent Effects on the Company

175. Everything finally caught up to Nimble at the end of the Class Period. The shift of investment away from commercial had a tectonic impact on revenues during the last quarter of the Class Period. After meeting and exceeding its guidance quarter after quarter, and after a pattern of explosive revenue growth, on November 19, 2015, Nimble missed its guidance of $86 to $88 million for the third quarter of fiscal year 2016 by $5.3 million on the low end to $7.3 million on the high end.

176. Defendants admitted the intentional shift in resources to focus on enterprise at the expense of commercial occurred. Moreover, they admitted it was a mistake and that they had abandoned Nimble's core commercial business. Vasudevan conceded that Nimble would need "to make some key investments to drive growth" and that Nimble's "**first priority is to**

**increase investment in our core commercial business**." In response to an analyst inquiry regarding growth prospects, Vasudevan admitted that "**one of our corrective actions [is] being focused on reinvesting in commercial, that's really aimed at making sure we get the midsize customers back**…."

177. Vasudevan also admitted that Nimble's product line was not allowing them to meaningfully break into the enterprise segment. Asked by an analyst for William Blair & Company if not having an all-flash array had an impact on the quarter, Vasudevan responded that while it was not "the most material factor," it was one of the factors that affected the quarter.

178. Analysts were shocked by the miss. Wells Fargo downgraded Nimble and wrote on November 20, 2015 that Nimble's "[d]ecelerating growth to result in materially lower multiple; very limited visibility looking forward." Wells Fargo showed how the market was completely misled by Defendants regarding Nimble's growth story:

> While most of the weakness in the quarter and guide is being chalked up to elongated enterprise sales due to competition from incumbents and misexecution in directing the focus away from the commercial market, **our expectation had been that it would have to be a combination of commercial growth along with new opportunities in enterprise afforded by the introduction of Fibre Channel into the portfolio that would continue to drive accelerated growth.**

179. Wells Fargo further noted that "the growth opportunity in the enterprise may be more muted (or lumpy, at best) and expect it to take some time for the commercial business to recover." Wells Fargo **also commented on a "lack of visibility as to whether its commercial strategy will reinvigorate revenue**." Its "Investment Thesis" on Nimble noted "limited visibility to revenue reacceleration" and that a "recovery in commercial market to take some time."

180. Wunderlich Securities wrote on November 20, 2015 that Nimble "missed F3Q16 without warning and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." It concluded that Nimble was "**Off track.** Management lost the

execution recipe, focusing on large accounts and the now-revised F4Q16 profitability goal" (emphasis in original). It also noted that "management feels the company underinvested in smaller/commercial account channels."

181. Oppenheimer downgraded its Stock Rating of Nimble on November 19, 2015, noting that Nimble reported poor results blaming in part "collateral damage to its commercial customer base from the enterprise shift. We're stepping to the sidelines reflecting (1) the need for greater sales investment and an unknown execution time-frame required to drive stronger growth in both enterprise/commercial...."

182. Morgan Stanley wrote on November 20, 2015 that "it will take a couple quarters of better execution to change investor sentiment." It also concluded that "Nimble's focus on the enterprise market over the last year caused them to underinvest in the commercial market where competition is also intense."

183. On November 20, 2015, William Blair downgraded Nimble:

> following a sharp miss-and-lower quarter, which management directly attributed to intensifying competition **and an ill-advised <u>pullback</u> in investment in pursuit of profitability.** We have previously noted our skepticisms regarding management's pursuit of breakeven at such a critical juncture, but the impact has been much swifter and forceful than we expected.

184. As a result of Defendants' full disclosure of the truth, Nimble's stock plunged more than 50%, falling $10.34 to close at $10.05 a share on heavy volume of more than 16 million shares compared to approximately 892,000 shares traded daily during the Class Period.

185. On November 23, 2015, echoing other analysts' surprise, *Barron's* wrote that Nimble "attributed the revenue miss to [Defendants'] decision to constrain investments in favor of reaching [a] break-even point. **However, prior to this quarter, there was no indication that revenue growth was constrained.**"

## VI. POST CLASS-PERIOD ADMISSIONS

### A. December 2, 2015 – Credit Suisse Technology Conference

186. On December 2, 2015, Vasudevan attended and spoke at the Credit Suisse Technology Conference. Analysts were still surprised by the Company's bombshell on

November 19, 2015 and wanted to understand what had gone wrong with Nimble's growth story. During the conference, Vasudevan again admitted that the Company focused on enterprise to the detriment of commercial during the Class Period. He also reiterated that Nimble had consciously made the decision to ***cap*** overall investments in order to achieve profitability, thus harming commercial investments in two crucial ways:

> And over the course of the last four quarters, **roughly 45% of our incremental sales and marketing investments were directed at building out a sales and marketing organization aimed at large customers and large deals for that segment**. So that was one goal we were executing to which is diversifying our customer base. At the same time, **we had a second goal which is a desire to break even in Q4 of this year which meant that we've capped our overall sales and marketing investment. So the investments that we made in going after the large Enterprise segment were from pulling back some of the investments that we would have otherwise made in our Commercial segment**. So that's the two-pronged strategy we were executing; diversify our sales effort towards large customers and larger deals, and cap the overall sales and marketing, **which meant that those investments were coming from the Commercial segment of our business**.

187. Vasudevan again admitted that Nimble pulled investments away from commercial—the "larger, most significant" part of its business—during the Class Period, which also cannibalized the commercial pipeline:

> Now, when you look at the other part of our business, **the Commercial segment which is the larger, most significant, more mature part of our business**, that business did very well in terms of pipeline conversion rates, in terms of win/loss rates, nothing changed in that segment with respect to our win rates given the market context.
>
> However, **given that we had pulled investments from Commercial into Enterprise, we just didn't have enough pipeline in the Commercial to make up for the gap in Enterprise** and that in a nutshell is what we saw happening during Q3 that caused the revenue miss.

188. Vasudevan clarified on this same call that Defendants "pulled investment from our commercial segment, almost 45% of the investment towards enterprise." At no time during the Class Period did Defendants tell the market that the enterprise segment, **which represented**

**less than 20% of the Company's customers**, was receiving roughly half of the Company's investments.[8]

189. Vasudevan further admitted that Defendants "clearly" made a mistake:

> We feel uncomfortable getting into an extremely aggressive cash burn situation whereas **we were clearly too conservative on threading the needle of getting to profitability as well as growing our enterprise and growing our commercial.** So we're pulling back from that, but going to a scenario where we are burning a lot of cash for some future price, I believe is not prudent, it's better to drive both growth and leverage.

190. Finally, Vasudevan admitted that Nimble's growth story had been derailed ***by over a year***, as Vasudevan indicated Nimble might see "growth and operating leverage ***in the second half of next year***."

**B. December 8, 2015 – Raymond James Technology Conference**

191. On December 8, 2015, Nimble presented at the Raymond James Technology Conference. During this conference, Singh admitted that ***over half*** of the Company's investments in the last year were directed to enterprise and international:

> **Now, if you go back and you look at overall the investments we've made, over half of the dollars we've spent in the last year have either been in the enterprise account teams or in international. So the combination of those two have accounted for over half of our S&M dollars in the past year.**
>
> **And those are taking longer to ramp up, so the payback period is longer**, which is probably the reason -- **if you look at sales and marketing overall as a percentage of revenue**, you've not seen a great increase in leverage from year-over-year. Because we -- and this was a strategy I talked about earlier on, in which **we diverted a greater share of our investments into the enterprise and international.** And the commercial sort of business was doing really well and profitable for us already. So that's how we're measuring investments.

192. Singh also reiterated that Defendants consciously chose to cap the spending limit of sales and marketing for the Company and simultaneously made the decision to divert sales

---

[8] Furthermore, the number of enterprise clients Nimble **actually** had was likely far less than twenty percent. First, Nimble systematically relabeled commercial accounts as enterprise accounts throughout the Class Period in order to inflate the latter's numbers. *See supra* ¶¶165-68. Second, sales to federal government customers also represented a portion of Nimble's non-commercial market.

and marketing resources from commercial to enterprise a year prior at the start of the Class Period (which was not timely disclosed to investors):

> And I think **if you go back about a year now at Nimble, we've been investing in what we call the enterprise business**, which basically means we bring on board a number of named enterprise account teams. We give them a list of 20 accounts at the enterprise and say, off you go.
>
> And so **this is an investment that we essentially started about a year ago, after we brought our FC** [*i.e.*, Fibre Channel] **product to market. At the same time of that essentially shifting of investment to the enterprise**, we were also trying to achieve the goal of breakeven in Q4 of this year. Okay? So **the goal of breakeven defined a certain investment envelope for** us, the **sales and marketing**. **And then in that investment envelope we basically were doing a rebalancing of investment to the enterprise**.

193. Singh's comment that Nimble capped investments and underwent "a rebalancing of investment to the enterprise" was completely at odds with Leary's statement on December 2, 2014 that Nimble was not engaging in any "trade-offs" and Defendants' statements throughout the Class Period that Nimble was investing in a "balanced" manner. *See supra* ¶¶104, 106.

**C. December 9, 2015 – Barclays Global Technology Conference**

194. During a Barclays Global Technology Conference on December 9, 2015, Vasudevan again confirmed that Nimble diverted nearly half of its sales and marketing investments to enterprise during the Class Period while simultaneously "cap[ping]" investments to try and get to breakeven—all of which was not disclosed to the market:

> So **over the last four quarters**, when you look at the incremental sales and marketing investments that we have made as a Company, some portion of those incremental investments, **almost 45% of the new sales and marketing investments we added over the last four years** [*sic – quarters*]**, were aimed at going after large global enterprises**. The balance went back into our commercial business, if you will, something that we've done for the last five years, something that really drove our growth for the last five years.
>
> Now, as we went after named accounts, **we had one other priority besides going after and augmenting our customer base with large enterprise customers. The other priority we were executing to was to break even in terms of operating income by Q4 of this year. So what we also did was cap our overall sales and marketing investment as we focused on broadening beyond commercial into enterprise customers.** So that's sort of a strategy we've been executing for the last year now.

195. In the context of asking a question regarding Defendants' surprising disclosures, Mark Moskowitz, an analyst for Barclays Capital, noted that "I know since the earnings call [on November 19] investors have suddenly shifted where they just feel the story is going to hell in a bucket."

