UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE NIMBLE STORAGE, INC. SECURITIES LITIGATION** | Case No. 15-cv-05803-YGR<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 98 |

Plaintiff Arkansas Teacher Retirement System, as Lead Plaintiff, brings this consolidated amended complaint against defendants Nimble Storage, Inc. ("Nimble"), Suresh Vasudevan, Anup Singh, Varun Mehta, and Dan Leary for alleged violations of federal securities laws. (Dkt. No. 97, "CAC.") Specifically, plaintiff claims that all defendants violated section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder for allegedly making fraudulent statements and omissions regarding Nimble's prospects and financial condition between November 25, 2014 and November 19, 2015 (the "Class Period"). Additionally, plaintiff brings claims against defendants Vasudevan and Singh under section 20 of the Exchange Act, alleging that they are liable as control persons.

Now before the Court is defendants' motion to dismiss the consolidated class action complaint. Having carefully reviewed the pleadings, the papers and exhibits submitted on this motion, and oral arguments heard on November 8, 2016, and for the reasons set forth more fully below, the Court **GRANTS** defendants' motion with leave to amend.[1]

---

[1] In connection with their motion to dismiss, defendants submitted a request for judicial notice ("RJN") for the following documents (Dkt. No. 99): (i) Exhibit A, excerpts of Nimble Form 8-Ks, dated November 25, 2014, February 26, 2015, May 26, 2015, August 25, 2015, and November 19, 2015; (ii) Exhibit B, excerpts of Nimble Form 8-Ks, dated February 27, 2014, May 29, 2014, August 26, 2014, November 25, 2014, February 26, 2015, May 26, 2015, August 25, 2015, and November 19, 2015; (iii) Exhibit C, Maxim Group Analyst Report, dated November 20,

# I. BACKGROUND

Plaintiff brings this federal securities class action on behalf of all who purchased Nimble's publicly traded common stock and/or exchange-traded options on such common stock during the Class Period and were damaged thereby. (CAC ¶ 1.) Nimble is a Delaware corporation that was incorporated in November 2007 and had its Initial Public Offering on December 13, 2013. (*Id.* at ¶ 30.) The individual defendants are as follows: (1) Suresh Vasudevan, who is, and was at all relevant times, Nimble's Chief Executive Officer; (2) Anup Singh, who is, and was at all relevant times, Nimble's Chief Financial Officer; (3) Varun Mehta, who is, and was at all relevant times, Nimble's Vice President of Engineering; and (4) Dan Leary, who is, and has been since October 2015, Nimble's Vice President for Corporate Development, and who was from May 2008 through October 2015 Nimble's VP for Marketing. (*Id.* ¶¶ 32–35.) The following allegations relate to plaintiff's claims of securities fraud against defendants:

---

2014; (iv) Exhibit D, excerpts of Nimble's Form 10-K for period ending January 31, 2015; (v) Exhibit E, excerpts of transcripts of Nimble's earning calls, dated November 25, 2014, February 26, 2015, May 26, 2015, and August 25, 2015; (vi) Exhibit F, excerpts of Nimble Form 10-Qs for the quarters ended July 31, 2014, April 30, 2015, and July 31, 2015; (vii) Exhibit G, Form 4s for Daniel Leary, filed between March 11, 2014 and October 21, 2015; (viii) Exhibit H, Form 4s for Varun Mehta, filed between March 11, 2014 and September 11, 2015; (ix) Exhibit I, Form 4s for Anup Singh, filed between February 28, 2014 and December 1, 2015; (x) Exhibit J, Form 4s for Suresh Vasudevan, filed between March 11, 2014 and December 11, 2015. Additionally, defendant attached as an exhibit a November 20, 2015 William Blair Report to the Supplemental Declaration of Felix S. Lee. (Dkt. No. 106, SRJN Ex. A.) Defendants argue that Exhibits A, B, D, and F through J can be judicially noticed as documents filed with the Securities Exchange Commission ("SEC"). *See In re Silicon Graphics Inc., Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *abrogated on other grounds as rec'd in S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *In re Netflix, Inc. Sec. Litig.*, No. 04-CV-2978-FMS, 2005 WL 1562858, at *5 (N.D. Cal. June 28, 2005) (finding that "SEC filings are appropriately noticed by the Court" on a motion to dismiss, even when those documents were filed with the SEC outside the class period). Exhibits A through E, G through J, and SRJN Exhibit A are also appropriately noticed as documents which are incorporated into the complaint by reference. *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1061–62 (C.D. Cal. 2012). Additionally, defendants argue that Exhibits D through F can be noticed as documents relating to the Private Securities Litigation Reform Act's ("PSLRA's") safe harbor provision, *see In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004), and Exhibits A through C and E can be noticed in a securities fraud action as documents reflecting publicly available information about the company, *see Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (holding that it is appropriate to take judicial notice of news articles on motion to dismiss); *SEC v. Mozilo*, No. 09-CV-3994-JFW, 2009 WL 3807124, at *7 n.2 (C.D. Cal. Nov. 3, 2009) (taking judicial notice of "transcripts of earnings conference calls and investor forums, newspaper articles" and other documents). Plaintiff does not oppose. Accordingly, the Court **GRANTS** defendants' requests and takes judicial notice of the exhibits attached to Docket Numbers 99 and 106.