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS THERETO

196. During the Class Period, Defendants made the following false and misleading statements and material omissions.[9]

### A. November 25, 2014 – Q3 2015 Earnings Call

197. On November 25, 2014, Nimble hosted a conference call with analysts to discuss the Company's 3Q 2015 earnings. Vasudevan and Singh participated in this call. Nimble announced that it generated revenue of $59.096 million during 3Q 2015, exceeding guidance for the quarter of $56 to $58 million. Singh told the market that Nimble expected revenue for the following quarter, 4Q 2015, to be in the range of $65 to $67 million, an increase of between $6 and $8 million over the prior quarter.

198. During the call, Vasudevan discussed the Company's goal of breakeven by the end of 4Q 2015. Vasudevan also discussed Nimble's growth in its two main segments – commercial and enterprise. He stated: "So ***we feel very good about both the pace of new customer acquisition in the mid-sized enterprise segment*** [which is the commercial segment], ***as well as the fact that we are growing our base in large enterprises*** and cloud service providers, and we have a predictable manner in which they come back to do more with us."

199. This statement was false and misleading because while discussing the growth of both commercial and enterprise, Vasudevan failed to disclose that Nimble was implementing a strategy of first capping (instead of growing) total investments in sales and marketing as a percentage of revenue and diverting roughly **half** of its now-capped investment resources from

[9] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. Additional statements are **bolded** (and <u>not</u> italicized) for emphasis.

commercial to the large enterprise segment, which represented a very small portion of the business.

200. This statement was also false and misleading because Vasudevan failed to disclose that Nimble was not growing its base of large enterprise customers in a meaningful manner. Nimble's products did not have the features that enterprise clients wanted, and as a result, Nimble was simply relabeling commercial accounts as enterprise accounts to make it seem as if the Company was "growing our base in large enterprises," when in reality it was not.

201. Wells Fargo issued a report on November 25, 2014 that indicated its understanding that Nimble would continue to grow the important commercial sales segment and that new products offerings would drive expansion into enterprise clients:

> **Our Outperform rating is predicated on Nimble Storage's growth opportunity from** 1) material market share gain opportunity due to its relative nascency, **2) continued growth in its SMB [*i.e.*, small and medium business] market**, 3) the market expansion opportunity in large enterprise driven, in part, by new products, 3) international expansion growth, 4) repeat customer buying patterns, and 5) channel leverage.

Wells Fargo also pointed to Nimble's revenues "driven by strength **across its customer segments**."[10]

202. Morgan Stanley issued a report on November 26, 2014 reflecting that the market clearly did not have an understanding that (1) Nimble was capping its investments in sales and marketing as a percentage of revenue, and (2) Nimble was diverting the now limited pool of resources to enterprise. "Even with **continued investments** to execute its growth strategy, we expect to see further leverage with breakeven profitability in C4Q15."

**B. December 2, 2014 – Credit Suisse Technology Conference**

203. On December 2, 2014, Nimble presented at the Credit Suisse Technology Conference. Vasudevan and Singh attended this conference on behalf of Nimble. In response to

---

[10] Wells Fargo repeated this sentiment and investment thesis on Nimble throughout the entire Class Period, again commenting on the same fundamentals on February 19, 2015, February 27, 2015, April 6, 2015, May 27, 2015, June 11, 2015, and September 22, 2015.

an analyst question regarding a target date for breakeven, Vasudevan reiterated the plan for Nimble to breakeven by the fourth quarter of fiscal year 2016, *i.e.*, by January 2016:

> [W]e basically picked a point in time, we picked Q4 of next year and we said we're going to breakeven in that timeframe from a non-GAAP operating income perspective. What drove that was a philosophy that sort of growth -- we have a large TAM, we have massive differentiation.

204. Vasudevan discussed Nimble's penetration of the enterprise market: "***So that's a second growth driver that we focused on, large enterprises and therefore, large deal ASPs*** [average sale price]***. Fiber channel is a big enabler of continuing to do that.***" This statement was false and misleading because the Company was struggling to gain enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others. Moreover, Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by relabeling commercial customers as enterprise customers.

**C. December 8, 2014 – Raymond James Systems Conference**

205. On December 8, 2014, Leary attended the Raymond James Systems Conference. During the conference, he reiterated the goal of breakeven by 4Q 2015.

206. In response to an analyst's question regarding revenue growth, Leary made the following statements regarding Nimble's investment strategy as it pertained to growth:

> **Brian Alexander - Raymond James - Analyst**
>
> ***
>
> So why wouldn't we be at a point where revenue growth is at least being consistent or perhaps accelerating given all of the announcements that you have made and how that expand your market opportunity?
>
> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> We have always looked at our investments as a couple things. ***One is we want to make investments in a balanced way so that we can continue to grow the top line very aggressively, but do it in a way where we are going to get continued improvements in operating leverage.*** Part of that is, as we said, we are going to be operating from a non-GAAP perspective breakeven by the end of next year.

> And the nature of those investments, they pay off at different rates. Part of what we are doing is trying to build a foundation for a company that we think can grow at well above industry rates for many, many, many years. ***And so we are not making trade-offs on investments that might yield and*** [sic] ***even shorter-term growth in revenue in the short run.***
>
> ***We want to balance those investments out, some of which can take many quarters to pay off, because we believe the market opportunity we have is so substantial. And we are looking at a multiyear view of how we continue that very rapid growth.***

207. Leary's statements that Nimble was making "investments in a balanced way," that "we are not making trade-offs on investments that might yield and even shorter-term growth in revenue in the short run," and "[w]e want to balance those investments out" were false and misleading because by the beginning of the Class Period, Nimble had in fact done just that – "traded off" the certainty and consistency of revenues from the "shorter term" bread and butter commercial segment in favor of the enterprise business by shifting investments from commercial to enterprise, while also capping as a percentage of revenue (and not growing) the total investments being dedicated to these segments. Furthermore, Leary omitted to tell the market that rather than being "balanced" in its investment approach, Nimble had shifted nearly half of its sales and marketing resources to enterprise even though large enterprises accounted for less than 20% of the Company's customer base at both the start and end of the Class Period.

208. In response to another analyst's question, Leary also made the following statements regarding Nimble's approach to its "mid-size enterprise" and "midmarket accounts," which fell into the commercial bucket:

> **Brian Alexander - Raymond James - Analyst**
>
> When I've talked to management about revenue growth coming from new customers versus penetrating existing customers, it seems like management's view is the bigger opportunity is to penetrate existing customers. I think about that and you are only selling to 260 of the Global 5000 accounts, so I would intuitively think that the bigger opportunity is to find more customers.
>
> Help us think about the opportunity and how you think about growth coming from new versus existing and why we wouldn't see more of an emphasis on new customers given that again you are only selling to 260 of the top 5,000 on the enterprise side.

> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> **Well, I would say certainly it is a balance. And we definitely want to and believe that we need to go after new accounts, continue to be very aggressively. And maybe we break that down into the two segments, because even though we have several thousand midsize enterprise or midmarket accounts worldwide there are tens of thousands of those accounts and so there is a huge opportunity for us to grow that customer base very, very substantially.**
>
> ***We will continue to do that and part of the way we get there is continue to do investments in our indirect and our channel strategy.*** The relationships and the trust and what we built with our channel partners we think gives us a huge leg up on other new entrants in the market for sure, but even many of the incumbents and continuing to make rapid share gains there.

209. The statement regarding Nimble achieving its commercial growth strategy by "continu[ing] to do … investments in our indirect and our channel strategy" was false and misleading because Nimble was not "continuing" its investments as it previously had done. Instead, Nimble had actually changed and decreased that investment by first capping its overall investments in sales and marketing as a percentage of revenue and then diverting resources from the commercial segment to enterprise to the detriment of the commercial business.

210. Leary also stated that "we are excited that ***we just now quadrupled our TAM with the introduction of fiber channel and obviously that has opened up a huge swath of the market***." This statement was false and misleading because he failed to disclose to the market that Nimble could not presently meaningfully penetrate the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients demanded. Thus Fibre Channel did not realistically quadruple Nimble's TAM.

**D. December 9, 2014 – Barclays Global Tech Conference**

211. On December 9, 2014, Singh attended the Barclays Global Technology Conference. During this conference, Singh made the following statements in response to an analyst's question regarding Nimble's plan to breakeven:

**Ben Reitzes - Barclays - Analyst**

So, let's tie this all into the business model. You're pretty much of a $200 million run rate at least, that's what I'm around, the Street's around $200 million I believe for the upcoming year and you have a cash flow breakeven target that you talked about on the call. Do you mind just kind of -- and then if you could touch on that and your philosophy on leverage at this time (multiple speakers) investment?

**Anup Singh - Nimble Storage Inc. - CFO**

**I think the best way to think about the business model is in the context of the near-term approach and then the longer-term philosophy.** ***So, in terms of the near-term strategy, if you look at the approach we've taken so far, it's been strong investments for growth and obviously we've seen that show up from a topline standpoint.*** At the same time, we've maintained, as Suresh alluded to, our gross margins are best in class. We ended last quarter at 67% from a gross margin, which is significantly ahead of everyone else. That is a reflection of the efficiency of the capital architecture that we've talked about.

From an operating income and expense prospective, we have been driving to show that improvement in leverage sequentially each quarter. So, going year-over-year we're improving our leverage and then we've established the milestone or breakeven as a Company in non-GAAP operating income in Q4 of next year and breakeven on a cash flow basis even sooner than that. So as you look ahead to next year, we're making our progress and we're confident in being able to achieve that.

From a longer-term standpoint, I think Suresh has alluded to the fact that ***the TAM that we are addressing is huge, it's a $20 billion opportunity***. ***Our view is that the investments that we have made so far and we intend to continue to make is going to drive sustainable growth for us as a Company over a long period of time.***

212. Singh's statements were false and misleading because while discussing the "near-term strategy" as being "strong investments for growth" and that Nimble was making and would "continue to make" investments "to drive sustainable growth for [Nimble] as a Company over a long period of time" he failed to disclose that the Company was implementing a strategy of first capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly **half** of its resources from commercial to the enterprise segment, which represented a very small portion of the business (and which was struggling to land enterprise clients), and a portion of the business that was not "driving growth." In addition,

Singh's statement that the total addressable market for Nimble was a "$20 billion opportunity" was false and misleading because he failed to disclose to the market that Nimble could not presently meaningfully penetrate the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise customers demanded. Thus Fibre Channel did not expand Nimble's TAM to $20 billion.