2

### A. Nimble's Business and Products

Nimble sells hybrid data storage products. (*Id.* at ¶ 45.)[2] Nimble currently markets two types of "storage protocols": Internet Small Computer System Interface ("iSCSI") and Fibre Channel. (*Id.* at ¶ 55.) Nimble's iSCSI protocol was primarily marketed to Nimble's "commercial" business, which was composed of Nimble's small to mid-sized customers. (*Id.* at ¶ 50.) Throughout the Class Period, such clients represented approximately 81% of Nimble's business. (*Id.* at ¶ 4.) The remaining 19% "are made up of federal government organizations, enterprises, and others." (*Id.* at ¶ 50.) Fibre Channel, on the other hand, was developed by Nimble to appeal to its "enterprise" clients, which are larger companies that Nimble believed would bring in larger deals. (*Id.* ¶¶ 6, 58.) At the beginning of the Class Period, Nimble only had a small number of enterprise clients. (*Id.* at ¶ 83.)[3]

Nimble was incorporated in November 2007 and began shipping its first products in August 2010. (*Id.* at ¶ 30.) The company grew quickly and between its fiscal year ending January 31, 2011 and its fiscal year ending January 31, 2015, its "annual revenues increased exponentially from $1.6 million to over $227 million, growing over 13,000% in just five years." (*Id.* at ¶ 3.)[4] As Nimble's revenues grew, Nimble was also attempting to become profitable. Since its initial public offering in December 2013, Nimble had consistently "posted a net operating loss." (*Id.* at ¶ 5.) Between the fiscal year ending January 31, 2013 and the fiscal year ending in January 31, 2015, such operating loss had decreased as a percentage of revenue from -47% to -17%. (*Id.*)

---

[2] Prior to Nimble, storage products "tended to be composed of hardware that on the inside had a spinning 'disk' that stored data." (*Id.* at ¶ 46.) Others had "flash" storage products, which removed the spinning disk in favor of different "solid state" components. (*Id.*) Nimble's products are a hybrid of the two, containing both disk and flash components. (*Id.*)

[3] An important difference between these two markets is the length of the sales cycles: typically, the sales cycle for the commercial business was approximately two to three months whereas for enterprise customers, the cycle could take four to six months. (*Id.* at ¶ 52.)

[4] Nimble's fiscal year ends on January 31 of each year. Relevant to the claims here, its 2015 fiscal year ended on January 31, 2015, with each of its quarters (Q1, Q2, Q3, and Q4) ending on the last day of April, July, and October 2014, and January 2015, respectively. Nimble's 2016 fiscal year ended on January 31, 2016 and similarly each quarter ending on the last day of April, July, and October 2015, and January 2016, respectively. (*Id.* at ¶ 31.)

3

Similarly, Nimble's customer base had increased dramatically over the same time period, from approximately forty customers as of January 31, 2011 to more than 4,970 by January 31, 2015.  (*Id.* at ¶ 66.)

### B.  Events During the Class Period

On the first day of the Class Period, Vasudevan announced the successful launch of Fibre Channel, which he viewed to be a vital product in pursuing more enterprise clients.  (*Id.* at ¶ 85.) Vasudevan believed that the release of Fibre Channel would allow Nimble to penetrate the large enterprise market, which would increase their total addressable market from $5 billion to $20 billion.  (*Id.* at ¶¶ 90–91.)  At the same time, Nimble was attempting to become profitable, or at the very least breakeven, by the end of the 2016 fiscal year.  (*Id.* at ¶ 96.)

Plaintiffs allege, however, that defendants were secretly capping Nimble's investments in sales and marketing to achieve profitability.  Specifically, plaintiffs allege that in the fiscal year prior to the Class Period and during the Class Period, Nimble's overall investments in sales and marketing ("S/M") stayed flat (62.95% and 60.89% respectively), information which was not available to the market.  (*Id.* at ¶ 146.)[5]  Plaintiff also alleges that Nimble had clandestinely shifted almost half of its investments in S/M to the enterprise segment, despite the fact that this segment only accounted for a small part of Nimble's client base.  (*Id.* at ¶ 148.)[6]  Furthermore, plaintiffs allege that Nimble failed to inform the investing public that it was not meaningfully penetrating the enterprise market because it was not meeting enterprise client needs.  To hide this fact, defendants allegedly re-labeled existing commercial segment clients as enterprise clients.  (*Id.* at ¶ 153.)

---

[5] Plaintiff alleges that for the four quarters prior to the Class Period (4Q 2014 to 3Q 2015), Nimble's revenue totaled $201.124 million with S/M expenses at $126.612 million, and that for the four quarters during the Class Period (4Q 2015 to 3Q 2016), Nimble's revenue was at $300.393 million with S/M expenses at $182.896 million.  (*Id.* at ¶ 146.)