213. Vasudevan also discussed Nimble's penetration of the large enterprise segment during this call, including regarding the impact that Fibre Channel was having:

> Another way of looking at it, ***fiber channel was often the reason that even when a large enterprise liked a lot of what we do from a platform standpoint, it was a barrier to being deployed.*** Two out of three large enterprise engagements, fiber channel was the barrier to being deployed, ***that barrier has gone away***.

214. This statement was false and misleading because Fibre Channel was not sufficient for Nimble to presently meaningfully penetrate the enterprise market. Certain of the arrays marketed to enterprise clients did not have enough ports in the back of the array. Nimble was also still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS.

**E. January 14, 2015 – Needham Growth Conference**

215. On January 14, 2015, Vasudevan attended the Needham Growth Conference, where he made the following statement regarding the impact of Fibre Channel on potential enterprise sales:

> [Fibre] channel was a second aspect of your question and so without being specific, I think when we announced Fibre Channel early at the end of Q3, what prompted us to do that ***was a faster adoption by our customers than we thought***, ***a faster time to stability and sort of a very strong reaction to the value proposition that we brought to bear. Very strong start that we had, all of those attributes remain in place when we talk about our long-term opportunity with Fibre Channel as the two comments I've already made, it is a big expansion in our available market***. ***It's 3X to 4X expansion in the size of the market we're going after and fundamentally it was a big barrier in larger enterprises. It was the single biggest driver of when we didn't get deployed what caused us to not get deployed in***

> ***large enterprises. That goes away and we are seeing that very much to be true.***

216. This statement was false and misleading because Fibre Channel was not sufficient for Nimble to presently meaningfully penetrate the enterprise market. Certain of the arrays marketed to enterprise clients did not have enough ports in the back of the array. Nimble was also still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS, among others. Moreover, Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by relabeling commercial customers as enterprise customers. Finally, this statement was false and misleading because Thus Fibre Channel did not realistically increase Nimble's TAM by a factor of three or four.

### F. PARTIAL CORRECTIVE DISCLOSURE – February 26, 2015 – Q4 2015 Earnings Call – The Truth Partially Emerges But Defendants Continue to Mislead the Market

217. After the market closed on February 26, 2015, Nimble issued a Q4FY15 Shareholder Letter via a Form 8-K announcing its results for the fourth quarter of fiscal year 2015. Nimble announced that it generated revenue of $68.269 million during 4Q 2015, barely exceeding the guidance for the quarter of $65 to $67 million. However, Nimble told the market it expected revenue for the following quarter, 1Q 2016, to be in the range of $68 to $70 million, a weak increase of up to $2 million over the prior quarter.

218. Also after the markets closed, Nimble hosted a conference call with analysts to discuss its 4Q 2015 results and 1Q 2016 guidance. During this call, Vasudevan and Singh told the market that growth for 1Q 2016 would be constrained in part by Nimble's decision to put more resources into large enterprise sales (which had longer sales cycles) rather than into its commercial market (which had shorter sales cycles). In response to an analyst's question regarding the progress of Nimble's sales force hiring, Vasudevan partially disclosed the truth regarding the Defendants' conscious choice to focus on enterprise sales at the expense of its core commercial segment, noting that:

> [W]ithin that sales and marketing investment bucket, over the last couple of quarters and over the next couple of quarters, a greater share of the

> investment is going towards enterprise and major account teams, rather than simply going down to commercial teams. And we're making that choice consciously. To some degree that impacts our short-term growth rate, but in the longer-term sense we think that's the right way to make sure we have multiple years of consistent high growth, rather than just short-term boost in growth, if you will.

219. As a result of the disclosure that Nimble had partially diverted resources away from its core, bread-and-butter business, the next day on February 27, 2015 Nimble's stock fell **more than 7%** on unusually heavy trading with more than 4.6 million shares trading hands, dropping $2.16 to close at $25.26. However, Defendants continued to mislead the market during the February 26 call regarding the extent of the Company's shift in focus by telling the market that this shift would only impact the short term growth rate minimally, while allowing for future long term growth:

> To some degree that impacts our short-term growth rate, but in the longer-term sense we think that's the right way to make sure we have multiple years of consistent high growth, rather than just short-term boost in growth, if you will.

220. Vasudevan, however, failed to tell the market that Nimble had capped investments in sales and marketing as a percentage of revenue (instead of growing them), and that the limited pool of investments was being diverted from commercial to enterprise, which represented a very small portion of the business, and a portion of the business that was not driving "strong growth." Moreover, he continued to omit that Nimble was not penetrating the enterprise segment in a meaningful manner because its products lacked the features and functionalities that enterprise clients required. He also omitted to tell the market that Nimble was relabeling commercial accounts as enterprise accounts in order to boost the number of enterprise accounts reported and misled the market about enterprise growth.

221. Singh also made the following statement regarding Nimble's growth strategy in response to a series of questions from an analyst regarding growth and expenses:

> So at the same time, ***we are investing in the business because our view is we can drive sustainable strong growth in our business this year as well as in future years after this***. So the intent of giving you the color in terms of the slope of the curve, to break even, was just to assist you guys in the model, to let you know that, look it's not just going to be a straight line all the way down to zero. But, basically, it's going to be flat from Q2 to Q1,

> and then it is going to make its way down to breakeven. ***But absolutely, the Company is on track for breakeven in Q4***.

222. Singh's statement that Nimble was "investing in the business because our view is we can drive sustainable growth in our business **this year** as well as in future years" was false and misleading because the Company was capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the large enterprise segment, which represented a very small portion of the business, and a portion of the business that was not driving "strong growth." Singh's statement that Nimble was "on track for breakeven in Q4" was also false and misleading because he failed to disclose the spending cap, the shift in investments, and that Nimble was not presently meaningfully penetrating the enterprise segment.

223. Singh reinforced the false portrayal of Nimble's investments in sales and marketing—despite the partial disclosure regarding the focus on enterprise hiring—by making the following statement regarding investments and recruiting in response to an analyst's question:

> **James Kisner - Jefferies & Co. - Analyst**
>
> Okay. And so we had a pretty big step up also in sales and marketing along these lines. So I assume we won't see this quite size of magnitude in increase in sales and marketing going forward? Or should we expect that? Could you talk about just what really -- were there any one-time factors that drove that big increase of about $5 million, I guess $4.5 million?
>
> **Anup Singh - Nimble Storage, Inc. - CFO**
>
> Yes, I think as far as sales and marketing is concerned, we continue to show improvement in leverage as a percentage of sales from year over year. As we look ahead, in actually all of the categories that we are talking about, R&D, G&A, and even in sales and marketing, we expect from a year-over-year to show an improvement in leverage in all three of the categories.
>
> In terms of the dollars itself, in sales and marketing in Q4, we didn't have anything unusual which drove the increase. ***We continue to recruit, invest in sales and marketing, as we've done throughout the year, and as we intend to continue to do in the coming year as well. As I said, the investments are going into sales and marketing to drive that sustainable, strong growth in revenue we're talking about, but at the same time,***

> ***showing the improvement in leverage from a year-over-year, and definitely on track for breakeven in Q4.***

224. Singh's statement was false and misleading because he failed to disclose that the Company was capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the large enterprise segment, which represented a very small portion of the business, and a portion of the business that was not driving "strong growth."

225. Vasudevan also made statements during this call regarding the impact of Fibre Channel on Nimble's ability to penetrate enterprise: "***Fibre Channel is helping to increase deal sizes and is helping drive large enterprise penetration***." Vasudevan also stated that "***we've successfully broadened our base beyond mid-size enterprises to large enterprises***." Vasudevan also remarked that "[***i***]***n many ways Fibre Channel was a key step to getting into the enterprise, a fairly major move for us in terms of expanding TAM***." These statements were false and misleading because Vasudevan failed to disclose to the market that Nimble was not presently meaningfully penetrating the enterprise market. Nimble's products, including those with Fibre Channel, lacked features enterprise customers wanted such as four ports in the back of arrays, an all-flash array, deduplication and CIF/NFS. Thus Fibre Channel did not realistically expand Nimble's TAM in a major way. These statements were also false and misleading because Vasudevan omitted to tell the market that Nimble was relabeling commercial accounts as enterprise accounts in order to boost the number of enterprise accounts reported and give the market the impression Nimble had "successfully broadened [its] base" beyond commercial to enterprise and that enterprise was growing.

226. Analysts recognized Defendants' partial disclosure of the truth. An analyst from Maxim Group commented on February 27, 2015 that Nimble's sales productivity metrics' "weakening is more likely a result of an extension of time for new S&M [sale and marketing] investments to ramp to full productivity from 6 to 9 months to 9 to 12 months" (referring to investments in enterprise).

227. Wunderlich Securities also noted on February 27 that "the Nimble sales force [is] shifting to the higher priced products." But at the same time, the market did not understand that Defendants had capped investment in sales and marketing as a percentage of revenue and that nearly half of this now limited pool of investments were being diverted to enterprise. Indeed, the market believed, based on Defendants' statements, that Nimble was actually **increasing** investments. Wunderlich Securities also noted that "Management aims to add more sales teams to ensure balance between Fibre Channel and iSCSI wins" and that Nimble "appears on track for the year-end profitability target, **but in the meantime plans to invest more than we anticipated**."

**G. March 4, 2015 – Morgan Stanley Technology, Media & Telecom Conference**

228. On March 4, 2015, Leary and Singh attended the Morgan Stanley Technology, Media & Telecom Conference on behalf of Nimble. In response to a question from an analyst regarding the impact of Fibre Channel, Singh stated:

> **Katy Huberty - Morgan Stanley - Analyst**
>
> Yes. 2014 was a big year of product investment and expansion of the portfolio and the addressable market. And you topped it off with the fiber channel late last year. Talk about how that is tracking, how it is impacting ASPs and win rates.
>
> **Anup Singh - Nimble Storage - CFO**
>
> Sure. I will take a crack at that and then, Dan, feel free to jump in. ***So we are off to a great start in terms of the adoption of the fiber channel.*** On the call, we talked about over 80 customers have now deployed it. We are a quarter in since we introduced. We have noticed a couple of things which were expected. Number one, the win rate against the competition has increased appreciably, so against the incumbent as well as against the emerging set of competitors that we have. If you recall, we always used to say that the greatest objection we had in a competitive situation was a lack of the fiber channel solution. And even though it has only been 90 days, we have seen a marketable increase in win rates.
>
> The other thing that we had expected was an increase in ASPs. We have seen that as well. The Q4 was us, our ASPs, increased even from Q3, which is an all-time high. So now we have had a couple of quarters of increasing ASPs. And looking at our customers and deals which have closed fairly recently, that is a trend we expect to actually continue.