[6] Plaintiffs concede that on February 26, 2015, defendants disclosed that a "greater share of the investment is going towards enterprise and major account teams, rather than simply going down to commercial teams." (*Id.* at ¶ 170.)  However, plaintiffs allege that defendants still misled the market by not revealing the cap on investments, the extent to which resources were shifting, Nimble's failure to penetrate the enterprise market, and the degree to which these factors affected Nimble's growth.

4

Relevant to plaintiff's claims that such misleading statements and omissions resulted in significant harm, Nimble throughout the Class Period released guidance on its revenue projections each quarter. In each quarter prior to the end of the Class Period, Nimble was able either to meet or exceed the guidance it provided to the market. For instance, Nimble predicted that its revenue in Q4 2015 would be $65 to $67 million and exceeded the high-end of that prediction by $1.3 million. (*Id.* at ¶ 110.) For Q2 2016, Nimble predicted revenues ranging between $77 and $79 million, and again exceeded the high-end by $1.1 million. (*Id.*) However, on November 19, 2015, Nimble announced that it missed its revenue guidance of $86 to $88 million for the third quarter of fiscal year 2016 by $5.3 million on the low end to $7.3 million on the high end. (*Id.* at ¶ 175.) As a result, Nimble's stock plunged more than 50%, falling $10.34 to close at $10.05 a share. (*Id.* at ¶ 184.)

### C. End of Class Period Disclosure

In conjunction with Nimble's disclosure that it had missed its revenue guidance, plaintiff alleges that defendants made several statements revealing the misleading nature of defendants' statements and omissions. Specifically, in the Form 8-K dated November 19, 2015, Nimble stated:

> The shift in investment from our commercial business to enterprise business impacted our growth. We have been managing our total sales and marketing investments in light of our goal of achieving non-GAAP breakeven operating income in Q4FY16. Within this overall investment envelope, we increased our investments in the large enterprise business at the expense of investments in our commercial business. At the time when the storage market remains very competitive, this led to lower growth in our commercial business than we believe we could have achieved by maintaining our prior pace of investment in that segment of the market.

(*Id.* at ¶ 260.) Vasudevan repeated the same sentiment to investors in a conference call on November 19, 2015:

> [W]e shifted investments from our commercial segment to the large enterprise segment. The decreased investment affected areas such as the number of commercial teams and inside sales teams, demand generation programs, and channel incentives. We believe that this decreased investment led to slower growth than we would have seen had we maintained our previous pace of investment.

(*Id.* at ¶ 261.) Singh also stated: "[O]ur slower than expected growth in revenues was due to the

1    investments in our enterprise segment taking longer to pay off.  While, at the same time, the

2    shifting mix of our investment strategy between enterprise and the commercial business resulted in

3    not enough investment being made in the commercial segment." (*Id.* at ¶ 265.)

4        On these bases, plaintiff claims that defendants misled investors throughout the Class

5    Period, resulting in significant losses for plaintiff and the class of investors it represents.

6    **II.    LEGAL FRAMEWORK**

7        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

8    the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003).  "Dismissal can be

9    based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

10   cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

11   All allegations of material fact are taken as true and construed in the light most favorable to the

12   plaintiff. *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010–11 (9th Cir. 2011).  To survive a

13   motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a

14   claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

15   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

16       In pleading a cause of action for fraud under rule 9(b), "a party must state with

17   particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other

18   conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Similarly, in

19   pleading a cause of action for securities fraud under the PSLRA, "the complaint shall specify each

20   statement alleged to have been misleading, the reason or reasons why the statement is misleading,

21   and, if an allegation regarding the statement or omission is made on information and belief, the

22   complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

23   4(b).  However, the PSLRA requires particularity in pleading the required state of mind:  "in any

24   private action arising under this chapter in which the plaintiff may recover money damages only

25   on proof that the defendant acted with a particular state of mind, the complaint shall, with respect

26   to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a

27   strong inference that the defendant acted with the required state of mind." *Id.*  Thus the PSLRA

28   requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter."

1  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation and

2  citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007);

3  15 U.S.C. § 78u-4(b)(1)–(2). The Ninth Circuit has dubbed the pleadings requirements under the

4  PSLRA "formidable" for a plaintiff seeking to state a proper claim and avoid dismissal. *Metzler*

5  *Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).

**III.    DISCUSSION**

### A.    Section 10(b) Claim

To state a claim under Section 10b, a plaintiff must "show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). Thus, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37–38 (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157 (2008)). Defendants raise three primary arguments in support of their motion to dismiss plaintiffs' section 10(b) claims: (1) plaintiff fails to plead with particularity any false or misleading statements of omissions; (2) any such statements would, in any event, be protected by the PSLRA's safe harbor;[7] and (3) plaintiff failed to plead adequately a strong inference of scienter. Because, as discussed below, the Court finds that plaintiff has not adequately pled any false or misleading statements or omissions, the Court does not address issues related to the PSLRA safe harbor or defendants' scienter.