> ***So we really see that, in addition to the expansion of the TAM, so now a $20 billion opportunity with the introduction of the fiber channel sort of protocol increasing the win rate which we have and driving up our ASPs is increasing the amount of acquisition and penetration of large enterprises.***
>
> **Katy Huberty - Morgan Stanley - Analyst**
>
> Yes. And has that already kicked in, the penetration into large enterprise, into tier 1 apps with fiber channel, or is it still too early to see that at this point?
>
> **Anup Singh - Nimble Storage - CFO**
>
> ***I think we are making really good progress.*** So we ended the year with about 300 of the largest enterprises around. And the addition of large enterprises we saw in Q4 was actually at an all-time high. We talked about some deals we won in Q4, the largest-ever deal in the company, and that was actually aided as part of the fiber channel launch as well.

229. These statements were false and misleading because Nimble was not presently materially penetrating the enterprise market in a meaningful manner. These statements were also false and misleading because Fibre Channel was not being adopted by the enterprise market because the product lacked features enterprise customers wanted such as an all-flash array, deduplication, and CIFS/NFS. Thus, Fibre Channel did not realistically expand the TAM to $20 billion. Moreover, Singh failed to disclose that Nimble was misleading the market as to enterprise growth by relabeling commercial customers as enterprise customers to mask weak enterprise growth.

### H. April 2, 2015 – Nimble FY 2015 Form 10-K

230. On April 2, 2015, Nimble filed its Annual Report on Form 10-K for the year ending January 31, 2015 with the SEC. The 2015 Form 10-K was signed by Vasudevan and Singh.

231. The Form 10-K contained the following statements:

> ***Our focus is on acquiring mid-sized enterprises***, large global enterprises and cloud service providers as customers, spanning a broad spectrum of industries and geographies. ***We will continue to expand our sales organization with additional teams focused on sales into territories***, sales to named enterprises, government sales, ***and teams supporting our channel partners***.

232. Vasudevan and Singh each signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 affirming that the 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

233. The above statements were false and misleading because the Form 10-K failed to tell the market that instead of "expand[ing]" the sales organization, Nimble was first capping (instead of growing) total investments in sales and marketing as a percentage of revenue including sales. Moreover, while telling the market Nimble was still "focus[ed]" on the commercial (mid-size) segment, it had actually taken its focus off commercial and instead diverting roughly half of its investment resources to the enterprise segment, which represented a very small portion of the business, and a portion of the business that was not driving growth.

234. Wells Fargo wrote on April 6, 2015 that its Investment Thesis remained an "Outperform rating" that was:

> **[P]redicated on Nimble Storage's growth opportunity from** 1) material market share gain opportunity due to its relative nascency, **2) continued growth in its SMB [*i.e.*, small and medium business] market**, 3) the market expansion opportunity in large enterprise driven, in part, by new products, 3) international expansion growth, 4) repeat customer buying patterns, and 5) channel leverage.

## I. May 26, 2015 – Q1 2016 Earnings Call

235. On May 26, 2015, Nimble hosted an earnings call with analysts to discuss its results for the first quarter of fiscal year 2016. Vasudevan and Singh participated in this call with analysts. Nimble announced that it generated revenue of $71.3 million during 1Q 2016, barely exceeding the guidance for the quarter of $68 to $70 million. It told the market it expected revenue for the following quarter, 2Q 2016, to be in the range of $77 to $79 million, an increase of between $5 and $7 million over the prior quarter.

236. Vasudevan made statements regarding Nimble's strategy for short-term and long-term growth in response to an analyst's question:

**Alex Kurtz - Sterne, Agee & Leach, Inc. - Analyst**

I understand that FX has been a headwind here the last couple quarters, but looking at the second half, Anup and Suresh, obviously the sequential growth rates for what the Street has for you guys is going to start accelerating. So just looking at the pipeline now, bringing new sales leadership on board, Fibre Channel ramping, are you still comfortable with these double-digit sequential growth rates? And what is the key drivers that you see emerging in the second half of fiscal 2016?

**Suresh Vasudevan - Nimble Storage, Inc. - Chairman, CEO**

Yes, I won't comment on Street estimates for the second half or on what the specific growth rates look like. But let me just reiterate, as you can see, we guide a quarter at a time. And as I step back a little bit and think about our growth opportunity, ***we've said before the way we are investing is making sure that our sales capacity is driving both short-term growth but, more importantly, the ability to sustain growth rates for many years at a time.***

And that's partly why you see us investing in, for example, enterprise and major account teams, investing in international teams that tend to favor longer-term growth over short-term growth. And that's been very consistent for us for some time, the ability to drive growth rates for many years rather than just a couple of quarters. And we see that unchanged -- the market opportunity is unchanged. ***The way we are investing is allowing us to drive sustained growth over many quarters and many years.***

The other internal philosophy we have is, even as we invest to drive growth, we want to make sure our investments are yielding operating leverage. So, you'll continue to see us improve our operating margin as a percent of revenue on a year-over-year basis consistently. That's what I would reiterate, is our growth philosophy. ***I don't see anything changing nor do I see the opportunity in any way diminishing as I look ahead***.

237. Vasudevan's statements that Nimble was investing for "both short-term growth" and "growth rates for many years," "allowing us to drive sustained growth over many quarters and many years" were false and misleading because he failed to disclose that Nimble was implementing a strategy of first capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the large enterprise segment, which represented a very small portion of the business, and a portion of the business that was not driving "sustained growth." By diverting

resources away from commercial, Nimble was not investing to drive short term growth. Moreover, Vasudevan's statement that the ability to drive growth and market opportunity remained "unchanged" and that Vasudevan did not "see anything changing nor do I see the opportunity in any way diminishing as I look ahead" was false and misleading because the shift from commercial to enterprise was causing the commercial pipeline to run dry, and the enterprise segment was not growing, as evidenced by Defendants relabeling of commercial accounts as enterprise accounts to mask weak growth in the enterprise segment.

238. Vasudevan also discussed the impact of Fibre Channel on Nimble's penetration of enterprise clients: "***As anticipated, our Fibre Channel product is helping to drive our enterprise adoption as it is breaking down barriers to adoption within large enterprises. And it's driving much larger deal sizes on average.*** During 1Q, Fibre Channel accounted for 14% of our total bookings." Vasudevan also stated that "[a] ***major driver of the growth in large deals is the momentum we are seeing in penetrating large enterprises***." He also stated that Fibre Channel is "***a key contributor to why our win rates are higher and we're landing big enterprises***." These statements were false and misleading because Fibre Channel was not sufficient for Nimble to presently meaningfully penetrate the enterprise market. Certain of the arrays marketed to enterprise clients did not have enough ports in the back of the array. Nimble was also still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS. Moreover, Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by relabeling commercial customers as enterprise customers to mask weak enterprise growth.

239. Analysts reacted as expected to these statements. Summit Research reiterated on May 26, 2015, as it had throughout the Class Period, that it "expect[s] the company to grow faster than the market and gain share at the entry and mid-range level, first taking share from the likes of Dell, HP and other lesser known OEMs."

240. The market also did not understand that Nimble had capped its investments in sales and marketing, calling the investment in sales capacity "aggressive." Morgan Stanley noted on May 26, 2015 that "**[d]espite aggressive planned investment in sales capacity**, we

see revenue scale helping deliver break-even profitability by fiscal year-end...." Moreover, there was no mention of any diversion of resources within the Company, or the focus of this aggressive new sales capacity going disproportionally to large enterprises.

241. An analyst from FBN Securities also wrote on May 27, 2015 that "NMBL continues to gain share in this market, and there is still ample room left for it to penetrate. Moreover, the company has barely scratched the surface in the enterprise" market, showing that the market did not understand that not having an all-flash array or the other features discussed above were in fact major impediments to Nimble truly breaking into the large enterprise market.

### J. June 9, 2015 – William Blair Conference

242. On June 9, 2015, Mehta attended the William Blair Annual Growth Stock Conference. While speaking at this conference, Mehta discussed the Company's early growth and made the following statements:

> And the last thing I'll talk about is some initiatives that we're focusing on. **We started out attacking the mid-market. And the reason was that the mid-market is a really nice, attractive market for a start-up to attack. There are lots and lots of customers. There are hundreds of thousands of customers.** They're hard for incumbents to defend because there are so many customers. They don't require that you have global support in every major city in the world. They don't require a huge, long list of customers. They don't require a one-year POC before buying. They will make their buying decisions very quickly. They will buy on value.
>
> **Those are all the reasons we started out with the mid-market, and it turned out to be a very successful way to go. We were able to ramp very quickly.** We didn't need to raise a lot of money compared to a lot of storage start-ups out there. We were able to IPO fairly quickly. ***And we've been able to sustain our growth ramp based on our customer acquisition machine.***
>
> Well, we've used that as a foundation now to grow into two very large markets. So one is the Global 5000 market, and these are the 5,000 largest buyers of storage in the world. And then on the right side, we have the cloud service providers. So I'll talk a little bit about both of these.

243. Mehta's statement that "we've been able to sustain our growth ramp based on our customer acquisition machine" while discussing the commercial segment was false and misleading because he failed to disclose that Nimble was implementing a strategy of first

capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the enterprise segment.

244. Mehta also stated in response to an audience member's question that Nimble would penetrate the enterprise market because of Fibre Channel:

> **Unidentified Audience Member**
>
> Yes, so fiber channel more or less tripled the market that you're going after? And how long do you think it will take for all those guys that passed on you because you didn't have fiber channel, come back and say, we want to try.
>
> **Varun Mehta - Nimble Storage, Inc. - VP Engineering**
>
> Well, so that does go back to the speed at which we'll penetrate the enterprise. ***I have no doubts that we will penetrate the enterprise, because really, there is no response to us. Nobody is re-architecting the hybrid architectures. So it's just a question of time.***
>
> What we do have to get over is the incumbency wall that the current vendors have.