---

[7] The PLSRA creates a safe harbor for untrue statements of material fact with respect to any forward looking statement where any of the following conditions are met: (i) the forward looking statement is identified as such and is accompanied by meaningful cautionary statements; (ii) the forward looking statement is immaterial; (iii) the plaintiff fails to prove that the declarant made the statement with actual knowledge that the statement was false or misleading; or (iv) if made by an entity, the plaintiff fails to show that it was made by an officer with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1).

**1. False or Misleading Statements or Omissions**

"Materially misleading statements or omissions by a defendant constitute the primary element of a section 10(b) and rule 10b-5 cause of action." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1017 (S.D. Cal. 2005) (quoting *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1305 (C.D. Cal. 1996). "A statement or omission is misleading in the securities fraud context 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). "If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete." *In re Immune Response*, 375 F. Supp. 2d at 1017 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002)). To provide sufficient notice, plaintiff, "in addition to alleging the 'time, place[,] and nature of the alleged fraudulent activities,' must 'plead evidentiary facts' sufficient to establish any allegedly false statement 'was untrue or misleading when made.'" *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012).

Here, plaintiff alleges that defendants made the following categories of fraudulent statements or omissions: (a) failure to disclose that defendants were limiting investments in S/M expenses; (b) failure to disclose that defendants were diverting such investments from commercial to enterprise; and (c) statements regarding defendants' entry into the enterprise market.

***a. Limiting of Investments in Sales and Marketing***

Plaintiff alleges that several statements made by defendants during the Class Period were misleading because they failed to disclose that defendants were capping Nimble's investments in S/M as a percentage of its revenue. For instance, plaintiffs point to a statement by Leary at a conference on December 8, 2014 in which he stated: "We will continue to [grow midsize enterprise or midmarket accounts] and part of the way we get there is to continue to do investments in our indirect and our channel strategy." (CAC ¶ 208.) In a statement at a conference on December 9, 2014, Singh stated: "Our view is that the investments that we have made so far and we intend to continue to make is going to drive sustainable growth for us as a

8

1    Company over a long period of time." (*Id.* at ¶ 211.)  Again, in August 25, 2015, plaintiff alleges
2    that the following statement made by Singh at an earnings call was misleading:  "If you look at the
3    increase in the [operational expenses] quarter-over-quarter, I think it's consistent largely with the
4    investment plans. . . . So absolutely, in the [operational expenses] that you saw this quarter, we
5    would expect that trend to continue." (*Id.* at ¶ 247; *see also id.* at ¶¶ 198, 208, 211, 221, 223, 231,
6    236, 242, 247, 249, 251.)

7    Plaintiff argues such statements were misleading because defendants had been capping
8    Nimble's investments in S/M throughout the Class Period rather than increasing or maintaining
9    the level of investments.  Additionally, throughout the Class Period, defendants allegedly told the
10   market that Nimble would "breakeven" by the end of the 2016 Fiscal Year (*see, e.g.*, *id.* at ¶ 98),
11   but failed to disclose that such goal was to be met, in part, by placing limitations on Nimble's
12   investments.  According to plaintiff, defendants only revealed such to the public in November and
13   December of 2015.  (*See, e.g.*, *id.* at ¶ 186 (Vasudevan indicating that Nimble had "capped [its]
14   overall sales and marketing investments" as part of their goal to breakeven by the end of the fourth
15   quarter).)  At least one analyst "attributed revenue miss to [defendants'] decision to constrain
16   investments in favor of reaching [a] break-even point." (*Id.* at ¶ 282.)

17   Defendants, on the other hand, argue that such statements could not have been misleading
18   for two reasons:  (1) Nimble's investments in sales and marketing did continue and in fact grew
19   throughout the Class Period in absolute value terms; and (2) defendants disclosed quarterly to the
20   investing public its investment in S/M.  The following chart reflects Nimble's S/M expenditures
21   and total revenue throughout the Class Period and for the four quarters directly preceding the
22   Class Period, as disclosed in Nimble's quarterly Form 8-Ks:

|  | Fiscal Quarter | Sales and Marketing Expenditure | Total Revenue | Sales and Marketing Expense as % of Revenue |
|---|---|---|---|---|
| Prior to the Class Period | Q4/14 | $23,777,000 | $41,720,000 | 56.99% |
| | Q1/15 | $29,202,000 | $46,547,000 | 62.74% |
| | Q2/15 | $36,639,000 | $53,761,000 | 68.15% |
| | Q3/15 | $36,994,000 | $59,096,000 | 62.60% |
| | **Total** | **$126,612,000** | **$201,124,000** | **62.95%** |

9

| | | | | |
|---|---|---|---|---|
| Class Period | Q4/15 | $40,740,000 | $68,269,000 | 59.68% |
| | Q1/16 | $44,443,000 | $71,288,000 | 62.34% |
| | Q2/16 | $47,860,000 | $80,109,000 | 59.74% |
| | Q3/16 | $49,853,000 | $80,727,000 | 61.76% |
| | **Total** | **$182,896,000** | **$300,393,000** | **60.89%** |

(Dkt. No. 100-1 at 26 (Q4FY15); 31 (Q1FY16); 36 (Q2FY16); and 41 (Q3FY16); Dkt. No. 100-2 at 6 (Q4FY14); 11 (Q1FY15); 16 (Q2FY15); and 21 (Q3FY15).)