245. This statement was false and misleading because Fibre Channel was not sufficient for Nimble to presently meaningfully penetrate the enterprise market. Certain of the arrays marketed to enterprise clients did not have enough ports in the back of the array. Nimble was also still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS. Moreover, Mehta failed to disclose that Nimble was misleading the market as to enterprise growth by relabeling commercial customers as enterprise customers to mask weak enterprise growth.

246. On June 9, Nimble's stock swelled 5.11%, closing up $1.41 to close at $29 per share.

**K. August 25, 2015 – Q2 2016 Earnings Call**

247. On August 25, 2015, Nimble hosted a conference call with analysts to discuss the Company's results for the second quarter of fiscal year 2016. Singh made statements during this earnings call in response to an analyst's inquiry regarding spending:

> **George Iwanyc - Oppenheimer & Co. - Analyst**
>
> Looking at the spending level that you have right now, the increase from April to July, is that something that we should see continue as we look towards the end of the fiscal year into calendar 2016?
>
> **Anup Singh - Nimble Storage Inc. - CFO**
>
> ***
>
> During -- ***if you look at the increase in the OpEx quarter-over-quarter, I think it's consistent largely with the investment plans.*** But we have for Q3 and Q4, we've talked about the fact that each quarter we add between 60 to 80 heads a quarter. We did that in Q2, and we intend to do that again in Q3 and Q4. So absolutely, ***in the OpEx that you saw this quarter, we would expect that trend to continue***, even as we stay on track for breakeven in Q4.

248. Singh's statement that Nimble's operating expenses were "consistent largely with the investment plans" and that it would continue the trend of increasing OpEx spending into the future was false and misleading because he failed to disclose to the market that Nimble was implementing a strategy of first capping (instead of increasing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the large enterprise segment, which represented a very small portion of the business, and a portion that did not support growth.

249. Vasudevan also made statements regarding the concentration of Nimble's sales and marketing investments when asked to discuss the Company's priorities by an analyst:

> **James Kisner - Jefferies LLC - Analyst**
>
> Relatedly, on the international side, I'm just curious how important is the international expansion in terms of priority versus driving deal size domestically? Is there relative importance? Is international going to become an increasing part of the customer additions, or just the growth story in general or not? Thanks.
>
> **Suresh Vasudevan - Nimble Storage Inc. - CEO**
>
> International is important, but the context in which we make our investments -- so let me step back and express that and then international becomes part of that. **Generally speaking in any given quarter, for us there are three main areas that we can concentrate our sales and marketing investments.**

> ***One tends to be in the US commercial. This is mid-sized customers that we've always done well at.* This is where we started several years back. *The second area for investment for us is large enterprises*** with main [decon] dedicated teams. That tends to be one where the return tends to be on a longer time frame. And international is the third.

250. Vasudevan's statement that Nimble was spreading investments across all of its major vectors, including both commercial and enterprise, was false and misleading because he failed to disclose that Nimble was implementing a strategy of first capping (instead of growing) total investments in sales and marketing as a percentage of revenue and then diverting roughly half of its resources from commercial to the enterprise segment, which represented a small portion of the business and one that was not driving growth.

251. Singh also provided guidance during this call for the following quarter:

> Moving on to guidance for Q3. ***In Q3, we expect our revenue to be in the range of $86 million to $88 million*** and operating losses between $5 million and $6 million. This translates into a non-GAAP loss of $0.08 to $0.09 per share, which is based on approximately 80 million shares outstanding. We remain on track to achieve our goal of breakeven in non-GAAP operating income at the end of FY16.

252. This guidance was false and misleading because the commercial pipeline was drying up due to the investment cap and the lack of investment in commercial, and because Nimble was failing to meaningfully penetrate the enterprise market. Defendants knew there was no reasonable basis to believe the Company would achieve the guidance because the predictive analyses developed by Cloud 9, which Defendants had access to and reviewed on a daily basis, had data showing bookings, pipeline information, and reasons for lost deals, among other metrics. *See, e.g.*, *supra* 129-139; 162-63.

253. The next trading day, August 26, 2015, Nimble's common stock surged more than 12%, closing up $2.89 to close at $26.72 a share.

254. UBS Global Research noted on August 26, 2015 that "Nimble continues to nibble at the edges of the storage market in SMB and now is making headway in large enterprises." It concluded that "Nimble is executing as planned with reasonable balance of sustained 40% plus revenue growth and profitability in sight."

**L. September 22, 2015 – Meeting With Wells Fargo Securities**

255. According to a Wells Fargo Securities Equity Research report published on September 22, 2015, Singh and Mehta had recently met with Wells Fargo and discussed Nimble's growth strategy. Wells Fargo wrote that "[o]ur sense is the growth story is still on track, following a recent meeting with NMBL's Founder/VP of Engineering, Varun Mehta, and CFO Anup Singh." Wells Fargo reiterated what Defendants had been telling the market, that "NMBL also continues to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth (FQ4 tends to be the strongest seasonally)."

256. Wells Fargo also reported that Mehta criticized all-flash arrays as being inferior to Nimble's hybrid arrays:

> Mr. Mehta believes that data management will be a key differentiator in the industry and ***sees issues with 1) the all-flash only array market as it tends to be silos that don't integrate as well with other arrays, has capacity limitations because of dedupe, an inability to move data, and high costs per MIPS (million instructions per second).***

257. Mehta's statement was false and misleading because while being critical of an all-flash array, he failed to disclose to the market that a lack of an all-flash array and capabilities such as deduplication were negatively affecting the Company's ability to grow in the enterprise market. Mehta failed to tell the market that Nimble's potential enterprise customers were not adopting the hybrid arrays with Fibre Channel because they still lacked critical features or preferred an all-flash array.

258. As the quarter progressed, analysts' reaction was unchanged. Oppenheimer wrote on October 5, 2015 that "[i]t's our impression the overall market is behaving largely as Nimble expected. Tough competition, aggressive pricing, and careful spending remain the norm, but we believe Nimble's traditional strengths (CASL/InfoSight/hybrid), newer product additions (F[ibre]C[hannel], all-flash shelf[11]), and its strong Cisco partnership are driving steady win rates/gains vs. the competition and with larger customers."

---

[11] The all-flash shelf was a different product than an all-flash array; the shelf was part of the hybrid array Nimble was selling.

259. On October 9, 2015, UBS wrote that "[w]e like the Company's balanced approach regarding growth vs profitability, believe its hybrid array share gains will continue, and expect that Nimble can become a successful all-flash vendor." It further noted that its "sense is that management thinks multiple years of high growth lie ahead if it invests in sales teams, especially overseas and for the enterprise. The model works as shown by US commercial, which already is close to the long-term margin goal."

## VIII. FINAL CORRECTIVE DISCLOSURE – THE TRUTH IS REVEALED

260. On November 19, 2015, Nimble announced ***for the first time*** since going public that it failed to meet quarterly guidance, falling short by $8 million, an enormous shortfall. Revenues for 3Q 2016 were a mere $80.727 million, just $600K higher than the prior quarter. In a Form 8-K enclosing a Shareholder Letter issued after the close of the market on November 19, 2015, Nimble stated:

> **The shift in investment from our commercial business to enterprise business impacted our growth**. We have been managing our total sales and marketing investments in light of our goal of achieving non-GAAP breakeven operating income in Q4FY16. Within this overall investment envelope, **we increased our investments in the large enterprise business <u>at the expense</u> of investments in our commercial business**. At the time when the storage market remains very competitive, this led to lower growth in our commercial business than we believe we could have achieved by maintaining our prior pace of investment in that segment of the market. [First emphasis in original]

261. During a conference call with analysts that also took place after the close of the market on November 19, Vasudevan announced that Nimble's "Q3 FY16 results fell short of our expectations." He admitted, for the first time, that during the Class Period:

> **[W]e shifted investments from our commercial segment to the large enterprise segment**. **This decreased investment** affected areas such as the number of commercial teams and inside sales teams, demand generation programs, and channel incentives. We believe that **this decreased investment led to slower growth than we would have seen, had we maintained our previous pace of investment**.

262. Responding to an analyst inquiry regarding growth prospects, Vasudevan further admitted that "as we shifted some investment towards going after both large enterprises and

larger deployments across our customer base, that's come at the cost of investments in our traditional midsize enterprise customer base."

263. Later in the same call Vasudevan went further, blaming "the under-investment" and "constrained investment" in commercial as the cause of the Company's malaise.

264. Defendants further admitted that the cap and subsequent material shift in the now-capped investments, which had been withheld from the market for over a year, started four quarters earlier. In response to an inquiry from an analyst asking "what exactly did stop investing [*sic*] on the commercial side that is hurting you," Singh admitted that "when we look at a mix of teams that we have brought on board, **<u>over half</u> of the teams in the last four quarters have been non-commercial teams, named account teams**. So number of sales teams we are adding [for the last four quarters] is lower in the commercial segment than traditionally has been true. That is the first thing." He also conceded that "**we pulled investments from both marketing and channel**, or **shifted investments towards larger enterprise wins rather than commercial wins**."

265. Singh, discussing the financial results in more detail, admitted that "our slower than expected growth in revenues was due to the investments in our enterprise segment taking longer to pay off. While, at the same time, the shifting mix of our investment strategy between enterprise and the commercial business resulted in **not enough investment being made in the commercial segment**."

266. Defendants acknowledged several times that Nimble had abandoned its core business to the detriment of the Company. Vasudevan conceded that Nimble would need "to make some key investments to drive growth" and that Nimble's "**first priority is to increase investment in our core commercial business**." In response to an analyst inquiry regarding growth prospects, Vasudevan admitted that "**one of <u>our corrective actions</u> [is] being focused on reinvesting in commercial, that's really aimed at making sure we get the midsize customers back**…."

267. Defendants also admitted that enterprise revenue was not as significant a source of revenue as they had promised the market it would be during the Class Period. Vasudevan

conceded that "**[l]arge deals and large enterprises were not as significant a contributor as we had modeled, and we pulled investment from commercial to make that happen**, which reflected in not enough in the commercial side."