Based on the information disclosed in the Form 8-Ks, the accuracy of which plaintiff does not dispute, plaintiff fails to demonstrate how statements that Nimble "continue[s] to do investments" (CAC ¶ 208) or that Nimble is engaged in "strong investments for growth" (*id.* at ¶ 211) are false or misleading. In absolute value terms, Nimble's expenditures in sales and marketing grew every quarter, more than doubling between the fourth quarter of 2014 and the third quarter of 2016.

With regards to whether Nimble should have disclosed that it was capping such expenditures as a percentage of revenue, again the disclosures reveal that Nimble's expenditures as a percentage of revenue remained largely consistent for eight quarters. Such information, therefore, was available to the investing public. *See Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1007 (9th Cir. 2002) (holding that "although the press release did not provide all the information," where the "information [defendant] did provide—and the reasonable inferences one could draw from that information—were entirely consistent" with the information plaintiffs argue should have been included, the district court "properly dismissed that aspect of the plaintiffs' complaint"). Additionally, many of the statements plaintiff alleges are misleading indicate that Nimble was attempting to reduce its expenditures as a percentage of revenue. For instance, at an earnings call on February 26, 2015, Singh stated: "As I said, the investments are going into sales and marketing to drive that sustainable strong growth in revenue we're talking about, but at the same time, showing the improvement in leverage from a year-over-year, and definitely on track for breakeven in Q4." (CAC ¶ 223.) And at an earnings call on May 26, 2015, Vasudevan stated: "So, you'll continue to see us improve our operating margin as a percent of revenue on a year-

over-year basis consistently." (*Id.* at ¶ 236.)  Such statements are also consistent with statements made in defendants' SEC filings indicating Nimble's attempt to reduce S/M investments as a percentage of revenue. (*See, e.g.*, Dkt. No. 100-1 at 16 (February 26, 2015 Form 8-K indicating that Nimble's "long-term target for [sales and marketing] spending is 28% to 31% of total revenue").[8]

Accordingly, the Court finds that such statements are not fraudulently misleading on the grounds that defendants failed to disclose that the company was capping sales and marketing investments as a percentage of revenue.

### b. *Diversion of Investments from Commercial to Enterprise*

Relatedly, plaintiff argues that the same statements, in addition to others, are misleading because they falsely implied that Nimble was continuing its investment strategy of focusing on its traditional core business, the commercial sector. (*See, e.g.*, CAC ¶¶ 198 ("So we feel very good about both the pace of new customer acquisition in the mid-sized enterprise segment [which is the commercial segment] as well as the fact that we are growing our base in large enterprises."); 208 ("We will continue to [grow midsize enterprise or midmarket accounts] and part of the way we get there is continue to do investments in our indirect and our channel strategy."); *see also id.* at ¶¶ 206, 211, 221, 223, 231, 236, 242, 247, 249, 251.)

Plaintiff concedes that defendants disclosed on February 26, 2015 that Nimble was diverting its investments from the commercial sector to its enterprise business. Specifically, at an earnings call on February 26, 2015, Vasudevan announced:

> [O]ver the last couple of quarters and over the next couple of quarters, a greater share of investment is going towards enterprise and major account teams, rather than simply going down to commercial teams.  And we're making that choice consciously.  To some degree that impacts our short-term growth rate, but in the

---

[8] Plaintiff also argues that analyst reports during the Class Period demonstrate that the market expected defendants to achieve profitability by increasing revenue rather than decreasing sales and marketing investments.  For instance, a Morgan Stanley report from May 26, 2015 indicated that "[d]espite aggressive planned investment in sales capacity, we see revenue scale helping deliver break-even profitability by fiscal year-end." (*Id.* at ¶ 240.)  However, as demonstrated by the chart above, such was not mutually exclusive.  Nimble's revenues and investment in S/M in absolute value terms almost doubled between the fourth quarter of 2014 and the end of the Class Period.

11

> longer-term sense we think that's the right way to make sure we have multiple years of consistent high growth, rather than just short-term boost in growth, if you will.

(*Id.* at ¶ 218.) Yet, plaintiff maintains that defendants' statements remained misleading because they failed to disclose to what extent their priorities had shifted. Plaintiff argues that at the end of the Class Period, defendants admitted that they diverted about 50% of the S/M investment from commercial to enterprise: "And over the course of the last four quarters, roughly 45% of our incremental sales and marketing investments were directed at building out a sales and marketing organization aimed at large customers and large deals for that segment." (*Id.* at ¶ 186.) Vasudevan reiterated the same sentiment at a conference on December 9, 2015:

> So over the last four quarters, when you look at the incremental sales and marketing investments that we have made as a Company, some portion of those incremental investments, almost 45% of the new sales and marketing investments we added over the last four [quarters], were aimed at going after large global enterprises. The balance went back into our commercial business, if you will, something that we've done for the last five years, something that really drove growth over the last five years.