268. Acknowledging the reckless nature of Nimble's actions, Vasudevan discussed the need for **corrective actions**. Responding to an analyst's inquiry regarding growth during the next year, he stated that:

> **[A]s you think about our corrective actions** besides sort of strengthening our competitive position in the large enterprise segment by broadening our platform, investing in commercial over the next first two quarters of next year is really what we are doing. Which, I think, will translate into growth again.

269. Defendants further ***admitted*** that they knew ***throughout*** the past three months that 3Q 2016 would see poor results. Asked by an analyst when the Company "started to see the weakness emerge," Vasudevan admitted that "**[i]t was really pressure that we saw throughout** Q3…. for us this quarter, throughout, we noticed that there was more competitive intensity, and certainly that carried on through month three."

270. Asked by an analyst for William Blair & Company if not having an all-flash array had an impact on the quarter, Vasudevan responded that it was one of the factors that quarter:

> **Jason Ader - William Blair & Company - Analyst**
>
> Okay, not having all flash probably had an impact too?
>
> **Suresh Vasudevan - Nimble Storage Inc. - CEO**
>
> I would say in our competitive engagements, pricing action by the large vendors is by far the most dominant factor that impacted us. All flash just this last quarter went over double-digit percentage in terms of how frequently we compete against all flash arrays. So while it's been increasing every quarter, it's not the most material factor that impacted us, Jason.

271. Nimble's stock collapsed as a result of these disclosures. Shares lost more than 50% of their value, falling $10.34 to close at $10.05 a share on volume of over 16 million shares.

272. The market was shocked. Reuters reported on November 20, 2015 that "[a]bout [three-quarters] of the covering analysts . . . cut their ratings on and price targets for Nimble Storage following" the announcements. Analysts' comments that day paint the picture of a misled investing public.

273. UBS wrote on November 20, 2015 that Nimble "blamed its discipline, finding that shifting resources to enterprise selling (1) **short-changed the commercial (SMB) market that is its bread and butter** while (2) enterprise deals took longer than expected to close." UBS concluded that "[b]ecause of the first half transition and delayed profit, we are downgrading to Neutral."

274. That same day, William Blair downgraded Nimble:

> [F]ollowing a sharp miss-and-lower quarter, which management directly attributed to intensifying competition and an ill-advised pullback in investment in pursuit of profitability. We have previously noted our skepticisms regarding management's pursuit of breakeven at such a critical juncture, but the impact has been much swifter and forceful than we expected."

275. Wunderlich Securities wrote that Nimble "missed F3Q16 **without warning** and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." It concluded that Nimble was "**Off track.** Management lost the execution recipe, focusing on large accounts and the now-revised F4Q16 profitability goal" (emphasis in original). It also noted that "management feels the company underinvested in smaller/commercial account channels."

276. Wells Fargo also downgraded Nimble. For the first time since the start of the Class Period, Wells Fargo changed its investment thesis on Nimble. It wrote that:

> [M]ost of the weakness in the quarter and guide is being chalked up to elongated enterprise sales due to competition from incumbents and misexecution in directing the focus away from the commercial market, **our expectation had been that it would have to be a combination of commercial growth along with new opportunities in enterprise afforded by the introduction of [F]ibre [C]hannel into the portfolio that would continue to drive accelerated growth.**

It further noted that "the growth opportunity in the enterprise may be more muted (or lumpy, at best) and expect it to take some time for the commercial business to recover." Wells Fargo's revised investment thesis noted a "lack of visibility as to whether its commercial strategy will reinvigorate revenue."

277. Oppenheimer downgraded its Stock Rating of Nimble on November 19, 2015, noting that Nimble reported poor results blaming in part "collateral damage to its commercial customer base from the enterprise shift. We're stepping to the sidelines reflecting (1) the need for greater sales investment and an unknown execution time-frame required to drive stronger growth in both enterprise/commercial...."

278. Morgan Stanley wrote on November 20, 2015 that "it will take a couple quarters of better execution to change investor sentiment." It also concluded that "Nimble's focus on the enterprise market over the last year caused them to underinvest in the commercial market where competition is also intense."

279. Barclays heralded a "Major Thesis Change Drives Downgrade," noting that "we have seen this movie before, and it can be difficult to get to a positive outcome." Barclays was concerned management would not be able to successfully execute the turnaround strategy announced on the earnings call.

280. Fox Business News wrote that the Company admitted "its commercial revenue growth [was] being negatively affected by the company's shift in investment from its commercial business to its enterprise business."

281. On November 20, 2015, *The Register*, an internet publication focusing on IT, commented on the lack of all-flash array stating: "trying to penetrate mainstream storage incumbent's large enterprise customer bases with a hot hybrid [disk drive and flash] box isn't enough; it needs a hot all-flash box, and it doesn't have one."

282. On November 23, 2015, *Barron's* wrote that Nimble "attributed the revenue miss to [Defendants'] decision to constrain investments in favor of reaching [a] break-even point. **However, prior to this quarter, there was no indication that revenue growth was constrained.**"

283. A few weeks later, on December 4, 2015, Oppenheimer reported that it "hosted investor meetings with Nimble's management." Oppenheimer noted that "[a]s Nimble shifted focus to enterprise, its commercial pipeline slowly dried out."

284. On December 9, 2015, in the context of asking a question to Vasudevan regarding Defendants' corrective disclosure of the truth, Mark Moskowitz, an analyst for Barclays Capital, noted that "I know since the earnings call [on November 19] investors have suddenly shifted where they just feel the story is going to hell in a bucket."

## IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

285. At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above. Each of the Individual Defendants had actual knowledge that the statements and omissions made by him were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements and omissions. Each of the Individual Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above.

### A. Individual Defendants' Trading

286. Each of the Individual Defendants sold Nimble stock during the Class Period in a manner that was highly suspiciously and dramatically out of line with their trading practices both before and after the Class Period. This insider trading activity raises a strong and compelling inference of scienter for five independent reasons.

287. *First*, the Individual Defendants' insider stock sales during the Class Period, both individually and collectively, generated highly abnormal profits compared to their transactions for a Control Period.

288. *Second*, each of the Individual Defendants entered into or amended Rule 10b5-1 trading plans in close proximity to each other in March 2015, in the middle of the Class Period, during which time they had access to material nonpublic information regarding the fraud as alleged herein.

289. *Third*, Vasudevan and Mehta sold a large amount of Nimble stock during the Class Period on the open market and ***not*** pursuant to a Rule 10b5-1 Trading Plan, and the sales were dramatically out of line with their trading practices both before and after the Class Period.

290. *Fourth*, each of the Individual Defendants sold a significant amount of Nimble stock in September and October 2015. This is important for two reasons: the sales took place just weeks before Defendants announced the full truth of the fraud alleged herein to the market, and most of the trades were themselves pursuant to the very Plans that were suspiciously entered into or amended during the Class Period.

291. *Fifth*, the Individual Defendants have significantly curtailed their sales of Nimble stock in the six months since the end of the Class Period, during which time Nimble's stock has never recovered from its freefall after Defendants' revelation of the full truth regarding their fraud.

292. As a result of their Class Period insider trades, the Individual Defendants profited from the artificial inflation embedded in the trading price of Nimble stock caused by their false and misleading statements and omissions.

293. To analyze and evaluate the Individual Defendants' insider sales of Nimble stock, Lead Plaintiff engaged an expert in insider trading who used the publicly-available trading data that the Individual Defendants were required to report on Form 4 to the SEC which was obtained from Thomson Reuters. Lead Plaintiff's expert analyzed the Individual Defendants' trading during the Class Period (360 days; November 25, 2014 to November 19, 2015, inclusive), during a Control Period equal in length to the Class Period (360 days; November 30, 2013 to November 24, 2014, inclusive), and in the six months since the Class Period ended (179 days; November 20, 2015 to May 16, 2016, inclusive). The Form 4s filed during the Class Period, Control Period, and post-Class Period are hereby incorporated by reference.

### 1. The Individual Defendants' Class Period Sales of Nimble Stock Generated Highly Abnormal Profits

294. Lead Plaintiff's expert also analyzed whether the Individual Defendants' sales of Nimble stock during the Class Period generated abnormal (above-average) profits as compared

to the Control Period. As shown below, the Individual Defendants did generate abnormal profits from their stock sales during the Class Period, further suggesting suspicious trading activity that raises a strong inference of scienter.

295. Lead Plaintiff's expert evaluated abnormal profits by using an event study methodology called the "market-adjusted model method," which computed cumulative shareholder returns not explained by the market. To consider a simple example of the analysis, assume that the sensitivity of Nimble stock to market index is one (beta is one). In that case, if an insider buys a share of Nimble stock, which then increases in price from $100 to $120 (20%), and the market index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%. Similarly, if a company's stock price declines subsequent to a sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline. This methodology is widely-accepted, having been used extensively in academic literature *See, e.g.*, Joanne Horton & George Serafeim, *Market Reaction To And Valuation Of IFRS Reconciliation Adjustments: First Evidence From The UK*,15 REV. ACCT. STUD. 725, 732 (2010); James W. Kolari & Seppo Pynnonen, *Event Study Testing With Cross-Sectional Correlation Of Abnormal Returns*, 23 REV. FIN. STUD. 3996 (2010); Khamis H. Al-Yahyaee et al., *The Information Content of Cash Dividend Announcements in a Unique Environment*, 35 J. BANKING & FIN. 606 (2011).

296. To give a numerical example, assume that insiders sell stock and the stock price declines subsequently by 11% (from $100 to $89) while the overall stock market itself declines by 1%, once again, insiders will have positive abnormal profits by avoiding subsequent losses. In this example, insiders' gross profit is 11%. Since 1% of the 11% is due to market conditions, insiders' abnormal profit equals only 10%. Abnormal profits were calculated using a value-weight index of NYSE, NYSE MKT, and NASDAQ stocks as the market index during the Control Period and Class Period.

297. To determine whether insiders made abnormal profits and whether these abnormal profits were the result of random chance, Lead Plaintiff's expert used equally-weighted prediction errors from the market-adjusted model method for the 250 trading days before

(approximately one year) and the 250 trading days after the day of the each insider trade, and then equally averaged these prediction errors across event days for each Individual Defendant and then summed them. These prediction errors were also used to compute t-statistics to infer the probability that the observed cumulative abnormal profits were due to random chance.