(*Id.* at ¶ 194.)[9] Defendants also conceded that such a shift in strategy resulted in their failure to meet revenue projections that quarter, and thus, the subsequent loss in value of their stock: "[G]iven that we had pulled investments from Commercial into Enterprise, we just didn't have enough pipeline in the Commercial to make up for the gap in Enterprise." (*Id.* at ¶ 187.) On these grounds, plaintiff contends that defendants should have disclosed such a monumental shift in strategy to the investors, especially given that Nimble's commercial business made up approximately 81% of Nimble's customer base. (*See id.* at ¶¶ 50, 67.)

Defendants argue that plaintiff has identified no legally cognizable duty to disclose the actual percentages Nimble invested in its commercial business as opposed to its enterprise business. "As a matter of law, silence is not misleading in the absence of a duty to disclose." *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1480 (N.D. Cal. 1992) (citing *Basic Inc. v. Levinson*,

---

[9] As an initial matter, the statements cited by plaintiff do not appear to support plaintiff's interpretation that defendants shifted nearly half of the entire S/M investment from commercial to enterprise. Rather, the statements suggest that, to the extent defendants increased their investment in S/M, nearly 45% of the increase was directed towards the enterprise sector.

485 U.S. 224, 238–39 & n.17 (1998)). Courts have found a legal duty to disclose where the information is specifically required by statute or regulation or when such information is "necessary to insure that statements actually made are not misleading." *Id.* Defendants contend that plaintiff has identified no statement that was misleading absent the charged failed disclosure, and plaintiff raises no argument that such information was specifically required by any statute or regulation.

Against this backdrop, the only statement plaintiff identifies as arguably misleading is a statement from Leary on December 8, 2014 in which Leary stated: "And so we are not making trade-offs on investments that might yield and [sic] even shorter-term growth in revenue in the short run." (CAC ¶ 206.) However, when viewed in context, Leary does not appear to imply that Nimble planned to maintain its current investing strategy with respect to its commercial and enterprise sectors:

> We have always looked at our investments as a couple things. One is we want to make investments in a balanced way so that we can continue to grow the top line very aggressively, but do it in a way where we are going to get continued improvements in operating leverage. Part of that is, as we said, we are going to be operating from a non-GAAP perspective breakeven by the end of next year.
>
> And the nature of those investments, they pay off at different rates. Part of what we are doing is trying to build a foundation for a company that we think can grow at well above industry rates for many, many, many years. And so we are not making trade-offs on investments that might yield and [sic] even shorter-term growth in revenue in the short run.
>
> We want to balance those investments out, some of which can take many quarters to pay off, because we believe the market opportunity we have is so substantial. And we are looking at a multiyear view of how we continue that very rapid growth.

(*Id.*) Such a statement is insufficient to create a duty in this circumstance to disclose the percentages of S/M investments defendants were devoting to its sectors.

Accordingly, the Court finds that such statements are not fraudulently misleading on the basis that defendants failed to disclose their specific investment strategies.

### c. *Meaningful Penetration of Enterprise Market*

Finally, plaintiff alleges that several of defendants' statements regarding Nimble's expansion into the enterprise market were fraudulently misleading. Specifically, plaintiff contends

13

that Nimble knew that its product, Fibre Channel, was not performing as well as defendants' statements throughout the Class Period suggested. For instance, defendants made several statements throughout the Class Period indicating that the introduction of Fibre Channel expanded Nimble's total available market to $20 billion. (*See, e.g.*, CAC ¶¶ 210, 211, 213.) Defendants informed the market that Fibre Channel was allowing Nimble to take advantage of new customers in the enterprise sector. For instance, at a conference on December 2, 2014, Vasudevan stated: "So that's a second growth driver that we focused on, large enterprises and therefore, large deal ASPs [average sale price]. Fibre Channel is a big enabler of continuing to do that." (*Id.* at ¶ 204; *see also id.* at ¶ 213.) At an earnings call on February 24, 2015, Vasudevan indicated: "Fibre Channel is helping to increase deal sizes and is helping drive large enterprise penetration. . . . [W]e've successfully broadened our base beyond mid-size enterprises to large enterprises. . . . In many ways Fibre Channel was a key step to getting into the enterprise, a fairly major move for us in terms of expanding TAM." (*Id.* at ¶ 225.) And throughout the Class Period, plaintiffs allege that defendants deceived the public into believing that Nimble was seeing meaningful growth in this area. (*See, e.g.*, *id.* at ¶¶ 198, 215, 221, 228, 238, 244, 256.)