298. The cumulative abnormal returns generated by the event study is plotted in Figures 1 to 5. By definition, the cumulative abnormal return equals zero on the insider trading day (Day zero in the graph). If insiders are able to avoid subsequent losses by selling their stock in advance, then the graph will show a positive abnormal profit (rising line). The graph also shows what happens before the insider trading day (days -250 to day -1) to explore whether price movements following the insider trading are unusual compared to price movements prior to the insider trading day.

299. Applying this methodology, it is clear that nothing significant was going on prior to the insider trading days as the cumulative average abnormal profit is flat around zero. After the insider trading day, however the abnormal profit line rises sharply for insider trades during the Class Period and remains flat for insider trades during the Control Period. Based on these graphs, it is clear that the Individual Defendants each generated extremely large abnormal profits on their transactions in Nimble stock during the Class Period, particularly when compared to their trading behavior during the Control Period, as reflected in the following charts:


Abnormal Profitability of Trading by Vasudevan in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Singh in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Mehta in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
1.4
1.3
1.2
1.1
1
0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
0.1
0
-0.1
-0.2
-0.3
-0.4
-250 -225 -200 -175 -150 -125 -100 -75 -50 -25 0 25 50 75 100 125 150 175 200 225 250
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Leary in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
1.4
1.3
1.2
1.1
1
0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
0.1
0
-0.1
-0.2
-0.3
-0.4
-250 -225 -200 -175 -150 -125 -100 -75 -50 -25 0 25 50 75 100 125 150 175 200 225 250
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)




300. As shown above, based on the timing of the Individual Defendants' Class Period trades, (i) Vasudevan generated abnormal annual returns that exceeded ***100%*** after about one year; (ii) Singh's profits exceeded the benchmark by more than ***100%*** after about one year; (iii) Mehta's trades delivered abnormal annual profits of ***100%*** after about one year; and (iv) Leary generated average abnormal annual profits that exceeded ***100%*** after about one year. Further, using the market-adjusted model method described above, it is clear that the possibility that these abnormal profits result from random chance is close to zero: the probability of these profits occurring randomly is less than one percent for each Individual Defendant. The results are therefore strongly statistically significant.

301. Collectively, each of the Individual Defendants' trades delivered abnormal profits in excess of ***100%*** after about one year. The timing and extent of these abnormal profits, as well as the contrast between Control Period and Class Period trades, are reflected graphically in the charts above. Again, the charts compare the trades for the Control Period and Class Period for the Individual Defendants, and depicts cumulative abnormal profit (or loss) on all trades

occurring during each period, calculated daily for one to 250 trading days (one calendar year) following the day of trade. As reflected in the chart above, trades during the Class Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-timed and therefore highly suspicious, particularly when compared to the complete lack of abnormal profits generated during the Control Period.

302. Similarly, excluding Plan Trades, abnormal profitability for each Individual Defendant individually and collectively in aggregate reaches over 100%. Each of these is statistically significant at the 1% level. None of the four Individual Defendants' Control Period insider trading show any abnormal profitability.

**2. The Individual Defendants Entered Into, Amended, and Traded Pursuant To Rule 10b5-1 Trading Plans in a Highly Suspicious and Coordinated Manner**

303. Rule 10b5-1, 17 C.F.R. § 240.10b5-1, provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans," "Trading Plans," or "Plans"). *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "[b]efore becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

304. Furthermore, "[a] purchase or sale is not 'pursuant to a contract, instruction, or plan' if, among other things, the person who entered into the contract, instruction, or plan altered or deviated from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or entered into or altered a corresponding or hedging transaction or position with respect to those securities." 17 C.F.R. § 240.10b5-1(c)(1)(C).

305. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson West, CORPORATE COUNSEL'S GUIDE TO INSIDER TRADING AND REPORTING § 12:26 (2006). Conversely, the adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

306. The Individual Defendants' sales of stock during the Class Period were suspiciously timed because they all entered into and/or amended their Trading Plans after March 9, 2015, and sold a large number of shares after March 9, 2015, many pursuant to the very Plans that were entered into or amended on or after March 9, 2015.

307. Vasudevan sold Nimble stock pursuant to five Trading Plans during the Class Period. Three of these Plans are highly suspicious because even though two were adopted before the Class Period on September 30, 2014 and October 1, 2014, they were amended ***during*** the Class Period on March 20, 2015. A third Plan was also ***adopted*** on March 20, 2015.

308. Singh sold Nimble stock pursuant to five Trading Plans during the Class Period. Two of these Plans are highly suspicious because the one that was entered into on March 12, 2014 was amended during the Class Period on March 9, 2015 and a second plan that was also entered into on March 12, 2014 was also amended on March 10, 2015. Singh amended these plans just a week and a half before Vasudevan modified and entered into his Trading Plans on March 20, 2015.

309. Mehta sold Nimble stock pursuant to four Trading Plans during the Class Period, three of which were adopted before the Class Period, and a fourth adopted on March 13, 2015. This fourth Plan was entered into just three days after Singh's Trading Plans were modified, and one week before Vasudevan amended his Trading Plans.

310. Leary entered into and amended four of his six Trading Plans before the Class Period. But as with the other Individual Defendants, he had significant Plan activity in March 2015. Leary entered into two Trading Plans on March 30, 2015—just ten days after Vasudevan amended his Plans, and a few weeks after Singh and Mehta entered into and amended several of

their Plans. One of the two was subsequently amended on June 25, 2015—and Leary sold shares later in the Class Period pursuant to that very Plan.

311. In addition to the highly suspicious and coordinated nature of this activity, most of the Individual Defendants' Class Period sales of Nimble stock were pursuant to these suspiciously adopted and modified Plans:

| Rule 10b5-1 Trading Plans Modified During Class Period By Individual Defendants | | | |
|---|---|---|---|
| **Defendant** | **Plan Entered Into** | **Class Period Amendments**[12] | **Sales Pursuant to Plan** |
| Vasudevan | Sept. 30, 2014 | March 20, 2015 | $78,183.84 |
| Vasudevan | Oct. 1, 2014 | March 20, 2015 | $200,531.23 |
| | | | |
| Singh | March 12, 2014 | March 9, 2015 | $731,350.94 |
| Singh | March 12, 2014 | March 10, 2015 | $111,750.50 |

| Rule 10b5-1 Trading Plans Adopted During Class Period By Individual Defendants | | | |
|---|---|---|---|
| **Defendant** | **Plan Entered Into** | **Class Period Amendments** | **Sales Pursuant to Plan** |
| Vasudevan | March 20, 2015 | N/A | $2,621,442.74 |
| | | | |
| Mehta | March 13, 2015 | N/A | $518,670.62 |
| | | | |
| Leary | March 30, 2015 | N/A | $611,919.74 |
| Leary | March 30, 2015 | June 25, 2015 | $243,791.69 |

Sources: Form 4s.

312. Finally, even if the Individual Defendants had entered into all their 10b5-1 Plans prior to the Class Period and traded within them consistently throughout the Class Period, and not amended them during the Class Period, such plans are under heavy SEC scrutiny. For example, a *Wall Street Journal* investigation found that insiders who were trading pursuant to

[12] Only amendments made during the Class Period are shown. Additional amendments prior to the Class Period, not relevant here, are omitted.

10b5-1 Plans were still trading at opportune times and reaping better-than-expected results. According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.[13] Also noteworthy is the fact that Joseph Nacchio, former CEO of Qwest Communications was criminally convicted of illegal insider trading in 2007 notwithstanding the fact that certain of the transactions were made under 10b5-1 plans.[14]

### 3. Two Individual Defendants Sold Stock Outside Rule 10b5-1 Trading Plans in a Highly Suspicious Manner

313. Two of the Individual Defendants, Vasudevan and Mehta[15] dramatically increased their open market sales of Nimble stock not pursuant to any Trading Plan during the Class Period:

| **Open Market Trades of Nimble Stock by Individual Defendants Not Made Pursuant to Rule 10b5-1 Trading Plans** | | | | | | |
|---|---|---|---|---|---|---|
| | **Pre-Class Period ("Control Period")** | | **Class Period** | | | |
| **Defendant** | **Shares Sold** | **Net Proceeds** | **Shares Sold** | **Increase Over Control Period** | **Net Proceeds** | **Increase Over Control Period** |
| Vasudevan | 0 | $0 | 24,247 | 24,247 | $610,095 | $610,095 |
| Mehta | 0 | $0 | 11,086 | 11,086 | $276,039 | $276,039 |
| **Totals** | **0** | **0** | **35,333** | **35,333** | **$886,134** | **$886,134** |

Sources: Form 4s.

---

[13] *See* Taylan Mavruk & H. Nejat Seyhun, *Do SEC's 10b5-1 Safe Harbor Rules Need to be Rewritten*, COLUMBIA BUS. L. REV. (forthcoming 2016).

[14] *See, e.g.*, Dan Frosch, *Ex-Chief at Qwest Found Guilty of Insider Trading*, N.Y. TIMES, Apr. 20, 2007, http://www.nytimes.com/2007/04/20/technology/20qwest.html?_r=1; Peter J. Henning, *The Fine Line Between Legal, and Illegal, Insider Trading*, N.Y. TIMES, Dec. 10, 2012, http://dealbook.nytimes.com/2012/12/10/the-fine-line-between-legal-and-illegal-insider-trading/?_r=0; *Corporate Governance*, Mondaq, Aug. 3, 2007, 2007 WLNR 14910004; *Not So Taxing?*, CFO MAG., June 1, 2007, http://ww2.cfo.com/2007/06/not-so-taxing/.

[15] For the other two defendants, Leary and Singh, non-plan sales declined slightly during the Class Period.

**4. The Individual Defendants Each Sold Stock Near the End of The Class Period in a Highly Suspicious and Coordinated Manner**

314. The Individual Defendants also suspiciously sold a vast number of shares in September and October 2015, when they already knew, among other things, that the guidance they had issued for the quarter in August 2015 had no reasonable basis.

315. On September 3, 4 and 11, 2015, Vasudevan sold 74,247 shares that pocketed him $1,842,448.10. On September 3, 4, and 14, and October 1, 2015, Vasudevan sold 61,394 shares for $1,511,068.31 all pursuant to the Plans he entered into or modified on March 20, 2015.

316. Singh sold 31,921 shares between June 15, 2015 and October 1, 2015 for a value of $843,100.16 pursuant to the Plans he modified on March 9 and 10, 2015.