Contrary to defendants' representations, plaintiff contends that Nimble was not meaningfully penetrating the enterprise market, as defendants admitted at the end of the Class Period when they stated that "[l]arge deals and large enterprises were not as significant a contributor as [Nimble] had modeled." (*Id.* at ¶ 267.) Plaintiff further alleges that defendants actively attempted to conceal this fact throughout the Class Period.[10] The crux of plaintiff's claim

---

[10] Plaintiff concedes that the market knew that Fibre Channel lacked certain features, but argues that defendants concealed that Nimble's products were not attractive to the enterprise clients because they lacked such features. Plaintiff does not persuade in this regard. The market was aware that the shortcomings in Nimble's products could present a challenge to Nimble's entry into enterprise. For instance, a market analyst report dated November 20, 2014 indicated that certain product deficiencies could slow Nimble's entry into the enterprise market. (*See* Dkt. No. 100-3 at 2.) In such circumstances, courts have found that defendants need not disclose the same facts. *See Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96-CV-20711-SW, 1997 WL 514993, at *4 (N.D. Cal. Aug. 14, 1997) (finding that defendants need not have disclosed certain product features and consumer preferences because "information about consumer preferences is indeed available to the investing public . . . and [d]efendants cannot be held liable for 'failing to educate the public about [the] potential impact on [the] company of publicly known facts'"). Thus, the Court finds plaintiff's argument unpersuasive.

in this regard is that defendants improperly reclassified existing commercial clients as enterprise clients to bolster deceptively Nimble's apparent growth in this sector.[11]  In support of these claims, plaintiff provides allegations supported by three confidential witnesses ("CWs"):  CW 5[12] alleges that throughout the Class Period, Nimble was relabeling "small and medium-sized commercial accounts as 'enterprise' accounts," which was "usually done by assigning commercial accounts to an enterprise sales representative."  (CAC ¶ 166.)  CW 3[13] alleges that Nimble began this relabeling practice in his region in August 2015 "in order to make enterprise sales look like they were doing better than they actually were."  (*Id.* at ¶ 167.)  CW 3 further recalls conversations with the Vice President of West Sales in which the Vice President indicated that Nimble would be engaged in this relabeling practice in every region.  (*Id.*)  CW 8[14] alleges that twenty of his accounts were relabeled as enterprise clients and given to new enterprise representatives that Nimble was hiring at the time.  (*Id.* at ¶ 168.)  With respect to at least one of his clients, CW 8 believes that "no other vendor would consider [such client] to be an enterprise account."  (*Id.*)  CW 8 further alleges that Nimble engaged in such practice "to make it look like the new enterprise sales representatives had enough to sell and that Nimble's enterprise business was thriving."  (*Id.*)

---

[11]  In Nimble's Form 8-K for 3Q15, defendants reported that the quarter ended with 260 enterprise customers (Dkt. No. 100-1 at 7) and by the end of the Class Period, that number had grown to 400 enterprise customers (Dkt. No. 100-1 at 36).  Plaintiff does not claim that those numbers are incorrect, but argues that they are nonetheless misleading because at least some of that growth was attributed to the deceptive reclassifications.

[12]  CW 5 worked as a Senior Sales Engineer for Nimble from December 2014 to February 2016, and worked in the mid-Atlantic region, which included Washington, D.C., Maryland, and northern Virginia.  (*Id.* at ¶ 122.)  CW 5's duties included visiting commercial accounts to learn about the clients' data storage needs.  (*Id.*)  CW 5 recalled that he participated in weekly regional conference calls and in-person regional business reviews, during which he provided projections of pipeline (sales opportunities not near closing), upside (sales that had a 25% chance of closing during the quarter), strong-upside (sales that had a 50% chance of closing during the quarter), and commits (sales that had an almost 100% chance of closing during the quarter).  (*Id.* at ¶¶ 123, 124.)

[13]  CW 3 worked for Nimble from February 2012 to March 2016, first as an Individual Contributor/Sales Representative, and then starting in October 2015, as Regional Director of Sales in Southern California.  (*Id.* at ¶ 120.)  CW 3 was "responsible for both commercial and enterprise accounts in his territory, had some of Nimble's largest accounts, and was one of the top Sales Representatives."  (*Id.*)

[14]  CW 8 worked as a Sales Representative in Nimble's San Francisco region from May 2014 to January 2016.  (*Id.* at ¶ 164.)

Defendants argue that plaintiff's allegations with respect to the reclassifications are insufficient. First, defendant contends that the allegations do not adequately plead that any such reclassification was improper, and any allegations that they were done for an improper purpose were conclusory. Only CW 8 specifically identified a client he believes should not have been reclassified, but he does not provide an explanation as to why such reclassification was fraudulent. Second, defendant argues that none of the CWs were responsible for the reclassifications and therefore had no foundation on which to opine on the propriety of such actions. *Zucco*, 552 F.3d at 996 (holding that CW statements were insufficient where CWs were "not positioned to know the information alleged," "report only unreliable hearsay," and "allege conclusory assertions of scienter").[15] The Court agrees.