317. Mehta sold 11,086 shares on September 3 and 11, 2015 for $276,039.11, none of which were pursuant to a Plan. Mehta also sold 19,467 shares for $518,670.62 between July 22, 2015 and September 8, 2015 pursuant to the Plan he adopted on March 13, 2015. Notably, 5,633 of those shares were sold for $144,710.34 on August 26, 2015 and September 8, 2015—just one day and two weeks (respectively) after Nimble issued the 3Q 2015 guidance it would not be able to meet.

318. Between September 3, 2015 and October 19, 2015, Leary sold 35,811 shares for a total of $855,711.43 pursuant to Plans adopted on March 30, 2015, one of which was amended on June 25, 2015.

**5. The Individual Defendants Have Significantly Curtailed Their Sale of Nimble Stock Since Their Full Disclosure of the Truth and the Collapse of Nimble's Stock**

319. Since the end of the Class Period and the associated collapse in stock price that occurred as a result of Defendants' false and misleading statements and omissions, the Individual Defendants have largely and suspiciously cut back on their sale of Nimble stock. During the six months following the end of the Class Period (from November 20, 2015 to May 16, 2016), Leary sold zero shares. Vasudevan has sold 28,423 shares for a total of $205,235.78. Singh has sold a mere 19,552 shares for $150,424.20. Mehta has sold only 14,149 shares for $103,467.91.

320. In total, the Individual Defendants reduced their selling in Nimble stock by approximately 98% since the end of the Class Period, from over $33 million to just $670 thousand.

321. These facts further corroborate the inference that the Individual Defendants' Class Period sales were motivated by a desire to take advantage of the artificially high price of Nimble stock during the Class Period.

## X. CLASS ACTION ALLEGATIONS

322. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from November 25, 2014 through November 19, 2015, inclusive (the "Class Period"), purchased the publicly traded common stock of Nimble and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nimble during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nimble's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

323. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Nimble had between 77 million to 79 million shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "NMBL." While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Nimble or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

324. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

325. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

326. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;
- whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;
- whether and to what extent the market price of Nimble's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;
- whether Defendants acted with the requisite level of scienter;
- whether the Individual Defendants were controlling persons of Nimble;
- whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and
- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

327. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. LOSS CAUSATION

328. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nimble common stock and operated as a fraud or deceit on Class Period purchasers of Nimble common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Nimble common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

329. As a result of their purchases of Nimble common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Nimble common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $31.60 per share at the close of the market on June 17, 2015.

330. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Nimble's business and prospects. As the truth about the Company was revealed to the market, the price of Nimble common stock fell significantly. These declines removed the inflation from the price of Nimble common stock, causing real economic loss to investors who had purchased Nimble common stock and exchange-traded options on such common stock during the Class Period.

331. The declines in the price of Nimble common stock after the partial corrective disclosure on February 26, 2015 and the fully corrective disclosure on November 19, 2015 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Nimble common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions,

macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

332. During the Class Period, the price of Nimble stock declined as the true state of Nimble's operations was revealed to the investing public.

333. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Nimble common stock and the subsequent significant decline in the value of Nimble common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

334. On February 26, 2015, Defendants partially revealed the truth regarding their shift of investments from commercial to enterprise. *See supra* ¶¶217-25. As a result, on February 27, 2015 Nimble's stock fell ***more than 7%*** on unusually heavy trading with more than 4.6 million shares trading hands, dropping $2.16 to close at $25.26. However, Defendants' failed to disclose the cap in overall sales and marketing expenses and the degree to which Nimble materially shifted investment away from commercial to enterprise. Moreover, Defendants failed to disclose that Nimble was failing to meaningfully penetrate the enterprise segment. *See id*.

335. On November 19, 2015, Defendants' disclosed the full truth regarding the decisions to materially shift investment away from commercial to enterprise and cap overall sales and marketing investments, and Nimble's failure to meaningfully penetrate the enterprise segment. *See supra* ¶¶260-70. As a result, on November 20, 2015 Nimble's stock fell $10.34 to close at $10.05 a share on volume of over 16 million shares.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

336. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

337. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

- Nimble's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.
- Nimble's common stock traded at high weekly volumes during the Class Period.
- As a regulated issuer, Nimble filed periodic public reports with the SEC.
- Nimble regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.
- The market reacted promptly to public information disseminated by Nimble.
- Nimble's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote reports on Nimble during the Class Period included, but are not necessarily limited to, the following: BMO Capital, Bank of Montreal, Barclays, Buy Sell Signals, Credit Suisse, Cross Research, Directors Deals, FBN Securities, Goldman Sachs, Jefferies & Co., Key Banc Capital, Longbow Research, Macquarie Research Equities, MarketLine, Maxim Group, Monness, Crespi, Hardt & Co., Morgan Stanley, Needham & Company, Oppenheimer & Co., Pacific Crest Securities, Piper Jaffray, RBC Capital Markets, Raymond James & Associates, Inc., Roth Capital Partners, Sterne, Agee & Leach, Stifel Nicolaus, Susquehanna International Group, UBS, ValuEngine, Vermilion Technical Research, WR Hambrecht Summit Research, Wells Fargo Securities, William Blair & Co., Wright Investors' Service, and Wunderlich Securities, Inc.

- The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nimble's common stock.

- Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Nimble's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XIII. NO SAFE HARBOR

338. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint. *First*, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking

339. The false and misleading statements in, *e.g.*, ¶¶198-200; 204; 206-13; 215; 221; 223; 225; 228; 231; 236; 238; 242; 244; 247; 249; 256 (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to Nimble's current business strategy (*see, e.g.*, ¶¶ 206; 208; 211; 223; 256); current investment strategy to achieving growth and profitability (*see, e.g.*, ¶¶206; 221; 236; 247; ); continued focus on commercial clients (*see, e.g.*, ¶¶198; 231; 242;

249); and growth in the enterprise segment (*see*, *e.g.*, ¶¶ 198; 204; 211; 213; 215; 225; 228; 230; 238; 244; 256).

340. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

**B. Several False and Misleading Statements are Not Properly Identified as "Forward-Looking"**

341. The PSLRA imposes an additional burden on "oral" forward looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward looking and failed to include the language required by the PSLRA. The following oral statements made by Vasudevan, Leary, and Singh were neither identified as forward-looking pursuant to the PSLRA nor accompanied by *any* cautionary language, and thus to the extent that any such statements may be considered forward-looking, they are not afforded any immunity by the PSLRA:

- Vasudevan's statements at the December 2, 2014 Credit Suisse Technology Conference (¶¶203-04).
- Leary's statements at the December 8, 2014 Raymond James Conference (¶¶206-10).
- Singh's statements December 9, 2014 Barclays Technology Conference (¶¶211-13).

**C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language**

342. None of Defendants' statements were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

343. To the extent Defendants included any cautionary language, that language was not meaningful because any potenial risks identified by Defendants had already manifested. As

detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, they were capping investments and diverting resources from commercial into enterprise sales and that Nimble was not actually penetrating the enterprise segment in a meaningful way. As a result, the impact of this conduct by Defendants had already begun to severely deteriorate the commercial pipeline in such a manner that Nimble experienced anemic growth in the third fiscal quarter of FY2016. For example, Cloud 9 and Salesforce provided Defendants with advanced insights into the Company's pipeline and customer prospects. Furthermore, Defendants knew throughout 2015 that enterprise customers were rejecting Nimble because its products lacked the features and functionalities that enterprise customers required and that Nimble's competitors offered.

### D. Defendants Knew that the Risks They Warned of Had Already Come to Pass

344. To the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by an executive officer of Nimble who actually knew that each such statement was false and/or misleading when made.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

345. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

346. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

347. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate

commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Nimble common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Nimble common stock and options on such common stock at artificially inflated prices.

348. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

349. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Nimble common stock and options during the Class Period.

350. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nimble common stock and options, Lead Plaintiff and other members of the Class purchased Nimble common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Nimble common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Nimble common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Nimble common stock and options at

artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

351. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act Against Defendants Vasudevan and Singh

352. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

353. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Vasudevan and Singh.[16]

354. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Nimble's common stock and options on such common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus Nimble is primarily liable under Section 10(b) of the Exchange Act.

355. As set forth above, Defendants Vasudevan and Singh were controlling persons of Nimble during the Class Period, due to their senior executive positions with the Company and

[16] Lead Plaintiff excludes Defendants Leary and Mehta from Count II at this time because it does not have information leading it to believe that either was a controlling person of Nimble during the Class Period. Lead Plaintiff reserves the right to further amend this pleading to add either Defendant Leary or Mehta, or both, as defendants in Count II should it come to light that either was in fact a controlling person of Nimble during the Class Period.

their direct involvement in the Company's day-to-day operations, including Nimble's sales force.

356. By virtue of the foregoing, Defendants Vasudevan and Singh each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nimble, including the content of its public statements with respect to the Company's investments, the success (or lack thereof) of its enterprise segment, and the growth of the business.

357. Defendants Vasudevan and Singh acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Nimble common stock and options during the Class Period.

358. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Nimble common stock and options, Lead Plaintiff and other members of the Class purchased Nimble common stock and options at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Nimble common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Nimble common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Nimble common stock and options at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

359. By reason of the foregoing, Defendants Vasudevan and Singh are liable to Lead Plaintiff and the members of the Class as controlling persons of Nimble in violation of Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: July 15, 2016

**LABATON SUCHAROW LLP**

By: *_/s/ Jonathan Gardner_*
Jonathan Gardner

Carol C. Villegas
Guillaume Buell
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
cvillegas@labaton.com
gbuell@labaton.com

***Lead Counsel for the Class***

Nicole Lavallee (sbn 165755)
A. Chowning Poppler (SBN 272870)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Tel. (415) 433-3200
Fax (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

***Liaison Counsel***

## CERTIFICATE OF SERVICE

I, the undersigned, state that I am employed in the City and County of New York, State of New York, that I am over the age of eighteen (18) years and not a party to the within action, that I am employed at Labaton, Sucharow LLP, 140 Broadway, New York, New York 10005, and that on July 15, 2016, I served a copy of the attached:

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

to the parties listed on the attached Service List by the following means of service:

[X] BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record registered with the Court's electronic filing system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on the 15th day of July, 2016.

*/s/ Jonathan Gardner*
JONATHAN GARDNER