As a threshold matter, plaintiff does not dispute that commercial clients can, under the proper circumstances, grow into enterprise clients. Plaintiff also does not dispute that none of the CWs were responsible for determining which clients should be reclassified as enterprise clients. *See Zucco*, 552 F.3d at 996. Plaintiff argues only that the CWs need not have been responsible for reclassifications to confirm that they occurred. While that is correct, defendants do not contend that reclassifications did not occur, but rather that any such reclassifications were proper and plaintiff has failed adequately to allege otherwise. Except for one client CW 8 alleges would not have been classified as an enterprise client by other vendors, plaintiff includes no other specific allegations of improper classifications. Although CW 3 and CW 8 allege that such reclassifications were done to make Nimble's enterprise segment appear stronger than it was, neither provide any facts or details upon which such conclusory allegations are based. *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) (finding certain CW statements unpersuasive where plaintiffs did not plead with particularity the basis of CW's

---

[15] Defendants further argue that even if commercial account sales were improperly reclassified and included in the "enterprise sales results," such results were not publicly disclosed and therefore such changes could not have misled investors. *See Brody*, 280 F.3d at 1006. This argument, however, misses the issue, namely, that defendants made statements indicating the rosy outlook of Nimble's enterprise segment, statements which were supported by numbers in SEC filings showing such growth. However, plaintiff argues that such are misleading because the facts underlying the disclosed numbers included the fraudulent reclassifications.

16

1  personal knowledge of the process at issue).  Additionally, only CW 3 provides any allegations as
2  to when such practice began, indicating that in his region only, Nimble began to reclassify some
3  commercial clients as enterprise clients in August 2015, almost a year into the Class Period.
4  Plaintiff must plead more to sustain a claim on this ground.[16]

Accordingly, the Court finds that plaintiff has failed to plead adequately any fraudulently misleading statements or omissions with regards to Nimble's penetration of the enterprise market.

### 2. Summary of Liability under Section 10(b) and Rule 10b-5

The Court finds that plaintiff has failed to allege adequately any misleading statements or omissions under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  With regards to the first two categories of statements—i.e. failure to disclose the capping and shifting of investments from commercial to enterprise—given the pleadings and Nimble's disclosures regarding the subject, the Court doubts whether plaintiff will be able adequately to amend its complaint.  With regards to statements concerning Nimble's penetration of the enterprise market, plaintiff may be able to allege further facts demonstrating that defendants' statements regarding the growth of the enterprise segment were misleading due to improper and fraudulent reclassification of Nimble's customers.  At this juncture, the Court does not conclude that amendment to plaintiff's allegations would be futile in any respect.  *See In re LeapFrog*, 527 F. Supp. 2d at 1052 (granting leave to amend despite previous attempts to cure deficiencies, noting that allowing leave to amend is "especially important in the context of the PSLRA").

---

[16] Defendant also identifies three statements they argue are inactionable puffery.  (CAC ¶¶ 198 (indicating that defendants "feel very good" and are "growing [their] base"); 215 (stating that Nimble was off to a "very strong start"); and 228 (stating that Nimble was "making really good progress").  To the extent that plaintiff is arguing that defendants should not have expressed such optimism in their statements about the growth of the enterprise segments, such statements would appear to be inactionable puffery.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (finding statements like "we feel very positive," "we all feel good," "consumer demand for our [] products is more vibrant than ever," or "we continue to make strong growth" amounted to inactionable puffery).  However, should plaintiff be able to plead adequately that defendants fraudulently relabeled its clients as enterprise clients, such statements could be actionable under the Exchange Act.

Accordingly, the Court **GRANTS** defendants' motion to dismiss with leave to amend consistent with this Order.[17]

### B. Section 20(a) Claim

Section 20(a) of the Exchange Act makes "controlling" individuals also liable for violations of section 10(b) and its underlying regulations. An employee of a corporation that has violated the securities laws is liable along with the corporation so long as the plaintiff demonstrates "a primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator." *No. 84 Employer-Teamster J. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (internal quotation and citation omitted); *Zucco*, 552 F.3d at 990.

The parties conceded at oral arguments that defendants' motion to dismiss as to this claim is dependent on whether plaintiff's section 10(b) claims survive. The Court has found that plaintiff has failed to allege adequately any predicate violations of section 10(b). Accordingly, the Court **GRANTS** defendants' motion to dismiss plaintiff's section 20(a) claim with leave to amend.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motion to dismiss with leave to amend. Given the upcoming holidays, plaintiff shall file an amended complaint within twenty-eight (28) days of this Order. Defendants shall file responsive pleadings within twenty-one (21) days after service.

This Order terminates Docket Number 98.

**IT IS SO ORDERED.**

Dated: December 9, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[17] Because the Court finds that plaintiff has failed to allege any actionable statements or omissions under section 10(b) and Rule 10b-5, the Court need not address whether plaintiff adequately alleged scienter. *See Reese*, 643 F.3d at 694; *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1012–13 (N.D. Cal. 2008). Similarly, the Court need not reach the issue of which statements, if any, are protected by the PSLRA's safe harbor provision.

18