**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Roger W. Yamada (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
cvillegas@labaton.com
ryamada@labaton.com

*Lead Counsel for the Class*

**BERMAN DEVALERIO**
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
One California Street, Suite 900
San Francisco, CA 94111
Tel. (415) 433-3200
Fax (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE NIMBLE STORAGE, INC. SECURITIES LITIGATION | CASE NO. 4:15-cv-05803-YGR<br><br>**CORRECTED THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**LEAVE TO FILE GRANTED JUNE 28, 2017**<br><br><u>CLASS ACTION</u><br><br>Jury Trial Demanded |

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION .......... 4

II. JURISDICTION AND VENUE .......... 11

III. PARTIES .......... 11

A. Lead Plaintiff .......... 11

B. Defendants .......... 12

IV. CONTROL PERSON ALLEGATIONS .......... 14

V. SUBSTANTIVE ALLEGATIONS .......... 16

A. Nimble Business Overview .......... 16

B. Nimble's Customers .......... 18

C. Nimble's Sales Organization .......... 19

D. Nimble's Products .......... 19

E. Nimble's Growth Story .......... 22

F. Nimble's Core Business Was Its Commercial Segment .......... 24

G. Nimble's Venture Into the Enterprise Market .......... 26

1. Penetration of the Enterprise Market Meant Penetration of the Global 5000 .......... 26

2. Penetration of the Global 5000 was Dependent on Fibre Channel .......... 30

3. Nimble Tells the Market that Fibre Channel Increases the Company's Total Addressable Market To Nearly $20 Billion .......... 31

H. Throughout the Class Period, Nimble Was Pursuing "Breakeven" or Profitability For the First Time .......... 32

I. Defendants Attempted to Grow the Enterprise Segment By Shifting Resources From the Commercial Segment .......... 34

J. Nimble Consistently Met Revenue Targets With Remarkable Precision .......... 34

K. Throughout the Class Period, Defendants Had Access to Sophisticated Internal Analyses and Metrics Concerning Sales .......... 36

L. Defendants (1) Misled the Market Throughout 3Q16 as to the True State of Nimble's Commercial and Enterprise Businesses, and (2) Misled the Market Throughout the Class Period as to Nimble's Penetration of the Enterprise Segment ........ 49

1. Defendants Misled the Market Throughout 3Q16 as to the Weakening of Nimble's Commercial Pipeline Due to the Shift in Resources and Its Failure to Penetrate the Enterprise Market ........ 49

2. Nimble Misled the Market About its Penetration of the Enterprise Segment ........ 55

(a) Nimble Was Not Penetrating the Enterprise Market Because Its Products Did Not Meet Prospective Enterprise Clients' Needs ........ 56

(b) Nimble Improperly Relabeled Commercial Accounts as Enterprise Accounts to Make it Seem as if Enterprise was Growing ........ 60

M. Nimble is Forced to Come Clean About the Enterprise Weakness, Commercial Weakness, and the Consequent Effects on the Company's Growth ........ 65

VI. POST CLASS-PERIOD ADMISSIONS ........ 67

A. December 2, 2015 – Credit Suisse Technology Conference ........ 67

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS THERETO ........ 68

A. November 25, 2014 – 3Q15 Earnings Call ........ 68

B. December 2, 2014 – Credit Suisse Technology Conference ........ 69

C. December 8, 2014 – Raymond James Systems Conference ........ 70

D. December 9, 2014 – Barclays Global Tech Conference ........ 73

E. January 14, 2015 – Needham Growth Conference ........ 73

F. February 26, 2015 – 4Q15 Earnings Call ........ 74

G. February 26, 2015 – Nimble Storage, Inc. 4Q15 Shareholder Letter ........ 78

H. March 4, 2015 – Morgan Stanley Technology, Media & Telecom Conference ........ 79

I. March 11, 2015 – Piper Jaffray Technology, Media, and Telecommunications Conference ........ 81

J. April 21, 2015 – Enterprise Strategy Group Interview of Dan Leary .................. 81

K. May 26, 2015 – Nimble Storage, Inc. Q1FY16 Shareholder Letter ..................... 82

L. May 26, 2015 – Nimble Storage, Inc. Press Release ........................................... 83

M. May 26, 2015 – 1Q16 Earnings Call .................................................................. 84

N. June 9, 2015 – William Blair Conference ............................................................ 84

O. August 25, 2015 – Nimble Storage, Inc. 2Q16 Shareholder Letter ...................... 85

P. August 25, 2015 – 2Q16 Earnings Call ............................................................... 89

Q. September 22, 2015 – Meeting With Wells Fargo Securities ............................... 96

VIII. CORRECTIVE DISCLOSURE – THE TRUTH IS REVEALED ................................. 98

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ........................................................................... 103

A. Individual Defendants' Trading ........................................................................ 103

1. The Individual Defendants' Class Period Sales of Nimble Stock Generated Highly Abnormal Profits ..................................................... 105

2. The Individual Defendants Entered Into, Amended, and Traded Pursuant To Rule 10b5-1 Trading Plans in a Highly Suspicious and Coordinated Manner ................................................................. 110

3. Two Individual Defendants Sold Stock Outside Rule 10b5-1 Trading Plans in a Highly Suspicious Manner ...................................... 113

4. The Individual Defendants Each Sold Stock Near the End of The Class Period in a Highly Suspicious and Coordinated Manner ............. 114

5. The Individual Defendants Have Significantly Curtailed Their Sale of Nimble Stock Since Their Full Disclosure of the Truth and the Collapse of Nimble's Stock ....................................................... 114

X. CLASS ACTION ALLEGATIONS .................................................................... 115

XI. LOSS CAUSATION ............................................................................................ 117

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........................................................................ 118

XIII. NO SAFE HARBOR ........................................................................................ 119

A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking ........................................................................ 120

B. Several False and Misleading Statements are Not Properly Identified as "Forward-Looking" ........ 120

C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........ 121

D. Defendants Knew that the Risks They Warned of Had Already Come to Pass ........ 123

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 124

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Vasudevan and Singh ........ 125

XIV. PRAYER FOR RELIEF ........ 127

XV. JURY DEMAND ........ 128

Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Nimble Storage, Inc. ("Nimble" or the "Company") and Suresh Vasudevan, Anup Singh, Varun Mehta, and Dan Leary (collectively, the "Individual Defendants," described more fully below) (together with Nimble, the "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Nimble and the Individual Defendants; (ii) research reports issued by financial analysts concerning Nimble's business; (iii) reports filed publicly by Nimble with the Securities and Exchange Commission (the "SEC"); (iv) an investigation conducted by and through Lead Plaintiff's attorneys, which included interviews of numerous former employees of Nimble and others with knowledge on a confidential basis; (v) internal Nimble documents obtained through this investigation which show, *inter alia*, the type of information regarding sales available to the Defendants during the Class Period; (vi) news articles, media reports, and other publications concerning the storage technology industry and markets; (vii) publications and reports defining the "Global 5000" companies during the Class Period, and (viii) other publicly available information and data concerning Nimble, its securities, and the markets therefor. Lead Plaintiff also retained an insider trading expert to analyze the Individual Defendants' trading in Nimble stock during the Class Period and a Control Period (defined below). Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

The former employees of Nimble who have knowledge of the relevant aspects of the case and who provided information to Plaintiff in the course of the investigation, relied upon herein include:

Confidential Witness 1 ("CW 1") was employed by Nimble from 2010 to March 2015 and served as Vice President of West Coast Sales.[1] Throughout his tenure, he reported to the Vice President of Worldwide Sales who in turn reported to Defendant Vasudevan.

Confidential Witness 2 ("CW 2") was employed by Nimble from 2013 through January 2015 and worked as a Marketing Manager for Product and Solutions Marketing.

Confidential Witness 3 ("CW 3") worked for Nimble from February 2012 to March 2016. At the start of the Class Period, he was an Individual Contributor/Sales Representative, and in October 2015 he was promoted to Regional Director of Sales in Southern California. CW 3 reported to Tim Maggs, VP of West, who reported to Mark Parrinello, VP of North America Sales. CW 3 was responsible for both commercial and enterprise accounts in his territory, had some of Nimble's largest accounts, and was one of the top Sales Representatives. CW 3 traveled to the Company's corporate offices at least every 60 days to train all new hires.

Confidential Witness 4 ("CW 4") was employed by Nimble from July 2012 to February 2015 as a Sales Engineer. His responsibilities included visiting accounts and prospective accounts with Nimble sales representatives to learn the clients' data storage needs and explain Nimble's technology to them. He worked primarily in northern Texas near the Dallas/Fort Worth area. CW 4 reported to the Sales Engineer Manager for South Central U.S., Derek Williams. His portfolio included both commercial and enterprise accounts.

Confidential Witness 5 ("CW 5") worked as a Senior Systems Engineer (or Senior Sales Engineer) for Nimble from December 2014 to February 2016. His responsibilities included visiting commercial accounts (and prospective accounts) with Nimble sales representatives to learn the clients' data storage needs and explain Nimble's technology to them. His territory was in Nimble's Mid-Atlantic region and included Washington D.C., Maryland, and northern Virginia. CW 5 reported to Director of Systems Engineering Herman Lisman and later in his tenure to Manager of Systems Engineering Keith Younger. Lisman reported to Vice President of Systems Engineering Randy Hopkins.

[1] All Confidential Witnesses will be described in the masculine to protect their identities.

Confidential Witness 6 ("CW 6") was employed as a Sales Operations Analyst at Nimble from June 2013 to November 2015, and as a Senior Sales Operations Analyst from November 2015 to May 2016. CW 6's responsibilities included systems set up and execution of tools. CW 6 reported to Senior Manager of Sales Operations Elizabeth "Liz" Luu, who reported to Adam Gerlinger, Senior Director of Worldwide Sales Operations.

Confidential Witness 7 ("CW 7") was employed from September 2013 to April 2015 as a Nimble Channel Manager. CW 7's responsibilities included recruiting, working with, and supporting channel distributors and resellers, and supporting Nimble regional sales teams in identifying and developing new customers. CW 7 reported to Senior Director of North American Sales Keith Macove, who reported to Vice President of Global Channel Sales Kristin Carnes, who reported to Vice President of Sales Mike Munoz, who reported to Defendant Vasudevan.[2]

Confidential Witness 8 ("CW 8") was a Sales Representative in Nimble's San Francisco region from May 2014 to January 2016. CW 8 initially reported to Matt Jacobs (former Sales Director), who reported to CW 1, who reported to Mike Munoz (former Vice President of North America).

Confidential Witness 9 ("CW 9") was employed throughout the Class Period as a Nimble Systems Engineer in one of Nimble's largest regions. CW 9 reported to a Systems Engineer Manager, who reported to a Director, who ultimately reported to the Regional Vice President. The reporting structure and duties of CW 9 are similar to that of CW 5.[3]

Confidential Witness 10 ("CW 10") was employed by Nimble from 2010 to October 2015 and served initially as Southwest Regional Director from 2010 to February 2013 and subsequently as Area Business Manager for the Southwest Region until October 2015. He

---

[2] CW 7 initially reported directly to Carnes, but Macove was added as a layer in between him and Carnes when Macove joined Nimble.

[3] Lead Plaintiff believes that the details of the identity of CW 9 contained herein are sufficient to satisfy the requirements of the PSLRA. Lead Plaintiff can provide additional specificity, including the exact title and dates of employment of CW 9 to the Court through an *in camera* submission.

initially reported to CW 1, and later reported to Tim Maggs, VP of West, who reported to Mark Parrinello, VP of North America Sales.

Confidential Witness 11 ("CW 11") began employment with the Company in August 2011, and from October 2014 to July 2015 was employed as Nimble's Vice President of Global Channel Sales. CW 11's responsibilities included supervising Nimble's channel sales, including resellers and distributors.

Confidential Witness 12 ("CW 12") worked as Director of Internal Audit at Nimble from September 2013 through May 2017. CW 12 reported directly to Defendant Singh. CW 12 focused mostly on compliance with the Sarbanes-Oxley Act during his time at Nimble.

Confidential Witness 13 ("CW 13") was employed by Nimble from January 2015 to May 2016 as the Vice President, East. CW 13 reported to Mark Parrinello, VP of North America Sales, who in turn reported directly, at various points, to either Defendant Vasudevan or to his direct report. CW 13 was in charge of the East Region at Nimble, including hiring sales representatives.

Confidential Witness 14 ("CW 14") was employed by Nimble from 2013 through February 2017. CW 14 was employed first as a Director, then as a Senior Director, of Worldwide Channels GTM Strategy and Marketing. During the Class Period, CW 14 initially reported to Defendant Dan Leary, Vice President of Marketing, and subsequently to Chief Marketing Officer Janet Matsuda. CW 14 was in charge of channel strategy, which including managing the channel partner relationships and the related budget.

Confidential Witness 15 ("CW 15") was employed by Nimble from 2011 through January 2017 as a Field Marketing Manager in several regions, including both the Southwest and in the Southeast. CW 15's territory as a Field Marketing Manager in the Southwest included California, Arizona, Hawaii, and Nevada. CW 15's territory as a Field Marketing Manager in the Southeast included South Carolina.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from November 25, 2014 through November 19,

2015, inclusive (the "Class Period"), purchased the publicly traded common stock of Nimble and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nimble during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nimble's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").[4]

2. Nimble sells data storage hardware systems. Since its founding in 2007, the Company has experienced extreme growth: Nimble's annual revenue increased more than 13,000% in five years, from $1.6 million to $227.7 million for the fiscal years ending January 31, 2011, and January 31, 2015, respectively. Nimble's initial rapid growth was attributable to its ability to meet the storage needs of customers in its "commercial" segment, for whom Nimble's products were well-suited. These commercial customers—accounting for approximately 80% of Nimble's customer base during the Class Period—preferred Nimble's hybrid storage products, which combined older disk drive technology with newer flash technology and tended to be cheaper than the cutting-edge all-flash technology.

3. While Nimble's revenue skyrocketed, however, the Company was also working hard to become profitable. From the time of its initial public offering in December 2013 and throughout the end of the Class Period, Nimble consistently posted quarterly net operating losses.

4. In pursuit of continued rapid growth (and profitability), Nimble announced on November 18, 2014, that it was launching a brand new line of storage products based on the

---

[4] By order dated May 10, 2017 (ECF No. 134), the Court dismissed Plaintiff's Second Amended Complaint. The claims relating to Defendants' statements regarding Nimble's commercial segment prior to August 25, 2015, were dismissed with prejudice and accordingly those claims have not been re-alleged herein.

"Fibre Channel" platform. Fibre Channel was more expensive and performance-focused than older platforms, but still incorporated the less advanced hybrid components rather than the newer all-flash technology. The Fibre Channel products were developed by Nimble to appeal to the "enterprise" segment, which was comprised of larger, more attractive customers with deeper pockets. This meant an opportunity for massive growth: Nimble told the market that its Total Addressable Market (or "TAM") had quadrupled to $20 billion due to the launch of its Fibre Channel products. Nimble tied its goal of avoiding losses—breaking even—to the increased TAM that Fibre Channel provided to the Company.

5. After the launch of Fibre Channel, Nimble shifted its limited resources from the commercial segment to its nascent enterprise business. As Defendant Vasudevan, Nimble CEO, acknowledged in an earnings call on February 26, 2015, "[O]ver the last couple of quarters and over the next couple of quarters, a greater share of the investment is going towards enterprise and major account teams, rather than simply going down to commercial teams."

6. The shift, however, had devastating consequences on the growth trajectory of Nimble's commercial segment. The accounts of multiple former Nimble employees corroborate the decline of the commercial pipeline following the shift in resources. Nimble devoted fewer resources to engaging potential commercial customers—the bread and butter driving Nimble's historic growth—in lieu of vigorous pursuit of new enterprise clients. This in turn caused the drying up of the commercial pipeline, the prime source of years of Nimble's rapid quarter-over-quarter growth. At least one internal Nimble document confirms that lead generation was suffering as early as February 2015 (the first month of 1Q16). By August 1, 2015 (the first day of 3Q16), as the Vice President, East put it, Nimble had to use all of its 1Q16 backlog cushion from booked orders that hadn't yet shipped to make up for the 2Q16 booking shortfall in the East in order to make its 2Q16 guidance. The Vice President, East stated that he heard this from Mark Parrinello and Denis Murphy.[5] The Vice President, East explained that while the East made up a portion of the 2Q16 booking shortfall, it certainly was not all of it—meaning there

[5] Denis Murphy became Nimble's Worldwide Vice President of Sales on May 4, 2015, reporting directly to CEO Vasudevan.

were booking shortfalls at Nimble outside of the East. The Vice President, East further stated that by 3Q16, there was no more backlog left to use.

7. As described in detail by former Nimble employees, the Individual Defendants used highly sophisticated sales software to track the Company's commercial and enterprise sales pipelines with extreme precision. One former Nimble employee stated that Cloud 9 (the Company's sales tracking software program) forecasted targets within 1% of actual outcomes. The Vice President of West Coast Sales stated that the Company's predictive analysis software allowed Nimble to tell by the first day of the quarter exactly how that quarter would end. Given that commercial deals take approximately ninety days to close, the dismal state of Nimble's pipeline (and what this meant to Nimble's growth story) was readily apparent to Defendants by no later than the beginning of 3Q16.[6]

8. Former Nimble employees corroborate the extent to which the Individual Defendants followed the sales metrics in Cloud 9: Defendants Vasudevan and Singh received Cloud 9 reports daily, and Singh constantly referenced Cloud 9 metrics in his weekly CFO meetings. A former Nimble employee stated that the Company's entire executive team tracked Nimble's pipeline on Cloud 9 on a daily basis.

9. Compounding the growing weaknesses of the commercial pipeline, Nimble failed to penetrate the coveted enterprise segment throughout the Class Period.

10. Despite internal metrics indicating the reality of Nimble's commercial and enterprise segments as of the beginning of 3Q16, as well as the failure to penetrate the enterprise market throughout the Class Period, the Defendants (1) misled the market throughout 3Q16 about the health of Nimble's commercial and enterprise businesses, and (2) misled the market throughout the Class Period that Nimble was meaningfully penetrating of the enterprise segment.

[6] Nimble's fiscal year ends on January 31 of each calendar year. Its 2016 Fiscal Year ended on January 31, 2016, and the first, second, third, and fourth quarters of the 2016 Fiscal Year ended on April 30, 2015, July 31, 2015, October 31, 2015, and January 31, 2016, respectively. *See infra* ¶30.

11. Twenty-five days into the third quarter, Nimble issued a positive forecast for total revenue of $86.0 to $88.0 million for 3Q16—an increase of approximately $6 to $8 million above actual revenue from the previous quarter (a quarter during which Defendants only made their public guidance by relying on their now inexistent backlog). Defendants Vasudevan and Singh also reiterated that Nimble "remain[ed] on track to achieve [its] goal of non-GAAP operating income break even by the end of the current fiscal year."

12. This positive guidance reaffirmed to the market that Nimble's growth story was still on track, and analysts reacted positively to Nimble's announcement. A UBS analyst noted that Nimble had "another beat and raise," and an analyst from Wells Fargo wrote: "NMBL expects strong growth to continue with guide for revenue to be up 47% yr/yr in FQ3…."

13. Defendant Vasudevan also repeatedly referenced in positive terms Nimble's "win rates" during an earnings call on the same day 3Q16 guidance was issued, on August 25, 2015. On that call, he stated that "our win rates have continued to remain very consistent," "we've managed to maintain a very healthy win rate," and "[o]ur win rates remain as healthy as they've ever been…." Analysts parroted these sentiments. For example, the next day, an analyst at UBS wrote: "We are impressed that the company's win rate has held…." Another analyst from Oppenheimer wrote: "Nimble's win rates/[gross margins] remain healthy." Defendant Singh repeated the positive 3Q16 guidance during the August 25, 2015 earnings call.

14. Nearly a month later, Wells Fargo analysts reported on September 22, 2015—seven weeks into 3Q16—that they met with Defendants Mehta and Singh, who conveyed that Nimble's "growth story is still on track." Defendants Mehta and Singh made this statement nearly two-thirds into 3Q16, when Defendants' highly predictive sales forecasting would have indicated that Nimble would not make its guidance for the quarter.

15. Despite the positive guidance and statements that Nimble's "win rates" were very healthy and that Nimble's "growth story is still on track," the Individual Defendants knew or recklessly disregarded the dismal state of Nimble's pipeline. A former Nimble employee, who reported directly to Defendant Singh, stated that in the months leading up to the announcement

of 3Q16 earnings, Nimble was not hitting historical targets within the third quarter, and stated that executive management, including Defendants Singh and Vasudevan, knew it was going to be impossible to achieve guidance for the quarter.

16. The escalating problems with Nimble's commercial and enterprise segments converged in 3Q16 with devastating consequences when, at the end of the Class Period, the Company announced a miss in guidance for the first time in the history of its public reporting. This earnings miss was huge: Nimble announced $80.7 million in 3Q16 revenue compared to guidance of $86 to $88 million, or a miss of $5.3 to $7.3 million. Given that the average Nimble deal size was approximately $80,000 per deal, the total value of the earnings miss represented the value of approximately 65 to 90 deals.

17. A former Nimble employee (who reported directly to Defendant Singh) recalled a concern among executive management in the months leading up to the 3Q16 miss and, as a result, executive management sought legal counsel to manage the situation. According to another former Nimble employee, the entire Nimble sales organization was told on the day of the 3Q16 earnings announcement by Mark Parrinello, the Vice President of North America Sales, that Nimble saw this miss coming. Asked by an analyst when Nimble "started to see the weakness emerge," Defendant Vasudevan himself admitted that "[i]t was really pressure that we saw throughout Q3…."

18. The positive 3Q16 guidance, as well as statements made during 3Q16 that Nimble had "managed to maintain healthy win rates" and that Nimble's "growth story is still on track," were false and misleading when made because the Defendants misrepresented or failed to disclose the adverse facts—corroborated by former Nimble employees and known to Defendants or recklessly disregarded by them—that (1) the commercial pipeline was suffering due to the shift in resources from the commercial to the enterprise segments; (2) Nimble was failing to penetrate the enterprise segment; (3) there was no more backlog in 3Q16 to make up for the gap between revenue and guidance; and (4) Cloud 9 data would have indicated to Defendants that Nimble would not make 3Q16 guidance due to the lack of bookings in the commercial pipeline and weakness in the enterprise segment.

19. During the Class Period, the Individual Defendants took advantage of the artificially increased Nimble stock price by engaging in highly suspicious and coordinated Class Period-trading of their Nimble stock and pocketing millions of dollars in well-timed stock sales. Notably, all of the Individual Defendants either entered into or amended 10(b)5-1 trading plans while they were in possession of material, non-public information about Nimble's weakening commercial pipeline and its failure to penetrate the enterprise segment.

20. On November 19, 2015, when Defendants announced a revenue miss for 3Q16 of $5.3 to $7.3 million, Nimble's stock dropped from $20.39 per share to $10.05 per share. This represented a more than 50% drop on heavy volume of more than 16 million shares, or ***more than seventeen times*** the average number of shares traded daily during the Class Period (approximately 892,045 shares).

21. Defendants finally admitted that both the commercial and the enterprise segments were not doing as well as they had led the market to believe and that the shift of investments to the enterprise segment from the commercial segment caused its commercial pipeline to dry up. Analysts were shocked by the revelations. Jefferies Equity Research Americas wrote that "***the negative impact*** from shifting marketing investments to Enterprise at the expense of traditional Commercial (SMB) business ***was greater than expected***." Wunderlich Securities wrote on November 20, 2015 that Nimble "missed F3Q16 ***without warning*** and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." Wunderlich continued: "management feels the company underinvested in smaller/commercial account channels." On November 19, 2015, analysts from Oppenheimer downgraded Nimble's stock rating, noting that the Company reported poor results in part due to "collateral damage to its commercial customer base from the enterprise shift. We're stepping to the sidelines reflecting (1) the need for greater sales investment and an unknown execution time-frame required to drive ***stronger growth in both enterprise/commercial***...."

22. These revelations concerning the drying up of the commercial pipeline and Nimble's inability to penetrate the enterprise segment prompted a course correction from

Nimble back to a focus on its commercial pipeline. As MacQuarie Equities Research wrote, "Following the quarter, ***Nimble does plan to renew its investment focus in the commercial / mid-market*** and hopes to grow both commercial (predominantly iSCSI) and Enterprise (predominantly Fibre Channel) segments in the future."

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

24. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

25. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Nimble has operations in this district and division, including its principal place of business at 211 River Oaks Parkway, San Jose, California.

26. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

27. On March 28, 2016, this Court appointed Arkansas Teacher to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 69).

28. Arkansas Teacher is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas. Arkansas Teacher was established by Act 266 of 1937,

Ark. Code § 24-7-101 et seq., as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system. Arkansas Teacher has more than $15 billion in net assets held in trust for pension benefits. As of June 30, 2015, Arkansas Teacher has 335 participating employers and more than 126,000 individual members. As set forth in its PSLRA certification previously filed with the Court (ECF No. 97-1), Arkansas Teacher purchased Nimble common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

**B. Defendants**

29. Nimble is a Delaware corporation with principal executive offices at 211 River Oaks Parkway, San Jose, California. Nimble was incorporated in November 2007, and shipped its first products in August 2010. The Company had its initial public offering ("IPO") on December 13, 2013. As of January 31, 2015 Nimble had approximately 838 employees worldwide. Throughout the Class Period, Nimble common stock traded actively on the New York Stock Exchange ("NYSE") under the ticker symbol "NMBL." During the Class Period, there were approximately 74 million to 80 million shares of NMBL common stock outstanding. On April 17, 2017, Hewlett Packard Enterprise announced that it had completed its acquisition of Nimble.

30. Nimble's fiscal year ends on January 31 of each year. Its 2015 Fiscal Year ended on January 31, 2015, and its 2015 fiscal Q1, Q2, Q3, and Q4 ended on April 30, 2014, July 31, 2014, October 31, 2014, and January 31, 2015, respectively. Nimble's 2016 Fiscal Year ended on January 31, 2016, and its 2016 fiscal Q1, Q2, Q3, and Q4 ended on April 30, 2015, July 31, 2015, October 31, 2015, and January 31, 2016, respectively:

| Nimble FY Period | Gregorian Calendar End Date |
|---|---|
| **FY 2015[1]** | **January 31, 2015** |
| Q1 2015[2] | April 30, 2014 |
| Q2 2015[3] | July 31, 2014 |
| Q3 2015[4] | October 31, 2014 |
| Q4 2015[1] | January 31, 2015 |
| | |
| **FY 2016[5]** | **January 31, 2016** |
| Q1 2016[6] | April 30, 2015 |
| Q2 2016[7] | July 31, 2015 |
| Q3 2016[8] | October 31, 2015 |
| Q4 2016[5] | January 31, 2016 |

[1] Source: SEC Form 8-K, dated February 26, 2015
[2] Source: SEC Form 8-K, dated May 29, 2014
[3] Source: SEC Form 8-K, dated August 26, 2014
[4] Source: SEC Form 8-K, dated November 25, 2014
[5] Source: SEC Form 8-K, dated March 3, 2016
[6] Source: SEC Form 8-K, dated May 26, 2015
[7] Source: SEC Form 8-K, dated August 25, 2015
[8] Source: SEC Form 8-K, dated November 19, 2015

31. Suresh Vasudevan ("Vasudevan") was at all relevant times during the Class Period Nimble's Chief Executive Officer ("CEO"). Vasudevan had been Nimble's CEO since March 2011, a member of Nimble's Board of Directors since September 2009, and the Chairman of Nimble's Board of Directors since September 2013. Prior to joining Nimble, Vasudevan was the Chief Operating Officer of Omneon Video Networks, Inc., a provider of storage and networking equipment for the broadcast industry. From 1999 to 2008, Vasudevan held various positions at NetApp, Inc., a provider of integrated data storage solutions, including time as Senior Vice President. NetApp is one of Nimble's primary competitors. Vasudevan was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Vasudevan made materially false and misleading statements and omissions of material fact in Nimble's quarterly conference calls, SEC filings, industry events, and events for analysts.

32. Anup Singh ("Singh") was at all relevant times during the Class Period Nimble's Chief Financial Officer ("CFO"). Singh had been Nimble's CFO since November 2011. Singh was a direct and substantial participant in the fraud. During the Class Period, as more fully

alleged below, Singh made materially false and misleading statements and omissions of material fact in Nimble's quarterly conference calls, SEC filings, industry events, and events for analysts.

33. Varun Mehta ("Mehta") was at all relevant times during the Class Period Nimble's Vice President of Engineering. Mehta had been Nimble's Vice President of Engineering since March 2011, and was Nimble's founding CEO from November 2007 to March 2011. Mehta had been a member of Nimble's Board of Directors since November 2007. Mehta was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Mehta made materially false and misleading statements and omissions of material fact at events and meetings with analysts.

34. Dan Leary ("Leary") was Nimble's Vice President, Marketing from May 2008 to October 2015. In October 2015 he was promoted to Vice President, Corporate Development, Solutions and Alliances. Leary was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, Leary made materially false and misleading statements and omissions of material fact at analyst events and in interviews with industry groups.

## IV. CONTROL PERSON ALLEGATIONS

35. Defendants Vasudevan and Singh, by virtue of their high-level positions at Nimble, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

36. According to several Confidential Witnesses, Defendant Vasudevan was an intimately involved CEO, who, for example, was very closely involved in all aspects of the Company's operation. *See, e.g.*, *infra* ¶¶ 125, 127, 129-30, 135-36.

37. On January 9, 2015, for example, Defendant Vasudevan sent an email to an "all" email group at Nimble indicating that, on an interim basis, the sales operations would report directly to him. In the email, Vasudevan announced that "Eric Mann [the head of sales] will be leaving Nimble, and we will be starting a formal search process for a new leader to lead the sales organization." He continued that Nimble has "launched the search for a sales leader and all of Eric's reports will report to me for now." In describing Mann's role, which he would assume on an interim basis, Defendant Vasudevan wrote:

> To really fulfill his role, Eric needed to integrate deeply and engage cross-functionally with other functions. This would have required him to spend a substantial amount of his time in San Jose, in additional to traveling to all of the sales regions – a degree of travel that he was not prepared for.

38. Nimble did not hire a permanent replacement for Mann until May 5, 2015, nearly four months later, when Nimble announced that it hired Denis Murphy as the new Vice President of Worldwide Sales.

39. Defendants Vasudevan and Singh, as senior executive officers, and Vasudevan as a director, of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Nimble's publicly-traded common stock would be based on accurate information. Defendants Vasudevan and Singh each violated these requirements and obligations during the Class Period.

40. Defendants Vasudevan and Singh, because of their positions of control and authority as senior executive officers of Nimble, and Vasudevan as a Nimble director, were able to and did control the content of the SEC filings, press releases, and other public statements issued by Nimble during the Class Period. Each was provided with copies of the statements made in SEC filings at issue in this action before they were issued to the public and had the

ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Vasudevan and Singh are responsible for the accuracy of the public statements detailed herein.

41. Defendants Vasudevan and Singh, because of their positions of control and authority as senior executive officers of Nimble, and Vasudevan as a Nimble director, had access to the adverse undisclosed information about Nimble's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Nimble management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Nimble materially false and misleading.

42. Defendants Vasudevan and Singh are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nimble common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nimble's products, business, operations, and management, and the intrinsic value of Nimble's common stock and options; and (ii) caused Lead Plaintiff and members of the Class to purchase Nimble common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Nimble Business Overview[7]

43. Nimble is a company that sells hybrid storage products. Nimble's hybrid storage products are data storage systems called "storage arrays" that can store between 8 and 640 terabytes of data. One terabyte is equal to 1,000 gigabytes. By way of example, Apple's iPhone 6S can store up to 128 gigabytes of data. The storage arrays are small boxes that

---

[7] This discussion of Nimble's business, products, and customers is limited to the Class Period, unless otherwise noted. After the Class Period, Nimble may have, and may be, offering new products and/or services and its business and customers may be different.

measure approximately 17.2 inches wide, 26.5 inches deep, and 5.2 inches high; they weigh approximately 55 to 76 pounds and visually look somewhat like a cable television set-box:




Source: SEC Form 10-K, dated April 2, 2015, at 7.

44. Each storage system is configured based on how fast a system (called "IOPS," which stands for Input/Output Operations Per Second, pronounced "eye-ops") the customer needs, and how much storage capacity the customer requires. Nimble's hybrid storage is different from legacy storage in various respects. First, prior to Nimble's products, storage products tended to be composed of hardware that on the inside had a spinning "disk" that stored data. (This was also common to many of the home and office computers built in the last few decades; the spinning disk was one of the sources of the "whirring" sound computers emitted when thinking.) Flash storage, on the other hand, works with and can (depending on the model) eschew the spinning disk in favor of different "solid state" components. Nimble's products are a hybrid combination of the two components. They consist of both disk and flash components, which Nimble markets as a unique hybrid solution for customers.

45. Nimble's products are considerably smaller in physical size than traditional disk-centered storage. Nimble's hybrid flash storage system can require one-third to one-tenth the physical footprint of legacy disk storage products.

46. The storage systems and associated software markets together accounted for approximately $40 billion in annual revenues during the Class Period. Nimble's main competitors during the Class Period included Dell, Inc., EMC Corporation, Hewlett-Packard Company, IBM, Pure Storage, and NetApp, Inc.

**B. Nimble's Customers**

47. Nimble sells to end customers across many different industries as well as internationally. Its customers include organizations in the educational, financial services, healthcare, and manufacturing sectors; federal, state and local government; and cloud-based service providers. Nimble's customer base includes small and mid-sized customers, large global enterprises, and cloud-based service providers.

48. Nimble publicly refers to its mid-sized customers alternatively as "mid-size enterprise" customers, and also refers to both small and mid-sized customers collectively as "SMB" or "commercial" customers.

49. Nimble publicly refers to large global enterprises alternately as "enterprise," "large enterprise," "Global 5000," or "G5000" customers.

50. Historically, Nimble's most important business is selling to the "commercial" segment which, as Defendant Vasudevan stated, makes up at least 81% of Nimble's customer base. Defendants have admitted that the commercial segment was its "core" business. *See, e.g.*, *infra* ¶¶ 77-82. The remaining 19% of Nimble's customers are made up of the small business portion of the commercial segment, federal government organizations, Global 5000 enterprises, and others.

51. An important part of Nimble's business was sales to existing customers, which Nimble termed its "land and expand" model. Nimble noted in its Annual Report on April 2, 2015 that such sales were more than 40% of the dollar amounts of orders received in fiscal year 2015:

> Our installed base of over 4,970 end-customers as of January 31, 2015 provides us a strong foundation in which to drive incremental sales through our "land and expand" model. In the years ended January 31, 2013, 2014 and 2015, approximately 25%, 34% and 41% of the dollar amounts of orders received were from existing end-customers.

52. A significant difference between commercial and enterprise customers is the length of the sales cycles in acquiring them as customers. During the Class Period, Defendant Vasudevan told the market that the sales cycle for mid-size customers (*i.e.*, commercial) was

approximately 75-90 days, and that the sales cycle for enterprise customers can be four to six months. One former Nimble employee has stated that enterprise deals can take up to eighteen months. *See* ¶ 198.

**C. Nimble's Sales Organization**

53. Nimble's sales organization is responsible for acquiring new customers, maintaining customer relationships, and overall market development. The sales organization also manages Nimble's relationship with its "channel partners" – third parties that work with Nimble to sell Nimble's products to end customers. Channel partners accounted for 89%, 92%, and 98% of Nimble's total revenue in the fiscal years ended January 31, 2013, 2014, and 2015.

54. Nimble has both commercial sales representatives and enterprise sales representatives. CW 9, a Nimble Systems Engineer during the Class Period, explained that a deal was labeled an enterprise deal if assigned to an enterprise sales representative, and it was labeled a commercial deal if assigned to a commercial sales representative. CW 5, a Nimble Senior Systems Engineer from December 2014 to February 2016, confirmed that accounts were internally labeled by virtue of the sales representative assigned to it. Thus, according to CW 5, if the account was managed by an enterprise sales representative, it was an enterprise account, and if the account was managed by a commercial sales representative, it was a commercial account.

**D. Nimble's Products**

55. Nimble's principal products and services are bundled together and sold to customers as an "Adaptive Flash platform." This platform includes two components: a "flash-optimized file system" (called the "Cache Accelerated Sequential Layout File System") contained in each storage array, and proprietary Nimble software called "InfoSight," which is sold to customers along with the storage arrays on a subscription basis. InfoSight is a reporting tool, allowing customers to track their data storage usage and needs, for which Nimble partnered with Cisco to sell to end customers and which comprised upwards of 10% of Nimble's revenues during the Class Period. The storage arrays and the InfoSight software, together, allow Nimble's customers to predict, manage, and deliver the data storage needs of their organization.

56. Nimble sells a line of five different storage arrays. The CS210 and CS215 arrays are intended for and principally marketed to smaller and medium-sized organizations. These arrays typically support data, software, and programs such as Microsoft applications, including email servers. The CS300, CS500, and CS700 arrays are designed for larger-scale deployments at enterprise-type customers. They support larger-scale programs and more intensive workloads. Each of Nimble's arrays' capacity and performance can be expanded using expansion shelves. These expansion shelves permit the arrays to handle larger amounts of data and perform more efficiently.

57. Nimble's storage arrays support two types of storage "protocols" or "platforms" for its customers to choose from: iSCSI and Fibre Channel. A storage platform facilitates the transfer of data between different networks and computers, and is how Nimble's end customers' systems communicate data to the storage arrays. All of Nimble's storage arrays support iSCSI, which is typically used by smaller and medium-sized organizations. iSCSI (pronounced "eye-scuzzy") stands for "Internet Small Computer System Interface."

58. Nimble's CS300, CS500, and CS700 arrays also support a storage platform called Fibre Channel. Fibre Channel support was built into these arrays in order to help attract enterprise clients. Nimble's CS300, CS500, and CS700 products were available for purchase starting November 18, 2014, before the start of the Class Period.

59. Although Nimble can and does sell Fibre Channel and iSCSI products to both commercial and enterprise clients, they are designed for and sold to principally different segments. Therefore, when Defendants refer to customers of Fibre Channel products in public statements, they are principally referring to enterprise clients, and when Defendants refer to iSCSI customers, they are principally referring to commercial clients. Indeed, on June 9, 2015, Mehta noted that "fiber [sic] channel is actually a good proxy for the enterprise [segment], because that's where it is entrenched."

60. On November 25, 2014, during Nimble's 3Q15 earnings call with analysts, Defendant Vasudevan linked Fibre Channel with the enterprise market while discussing the potential for larger deals with the release of Fibre Channel:

> **The second factor that helped this quarter is the set of investments we've made to get into larger enterprises.** As we put enterprise teams in place, as our base of large enterprises is growing, and as they come back to do more with us, they tend to drive larger deals as well. So both of those have been in play this quarter.
>
> **Fibre Channel is a factor that we expect will continue to help that trend.** Already as I mentioned, we've seen beta customers translate into customer deployments. And while it's early days, I do believe that the deal sizes, as a result of Fibre Channel, will tend to be larger than our historical average. That's already evidenced in what we've seen thus far.

61. The market understood this meaningful distinction. For example, on November 25, 2014, during Nimble's 3Q15 earnings call, Needham & Company analyst Rich Kugele commented that "Traditionally Fibre Channel has been a little bit more higher-end enterprise, more performance focused." Defendant Vasudevan confirmed that Kugele's characterization was correct.

62. Wells Fargo also noted on November 25, 2014 that its "Investment Thesis" for Nimble was based in part on "the market expansion opportunity in large enterprise driven, in part, by new products" including the CS300, CS500, and CS700 running on the Fibre Channel platform.

63. On November 26, 2014, Piper Jaffray wrote that "[t]he target customers for [Fibre Channel] arrays are enterprises within the Global 1000-5000," *i.e.*, enterprise clients.

64. On December 3, 2014, Sterne Agee wrote "FC [Fibre Channel] support should greatly expand its opportunities in larger enterprises...."

65. On November 19, 2015, a Macquarie Research analyst referred to "investment focus in the commercial / mid-market and hopes to grow both **commercial (predominantly iSCSI)** and **Enterprise (predominantly Fibre Channel)** segments in the future."

66. On February 23, 2016, several months after the Class Period ended, Nimble announced the release of its first-ever line of all-flash arrays, which included a line of four arrays called the AF3000, AF5000, AF7000, and AF9000. Among other things, one of the chief differences between the all-flash arrays and Nimble's hybrid arrays is that the all-flash array completely eschews disk-based components.

**E. Nimble's Growth Story**

67. Nimble was incorporated in 2007 and went public with an initial public offering on December 12, 2013.[8] Nimble has grown exponentially and in the past five years it has increased its annual revenues from approximately $1.6 million in FY 2011 to over $227 million in FY 2015:

| | Year Ended January 31, | | | | |
|---|---|---|---|---|---|
| | **2015** | **2014** | **2013** | **2012** | **2011** |
| | (in thousands) | | | | |
| **Revenue:** | | | | | |
| **Product** | $ 198,129 | $ 112,812 | $ 49,765 | $ 13,113 | $ 1,632 |
| **Support and service** | 29,544 | 12,921 | 4,075 | 900 | 49 |
| **Total revenue** | 227,673 | 125,733 | 53,840 | 14,013 | 1,681 |

Source: SEC Form 10-K, dated April 2, 2015, at 39

68. Nimble has also dramatically increased its customer base, growing from approximately 40 customers as of January 31, 2011 to more than 4,970 by January 31, 2015:

| Fiscal Year Ending | End-Customers |
|---|---|
| January 31, 2011 | 40 |
| January 31, 2012 | 270 |
| January 31, 2013 | 1,090 |
| January 31, 2014 | 2,640 |
| January 31, 2015 | 4,970 |

Source: SEC Form 10-K, dated April 2, 2015, at 2

69. Although Nimble did not provide the breakdown of customers by segment in any of its public filings after 4Q15, the Company did confirm early in the Class Period and immediately after that the vast majority of its customers were commercial. On December 2, 2014, shortly after the start of the Class Period, Defendant Vasudevan stated at a Credit Suisse conference that approximately 3,500 of Nimble's roughly 4,300 customers (81%) were mid-size enterprise clients, which were a part of its commercial segment. On December 2, 2015, shortly after the end of the Class Period, Defendant Vasudevan stated at another Credit Suisse

[8] Nimble is an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, and thus is not required to conform to GAAP when providing financial information to the market. *See, e.g.*, SEC Form 10-Q, dated September 9, 2015, at 40.

conference that roughly 5,500 of Nimble's approximately 6,800 customers (again, 81%) were mid-size enterprise clients, part of its commercial segment, and told the market that its enterprise customers had grown by approximately 140 customers - from 260 customers to at least 400 customers.

70. Nimble has also considerably increased its employee base in order to develop and grow its customer base. For example, from January 31, 2011 to January 31, 2015, its headcount increased from 47 to 838 employees:

| Date | Headcount |
|---|---|
| January 31, 2011[1] | 47 |
| January 31, 2012[1] | 147 |
| July 31, 2013[3] | 464 |
| January 31, 2014[2] | 592 |
| January 31, 2015[1] | 838 |

[1] Source: SEC Form 10-K, dated April 2, 2015
[2] Source: SEC Form 10-K, dated April 17, 2014
[3] Source: SEC Form S-1, dated October 18, 2013

71. Analysts recognized Nimble as a growth story. For example, the Maxim Group issued a report on November 20, 2014, just before the start of the Class Period, noting that Nimble was "a high growth company" in the context of discussing its sales productivity. At the December 8, 2014 Raymond James Systems, Semiconductors, Software & Supply Chain Conference (the "Raymond James Conference"), Raymond James analyst Brian Alexander remarked to Leary how Nimble was a growth company: "You just reported your October quarter. You are on track to grow I think about 80% for this fiscal year ending January." Leary agreed, saying "It was a strong quarter for us. We grew $59 million for the quarter on the top end. As you said, very strong growth from a year-over-year perspective."

72. At the December 2, 2014 Credit Suisse Technology Conference soon after the start of the Class Period, Defendant Vasudevan was asked by a Credit Suisse analyst how Nimble will capitalize on the $18 billion market opportunity before it, and what made Nimble unique in the market. Vasudevan responded by talking about the history of the industry and

then pivoted to Nimble, stating that Nimble's products are "truly a broad platform" and that "we think we have a multi-year growth opportunity, rather than a short-term spurt."

73. At the January 14, 2015 Needham Growth Conference, analyst Rich Kugele kicked off Nimble's presentation by saying that Nimble is "one of the leading hybrid array companies in storage" and noted its "extreme growth."

74. On February 26, 2015, during Nimble's 4Q15 earnings call, Defendant Vasudevan stated that Nimble looked ahead to the coming fiscal year, as it sees "an opportunity to drive sustained growth over multiple years, while simultaneously demonstrating operating leverage in our business model." Vasudevan replicated his comment again during Nimble's 1Q16 earnings call on May 26, 2015, noting that he "see[s] an opportunity to drive sustained growth over multiple years while simultaneously demonstrating operating leverage in [Nimble's] business model."

75. At the June 9, 2015 William Blair Annual Growth Stock Conference, Mehta stated that "we've been able to ***sustain*** our growth ramp based on our customer acquisition machine."

76. And on September 22, 2015, a Wells Fargo Securities Equity Research reported on a meeting in which Defendants Singh and Mehta stated that Nimble's "growth story is still on track" and that the Company had "confidence" in its ability to breakeven by 4Q16.

**F. Nimble's Core Business Was Its Commercial Segment**

77. Since the Company's inception, and throughout the Class Period, commercial clients were Nimble's primary and most reliable customer base. Growth in commercial clients was an easily predictable metric based on the amount of investment the Company put into its sales operation for commercial and the level of recurring business. During the Class Period, the commercial segment made up approximately 80% of the Company's clients, and that number did not change.

78. Nimble primarily marketed its CS210 and CS215 products, which use the iSCSI storage networking standard, to the commercial segment. The CS210 and CS215 provide a

lower IOPS than Fibre Channel and are geared towards lighter server workloads such as Microsoft Exchange and virtual desktop infrastructure ("VDI").

79. Throughout the Class Period, Nimble acknowledged that commercial clients were its core source of revenue and its "classic" source of business. At a December 2, 2014 Credit Suisse conference, Defendant Vasudevan discussed Nimble's "four fundamental growth drivers that we stay focused on," and the first one that he mentioned was "acquiring new customers in the territory based mid-size enterprise market." The "mid-size enterprise market" was a component of Nimble's commercial segment. As Defendant Vasudevan explained during the same call, the mid-size enterprise segment was "where we started four years ago," and that "[o]ver the last two years, we have rapidly grown our base of Global 5000 large enterprises as well. That's the second segment that's growing quickly for us."

80. At a Raymond James conference on December 8, 2014, Leary also described the Company's intense focus on commercial. An analyst asked Leary to discuss "how you think about growth coming from new versus existing." Leary's response emphasized the "several thousand … midmarket accounts" Nimble currently had, and that "worldwide there are tens of thousands of those accounts and so there is a huge opportunity for us to grow that customer base [referring to commercial] very, very substantially. We will continue to do that…."

81. On May 26, 2015, while announcing results for 1Q16, Defendant Vasudevan stated that "we are continuing to drive customer acquisition at a rapid pace by leveraging our channel partners," *i.e.*, a source of major investment by Nimble for the growth of its commercial clientele.

82. At a June 9, 2015 William Blair conference, Mehta spent time discussing Nimble's ongoing "attack" on mid-market clients from its earliest days, noting that the Company "started out attacking the mid-market" because it "is a really nice, attractive market for a start-up to attack." Commenting that "it turned out to be a very successful way to go," Mehta stated that "we've been able to sustain our growth ramp based on our customer acquisition machine."

### G. Nimble's Venture Into the Enterprise Market

83. At the beginning of the Class Period, Nimble had a small number of larger "enterprise" clients. Enterprise clients were still a new growth area for Nimble, and an important one. With the launch of Nimble's CS300, CS500, and CS700 products featuring the Fibre Channel storage networking platform instead of the iSCSI platform, the Company was able to target this new segment of enterprise clients, which were larger clients that had substantial storage needs beyond the basic systems used by Nimble's traditional commercial customer base. If Nimble was going to make the growth leap it had planned, it needed enterprise companies—and Fibre Channel—to do it.

#### 1. Penetration of the Enterprise Market Meant Penetration of the Global 5000

84. Global 5000 enterprise companies were significant to Nimble and the market because Global 5000 companies are the largest companies globally by revenue, spend considerable amounts on storage, and have significant storage needs. For Nimble, and the storage industry, the "enterprise" market and the "Global 5000" were one and the same.

85. For example, on February 26, 2015, in response to a question about the repeat order ratio for Global 5000 companies, Defendant Singh used  the terms "Global 5000" customers and "large enterprises" interchangeably:

> **Jeff Fidacaro - Monness, Crespi, Hardt & Co. – Analyst**
>
> Great. Just a quick follow-up is when you look at the repeat order ratio for those **Global 5000s**, how did that shape up in the quarter?
>
> **Anup Singh - Nimble Storage, Inc. - CFO**
>
> So the business that we are seeing from the **large enterprises** is definitely above the average, so it's—the metric we've given is over a two-year period 3.2X is the—which is also the case for the cloud SPs as well. So both of those are above the average of our mid-size customers.

86. In response to a December 8, 21014 question from an analyst about revenue growth, Leary also equated "Global 5000" customers with "large enterprises":

> **Brian Alexander - Raymond James - Analyst**

> When I've talked to management about revenue growth coming from new customers versus penetrating existing customers, it seems like management's view is the bigger opportunity is to penetrate existing customers. I think about that and you are **only selling to 260 of the Global 5000 accounts**, so I would intuitively think that the bigger opportunity is to find more customers.
>
> Help us think about the opportunity and how you think about growth coming from new versus existing and why we wouldn't see more of an emphasis on new customers given that again you are **only selling to 260 of the top 5,000 on the enterprise side**.
>
> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> Well, I would say certainly it is a balance. And we definitely want to and believe that we need to go after new accounts, continue to be very aggressively [sic]. And maybe we break that down into the **two segments**, because even though we have **several thousand midsize enterprise or midmarket accounts worldwide** there are tens of thousands of those accounts and so there is a huge opportunity for us to grow that customer base very, very substantially.
>
> We will continue to do that and part of the way we get there is continue to do investments in our indirect and our channel strategy. The relationships and the trust and what we built with our channel partners we think gives us a huge leg up on other new entrants in the market for sure, but even many of the incumbents and continuing to make rapid share gains there.
>
> In the enterprise, to your point, I agree. **We have a lot more large enterprise customers.**

87. Additionally, Defendant Singh stated during the Nimble 4Q15 earnings call on February 26, 2015 that with respect to the repeat order ratio for Global 5000 companies, "the business that we are seeing from the large enterprises is definitely above the average."

88. When describing the Company's growth in the enterprise segment during the Class Period, Nimble routinely discussed the Global 5000:

- In a shareholder letter dated February 26, 2015, Defendants Vasudevan and Singh touted Nimble's "[r]ecord number of new G5000 (Global 5000) enterprises and CSPs (Cloud Service Providers), and record share of bookings from these two segments compared to any previous quarter."[9]

[9] Nimble considered enterprise customers and cloud service providers to be separate. *See, e.g.*, Nimble Storage, Inc., Current Report (Form 8-K), Ex. 99.1 at 2 (Nov. 25, 2014).

- A Nimble Q3FY15 shareholder letter signed by Defendants Vasudevan and Singh and dated as of the first day of the Class Period stated that "[w]e ended the quarter with 260 Global 5000 enterprise customers."
- In a February 26, 2015 call to discuss 4Q15 earnings, Defendant Vasudevan stated: "Our second growth driver is our focus on Global 5000 enterprises and cloud service providers, where we experienced record performance during Q4. We added more G5000 customers and more cloud service providers in Q4 than in any previous quarter, and we saw the highest ever contribution to bookings in each of these segments compared to any previous quarter."
- During the William Blair Annual Growth Stock Conference on June 9, 2015, Mehta described growth in "the Global 5000 market, and these are the 5,000 largest buyers of storage in the world."
- In a shareholder letter dated November 19, 2015, Defendants Vasudevan and Singh stated that their "investments have helped to grow our enterprise business and we now have over 400 large, global enterprises within our customer base" and "[w]e now have over 400 global enterprises within our customer base, including 78 of the Global 500."

89. Analysts understood that Nimble defined the enterprise market as the Global 5000, and following Nimble's cue, used enterprise and the Global 5000 interchangeably. As a UBS analyst report stated on the second day of the Class Period, "Nimble has about 250 enterprise customers, **defined as Global 5000 companies**."

90. An article in the industry publication Daily Cloud stated in January 2015 that Nimble's "target customers are Global 5000 customers."

91. A William Blair Equity Research analyst report dated June 10, 2015 stated that "while Nimble originally made its name selling into the midmarket, management noted the company's focus on moving into larger accounts, particularly cloud service providers and global 5000 enterprises."

92. When describing the Company's growth in the enterprise segment during the Class Period, analysts also routinely discussed the Global 5000:

- A September 8, 2015 analyst report from Susquehanna Financial Group stated that Nimble's "customer growth – namely in G5000 enterprise, is a key aspect of our deal valuation framework."
- An analyst report from Summit Research stated on November 25, 2014 that "the company's penetration into global 5000 enterprises continues rapidly."
- A Summit Research analyst report dated February 26, 2015 stated that "Nimble's rapid penetration into global 5000 enterprises continues (with 41 new customers added on top of 31 new customers added during last quarter)."

93. Thus, when Nimble told the market it was growing its enterprise segment, it was telling the market that it was selling its product to Global 5000 companies. The corollary was also true: statements about the growth of Nimble's Global 5000 business signified to the market that the Company's enterprise business was growing.

94. A list of the Global 5000 companies is maintained on a database called the "Global 5000 Database." The Global 5000 Database is a researched and curated subscription-based public database indexing approximately 5,000 of the largest companies in the world based on revenue and sales generated. The Global 5000 Database contains both public and private companies, and covers all industries in all countries globally.[10]

95. The Global 5000 Database is updated continuously, and issues monthly reports detailing companies that were added to the list by virtue of their organic growth in revenue or sales as well as companies that were removed from the list due to merger, acquisition, or drop in revenue or sales. The list of Global 5000 companies is widely known and used by Nimble, and analysts covering the industry to refer to enterprise customers.

96. Indeed, Nimble itself published a copy of the list of the Global 5000 companies shortly before the Class Period began in connection with an incentive program to have more sales representative focus on these Global 5000 enterprise companies in the third and fourth quarters of 2014. With the roll-out of Fibre Channel, Nimble held a sales promotion called the

[10] As part of Lead Plaintiff's investigation, Lead Plaintiff obtained a listing of the companies that were on the Global 5000 Database during the Class Period, which is attached as Ex. A hereto.

"Nimble Storage Channel Sales Inventive Program" for third-party channel sales representatives to target Global 5000 accounts. In connection with this sales promotion, Nimble hosted a list of Global 5000 customers on its website in order for those third-party channel sales representatives to identify enterprise accounts eligible for the "G5000 Accounts" sales promotion.[11] According to Nimble's website-hosted list and the terms and conditions of the sales incentive program, the Global 5000 list was current for the third and fourth quarters of 2014. The Global 5000 Database as of the beginning of the Class Period contains all of the companies listed in the Nimble's "G5000 Accounts" list from the beginning of the Class Period as described above.[12]

### 2. Penetration of the Global 5000 was Dependent on Fibre Channel

97. The lynchpin for Nimble's growth and penetration into the G5000 was Fibre Channel. On the first day of the Class Period, November 25, 2014, Defendant Vasudevan announced the successful launch of the Fibre Channel product, which was meant to be a leading product in pursuing enterprise clients. On that same day, Vasudevan stated that "I think the first wave of customers that we are really anticipating being adopted as a Fibre Channel platform are what I would characterize as the Global 1000 to Global 5000 type of customers."

98. During a December 8, 2014 conference hosted by Raymond James, Leary reiterated that entering the Fibre Channel product world "represents a huge, new incremental addressable market opportunity for us…."

99. Defendant Vasudevan also directly connected Fibre Channel sales to large enterprise penetration during a December 9, 2014 analyst conference:

> Another way of looking at it, fiber [sic] channel was often the reason that even when a large enterprise liked a lot of what we do from a platform standpoint, it was a barrier to being deployed. Two out of three large enterprise engagements, fiber [sic] channel was the barrier to being deployed, that barrier has gone away.

---

[11] A copy of this list is attached as Ex. B hereto.

[12] Over the course of the Class Period, companies were added to the Global 5000 Database regularly due to revenue growth or corporate spin-off, or removed from the list due to drops in revenue or by virtue of being acquired. *See* Ex. A-1.

100. Analysts understood the connection between Fibre Channel and enterprise growth. For example, on December 3, 2014, a Sterne Agee analyst report stated that "FC [Fibre Channel] support should greatly expand [Nimble's] opportunities in larger enterprises."

### 3. Nimble Tells the Market that Fibre Channel Increases the Company's Total Addressable Market To Nearly $20 Billion

101. Nimble's Total Addressable Market, also known as its "TAM," is a measure of the amount of business it could capture. Throughout the Class Period, Defendants told the market that, with the introduction of Fibre Channel as a means to attract enterprise clients, Nimble's TAM was approximately $20 billion. Given that Nimble's revenues in FY 2015 totaled $227 million, it still had a huge opportunity in front of it, most of which was supposedly enterprise.

102. While speaking at Nimble's 3Q15 earnings call on November 25, 2014, Defendant Singh remarked that:

> When I think about our own TAM, in the past, we've characterized our TAM as somewhere in the $18 billion to $20 billion range. And our served market, which is the (inaudible) served market **prior to Fibre Channel as being in the $5 billion range.** And we still maintain exactly that, which is it's gone from $5 billion to $20 billion.

103. On December 8, 2014, at the Raymond James analyst conference, Leary stated that "we are excited that we just now quadrupled our TAM with the introduction of fiber [sic] channel and obviously that has opened up a huge swath of the market."

104. The next day, on December 9, 2014 at a Barclays Global Technology Conference, Defendant Vasudevan reiterated the opportunity enterprise and Fibre Channel presented:

> So, it's just quadrupling of our TAM, just five or six product lines that we compete against account for over $13 billion that now are entirely available to us because of the fiber [sic] channel introduction. Our TAM is, we think, somewhere in the $18 billion to $20 billion range. So, the market opportunity substantially expanded.

105. As a result, the market understood the growth in Nimble's TAM to be tied to its Fibre Channel platform, and thus to Global 5000 companies. For example, a UBS analyst report

dated November 26, 2014 stated, "Fibre channel increases the TAM to $18bn, which should provide years of growth if Nimble can execute."

106. Sterne Agee commented on December 3, 2014 that "the new support of Fibre Channel (FC) environments … should increase the company's addressable market from roughly $5 billion to $18 billion (management estimate)."

### H. Throughout the Class Period, Nimble Was Pursuing "Breakeven" or Profitability For the First Time

107. Since its founding, Nimble had not been profitable from an earnings standpoint, but it was moving toward breakeven. In its April 2, 2015 Annual Report on Form 10-K for the fiscal year ending January 31, 2015, Nimble provided the following chart tracking what it called "Key Business Metrics" giving an overall snapshot of the Company's growth trajectory. For example, its operating loss as a percentage of total revenue had declined year over year, evidencing that the Company was apparently growing and on its way to breakeven and eventual profitability:

**Key Business Metrics**

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Total revenue | $ 227,673 | $ 125,733 | $ 53,840 |
| Year-over-year percentage increase | 81 % | 134 % | 284 % |
| Gross margin | 65.3 % | 64.8 % | 62.0 % |
| Deferred revenue, current and non-current | 74,446 | 33,509 | 10,896 |
| Net cash provided by (used in) operating activities | 5,376 | (6,742 ) | (18,754 ) |
| Non-GAAP Net Loss | (41,779 ) | (33,974 ) | (25,253 ) |
| Non-GAAP Operating Loss | (39,010 ) | (33,420 ) | (25,160 ) |
| **Non-GAAP Operating Loss as a percentage of total revenue** | **-17 %** | **-27 %** | **-47 %** |
| Adjusted EBITDA | (32,328 ) | (29,393 ) | (24,068 ) |

Source: Nimble Storage, Inc., Annual Report (Form 10-K) (Apr. 2, 2015), at 42

108. This chart shows that if the Company could maintain its rapid growth rate throughout the Class Period (as Defendants were telling the market Nimble was), Nimble's revenues would overtake its expenses and lead to breakeven or profitability. So, while Nimble's non-GAAP operating loss increased, its non-GAAP Operating Loss as a percentage of total revenue had decreased from -47% in 2013 to -17% in 2015.

109. Throughout the Class Period, Defendants stated that Nimble was targeting breakeven or profitability by the end of FY 2016 (*i.e.*, by January 31, 2016). On December 2, 2014, at the Credit Suisse Technology Conference, Defendant Vasudevan stated that "we picked Q4 of next year and we said we're going to breakeven in that timeframe from a non-GAAP operating income perspective. What drove that was a philosophy that sort of growth – we have a large TAM [total addressable market], we have massive differentiation." The larger TAM was associated with the new foray into enterprise driven by Fibre Channel, and thus achieving breakeven relied upon Nimble's ability to penetrate the enterprise market.

110. On December 8, 2014, Leary attended the Raymond James Systems Conference, where he told the market that "we are going to be operating from a non-GAAP perspective breakeven by the end of next year."

111. On December 9, 2014, Defendant Singh attended the Barclays Global Technology Conference, and stated that:

> [G]oing year-over-year we're improving our leverage and then we've established the milestone or **breakeven as a Company in non-GAAP operating income in Q4 of next year and breakeven on a cash flow basis even sooner than that**. So as you look ahead to next year, we're making our progress **and we're confident in being able to achieve that**.

112. On February 26, 2015, during Nimble's 4Q15 earnings call with analysts, Defendant Singh reiterated that "absolutely, the Company is on track for breakeven in Q4."

113. On March 11, 2015, Piper Jaffray analyst Andy Nowinski asked Defendant Singh at a Piper Jaffray conference if there was "anything there that could potentially derail that timeline" of fiscal fourth quarter for breakeven. Defendant Singh responded, "in the absence of a major external shock the answer would be no."

114. On May 26, 2015, during Nimble's 1Q16 earnings call with analysts, Defendant Singh once again repeated that Nimble was "on track to breakeven at the end of the year."

115. On August 25, 2015, during Nimble's 2Q16 earnings call with analysts, Defendant Singh for the third time repeated that "absolutely, in the OpEx that you saw this quarter, we would expect that trend to continue, even as we stay on track for breakeven in Q4."

**I. Defendants Attempted to Grow the Enterprise Segment By Shifting Resources From the Commercial Segment**

116. With Nimble's introduction of its Fibre Channel products, it began shifting its strategy from the short-term growth prospects in the commercial business to penetrating the enterprise market. As part of this strategy, Nimble began shifting its sales and marketing resources from commercial to enterprise in late 2014, shifting nearly half of its investments in sales and marketing to the enterprise segment of the Company.

117. The Company first disclosed this shift in resources from commercial to enterprise on February 26, 2015, when Nimble announced its quarterly earnings for the fourth quarter of fiscal year 2014. On the earnings call that day, Defendants told the market that a greater share of sales and marketing investments were going towards the enterprise segment rather than the commercial segment as had been done in the past.

118. Despite this shift in resources from commercial to enterprise, Defendants repeatedly told the market the both segments were growing, and that the Company was continuing the "rapid pace" in new customer acquisition across all customer segments, including both commercial and enterprise. On June 9, 2015 Mehta told the market that Nimble had been able to sustain its growth trajectory based on the commercial segment.

**J. Nimble Consistently Met Revenue Targets With Remarkable Precision**

119. Leading up to the Class Period, Nimble consistently exceeded the top range of the guidance it issued to the market every quarter. Revenue increased by several million dollars each quarter prior to and during the Class Period:

| Fiscal Quarter | Guidance (Revenue) | Actual Results (Revenue) | Revenue Increase Q/Q |
|---|---|---|---|
| Prior to Class Period | | | |
| Q4 2014 | no guidance - IPO | $41.7 million[1] | -- |
| Q1 2015 | $42 to $44 million[2] | $46.5 million[2] | $4.8 million |
| Q2 2015 | $49 to $51 million[2] | $53.8 million[3] | $7.3 million |
| Q3 2015 | $56 to $58 million[3] | $59.1 million[4] | $5.3 million |
| Class Period | | | |
| Q4 2015 | $65 to $67 million[4] | $68.3 million[5] | $9.2 million |
| Q1 2016 | $68 to $70 million[5] | $71.3 million[6] | $3 million |
| Q2 2016 | $77 to $79 million[6] | $80.1 million[7] | $8.8 million |

[1] Source: SEC Form 8-K, dated February 27, 2014
[2] Source: SEC Form 8-K, dated May 29, 2014
[3] Source: SEC Form 8-K, dated August 26, 2014
[4] Source: SEC Form 8-K, dated November 25, 2014
[5] Source: SEC Form 8-K, dated February 26, 2015
[6] Source: SEC Form 8-K, dated May 26, 2015
[7] Source: SEC Form 8-K, dated August 25, 2015

120. The market came to rely on Nimble's ability to consistently provide such accurate guidance. For example, on November 26, 2014, William Blair commented on the Q3 2015 results as "another beat-and-raise ... with revenue coming in roughly $1.3 million above the Street target," which was in line with the Company's own guidance for the quarter.

121. On February 27, 2015, William Blair similarly commented on the 4Q15 results, noting that "Nimble delivered a solid close to the year, with revenue of $68 million ... topping the consensus by nearly $2 million."

122. On May 28, 2015, Macquarie Capital (USA) issued a report in light of the 1Q16 results headlined "Solid beat-and-raise reinforces confidence in positioning" and noting that the Company "reported 1QFY16 earnings that beat consensus expectations...." William Blair also noted on May 27, 2015 the "solid beat-and-raise quarter highlighted by continued large enterprise and service provider penetration."

123. On August 26, 2015, Jefferies reported in light of the 2Q16 results "Another Boring Beat" and commented that "Nimble again posted a FQ2 (Jul) beat and guided up FQ3 (Oct) revenues." William Blair also commented on August 26, 2015 on the fact that "Nimble delivered another top-line beat-and-raise...."

### K. Throughout the Class Period, Defendants Had Access to Sophisticated Internal Analyses and Metrics Concerning Sales

124. Nimble's ability to meet and beat street expectations was based on its sophisticated sales and accounting process, and the predictable way in which bookings turned into revenue over time. Several former employees confirm that Nimble had access to highly sophisticated tools, and programs, which conducted both historical analyses and highly accurate predictive analyses.

125. CW 1, who was employed by Nimble from 2010 to March 2015 and served as Vice President of West Coast Sales, stated that Nimble as a whole was very metrics driven. According to CW 1, Nimble conducted a lot of forecasting and predictive analysis using Salesforce, which is a cloud computing company, and a system called Cloud 9 to perform more extensive predictive analyses. According to CW 1, Nimble would use Cloud 9 to take each deal Nimble was working on and analyze it by close rate or close-ability. CW 1 explained that one of the features that Cloud 9 had was the ability to take seasonal effects out of the equation in order to get more precise forecasts. CW 1 further explained that Cloud 9 also calculated, for each individual sales person, historical data for each customer broken down by industry in order to get even more precise close rates. CW 1 recounted that he would use Cloud 9 to forecast three quarters into the future, and it would predict close to the exact number of sales that were achieved. CW 1 stated that Cloud 9's forecasts were very accurate. CW 1 further noted that the reports could be broken down by region and territory, and that he, Defendant Vasudevan, and other senior level executives received daily Cloud 9 reports.

126. CW 1 further stated that the accuracy of Nimble's forecasts should not have been affected by the push to focus on enterprise customers instead of commercial because Cloud 9 took into account historical or predictive analysis regardless of whether the customers were enterprise or commercial. CW 1 also stated that Nimble already had historical data during the Class Period reflecting that enterprise deals take longer to close than commercial.

127. CW 1 further noted that Defendant Vasudevan used the Company's predictive analysis software and reviewed Cloud 9 reports from his office. CW 1 stated that Vasudevan

ran a very metrics-driven operation. CW 1 also noted that Vasudevan was very involved in almost every aspect of the Company. CW 1 described Vasudevan as a very controlling CEO. CW 1 recalled Vasudevan often calling him and Vice President of Worldwide Sales Mike Munoz to discuss channel and pipeline metrics; if certain numbers were down, they would show up as red in reports.

128. CW 2, who was employed by Nimble from 2013 through January 2015 and worked as a Marketing Manager for Product and Solutions Marketing, stated that although 60% of deals traditionally close in the last month of a quarter, it was clear to everyone at Nimble prior to the last month of each quarter which deals would and would not close by looking at where they were in the sales cycles in Nimble's systems.

129. CW 3, who worked for Nimble from February 2012 to March 2016 as an Individual Contributor/Sales Representative and, starting in October 2015 as Regional Director of Sales in Southern California, stated that Nimble's sales leadership emphasized and lived by Cloud 9. CW 3 noted that Defendant Vasudevan worked directly with Senior Sales Operation Analyst Jonathan Aragon with respect to projections and Cloud 9 reports.

130. CW 4, a Nimble Sales Engineer from July 2012 to February 2015, described the end-of-quarter projections provided by Salesforce and Cloud 9 as "scary" accurate, and that Cloud 9's modeling was unbelievably accurate. CW 4 provided additional details regarding how Cloud 9 worked. CW 4 explained that sales personnel were consistently required to update information in Salesforce on each of their sales opportunities in the pipeline. CW 4 further explained that based on the tandem of constantly updated information in Salesforce and Cloud 9's algorithms, a very accurate picture for the end of each quarter was presented. CW 4 described Defendants Vasudevan and Singh as being intimately involved in the daily functions of the business during his tenure.

131. CW 5, a Nimble Senior Systems Engineer from December 2014 to February 2016, participated in weekly regional forecast conference calls and in–person regional Quarterly Business Reviews ("QBRs"). CW 5 stated that the regional conference calls were usually chaired by the Director of Sales in Mid Atlantic. District Managers, Vice President-East Mike

Wallerstedt, and Vice President of North American Sales Mark Parrinello participated in the QBRs. CW 5 explained that during the QBRs, the teams reviewed information that was in Salesforce. CW 5 also noted that pipeline opportunities (sales opportunities not near closing, but still opportunities); upside (sales that had a 25% chance of closing during the quarter); strong-upside (sales that had a 50% chance of closing during the quarter); and commit (sales that had an almost 100% chance of closing during the quarter) were discussed during QBRs. CW 5 continued that after the regional QBRs, Parrinello, Wallerstedt, and District Managers would fly to Nimble's headquarters in California and have their own QBR with senior executives (including Defendant Vasudevan) to update them in person about the regional QBRs.

132. CW 5 recalled that he provided updated pipeline, upside, strong-upside, and commit projections on the weekly regional conference calls as well. CW 5 also noted that if a deal was lost, the sales team would indicate the reason why in Salesforce. CW 5 explained that updated sales information was discussed during the weekly regional forecast calls. CW 5 believed that the consistently updated Salesforce information gave Nimble the ability to project by the end of the first month of a quarter whether or not quarterly goals would be met.

133. CW 6, a Sales Operations Analyst at Nimble from June 2013 to November 2015 and a Senior Sales Operations Analyst from November 2015 to May 2016, confirmed that Cloud 9 provided Nimble executives with insight into Nimble's future sales prospects. CW 6 further confirmed that Defendant Vasudevan received regular Cloud 9 reports. CW 6 was aware of his receipt of Cloud 9 reports because he was in Sales Operations and knew that every sales manager and Defendant Vasudevan were getting Cloud 9 reports. CW 6 stated that Salesforce allowed the Company to run breakout reports that differentiated between enterprise and commercial accounts.

134. CW 7, a Nimble Channel Manager from September 2013 to April 2015, confirmed that Nimble's use of Salesforce and Cloud 9 to project sales and provide accurate visibility into the Company's pipeline was excellent. CW 7 also stated that the further Cloud 9's projections went up the chain of command at Nimble, the more accurate the numbers and the visibility into the metrics got—to the point of being "scary good."

135. CW 7 confirmed that quarterly projections were discussed in detail at QBRs in his region chaired by the District Sales Managers, with Area Vice President Keegan Riley in attendance. CW 7 noted that area QBRs would take place in person or via teleconference, and they would recap and roll-up the area's sales projections. CW 7 stated that Riley flew to Nimble's corporate headquarters in San Jose and discussed the area's roll-ups and projections with Vasudevan, Singh, and other senior executives. CW 7 confirmed that he was told by Director of Sales for the Southern United States Jeff Heinberg that the regional roll-ups went to Vasudevan.

136. CW 7 described Defendant Vasudevan as a very involved CEO from a sales operating perspective. CW 7 recalled that sales representatives would arrange for Vasudevan to meet with clients when he visited their region, which he described as highly unusual for the CEO of a publicly traded company. CW 7 specifically recalled as an example one of Nimble's Account Executives in Houston arranging for Vasudevan to visit with one of his accounts.

137. CW 11, Nimble's Vice President of Global Channel Sales from October 2014 to July 2015, confirmed that the Company had robust internal systems to predict guidance and referred to an internal "forecasting machine," which included Vice President of North America, Mark Parrinello. CW 11 stated that Defendants Vasudevan and Singh had visibility into the forecasting machine, and Vasudevan in particular was historically very involved in the forecasting and sales process, and regularly read forecasting and sales reports. CW 11 stated that he received "roll-ups" of the detailed Cloud 9 reports, and that Cloud 9 was managed by Nimble's Sales Operations team but they did not have to manually circulate the report given that Cloud 9 generated the reports and circulated them to the recipients automatically.

138. CW 13, Nimble's Vice President, East from January 2015 to May 2016, stated that Nimble had excellent predictive analytics to forecast revenue. He added that Nimble was able to identify variances within their systems to predict sales more accurately.

139. The remarkable detail and visibility available to Defendants via Cloud 9 is explained by the amount of information Cloud 9 processed on a daily basis. Based on an

internal Nimble Cloud 9 "Daily Forecast Report" from November 2, 2015, Defendants had access to an extremely detailed and sophisticated range of data regarding the business.

140. The Daily Forecast Report issued to sales representatives was in the form of a Microsoft Excel spreadsheet and included seven different worksheets of information. The Daily Forecast Report included two worksheets that contain projections and forecasts. These were titled "Projected Bookings" and "Forecast Metrics." The Daily Forecast Report also included five worksheets with historical information, titled (1) "Discount & Margin Analysis," (2) "Sales QBR Metrics (per Rep)," (3) "Channel QBR Metrics (per Rep)," (4) "QBR Worksheet (per Rep)," and (5) "Bookings Distribution."

141. The Daily Forecast Report used several acronyms which refer to the following terms:

STLQ = Same Time Last Quarter

LQ = Last Quarter

EOQ = End of Quarter

NQ = Next Quarter

ASP = Average Sale Price

142. The first worksheet was titled "Projected Bookings." This worksheet indicated that the "report is designed to provide Sales Managers a bookings estimate for the current quarter according to historical close rates." The worksheet included estimates for "Projected Bookings" with four different "Pipeline Categories," including "Open Pipeline," "Open Weighted Pipeline," "Open Adv Stage Pipeline," and "Bookings," as well as an "Average." The worksheet included ***three quarters*** of estimates for each pipeline category, as well as averages. The worksheet also included a range of "Metrics" under the "Projected Bookings." These metrics included 24 rows of data regarding bookings for each quarter:

| Projected Bookings Calculations<br>Metrics |
|---|
| STLQ Bookings<br>LQ EOQ Bookings<br>STLQ Bookings Remaining |
| STLQ Open Pipeline<br>STLQ Open Pipeline to Bookings Conv Rate<br>CQ Open Pipeline<br>Estimate Bookings from CQ Open Pipeline<br>CQ Bookings<br>Est Total CQ Bookings |
| STLQ Open Weighted Pipeline<br>STLQ Open Weighted Pipeline to Bookings Conv Rate<br>CQ Open Weighted Pipeline<br>Estimate Bookings from CQ Open Weighted Pipeline<br>CQ Bookings<br>Est Total CQ Bookings |
| STLQ Open Adv Stage Pipeline<br>STLQ Open Adv Stage Pipeline to Bookings Conv Rate<br>CQ Open Adv Stage Pipeline<br>Estimate Bookings from CQ Open Adv Stage Pipeline<br>CQ Bookings<br>Est Total CQ Bookings |
| STLQ Bookings Conv %<br>CQ Bookings<br>Est Total CQ Bookings |

143. Each of the "Same Time Last Quarter" ("STLQ") metrics in the Daily Forecasting Reports tracked with precision Nimble's cumulative quarter-over-quarter bookings and pipeline conversions and would indicate clearly whether quarterly bookings were down for that period. By looking at the STLQ metrics, Vasudevan, Singh, and other senior executives would be able to tell that the Company's commercial pipeline was running dry and that enterprise sales were weak during the Class Period.

144. The second worksheet in the Daily Forecast Report was titled "Forecast Metrics." It indicated that: "This report is designed to provide Sales Managers a quick way to

review key current quarter performance metrics including QoQ [quarter over quarter] and YoY [year over year] growth rates." It included nine different metrics set forth in the following tables:

| Current Qtr Forecast Metrics |
|---|
| CQ Pipeline |
| CQ Weighted Pipeline |
| CQ Adv Stage Pipeline |
| CQ Bookings |
| |
| CQ SFC Pipeline |
| CQ SFC Upside |
| CQ SFC Expected |
| CQ SFC Won |
| SFC Won + Expected |

| Next Qtr Forecast Metrics |
|---|
| NQ Pipeline |
| NQ Weighted Pipeline |
| NQ Adv Stage Pipeline |
| |
| NQ SFC Pipeline |
| NQ SFC Upside |
| NQ SFC Expected |

| Current Qtr Opp Generation (S2+) |
|---|
| New S2+ Opps Generated |
| New Customer Opps Generated |
| Existing Customer Opps Generated |
| |
| CQ New S2+ Opps Created |
| CQ ISR Meetings Approved (S2+) |
| CQ Chan Meetings Approved (S2+) |
| CQ Field Meetings Approved (S2+) |
| |
| CQ New Pipeline Generated (S2+) |
| CQ CH Pipeline Generated (S2+) |
| CQ ISR Pipeline Generated (S2+) |
| CQ Field Pipeline Generated (S2+) |

| Total Pipeline Metrics (All Qtrs) |
|---|
| Total Pipeline |
| Total Weighted Pipeline |
| Total Adv Stage Pipeline |
| Total Bookings |
| |
| Total Open Opps |
| Total Open Opps >100K |
| Total Open Opps >250K |

| Current Quarter Channel Metrics |
|---|
| CQ Chan Regs Approved (S1+) |
| CQ Chan Meetings Approved (S2+) |
| CQ Chan Assoc Pipeline |
| CQ Chan Init Pipeline |
| CQ Chan Assoc Bookings |
| CQ Chan Init Bookings |

| Current Qtr Sales Development |
|---|
| CQ ISR Meetings Scheduled (S1+) |
| CQ ISR Meetings Approved (S2+) |
| CQ ISR Sourced Pipeline |
| CQ ISR Bookings |

| Current Qtr Bookings By Deal Type |
|---|
| CQ Bookings New Business |
| CQ Bookings Repeat Business |
| CQ Bookings Support Renewals |
| CQ Bookings NFR |
| CQ Bookings Other |
| Total |

| Current Qtr Deal Count By Deal Type |
|---|
| CQ Unit Count New Business |
| CQ Unit Count Repeat Business |
| CQ Unit Count Support Renewals |
| CQ Unit Count NFR |
| CQ Unit Count Other |
| Total |

| Current Qtr ASP By Deal Type |
|---|
| CQ ASP New Business |
| CQ ASP Repeat Business |
| CQ ASP Support Renewals |
| CQ ASP NFR |
| CQ ASP Other |
| Total |

145. The third worksheet in the Daily Forecast Report was titled the "Discount & Margin Analysis." It stated: "This report is designed to provide Sales Managers margin data for deals booked in the current quarter." It included four metrics: (1) "CQ Discount & Margin Analysis - Controller & Capacity"; (2) "CQ Discount & Margin Analysis – Controller"; (3) "CQ Discount & Margin Analysis - Customer Type"; and (4) "CQ Discount & Margin Analysis - Deal Size Segment." This worksheet included a link to the "VP Dashboard Margin Report."

146. The fourth worksheet in the Daily Forecast Report was titled "Sales QBR Metrics (per Rep)." It included detailed metrics for each individual sales representative, including "Current Quarter Sales Performance Metrics," "Current Quarter Sales Pipeline Metrics," and "Aggregate Pipeline Metrics." Within the "Current Quarter Sales Performance Metrics," the report provides ten subcategories of data, including (1) "CQ Net New Opportunities Generated (Channel, Inside, Field, Etc)"; (2) "CQ Inside Sales Set S2+ Opportunities"; (3) "CQ New Logo Count"; (4) "CQ Average Discount Levels (Hardware Only)"; (5) "CQ Average Sales Cycle (N&R)"; (6) "CQ 100K+ Deals (Open)"; (7) "CQ 100K+ Deals (Wins)"; (8) "CQ 250K+ Deals (Open)"; (9) "CQ 250K+ Deals (Wins)"; and (10) "CQ % of Wins Involving Pilots."

147. Within the "Current Quarter Sales Pipeline Metrics," the report provided metrics regarding (1) "CQ Pipeline (Includes Bookings)"; (2) "CQ Weighted Pipeline (Includes Bookings)"; (3) "CQ Adv Stage Pipeline (Includes Bookings)"; (4) "CQ Bookings"; and (5) a "CQ Margin Analysis."

148. Within the "Aggregate Pipeline Metrics," the report provides information regarding the "Total Pipeline (Excludes Bookings)"; "Total Weighted Pipeline (Excludes Bookings)"; "Total Adv Stage Pipeline (Excludes Bookings)"; "Total 100K+ Pipeline

(Excludes Bookings)"; and "Total 250K+ Pipeline (Excludes Bookings)." The report sets forth detailed metrics for each of these categories for each individual sales representative.

149. The fifth worksheet within the Daily Forecast Report is titled "Channel QBR Metrics (per Rep)." It includes ***eighteen different sets*** of metrics for each individual sales representative, including metrics related to bookings, pipeline generated, opportunities generated, and channel registration. It included updated numbers as of the date of the Report.

150. The sixth worksheet within the Daily Forecast Report is titled "QBR Worksheet (per Rep)." It states: "This report is designed to provide sales managers a quick way to review trends in their business across prior quarters including QoQ and YoY growth rates." It includes a range of 22 "QBR Metrics," along with hundreds of rows of granular metrics broken down by individual sales representative. It includes metrics going back ***seven quarters***. The 22 QBR Metrics included:

| **QBR Metrics** |
|---|
| Total Bookings |
| New Business Bookings |
| Repeat Business Bookings |
| Support Renewal Bookings |
| Other Bookings |
| |
| Channel Initiated Bookings |
| Channel Associated Bookings |
| Direct Bookings |
| |
| New Customer Deal Count |
| New Customer Avg Sales Cycle |
| New Customer Avg Deal Size |
| New Customer % of Deals w/ Pilots |
| New Customer # of 100K+ Deals |
| |
| Repeat Customer Deal Count |
| Repeat Customer Avg Sales Cycle |
| Repeat Customer Avg Deal Size |
| Repeat Customer % of Deals w/ Pilots |
| Repeat Customer # of 100K+ Deals |
| |
| Total S2+ Opportunity Count |
| New ISR Set S2+ Opportunity Count |
| New Field Set S2+ Opportunity Count |
| New Channel Set S2+ Opportunity Count |

151. The seventh worksheet within the Daily Forecast Report is titled "Bookings Distribution." It states: "This report is designed to allow Sales Managers to review monthly bookings distributions from previous quarter. Bookings data for the previous 8 quarters are shown below." It includes eight quarters of metrics, broken down by each individual sales representative, by month.

152. As these metrics indicate, Defendants had access to historical data and analyses that provided month-by-month granular details about the Company for each individual sales representative. The Company also generated forecasts and projections ***three quarters into the future*** within the same Daily Forecast Report that generates eight quarters of historical data.

153. CW 9, a Nimble Systems Engineer during the Class Period, stated that throughout his tenure at Nimble, the sales team was encouraged on sales calls to use a

forecasting and analytics tool called Clari that logged every detail about every potential sale. According to CW 9, Nimble used Clari and Salesforce in conjunction to make sales forecasts. CW 9 stated that a Vice President in his chain of command reinforced the use of Clari during quarterly business reviews.

154. CW 3[13] stated that by April 2015 the Company would have well known the projections for 3Q16, up to a year in advance. He explained that Cloud 9 provides every metric possible that would give complete visibility into Nimble's pipeline.

155. Additionally, CW 9 described his access to the "Win Notes" for every single Nimble deal that closed, regardless of the size or type. According the CW 9, the Win Notes were circulated to a distribution group within Nimble, including Defendants Vasudevan, Singh, and Mehta, and detailed the name of the customer, the size of the deal, whether the account was an enterprise or commercial account, and the sales representative assigned to the deal. CW 9 stated that Vasudevan would frequently respond to Win Notes with congratulatory messages.

156. The Individual Defendants also spoke publicly about their focus on metrics and their visibility into Nimble's pipeline and predictive capabilities. On November 25, 2014, while speaking during Nimble's 3Q15 earnings call with analysts, Defendant Vasudevan summarized the Company's accomplishments that quarter by stating that "we've demonstrated a strong track work for execution, which continued during the third quarter." Later on that same call, Vasudevan spoke about Nimble's ability to predict future growth:

> So we feel very good about both the pace of new customer acquisition in the mid-sized enterprise segment, as well as the fact that we are growing our base in large enterprises and cloud service providers, and **we have a predictable manner in which they come back to do more with us. All of which we can predict very well and look ahead and see how that translates into growth for our business model.**

157. Defendant Vasudevan also provided color about the predictability Nimble had with its business, in response to an analyst question regarding visibility:

[13] CW 3 worked for Nimble from the beginning of the Class Period as an Individual Contributor/Sales Representative and, starting in October 2015, as Regional Director of Sales in Southern California.

> On your question around predictability of the business going forward, the way I would characterize it is there are two rhythms and they are separate. On mid-si[z]ed enterprises, the repeat purchase propensity of that base has remained steady as we look back. **And really what drives our growth in that segment, and it is** [sic] **been a very predictable way in which we've given growth in that segment**, is channel leverage, the number of territories that we have sales teams deployed in, and all of that have been things that have worked well for us.

158. During the December 2, 2014 Credit Suisse Technology Conference, Defendant Vasudevan reiterated the visibility Nimble had into its customers' propensity to purchase additional products once they make an initial purchase:

> The fourth one, which operates against all of these, **every time we land a new customer, there is a very predictable pattern of how they come back to do more with us.** And so, repeat bookings in storage are always significant. We have seen a faster pace of repeat deployments as you can see from our pace of repeat bookings and ratio of existing customer versus new customer bookings.

159. At a December 8, 2014 analyst conference hosted by Raymond James, Leary noted how Nimble looked closely at new business initiated by channel partners, in response to a question regarding what percentage of sales comes from channel partners:

> **Unidentified Audience Member**
>
> What percent of your sales [is in your] channel?
>
> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> We are virtually 100%. We are 99% about indirect today. The other metrics that we really look at there are how much of our business is what we call channel initiated business brought to us by our partners, and how much is channeled associated, which is how much we are bringing to them as a result of our sales and marketing efforts. They run approximately -- it varies a little bit quarter by quarter -- but almost 50/50 across those two as a mix.

160. During Nimble's May 26, 2015 earnings call for 1Q16, Defendant Singh also admitted that Defendants closely monitored the work done by Nimble's channel partners, the third parties that Nimble relies on for the majority of its sales:

> **A metric that we track really closely** are deals that our partners are leading. So, basically doing all of the lifting to close those deals. And in Q1 for example, as a share of all of our business, the metric there was actually at an all-time high in terms of deals that came from the partners.

### L. Defendants (1) Misled the Market Throughout 3Q16 as to the True State of Nimble's Commercial and Enterprise Businesses, and (2) Misled the Market Throughout the Class Period as to Nimble's Penetration of the Enterprise Segment

161. Defendants misled the market as to the true state of Nimble's sales pipeline throughout 3Q16, and misled the market as to Nimble's penetration of the enterprise segment throughout the Class Period. First, Defendants misled the market as to the health of the commercial pipeline (which indicated potential sales opportunities). Beginning in early 2015, Nimble's commercial pipeline began exhibiting signs of escalating weakness due to the redirection of resources from the commercial segment to the enterprise segment. By August 1, 2015 (the first day of 3Q16), as the Vice President, East put it, Nimble had to use all of its 1Q16 backlog cushion from booked orders that hadn't yet shipped to make up for the 2Q16 booking shortfall in the East in order to make its 2Q16 guidance. CW 13 explained that while the East made up a portion of the 2Q16 booking shortfall, it certainly was not all of it—meaning there were booking shortfalls at Nimble outside of the East. According to the Vice President, East, by 3Q16 there was no more backlog to use.

162. Indeed, Defendants' visibility into the sales opportunities in Nimble's pipeline would have indicated that, because of the weakness in its pipeline, the Company was not on track to make guidance, and was not exhibiting the type of growth that Defendants publicly touted to the market. Second, Nimble simply was not penetrating the enterprise segment after the launch of the Fibre Channel platform throughout the Class Period because the new product line lacked features which enterprise customers required. In order to conceal this reality, Defendants relabeled commercial customers as enterprise customers in order to make it look like enterprise was doing better than it actually was.

#### 1. Defendants Misled the Market Throughout 3Q16 as to the Weakening of Nimble's Commercial Pipeline Due to the Shift in Resources and Its Failure to Penetrate the Enterprise Market

163. The convergence of the decline of Nimble's commercial pipeline and its failure to penetrate the enterprise segment had a catastrophic effect on the Company's 3Q16 revenues. According to former Nimble employees, as discussed herein, the decline of the state of

Nimble's commercial pipeline took root when Nimble, in order to grow its enterprise business, began dedicating resources from the commercial segment to the enterprise segment. This led to decreased engagement—or "demand generation"—of potential commercial customers, which itself led to fewer commercial customers in the pipeline. The commercial pipeline thus began exhibiting signs of weakness as a result of the shift in resources as early as the first quarter of calendar year 2015. Further, multiple former Nimble employees corroborate the fact that executive management had access to and reviewed on a daily basis detailed metrics of Nimble's customer pipeline. CW 1, the former Vice President of the West, stated that Nimble could predict exactly how a quarter would end on the first day of that quarter. Indeed, when announcing the huge earnings miss during the 3Q16 earnings call on November 19, 2015, Defendant Vasudevan himself admitted that "[i]t was really pressure that **we saw throughout Q3**… for us this quarter, throughout, we noticed that there was more competitive intensity, and certainly that carried on through month three" (emphasis added).

164. According to CW 2, who was employed by Nimble from 2013 through January 2015 and worked as a Marketing Manager for Product and Solutions Marketing, Nimble—while also focusing its investments on enterprise sales—did not during the Class Period increase the head count in its marketing department in 2014 or 2015 to accommodate the Company's focus on enterprise. CW 2 stated that Nimble began to focus on enterprise in 2014, and that commercial had always been Nimble's bread and butter. CW 2 reiterated that there was a lack of investment in growing Nimble internally in order to accommodate the needs of enterprise.

165. CW 1, who was employed by Nimble from 2010 to March 2015 and served as Vice President of West Coast Sales, confirmed that, in order to try to break even, Nimble had to tighten its belt by hiring less and marketing less. CW 1 stated that this slowed down the Company's momentum, which was not good for a hyper-growth company such as Nimble. According to CW 1, Nimble slowed down hiring and field marketing when the Company announced that it would break-even in four quarters, by FY 2016. CW 1 further stated that if Nimble had not shifted focus to enterprise, it would not have neglected its commercial business and would have continued to grow.

166. CW 9, a Nimble Systems Engineer during the Class Period, confirmed that Nimble's commercial business was drying up during the Class Period. CW 9 explained that Nimble was not getting enough at bats to market to commercial customers during this time. According to CW 9, Nimble shifted investment from commercial to enterprise at the expense of its commercial pipeline.

167. CW 5, a Nimble Senior Systems Engineer from December 2014 to February 2016, noted that Nimble was diverting resources from commercial to enterprise, which caused his territory's commercial pipeline to be weak during his entire tenure with Nimble (which began in December 2014), and that it was drying up in the first quarter of 2015. CW 5 also noted that commercial sales were weak because of a lack of investment in marketing.

168. An internal Company document also supports that by at least February 2015, lead generation was suffering. On February 13, 2015, Mark Parrinello, Nimble's Vice President of North American Sales, sent an email to the 'Sales.NA' email group noting that the Company's lead generation was way down.[14] Parrinello, according to a Nimble press release on September 30, 2014, reported directly to Eric Mann, the former head of Worldwide Sales.[15] Accordingly, he reported directly to Vasudevan at the time he sent this email:

> Folks, I have looked over the numbers and have seen tons of data. It appears that our lead gen is way down. Some of you say its marketing. Some of you say its channel. Some say inside sales. Probably all of the above and we have a deep dive meeting next week to drill down and come up with some ideas and answers.

169. Former employees of the Company state that, in addition to the growing weakness in the commercial business, Nimble was failing to penetrate the enterprise segment. *See infra* § V.L.2. This reality would have been reflected in the Company's Cloud 9 data. *See supra* § V.K. CW 2 confirmed that although 60% of deals traditionally close in the last month of a quarter, it was clear to everyone at Nimble before that last month which deals would and would not close

[14] CW 9 confirmed that Nimble's "Sales NA" email list during his tenure included the entire management team at Nimble, including Defendants Vasudevan, Singh, Mehta, and Leary.

[15] As discussed *supra* at ¶¶ 37-38, Mann left Nimble in January 2015 and his direct reports subsequently reported on an interim basis directly to Defendant Vasudevan.

by looking at where they were in the sales cycles in Nimble's systems. CW 1 further stated that Nimble's predictive analysis software gave a clear picture as to how the second quarter would end up, and given that knowledge it was clear that the third quarter would not be good. CW 1 explained that a rough second quarter meant that 3Q16 would be a mess.

170. According to CW 10, a Nimble Southwest Regional Director from 2010 to February 2013 and a Nimble Area Business Manager for the Southwest Region until October 2015, the Company knew that it was going to miss guidance for 3Q16 from the beginning of the year. He explained that the numbers in the Company's various internal forecasting system showed that Nimble had vulnerability in Q3.

171. CW 10 stated that Nimble employed a number of tools to estimate or project how it would do in subsequent quarters. Those tools worked with the information being inputted from the field by all of the sales personnel. According to CW 10, the lack of marketing and ramp in certain areas created a vulnerability that was clear for 3Q16.

172. CW 12, former Director of Internal Audit throughout the Class Period, stated that the executives at Nimble knew months in advance that they were going to miss 3Q16 guidance. CW 12 explained that Nimble expected to hit 20% of their quarterly forecast in the first month of the quarter (August 2015), 30% in the second month of the quarter (September 2015), and 50% in the final month of the quarter (October 2015). CW 12 stated that in the months leading up to the 3Q16 miss, nothing was hitting targets. CW 12 stated that the executives at Nimble knew that it was going to be impossible to achieve guidance for 3Q16.

173. CW 12 stated that Nimble's entire executive team, including Individual Defendants Vasudevan and Singh, logged onto Cloud 9 at least daily in order to monitor how Nimble was progressing towards achieving guidance. CW 12 participated in Defendant Singh's weekly CFO staff meetings and Singh would constantly reference the numbers he was seeing in Cloud 9 at every meeting.

174. CW 12 recalled a concern among the executive management, including Defendants Vasudevan and Singh, in the months leading up to the guidance miss when it became clear that the Company would not reach its guidance. According to CW 12, it was clear

among the executive team that Nimble's stock price was going to take a significant hit. CW 12 stated that executive management tried to manage the situation and sought legal counsel in the months leading up to the guidance miss.

175. CW 13, the Vice President, East from January 2015 through May 2016, stated that the 3Q16 miss was due to Nimble being light on commercial deals. CW 13 stated that his region had a slow first two months of 3Q16, during August and September 2015. CW 13 stated that by August 1, 2015 (the first day of 3Q16), Nimble had to use all of its 1Q16 backlog cushion from booked orders that hadn't yet shipped to make up for the 2Q16 booking shortfall in the East in order to make guidance for 2Q16. CW 13 stated that he heard this from Mark Parrinello and Denis Murphy. CW 13 explained that while the East made up a portion of the 2Q16 booking shortfall, it certainly was not all of it—meaning there were booking shortfalls at Nimble outside of the East. CW 13 continued that by 3Q16, there was no more backlog to use. Further, CW 13 estimated based on deals in the East that the average Nimble deal size was approximately $65,000 per deal. This meant that the total value of the earnings miss—$5.3 to $7.3 million for 3Q16—represented the value of approximately 80 to 110 deals.

176. CW 13 participated in weekly forecast calls led by Mark Parrinello, Vice President of North America Sales. According to CW 13, these calls took place every Monday morning and included all of Parrinello's direct reports—the Vice Presidents of the East, West, Central, and Federal— as well as the Vice President of Sales Operations and the Head of Channel. CW 13 described how Nimble's predictive forecasting software allowed Nimble to tell, on any given day, how the Company had done historically at that point in the month or quarter in order to predict if Nimble could achieve its quotas and sales goals. CW 13 stated that the executives at Nimble knew how much business had been done historically down to a district level, and that the executives had a daily grasp of how Nimble was doing compared to past quarters and years.

177. CW 13 further stated that the East region had a slow August and September in which the region was significantly behind where it was committed to finish (which was common and very back-end loaded). CW 13 stated that each deal was required to be rated in Salesforce

for the commit, upside, and pipeline scenario for the week, the month and the quarter. CW 13 tracked this information for the East. CW 13 stated that Nimble had used a tool called Clari, which added an additional level of transparency and similarly applied predictive analytics. CW 13 explained that with that tool, Nimble could see the percentage chance of closing for each deal.

178. CW 14, the Director and subsequently the Senior Director of Worldwide Channels GTM Strategy and Marketing throughout the Class Period, confirmed that Defendant Singh, the Chief Financial Officer of Nimble, and other executives had access to Nimble's projections in real time and that trending and analytical information were extremely tight. CW 14 stated the analytics from Cloud 9 were there to prove that Nimble would significantly miss 3Q16 guidance prior to the 3Q16 earnings announcement because Cloud 9 tracked the "run-rates" on every single deal, and Nimble knew from previous quarters when that deal would close. CW 14 stated that Nimble had an excellent predictive analytics program because the Company has only one product line: storage. CW 15, a Nimble Field Marketing Manager throughout the Class Period, confirmed that Nimble had a very tight analytical system that tracked everything. CW 15 recalled that Nimble used many internal analytical tools which would have indicated to anyone at Nimble that they were going to miss guidance.

179. CW 3, a former Regional Director of Sales, stated that sales leadership knew several months in advance that Nimble was not going to make their 3Q16 guidance. CW 5, a former Systems Engineer at Nimble, stated that the consistently updated Salesforce information gave Nimble the ability to project by the end of the first month of a quarter whether or not quarterly goals would be met.

180. Despite the state of the pipeline evidenced in Cloud 9 and as described by CWs, Defendants issued overly optimistic guidance. During the 2Q16 Earnings Call on August 25, 2015, the Company provided guidance to the market for the current quarter, 3Q16. Defendant Singh stated:

> Moving on to guidance for Q3. **In Q3, we expect our revenue to be in the range of $86 million to $88 million** and operating losses between $5 million and $6 million. This translates into a non-GAAP loss of $0.08 to $0.09 per share, which is based on approximately 80 million shares

> outstanding. **We remain on track to achieve our goal of breakeven in non-GAAP operating income at the end of FY16.**

181. Cloud 9 would have indicated to the Defendants that the souring realities of Nimble's business—the ongoing failure to penetrate the enterprise segment and the continuing deterioration of its commercial pipeline beginning in early 2015 due to the shift in resources—meant that Nimble was not on track to meet its 3Q16 guidance. Indeed, the fact that bookings were not materializing for 3Q16 could be viewed in Cloud 9 reports by comparing the STLQ ("same time last quarter") bookings quarter over quarter. The fact that the pipeline for both the commercial and enterprise segments was weak could also be seen in Cloud 9.

182. Despite this, Defendants Mehta and Singh told Wells Fargo in September 22, 2015 (seven weeks into the quarter) that Nimble's growth story was still on track. CW 9 stated that it was clear to the Company that Nimble was not going to meet its projected guidance by the middle of 3Q16. Defendant Vasudevan later admitted that the Defendants saw the weakness **throughout the quarter**. CW 9 stated that Mark Parrinello, Vice President of Sales, North America, relayed in a call with the entire sales organization that Nimble saw the miss coming but it was too late to steer clear because the Company didn't have the pipeline.

### 2. Nimble Misled the Market About its Penetration of the Enterprise Segment

183. According to former employees of Nimble, as discussed herein, Nimble was failing to penetrate the enterprise market during the Class Period. In particular, Nimble's products lacked so many features and functionalities that were crucial to enterprise clients and that were standard in Nimble's competitors' products, including a different storage device called an all-flash array. In order to hide that enterprise was not going as well as expected, Defendants started improperly relabeling commercial clients as enterprise clients, making it seem that enterprise customers and bookings were growing when, in fact, Nimble was just borrowing commercial clients and calling them enterprise.

#### (a) Nimble Was Not Penetrating the Enterprise Market Because Its Products Did Not Meet Prospective Enterprise Clients' Needs

184. CW 5, a Nimble Senior Systems Engineer from December 2014 to February 2016, stated that Nimble had a hard time competing for enterprise business because the Company's hybrid product was not offering what enterprise clients wanted or needed. CW 5 described Fibre Channel as having limited features and missing functions when it was first introduced in 2014 and throughout the Class Period. CW 5 explained that these missing functions included (i) an all-flash array; (ii) more than two ports in the hybrid array; (iii) the ability for the storage array to deduplicate; (iv) CIFS/NFS functionality; and (v) the ability to have both iSCSI and Fibre Channel functionality in one area (also known as redundancy). CW 5 noted that an all-flash array was important to many enterprise clients because it offered a level of capacity and performance that the hybrid arrays could not match. CW 5 stated that the deduplication feature was important and was a major point in many Requests For Proposals ("RFPs") received from prospective enterprise clients. CW 5 explained that deduplication takes blocks of data and only writes it one time. CW 5 further explained that, for example, if the word 'the' appears in a document numerous times, deduplication places a marker where the 'the' is used until needed, and places the word back in the document when it is recalled from storage. According to CW 5, Nimble's product could compress the storage space being used, but deduplication saved more space and was more efficient, which was what enterprise clients generally wanted.

185. CW 5 stated that enterprise clients needed storage arrays with four Fibre Channel ports, but that the Nimble arrays that contained four ports were too expensive compared to the all-flash arrays offered by Nimble's competitors.

186. CW 5 further indicated that the Nimble arrays marketed to enterprise clients did not offer CIFS and NFS functionality, which were standard features in Nimble's competitors' all-flash arrays. CW 5 described the CIFS/NFS functionality that many large enterprise clients required as an access protocol used by computers, servers, and storage arrays to link shared files together. CW 5 stated that because Nimble's arrays were missing this protocol, prospective

clients would have to install additional protocols on their servers or computers in order to link certain shared files together. CW 5 noted that this was another reason most prospective enterprise clients rejected Nimble's products throughout the Class Period.

187. CW 5 further stated that it was common for the RFPs from large enterprise clients to require these missing functions, meaning that Nimble often could not even get a seat at the table. According to CW 5, when Nimble lost deals because the products lacked certain features, the reasons for the lost deal would be indicated in Sales Force.

188. CW 5 stated that during engineering sessions and kickoffs, Defendant Vasudevan would ask for feedback from the field and engineering representatives on how to improve the Company's chance of closing deals, and the responses were that Nimble needed to add features such as deduplication, redundancy, CIFS, and NFS.

189. CW 5 stated that enterprise sales were not successful because Nimble's products did not have the features that enterprise clients wanted. CW 5 confirmed that colleagues in the New York, Atlanta, Pennsylvania, and New Jersey regions also explained to him that they had difficulty penetrating the enterprise market throughout CW 5's tenure.

190. CW 8, a Nimble Sales Representative from May 2014 to January 2016, stated that Nimble did not have success in selling to enterprise customers, unlike their rival Pure Storage, because Pure Storage offered an All-Flash Array that enterprise customers desired. CW 8 stated that true enterprise companies like Wells Fargo or Bank of America invest a lot in information technology infrastructure.[16]

191. CW 7, a Nimble Channel Manager from September 2013 to April 2015, also confirmed that, during Company-wide web conferences that occurred quarterly, Nimble sales and systems personnel asked when features enterprise clients desired, including deduplication, redundancy, and NFS/CIFS would be available. CW 7 stated that Defendants Vasudevan and Singh attended these web conferences, as did Vice President of North American Sales Mark Parrinello and Vice President of Product Development Ajay Singh. CW 7 stated that sales

[16] During the Class Period both of these companies were, and continue to be, on the Global 5000 Database. *See* Exs A and B.

representatives were telling Nimble senior executives that they needed all-flash features and the afore-mentioned features in order to compete. According to CW 7, Vice President of Product Development Ajay Singh, whom he believed reported to Vasudevan, would typically respond to the sales teams' questions about the missing features that customers required. CW 7 stated that Ajay Singh's response to such questions would include what was and was not on the roadmap, and to focus on selling what Nimble currently offered.

192. CW 7 explained that he, his channel partners, and Nimble's sales and systems personnel received negative feedback from enterprise customers about Fibre Channel's lack of systems features, including deduplication, and that this information was relayed to senior level executives including Defendant Vasudevan.

193. CW 7 also stated that RFPs for potential enterprise deals included requirements including deduplication, redundancy, and CIFS/NFS, which Nimble could not meet. CW 7 confirmed that these features were still lacking by the time he left Nimble in April 2015.

194. CW 1, who was employed by Nimble from 2010 to March 2015 and served as Vice President of West Coast Sales, stated that Nimble knew in 2014 that it did not have the product to attract enterprise customers. CW 1 recalled that Nimble's hybrid arrays lacked features including deduplication, CIFS, NFS, and redundancy that prevented Nimble from even getting a seat at many enterprise RFPs. CW 1 also noted that Nimble did not offer metro clusters, which was something its competitors offered and which also negatively impacted Nimble's ability to compete on RFPs. CW 1 described metro clusters as having arrays for customers in two different areas, so that if one array stops working most of the information will be transferred to a second array. CW 1 also stated these issues were why the Company lost out on many of the enterprise RFPs in which it participated. CW 1 recalled that sales personnel all had conversations with the CEO about these missing features, and they all acknowledged it. CW 1 stated that at Nimble, of all the worldwide Enterprise sales representatives in the history of the Company, only one or two had ever made their numbers, which means a lot of people never made their numbers.

195. CW 1 further stated that there were a lot of arguments and disagreements between the field (sales) teams and executive management regarding the push to enterprise and whether Nimble had the right product offering to attract enterprise clients. According to CW 1, this was a constant battle beginning in late 2014 at Nimble led by Defendant Vasudevan.

196. CW 8, a Nimble Sales Representative from May 2014 to January 2016, explained that Nimble was having difficulty getting true enterprise customers to buy its products, because Nimble was missing an all-flash array, which was a piece that enterprise customers were really gravitating towards. CW 8 stated that Nimble's lack of an all-flash array product kept Nimble out of "a chunk of the market" of enterprise customers, and that he had trouble penetrating a lot of enterprise customers because of this issue. CW 8 also confirmed that deduplication was a feature that Nimble lacked. CW 8 recounted that there were a number of enterprise opportunities that Nimble knew about but that it was not invited to the party because Nimble did not have the storage device that enterprise customers were looking for. CW 8 noted that from the feedback he got from his customers, they wanted an all-flash array and the missing features.

197. CW 9, a Nimble Systems Engineer during the Class Period, confirmed that Nimble had difficulties penetrating the enterprise market during the Class Period. CW 9 explained that, during his tenure at Nimble, there were Enterprise Sales Representatives in his region that had been at Nimble for eighteen months and had still not closed a single enterprise deal. He added that during the Class Period he had a colleague who was a Sales Representative for enterprise accounts who relayed that he was lucky if he had one or two client meetings per month during the Class Period. CW 9 explained that when Nimble sales representatives targeted enterprise accounts in the Northeast, there was no compelling reason for those accounts to switch from competitors like EMC to Nimble. According to CW 9, Nimble's lack of an all-flash array product disqualified Nimble in approaching potential enterprise customers throughout the Class Period.

198. CW 9 described how enterprise sales representatives had no closes, meaning they were unable to get accounts into the pipeline to booking revenue. CW 9 added that enterprise

sales representatives in his region were an embarrassment because they did not close any enterprise deals. CW 9 stated that commercial deals tend to take 2-4 months while enterprise deals traditionally take 12-18 months.

199. CW 14, former Nimble Senior Director of Worldwide Channels GTM Strategy and Marketing, corroborated that Nimble encountered challenges in trying to sell to Enterprise customers. CW 14 continued that Nimble was unable to compete against what were known as the "incumbent partners," or storage companies like EMC and NetApp.

**(b) Nimble Improperly Relabeled Commercial Accounts as Enterprise Accounts to Make it Seem as if Enterprise was Growing**

200. As shown above, despite Fibre Channel, the Company was not truly piercing the enterprise segment as the market was led to believe. Although Defendants frequently touted their success with new enterprise customers and an incremental increase in sales to large enterprises, they were in reality not making meaningful headway in the enterprise market. The Company hid this from the market by improperly relabeling commercial accounts as enterprise accounts.

201. CW 5 stated that, beginning in December of 2014 and continuing throughout the remainder of the Class Period in his region (the Mid-Atlantic), Nimble was relabeling small and medium-sized commercial accounts as enterprise accounts. CW 5 detailed that this was usually done by assigning commercial accounts to an enterprise sales representative and then including that commercial account in the enterprise sales representatives' enterprise sales results. CW 5 stated that, prior to commercial accounts being transferred to enterprise account sales representatives, the enterprise sales representatives did not have true enterprise sales materializing in the pipeline. CW 5 advised that Nimble's Salesforce metrics allowed the Company to track the history of previous owners of the accounts within each account entry. According to CW 5, Salesforce would indicate whether an account assigned to an enterprise sales representative had been previously assigned to a commercial sales representative. CW 5 stated that anyone up the chain of command could view and access this information, and it would have appeared in roll-up reports to upper management.

202. CW 13 confirmed that managers of enterprise representatives were encouraged to give a couple commercial accounts to learn the mechanics of closing, shipping, and installing a Nimble deal, and to get them off of $0 booked to feel some success. CW 14 (who reported first to Defendant Leary and subsequently to Chief Marketing Officer Janet Matsuda during the Class Period) stated that Nimble reclassified its top end commercial accounts as enterprise accounts when the Company began hiring enterprise sales representatives during the Class Period. CW 14 stated that the way that Nimble's internal Salesforce and Cloud 9 systems worked, if a Commercial account was reclassified as an enterprise account, that account would have been counted as a "win" during that quarter and announced to the market as such.

203. CW 3 confirmed that Nimble was relabeling commercial accounts as enterprise accounts. He stated that this began in December 2014 and continued throughout the remainder of his tenure (which ended in March of 2016). CW 3 stated that the reason behind the re-labeling of the accounts was ultimately to make enterprise sales look like they were doing better than they actually were. CW 3 stated that he was one of the last sales representatives at Nimble to be approached about the shift of some of his accounts from commercial to enterprise. CW 3 reiterated that this was something that was being done systemically throughout the Company. CW 3 recalled multiple conversations with Vice President of West Sales Tim Maggs in which Maggs said Nimble would be doing this everywhere.

204. According to CW 3, the reason for relabeling accounts as enterprise was so that those accounts would be recognized as enterprise sales if customers had add-ons. CW 3 stated that the re-labeling directive came from Mark Parrinello, VP of North America Sales, but added that Suresh absolutely had his hand and finger on everything. CW 3 recalled having a dispute with the District Manager for Enterprise in the West. CW 3 recalled having to involve Maggs and Parrinello because they had made him some guarantees related to keeping certain accounts under his purview.

205. As stated by CW 3, this was very aggravating because he felt that new hires on the enterprise side of the business should go out and sell rather than poach his accounts (in the Southern California region).

206. CW 8, who was employed by Nimble for the entirety of the Class Period, also confirmed that Nimble was relabeling commercial customers as enterprise. CW 8 explained that a number of his accounts were re-labeled and given to new enterprise representatives that Nimble was hiring. CW 8 said one example was a customer in Arizona called Prosper Lending, which was taken from him, relabeled as enterprise, and given to an enterprise representative. Prosper Lending was not on the Global 5000 database or Nimble's Global 5000 list during the Class Period.[17] CW 8 believed that no other vendor would consider Prosper Lending to be an enterprise account. CW 8 also identified Splunk as an additional commercial account that was taken away from him and relabeled as an enterprise account. Splunk was not on the Global 5000 Database or Nimble's Global 5000 list during the Class Period.[18] Similarly, CW 8 identified Esurance and AirBNB as commercial accounts that were relabeled as an enterprise accounts even though they were not truly enterprise accounts. Neither company was on the Global 5000 Database or Nimble's Global 5000 list during the Class Period.[19]

207. CW 8 stated that the reason for the re-labeling was because Nimble did not have a lot of enterprise customers so they decided to move these mid-tier customers to enterprise to create a buffer for the enterprise sales representatives, so that when they could not sell into the enterprise market they had backlog of additional customers that may help them show some success in Enterprise. CW 8 also stated that the enterprise representatives were able to grow these re-labeled accounts with more licenses and add-on storage, which allowed Nimble to tout the good potential for Nimble's enterprise business prospects. CW 8 advised that there was definite pipeline for his customers that were re-labeled as enterprise. CW 8 reiterated that from his prospective Nimble grabbed in more than what was legitimately enterprise in order to make it look like the new enterprise sales representative hires had enough to sell and that Nimble's enterprise business was thriving.

---

[17] *See* Exs. A and B.
[18] *See* Exs. A and B.
[19] *See* Exs. A and B.

208. CW 9 described a customer called Parsons Brinckerhoff that was relabeled from commercial to enterprise and that was in the enterprise pipeline during the Class Period, with the deal closing shortly thereafter. Parsons Brinckerhoff was not on the Global 5000 Database or Nimble's Global 5000 list during the Class Period. CW 9 also described Jefferies and New York Presbyterian as accounts that were reclassified from commercial to enterprise during the Class Period. Neither was on the Global 5000 Database or Nimble's Global 5000 list during the Class Period.

209. CW 10, a Nimble Southwest Regional Director from 2010 to February 2013 and a Nimble Area Business Manager for the Southwest Region until October 2015, described fighting against Parrinello's efforts to relabel his commercial accounts as enterprise accounts during the Class Period. CW 10 recalled fighting to keep certain customers in commercial accounts because he had built and cultivated those relationships.

210. CW 10 stated that, as Nimble brought in newly hired enterprise sales representatives, the Company gave them an account base of roughly twenty-five accounts. According to CW 10, since the newly hired enterprise sales representatives were unable to penetrate the enterprise accounts, Nimble had to give them an additional forty to fifty commercial accounts. CW 10 described this as Nimble's attempt at feeding the families of the enterprise sales representatives while they tried unsuccessfully to penetrate the enterprise market. CW 10 added that many of the newly hired Enterprise sales representatives ultimately sold to the commercial accounts and that was good enough.

211. The chart below lists just a few examples of some of the many commercial accounts that were reclassified as enterprise accounts during the Class Period. These accounts are not meant to be an exhaustive list of what various former employees describe as a prevalent, improper relabeling practice across the Company. What is significant about this list, however, is that none of these companies which were relabeled to enterprise customers appear on the Global 5000 Database or Nimble's Global 5000 list at any time during the Class Period.

| Account Name | Source |
|---|---|
| Splunk | CW 8 |
| Esurance | CW 8 |

| | |
|---|---|
| Prosper Lending | CW 8 |
| AirBNB | CW 8 |
| Jefferies Group | CW 9 |
| Parsons Brinckerhoff | CW 9 |
| New York Presbyterian Hospital | CW 9 |

These seven reclassified accounts identified by the confidential witnesses represent 5% of the approximately 140 Global 5000 companies that Defendants Vasudevan and Singh reported Nimble as having added during the Class Period.[20] The number of relabeled accounts is far greater, however, when considering that CW 3, CW 5 and CW 10—former employees in various parts of the county—all describe the same practice as CW 8 and CW 9. Collectively, CW 3, CW 5, CW 8, CW 9, and CW 10 all confirm that relabeling was happening in their regions for numerous accounts.[21]

[20] In a November 25, 2014 shareholder letter for the third quarter FY 2015, ending October 31, 2014 (the quarter that ended before the Class Period began), Vasudevan and Singh wrote, "We ended the quarter with **260 Global 5000 enterprise customers**, including 15 that are within the Global 100." In a shareholder letter for the next quarter, Vasudevan and Singh wrote, "We added **41 new G5000 customers** to our installed base during the quarter, and our installed base now includes dozens of Global 500 companies as well." This brought the total number of Global 5000 companies to 301 as of the fourth quarter FY 2015, ending January 31, 2015. In a shareholder letter published at the **end** of the Class Period on November 19, 2015, indicating earnings results for the third quarter FY 2016, ending October 31, 2015, Vasudevan and Singh wrote, "We now have **over 400 global enterprises** within our customer base, including 78 of the Global 500." Thus, from the beginning of the Class Period on November 25, 2014 to the end of the Class Period on November 19, 2015, Nimble disclosed that it had added approximately 140 Global 5000 companies.

[21] During the course of its investigation, Lead Plaintiff obtained a post-Class Period document listing the companies that Nimble internally characterized as "enterprise customers" for the Southern California region. The document, dated February 8, 2016, lists 38 customer names that do not appear on Nimble's G5000 list or on the Global 5000 enterprise list at any time throughout the Class Period. These companies are: Aerospace Corporation, Auto Club of Southern California, Beckman Coulter, ESRI, HireRight, Irvine Company, Murad, Rubicon Project, St Joseph Hospital, AEG Worldwide, Ares Capital Corp, Beachbody, Cetera Financial Group, Deluxe Digital Media/Studios, Digital Insight, eHarmony, Gibson Dunn & Crutcher, Harbor Freight, J2, Manatt Phelps & Phillips LLP, Mindbody, O'Melveny Myers, Paul Hastings, RAND Corporation, Shopzilla, Unitas, Wyle Laboratories, Yellowpages.com, Cedar Sinai, Space Ex, CAA, Green Dot, Henry Mayo, OneWest Bank/CIT, Paramount, Prime Health, Princess Cruises, and Riot Game. *See* Exs A and B. Lead Plaintiff has not uncovered a similar internal list of enterprise customers during the Class Period but believes that such a list would support its allegations.

**M. Nimble is Forced to Come Clean About the Enterprise Weakness, Commercial Weakness, and the Consequent Effects on the Company's Growth**

212. Everything finally caught up to Nimble at the end of the Class Period. The weakness in Nimble's commercial segment in 3Q16 and its inability to meaningfully penetrate the enterprise market throughout the Class Period had a tectonic impact on revenues during the last quarter of the Class Period by virtue of its effect on the commercial pipeline. After meeting and exceeding its guidance quarter after quarter, and after a pattern of explosive revenue growth, on November 19, 2015, Nimble announced that it missed its guidance of $86 to $88 million for the third quarter of fiscal year 2016 by $5.3 million on the low end to $7.3 million on the high end.

213. During the Nimble 3Q16 earnings call on November 19, 2015, Defendant Vasudevan conceded a lack of penetration in the enterprise market, stating that "[l]arge deals and large enterprises were not as significant a contributor as we had modeled, and we pulled investment from commercial to make that happen, which reflected in not enough in the commercial side." Defendants admitted the shift in resources to focus on enterprise at the expense of commercial was a mistake and that they had abandoned Nimble's core commercial business. Defendant Vasudevan conceded that Nimble would need "to make some key investments to drive growth" and that Nimble's "first priority is to increase investment in our core commercial business." In response to an analyst inquiry regarding growth prospects, Vasudevan admitted that "one of our corrective actions [is] being focused on reinvesting in commercial, that's really aimed at making sure we get the midsize customers back…."

214. Defendant Vasudevan also admitted that Nimble's product line was not allowing them to meaningfully break into the enterprise segment. Asked by an analyst for William Blair & Company if not having an all-flash array had an impact on the quarter, Vasudevan responded that it was one of the factors that affected the earnings results from the quarter. Vasudevan also admitted that Nimble needed to expand its platform offerings, conceding that it needed the next generation all flash array.

215. Analysts were shocked by the miss. A Jefferies Equity Research Americas analyst report stated that Nimble "missed Q3 revenue and provided disappointing Q4 guidance, blaming a slower than expected ramp in large Enterprise business partially due to more aggressive competitive activity from large storage incumbents." Wells Fargo downgraded Nimble and wrote on November 20, 2015 that Nimble's "[d]ecelerating growth to result in materially lower multiple; very limited visibility looking forward." Wells Fargo showed how the market was completely misled by Defendants regarding Nimble's growth story:

> While most of the weakness in the quarter and guide is being chalked up to elongated enterprise sales due to competition from incumbents and misexecution in directing the focus away from the commercial market, **our expectation had been that it would have to be a combination of commercial growth along with new opportunities in enterprise afforded by the introduction of Fibre Channel into the portfolio that would continue to drive accelerated growth.**

216. Wells Fargo further noted that "the growth opportunity in the enterprise may be more muted (or lumpy, at best) and expect it to take some time for the commercial business to recover." Wells Fargo also commented on a "lack of visibility as to whether its commercial strategy will reinvigorate revenue." Its "Investment Thesis" on Nimble noted "limited visibility to revenue reacceleration" and that a "recovery in commercial market to take some time."

217. Wunderlich Securities wrote on November 20, 2015 that Nimble "missed F3Q16 without warning and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." It concluded that Nimble was "**Off track.** Management lost the execution recipe, focusing on large accounts and the now-revised F4Q16 profitability goal" (emphasis in original). It also noted that "management feels the company underinvested in smaller/commercial account channels."

218. Oppenheimer downgraded its Stock Rating of Nimble on November 19, 2015, noting that Nimble reported poor results blaming in part "collateral damage to its commercial customer base from the enterprise shift. We're stepping to the sidelines reflecting (1) the need

for greater sales investment and an unknown execution time-frame required to drive stronger growth in both enterprise/commercial....”

219. Morgan Stanley wrote on November 20, 2015 that “it will take a couple quarters of better execution to change investor sentiment.” It also concluded that “Nimble’s focus on the enterprise market over the last year caused them to underinvest in the commercial market where competition is also intense.”

220. As a result of Defendants’ full disclosure of the truth, Nimble’s stock plunged more than 50%, falling $10.34 to close at $10.05 a share on heavy volume of more than 16 million shares compared to approximately 892,000 shares traded daily during the Class Period.

221. On November 23, 2015, echoing other analysts’ surprise, *Barron’s* wrote that Nimble “attributed the revenue miss to [Defendants’] decision to constrain investments in favor of reaching [a] break-even point. **However, prior to this quarter, there was no indication that revenue growth was constrained.**”

## VI. POST CLASS-PERIOD ADMISSIONS

### A. December 2, 2015 – Credit Suisse Technology Conference

222. On December 2, 2015, Defendant Vasudevan attended and spoke at the Credit Suisse Technology Conference. Analysts were still surprised by the Company’s bombshell on November 19, 2015 and wanted to understand what had gone wrong with Nimble’s growth story. During the conference, Vasudevan again admitted that the Company focused on enterprise to the detriment of commercial during the Class Period, and how the shift in resources had hurt the commercial segment:

> Now, when you look at the other part of our business, **the Commercial segment which is the larger, most significant, more mature part of our business**, that business did very well in terms of pipeline conversion rates, in terms of win/loss rates, nothing changed in that segment with respect to our win rates given the market context.
>
> However, **given that we had pulled investments from Commercial into Enterprise, we just <u>didn’t have enough pipeline in the Commercial to make up for the gap in Enterprise</u>** and that in a nutshell is what we saw happening during Q3 that caused the revenue miss.

223. Defendant Vasudevan also admitted that Nimble's growth story had been derailed **by over a year**, as Vasudevan indicated Nimble might see "growth and operating leverage **in the second half of next year**."

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS THERETO

224. During the Class Period, Defendants made the following false and misleading statements and material omissions.[22]

### A. November 25, 2014 – 3Q15 Earnings Call

225. On November 25, 2014, Nimble hosted a conference call with analysts to discuss the Company's 3Q15 earnings. Defendants Vasudevan and Singh participated in this call. Nimble announced that it generated revenue of $59.096 million during 3Q15, exceeding guidance for the quarter of $56 to $58 million. Defendant Singh told the market that Nimble expected revenue for the following quarter, 4Q15, to be in the range of $65 to $67 million, an increase of between $6 and $8 million over the prior quarter. On this call, Vasudevan also discussed the launch of Fibre Channel earlier that quarter.

226. During the call, Defendant Vasudevan discussed the Company's goal of breakeven by the end of 4Q15. Vasudevan also discussed Nimble's growth in its two main segments – commercial and enterprise. He stated: "So ***we feel very good about*** both the pace of new customer acquisition in the mid-sized enterprise segment [which is the commercial segment], as well as ***the fact that we are growing our base in large enterprises*** and cloud service providers, and we have a predictable manner in which they come back to do more with us."

227. This statement was false and misleading because Nimble was not growing its base of large enterprise customers in a meaningful manner. Nimble's products did not have the features that enterprise clients required, and as a result, Nimble was improperly relabeling

---

[22] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. Additional statements are **bolded** (and <u>not</u> italicized) for emphasis.

commercial accounts as enterprise accounts to make it seem as if the Company was "growing our base in large enterprises," when in reality it was not.

228. Wells Fargo issued a report on November 25, 2014, that indicated its understanding that Nimble would continue to grow both the large enterprisesegment —as a result of Fibre Channel—and the important commercial sales segment:

> **Our Outperform rating is predicated on Nimble Storage's growth opportunity from** 1) material market share gain opportunity due to its relative nascency, 2) continued growth in its SMB [*i.e.*, small and medium business] market, 3) **the market expansion opportunity in large enterprise driven, in part, by new products**, 3) international expansion growth, 4) repeat customer buying patterns, and 5) channel leverage.

**B. December 2, 2014 – Credit Suisse Technology Conference**

229. On December 2, 2014, Nimble presented at the Credit Suisse Technology Conference. Defendants Vasudevan and Singh attended this conference on behalf of Nimble. In response to an analyst question regarding a target date for breakeven, Vasudevan reiterated the plan for Nimble to breakeven by the fourth quarter of fiscal year 2016, *i.e.*, by January 2016:

> [W]e basically picked a point in time, we picked Q4 of next year and we said ***we're going to breakeven*** in that timeframe from a non-GAAP operating income perspective. What drove that was a philosophy that sort of growth -- ***we have a large TAM, we have massive differentiation***.

230. This statement that "we're going to breakeven" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

231. Defendant Vasudevan's statement that "we have a large TAM, we have massive differentiation" was false and misleading because Fibre Channel did not realistically quadruple Nimble's TAM. Nimble was not meaningfully penetrating or growing the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-

flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients required.

232. Defendant Vasudevan also discussed Nimble's penetration of the enterprise market: "***So, that's a second growth driver that we focused on, large enterprises and therefore, large deal ASPs*** [average sale prices]**.** ***Fiber*** [sic] ***channel is a big enabler of continuing to do that well.***" This statement was false and misleading because the Company was struggling to gain enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise customers required. Moreover, Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

**C. December 8, 2014 – Raymond James Systems Conference**

233. On December 8, 2014, Leary attended the Raymond James Systems Conference. During the conference, he reiterated the goal of breakeven by 4Q16.

234. In response to an analyst's question about revenue growth, Leary made the following statements regarding Nimble's penetration into the Global 5000 market:

> **Brian Alexander – Raymond James – Analyst**
>
> ***
>
> Maybe for those that didn't catch your latest quarterly results if you could just recap some of the highlights and some of the key aspects of your success and some of the product announcements that you have had in the last couple months that really opened yourselves up to a much bigger opportunity?
>
> **Dan Leary – Nimble Storage – VP, Worldwide Marketing**
>
> Sure. It was a strong quarter for us. We grew over $59 million for the quarter on the top end. As you said, very strong growth from a year-over-year perspective.
>
> It was also a quarter where we saw substantial increase in our large deals. We track separately deals above $100,000 and we had a record performance in terms of large deals as ***we have gotten increasing traction***

> ***both in large Global 5000 customers*** and within cloud service providers. It was also a record quarter from us from an international perspective, getting almost 20% of our revenue internationally as some of the investments that we have made over the course of the year have really paid off.

235. Leary's statements that "we have gotten increasing traction…in large Global 5000 customers" was false and misleading because the Company was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Leary failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

236. In response to an analyst's question about acquiring new Global 5000 customers, Leary made the following statements regarding Nimble's large enterprise customers:

> **Brian Alexander – Raymond James – Analyst**
>
> When I've talked to management about revenue growth coming from new customers versus penetrating existing customers, it seems like management's view is the bigger opportunity is to penetrate existing customers. I think about that and you are only selling to 260 of the Global 5000 accounts, so I would intuitively think that the bigger opportunity is to find more customers.
>
> Help us think about the opportunity and how you think about growth coming from new versus existing and why we wouldn't see more of an emphasis on new customers given that again you are only selling to 260 of the top 5,000 on the enterprise side.
>
> **Dan Leary – Nimble Storage – VP, Worldwide Marketing**
>
> Well, I would say certainly it is a balance. And we definitely want to and believe that we need to go after new accounts, continue to be very aggressively [sic]. And maybe we break that down into the two segments, because even though we have several thousand midsize enterprise or midmarket accounts worldwide there are tens of thousands of those accounts and so there is a huge opportunity for us to grow that customer base very, very substantially.
>
> We will continue to do that and part of the way we get there is continue to do investments in our indirect and our channel strategy. The relationships

> and the trust and what we built with our channel partners we think gives us a huge leg up on other new entrants in the market for sure, but even many of the incumbents and continuing to make rapid share gains there.
>
> In the enterprise, to your point, I agree. ***We have a lot more large enterprise customers.*** I think the only comment was we were saying there is the yardstick to maybe measure our deployment will over time become less how many net new of the Global 5000 we get and it will be more how much revenue are we getting out of that segment. And so it is a balanced view of how do we win more of the Global 5000, but also increasingly how do we really get in there and target and penetrate them and turn those from being small to medium-size initial opportunities to being really large annuity customers.

237. Leary's statement that Nimble had "a lot more large enterprise customers" is false and misleading because Nimble was improperly relabeling commercial customers as enterprise customers in order to hide the fact that Nimble was not penetrating or growing the enterprise market.

238. Leary also stated that "we are excited that ***we just now quadrupled our TAM with the introduction of fiber*** [sic] ***channel and obviously that has opened up a huge swath of the market***." This statement was false and misleading because Fibre Channel did not realistically quadruple Nimble's TAM. Nimble was not meaningfully penetrating or growing the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble's products still lacked an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients required.

239. In addition, Leary stated:

> **Brian Alexander - Raymond James - Analyst**
>
> * * *
>
> So why wouldn't we be at a point where revenue growth is at least being consistent or perhaps accelerating given all of the announcements that you have made and how that expand your market opportunity?
>
> **Dan Leary - Nimble Storage - VP, Worldwide Marketing**
>
> We have always looked at our investments as a couple things. One is we want to make investments in a balanced way so that we can continue to grow the top line very aggressively, but do it in a way where we are going to get continued

> improvements in operating leverage. Part of that is, as we said, ***we are going to be operating from a non-GAAP perspective breakeven by the end of next year.***

240. Leary's statement that "we are going to be operating from a non-GAAP perspective breakeven by the end of next year" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

**D. December 9, 2014 – Barclays Global Tech Conference**

241. On December 9, 2014, Defendants Vasudevan and Singh attended the Barclays Global Technology Conference. During this conference, Vasudevan discussed Nimble's penetration of the large enterprise segment, including the impact that Fibre Channel was having on large enterprise customers:

> Another way of looking at it, ***fiber*** [sic] ***channel was often the reason that even when a large enterprise liked a lot of what we do from a platform standpoint, it was a barrier to being deployed.*** Two out of three large enterprise engagements, fiber [sic] channel was the barrier to being deployed, ***that barrier has gone away***.

242. This statement was false and misleading because Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise customers required.

**E. January 14, 2015 – Needham Growth Conference**

243. On January 14, 2015, Defendant Vasudevan attended the Needham Growth Conference, where he made the following statement regarding the impact of Fibre Channel on potential enterprise sales:

> [Fibre] channel was a second aspect of your question and so without being specific, I think when we announced Fibre Channel early at the end of Q3, what prompted us to do that ***was a faster adoption by our customers than***

> ***we thought**, **a faster time to stability and sort of a very strong reaction to the value proposition that we brought to bear. Very strong start that we had, all of those attributes remain in place when we talk about our long-term opportunity with Fibre Channel as the two comments I've already made, it is a big expansion in our available market. It's 3X to 4X expansion in the size of the market we're going after and fundamentally it was a big barrier in larger enterprises. It was the single biggest driver of when we didn't get deployed what caused us to not get deployed in large enterprises. That goes away and we are seeing that very much to be true.***

244. The statements that Nimble was experiencing "faster adoption" of Fibre Channel and that Fibre Channel allowed greater deployment in large enterprises was false and misleading because Fibre Channel was not sufficient for Nimble to penetrate or grow the enterprise market. Nimble was also still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS, among others that enterprise customers required. In addition, Nimble was not having a "very strong start" with enterprise customer adoption of Fibre Channel. In order to hide the fact Nimble was not growing enterprise, Nimble improperly relabeled commercial customers as enterprise customers. Finally, the statements concerning the expansion of the TAM was false and misleading because Fibre Channel did not realistically triple or quadruple Nimble's TAM. Nimble was not meaningfully penetrating or growing the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients required.

**F. February 26, 2015 – 4Q15 Earnings Call**

245. After the market closed on February 26, 2015, Nimble issued a Q4FY15 Shareholder Letter via a Form 8-K announcing its results for the fourth quarter of fiscal year 2015. After the markets closed, Nimble hosted a conference call with analysts to discuss its 4Q15 results and 1Q16 guidance. During this call, Defendant Vasudevan made the following statement regarding Nimble's penetration of the Global 5000 enterprise market:

> ***Our second growth driver is our focus on Global 5000 enterprises*** and cloud service providers, ***where we experienced record performance during Q4. We added more G5000 customers*** and more cloud service providers ***in Q4 than in any previous quarter, and we saw the highest***

> ***ever contribution to bookings in each of these segments compared to any previous quarter.***

246. Defendant Vasudevan's statements that Nimble experienced a "record performance" from Global 5000 enterprise and that Global 5000 bookings were a large contributor to the quarter were false and misleading because the Company was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendant Vasudevan failed to disclose that Nimble was misleading the market as to growth in the enterprise Global 5000 by improperly relabeling commercial customers as enterprise customers.

247. Defendant Vasudevan also made the following statements during this call regarding the impact of Fibre Channel on Nimble's ability to penetrate enterprise: "***Fibre Channel is helping to increase deal sizes and is helping drive large enterprise penetration***." Vasudevan also stated that "***we've successfully broadened our base beyond mid-size enterprises to large enterprises***."

248. These statements were false and misleading because Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise customers required. In order to hide that Fibre Channel was **not** "driv[ing] large enterprise penetration," and that the Company had not actually "successfully broadened our base beyond mid-size enterprises to large enterprises," Nimble was improperly relabeling commercial customers as enterprise customers.

249. Defendant Vasudevan also remarked that "[***i***]***n many ways Fibre Channel was a key step to getting into the enterprise, a fairly major move for us in terms of expanding TAM***."

250. This statement was false and misleading because Fibre Channel did not realistically quadruple Nimble's TAM. Nimble was not meaningfully penetrating or growing the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-flash array, and its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients required.

251. During this February 26, 2015 earnings call, Defendant Singh stated:

> In Q1, we expect the revenue to be in the range of $68 million to $70 million and operating losses between $9 million and $10 million. This translates into a non-GAAP loss of $0.13 to $0.14 per share, which is based on approximately 76 million shares outstanding.
>
> ***We remain on track to achieve our goal of breakeven in operating income by the end of FY16***. As result of investments that we're making to continue our strong growth in sales and market share gains, our progression towards our breakeven in Q4 will be nonlinear. We expect our Q2 operating loss to be generally similar to Q1, an improvement in Q3, and then achieving our breakeven in Q4. We also expect that we will not incur a burn of cash after the end of Q1, and that after that, our cash in total should increase in a sustainable way as we go forward.

252. Defendant Singh's statement that Nimble remains "on track to achieve our goal of breakeven in operating income by the end of FY16" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

253. Defendant Singh also stated "***But absolutely, the Company is on track for breakeven in Q4***."

254. Defendant Singh's statement that Nimble was "on track for breakeven in Q4" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the

features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

255. Additionally, Defendant Singh repeated his statement regarding breakeven in response to an analyst's question:

> **James Kisner - Jefferies & Co. - Analyst**
>
> Okay. And so we had a pretty big step up also in sales and marketing along these lines. So I assume we won't see this quite size of magnitude in increase in sales and marketing going forward? Or should we expect that? Could you talk about just what really -- were there any one-time factors that drove that big increase of about $5 million, I guess $4.5 million?
>
> **Anup Singh - Nimble Storage, Inc. - CFO**
>
> Yes, I think as far as sales and marketing is concerned, we continue to show improvement in leverage as a percentage of sales from year over year. As we look ahead, in actually all of the categories that we are talking about, R&D, G&A, and even in sales and marketing, we expect from a year-over-year to show an improvement in leverage in all three of the categories.
>
> In terms of the dollars itself, in sales and marketing in Q4, we didn't have anything unusual which drove the increase. We continue to recruit, invest in sales and marketing, as we've done throughout the year, and as we intend to continue to do in the coming year as well. As I said, the investments are going into sales and marketing to drive that sustainable, strong growth in revenue we're talking about, but at the same time, showing the improvement in leverage from a year-over-year, and ***definitely on track for breakeven in Q4***.

256. Defendant Singh's statement that Nimble was "definitely on track for breakeven in Q4" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

**G. February 26, 2015 – Nimble Storage, Inc. 4Q15 Shareholder Letter**

257. On February 26, 2015, Nimble issued a Form 8-K enclosing a "Q4FY15 Shareholder Letter" signed by both Defendants Vasudevan and Singh. In the letter, Vasudevan and Singh wrote:

> We executed very well against that growth opportunity in Q4FY15:
>
> - We added 660 new customers in Q4 and over 2,300 new customers in FY15 to end with an installed base of 4,979 customers – a pace of customer acquisition that is several times faster than other emerging companies in our industry.
> - Fibre Channel accounted for more than 10% of our bookings in Q4FY15, a rapid pace of adoption given that Fibre Channel has been available for only one quarter. We ended FY15 with 83 customers deploying Fibre Channel—over 70% are new customers to Nimble.
> - Record share of bookings from deals over $100K and deals over $250K in Q4FY15, which further increased ASPs from record levels in Q3FY15.
> - ***Record number of new G5000 (Global 5000) enterprises*** and CSPs (Cloud Service Providers), ***and record share of bookings from these two segments compared to any previous quarter***.

258. Vasudevan's and Singh's statement that in the Fourth Quarter 2015 Nimble had a "[r]ecord number of new G5000 (Global 5000) enterprises" and a "record share of bookings" from the G5000 segment was false and misleading because the Company was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendants Vasudevan and Singh failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

259. Additionally, Defendants Vasudevan and Singh wrote, "During Q4FY15, ***we added new G5000 enterprises and CSPs at a record pace, and the contribution to bookings from these two segments achieved another all-time high. We added 41 new G5000 customers***

***to our installed base during the quarter, and our installed base now includes dozens of Global 500 companies as well.***"

260. Vasudevan's and Singh's statement that Nimble "added new G5000 enterprises…at a record pace" was false and misleading because Nimble was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendants Vasudevan and Singh failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

**H. March 4, 2015 – Morgan Stanley Technology, Media & Telecom Conference**

261. On March 4, 2015, Defendants Leary and Singh attended the Morgan Stanley Technology, Media & Telecom Conference on behalf of Nimble. In response to a question from an analyst regarding the impact of Fibre Channel, Defendant Singh stated:

> **Katy Huberty - Morgan Stanley - Analyst**
>
> Yes. 2014 was a big year of product investment and expansion of the portfolio and the addressable market. And you topped it off with the fiber [sic] channel late last year. Talk about how that is tracking, how it is impacting ASPs and win rates.
>
> **Anup Singh - Nimble Storage - CFO**
>
> Sure. I will take a crack at that and then, Dan, feel free to jump in. ***So we are off to a great start in terms of the adoption of the fiber*** [sic] ***channel.*** On the call, we talked about over 80 customers have now deployed it. We are a quarter in since we introduced. We have noticed a couple of things which were expected. Number one, the win rate against the competition has increased appreciably, so against the incumbent as well as against the emerging set of competitors that we have. If you recall, we always used to say that the greatest objection we had in a competitive situation was a lack of the fiber [sic] channel solution. And even though it has only been 90 days, we have seen a marketable increase in win rates.
>
> The other thing that we had expected was an increase in ASPs. We have seen that as well. The Q4 was us, our ASPs, increased even from Q3, which is an all-time high. So now we have had a couple of quarters of

> increasing ASPs. And looking at our customers and deals which have closed fairly recently, that is a trend we expect to actually continue.
>
> ***So we really see that, in addition to the expansion of the TAM, so now a $20 billion opportunity with the introduction of the fiber*** [sic] ***channel sort of protocol increasing the win rate which we have and driving up our ASPs is increasing the amount of acquisition and penetration of large enterprises.***
>
> **Katy Huberty - Morgan Stanley - Analyst**
>
> Yes. And has that already kicked in, the penetration into large enterprise, into tier 1 apps with fiber [sic] channel, or is it still too early to see that at this point?
>
> **Anup Singh - Nimble Storage - CFO**
>
> ***I think we are making really good progress.*** So we ended the year with about 300 of the largest enterprises around. ***And the addition of large enterprises we saw in Q4 was actually at an all-time high.*** We talked about some deals we won in Q4, the largest-ever deal in the company, and that was actually aided as part of the fiber [sic] channel launch as well.

262. The statements about a "very strong start" to Fibre Channel adoption, "really good progress" in the enterprise segment, and the growth in the enterprise market were false and misleading because the enterprise segment was not adopting Fibre Channel and Nimble was not making "really good progress." Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise customers required. In order to hide that the enterprise segment was not "adopting" Fibre Channel, Nimble was improperly relabeling commercial customers as enterprise customers in order to hide the fact that Nimble was not penetrating or growing the enterprise market.

263. The statements concerning the TAM and the "penetration" of the enterprise TAM were false and misleading because Fibre Channel did not realistically quadruple Nimble's TAM. Nimble was not meaningfully penetrating or growing the enterprise market because Fibre Channel was not sufficient for enterprise clients. Nimble was still lacking an all-flash array, and

its products lacked important features and functionalities including deduplication and CIFS/NFS that enterprise clients required.

### I. March 11, 2015 – Piper Jaffray Technology, Media, and Telecommunications Conference

264. On March 11, 2015, Defendants Singh and Mehta attended the Piper Jaffray Technology, Media, and Telecommunications Conference on behalf of Nimble. In response to a question from an analyst regarding the impact of Fibre Channel, Defendant Singh stated:

> **Andy Nowinski - Piper Jaffray - Analyst**
>
> * * *
>
> Okay. Varun I've got one more financial question in the model for Anup here but then we'll get it to some product level questions. You know the two points from investors that I'm more bearish on the stack that come up pretty consistently are your path to profitability and then cash burn.
>
> So maybe just starting with on the path to profitability **you said you'd be at breakeven exiting the fiscal year here so fiscal Q4. Is there anything there that could potentially derail that timeline?**
>
> **Anup Singh - Nimble Storage, Inc. - CFO**
>
> Well ***in the absence of a major external shock the answer would be no***.

265. Singh's statement, when asked if there was anything that could potentially derail the timeline of breakeven by the fourth fiscal quarter, that "in the absence of a major external shock the answer would be no," was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

### J. April 21, 2015 – Enterprise Strategy Group Interview of Dan Leary

266. On April 21, 2015, Enterprise Strategy Group, an industry and market research firm providing insight into the global IT community, published an interview on YouTube of

Leary by Enterprise Strategy Group Senior Analyst Mark Peters. In response to a question about Nimble's announcement in a February 19, 2015 press release that it had surpassed the 5,000 customer mark, Dan Leary stated:

> ***We've been able to go from serving primarily mid-sized enterprise companies in the early days to increasingly now a significant amount of Global 5000 enterprises*** and cloud services providers.

267. Leary's statement that Nimble was serving "increasingly now a significant amount of Global 5000 enterprises" was false and misleading because the Company was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Leary failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

### K. May 26, 2015 – Nimble Storage, Inc. Q1FY16 Shareholder Letter

268. On May 26, 2015, Nimble issued a Form 8-K enclosing a "Q1FY16 Shareholder Letter" signed by both Defendants Vasudevan and Singh. In the letter, Vasudevan and Singh wrote:

> As customers aim to simultaneously consolidate storage while delivering different service levels for hundreds or even thousands of applications, we believe that we stand alone in being able to span the entire spectrum of needs of Enterprise customers among next-generation flash-optimized storage platforms.
>
> In Q1FY16 we executed very well against that growth opportunity:
>
> - Continued momentum on new customer acquisition with 542 new customers in Q1 to end with an installed base of 5,521 customers.
> - ***Accelerated Enterprise momentum***:
> - Bookings from deals over $100K grew 142% year-over-year, and bookings from deals over $250K more than quadrupled from a year ago
>   - ***Bookings from Global 5000 Enterprises*** and cloud service providers

***more than doubled from a year ago***

- Channel accounted for 14% of our bookings, up from 10% in Q4

269. Vasudevan's and Singh's statement concerning "accelerated enterprise momentum," including that "Bookings from Global 5000 Enterprises … more than doubled from a year ago" was false and misleading because Nimble was not penetrating or growing the Global 5000 enterprise market in a meaningful manner. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendants Vasudevan and Singh failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

**L. May 26, 2015 – Nimble Storage, Inc. Press Release**

270. On May 26, 2015, Nimble issued a Form 8-K enclosing a press release titled "Nimble Storage Announces First Quarter 2016 Results." In the press release, Defendant Vasudevan was quoted as saying:

> As enterprises aim to consolidate storage infrastructure to contain cost and complexity, while still delivering tailored service levels for hundreds of business-enabling applications, we believe that we stand alone in our ability to address the broadest spectrum of requirements among next-generation flash-optimized storage platforms. ***Our Q1 results serve as evidence of our continued momentum. During the quarter, we added 542 new customers, more than doubled our bookings from enterprise*** and service provider customers, and achieved record bookings contribution from current customers expanding their Nimble installations.

271. Vasudevan's statements that "[d]uring the quarter, we … more than doubled our bookings from enterprise and service provider customers," were false and misleading because Nimble was not meaningfully penetrating or growing the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

Vasudevan's statement about Nimble's "continued momentum" was also misleading because Nimble's enterprise segment was falling flat.

272. The market continued to believe that Nimble was penetrating the enterprise market in a meaningful way. A Morgan Stanley Research analyst report from May 26, 2015 stated that a potential catalyst for Nimble growth was "[s]ales metrics indicating further traction with large enterprise accounts, increasing repeat purchases, and adoption of scale-out, Adaptive Flash and Fibre Channel solutions."

**M. May 26, 2015 – 1Q16 Earnings Call**

273. During a May 26, 2015 earnings call for 1Q16, Defendant Singh stated that Nimble was ***"on track to breakeven at the end of the year."***

274. Singh's statement that Nimble was "on track to breakeven at the end of the year" was false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

**N. June 9, 2015 – William Blair Conference**

275. On June 9, 2015, Mehta attended the William Blair Annual Growth Stock Conference. While speaking at this conference, Mehta stated that:

> Well, we've used that as a foundation now to grow into two very large markets. So one is the Global 5000 market, and these are the 5,000 largest buyers of storage in the world. And then on the right side, we have the cloud service providers. So I'll talk a little bit about both of these.
>
> ***So in the Global 5000, you could see that our growth rate has been north of 100%. And if you look at our Q1-to-Q1 revenue growth rate, that was just over 50%. So our Global 5000 growth rate is about double of what it is for our revenue as a whole, which is very good***, because the Global 5000 customers are the biggest buyers of storage. Getting into that is—that's basically where the money is. And so we expect to see, and we are seeing, larger ASPs, larger repeat buys. You see the chart below, on the

> left-hand bottom, and you can see that the average repeat buy of the Global 5000 customer is 3.2X compared to 2X for our customer base as a whole. So they come back and buy a whole lot more the next time around.

276. Mehta's statement concerning the growth rate of the Global 5000 were false and misleading because the Company was struggling to gain traction with Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Mehta failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

277. On June 9, Nimble's stock swelled 5.11%, closing up $1.41 to close at $29 per share as a result of Defendants' positive statements.

### O. August 25, 2015 – Nimble Storage, Inc. 2Q16 Shareholder Letter

278. On August 25, 2015, Nimble issued a Form 8-K enclosing a "Q2FY16 Shareholder Letter" signed by both Defendants Vasudevan and Singh. In the letter, Vasudevan and Singh wrote:

> **Q3FY16 Financial Outlook**
>
> ***Our financial guidance for Q3FY16 is as follows:***
>
> - ***Total revenue of $86.0 million to $88.0 million***
> - ***Non-GAAP operating loss of $5.0 million to $6.0 million***
> - ***Non-GAAP net loss of $0.08 to $0.09 per share, based on weighted average basic shares outstanding of approximately 80 million***
>
> As discussed previously, ***we remain on track to achieve our goal of non-GAAP operating income break-even by the end of the current fiscal year***.
>
> Our financial objectives remain (1) driving strong revenue growth and increasing our market share by growing significantly above the level of overall industry growth, (2) maintaining industry leading gross margins and (3) steadily progressing towards our long term target financial model of 16%-20% operating margin by delivering sequential improvement in operating margin every year.

279. This guidance statement was false and misleading for three reasons. First, the guidance statement was false and misleading when made because on August 25, 2015, the commercial pipeline had dried up and the enterprise segment was failing. Nimble had already used its backlog in 2Q16 to make up for the gap between revenue (for at least one region) and guidance for that quarter, and there was no backlog left to bolster 3Q16. Thus, financial guidance for 3Q16, which was nearly $9 million greater than guidance for 2Q16 (which Nimble had trouble meeting due to the weakened pipeline), was not achievable. Moreover, Defendants Vasudevan and Singh did not hold the belief that Nimble's financial guidance for total 3Q16 revenue was $86.0 million to $88.0 million given that Cloud 9 data would have indicated that Nimble would not make guidance for the quarter due to the lack of bookings in the commercial and enterprise pipelines, and given Defendants Vasudevan's and Singh's visibility into Cloud 9 metrics. Second, the guidance statement was false and misleading because the statement that Defendants Vasudevan and Singh supplied in support of Nimble's financial guidance—that Nimble "remain[ed] on track to achieve [its] goal of non-GAAP operating income break-even by the end of [FY 2016]"—was itself false and misleading because "break-even" was tied to the growth of the enterprise segment, which Nimble failed to penetrate, and because Cloud 9 data would have made evident that the shift in resources had caused Nimble's commercial pipeline to dry up. Third, the guidance statement was false and misleading because Defendants Vasudevan and Singh failed to disclose the adverse facts—known to or recklessly disregarded by them—which go to the basis of the guidance statement, and whose omission makes the guidance statement at issue misleading to a reasonable person reading the guidance statement fairly and in context. The adverse facts known to or recklessly disregarded by Defendants Vasudevan and Singh were that (1) the commercial pipeline was suffering due to the shift in resources from the commercial to the enterprise segments; (2) Nimble was failing to penetrate the enterprise segment; (3) Nimble used its backlog to cover the gap between revenue in at least one region and guidance for 2Q16, and did not have remaining backlog for the next quarter, 3Q16; (4) the commercial and enterprise pipelines would have indicated to Defendants that Nimble would not achieve its guidance for 3Q16; (5) Cloud 9 data would have indicated that

Nimble would not make 3Q16 guidance due to the lack of bookings in the commercial pipeline, which required approximately 90 days to close; and (6) Cloud 9 would have indicated Nimble's failure to meaningfully penetrate the enterprise segment.

280. The statement about remaining "on track to achieve…break-even" was itself false and misleading because "breakeven" was tied to Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not. This statement was also false because a shift in resources from commercial to enterprise had caused weakness in the commercial segment apparent in 3Q16.

281. In addition, Defendants Vasudevan and Singh wrote:

> Q2FY16 marked strong progress on all fronts:
>
> - Record pace of new customer acquisition with 690 new customers - our highest ever in a single quarter. Our global customer base now stands at more than 6,200 customers.
>
> - Rapid pace of growth in SmartStack converged infrastructure solutions, with a doubling of SmartStack customers on a year-over-year basis
>
> - ***Continued Enterprise momentum. Our penetration of Global 5000 enterprises continues to scale*** and we now have more than 70 customers within the Global 500. During Q2 we had a record number of deals over $100K driven by increasingly larger customer deployments.

282. Vasudevan's and Singh's statement concerning "[c]ontinued Enterprise momentum" and that "[o]ur penetration of Global 5000 enterprises continues to scale…" was false and misleading because Nimble was struggling to penetrate the Global 5000 enterprise segment. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendants Vasudevan and

Singh failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers.

283. Defendants Vasudevan and Singh also wrote:

- ***Rapid growth in Global 5000 Enterprises*** and Cloud Service Providers**.** With the introduction of our high-end CS700 platform five quarters ago, and with the introduction of Fibre Channel functionality three quarters ago, we made substantial investments in building out enterprise-centric sales teams to complement our territory-based sales teams. ***These product enhancements and sales investments are yielding strong bookings growth from Global 5000 enterprise*** and Cloud Service Provider customers.

284. Vasudevan's and Singh's statement about "[r]apid growth in Global 5000 Enterprises and Cloud Service Providers" was false and misleading because the Company was struggling to grow its Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendants Vasudevan and Singh failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers. Vasudevan's and Singh's statement that "[t]hese product enhancements and sales investments are yielding strong bookings growth from Global 5000 enterprise and Cloud Service Provider customers" was false and misleading for the same reasons.

285. In addition, Defendants Vasudevan and Singh wrote:

> We believe that we stand alone in our ability to address the entire market opportunity as Hybrid-Flash arrays and All-Flash arrays displace disk-only storage arrays over the next several years.
>
> To address this market opportunity, our go-to-market strategy has been focused on building a large, diverse and global customer base. ***We are systematically expanding our customer base across the mid-sized enterprise, large enterprise*** and cloud service provider ***segments of the market.*** We believe that a large, highly satisfied customer base will propel our long-term growth given that data growth drives repeat deployments by our customers.

286. Vasudevan's and Singh's statement that "[w]e are systematically expanding our customer base across the mid-sized enterprise, large enterprise and cloud service provider segments of the market" was false and misleading because Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not. This statement was also false because a shift in resources from commercial to enterprise was causing weakness in the commercial (mid-sized enterprise) segment.

**P. August 25, 2015 – 2Q16 Earnings Call**

287. On August 25, 2015, Nimble hosted a conference call with analysts to discuss the Company's results for the second quarter of fiscal year 2016. Defendant Vasudevan made statements during this earnings call in response to analyst questions regarding Nimble's "win rate":

> **Rich Kugele - Needham & Company - Analyst**
>
> Well great quarter and another in a long string of consistent quarters. I just wanted to ask, if we can only ask one, just about the competitive environment, especially in light of one of your larger public competitors talking about pricing aggressive, especially in all flash situations. In those instances where you are competing against all flash players, can you talk about how your win rate has been over the quarter and what you expect over the next couple?
>
> **Suresh Vasudevan -Nimble Storage Inc. - CEO**
>
> Absolutely. Thank you, Rich.
>
> I'll start by just saying that the competitive environment by and large has not changed fundamentally for us. The large incumbents continue to account for about three-quarters of all of our competitive engagements and ***our win rates have continued to remain very consistent***. There has been aggressive pricing action and as these vendors are seeing double digit declines, you can imagine that price continues to remain the primary vector on which they are trying to compete.
>
> But ***we've managed to maintain a very healthy win rate***. ***Our win rates remain as healthy as they've ever been*** and you can see our results from a gross margin perspective, the price competition is not hurting us as we maintain a very high degree of differentiation rate. So I'd say not much has changed from that perspective.

> Zooming in specifically to the old flash array competition question. As I mentioned over the last couple of earnings calls, the frequency at which we are competing against ASAs has gone up every quarter a little bit. And with our most recent release, where we now have made a very fundamental advance with the ability for a customer to choose an all flash service level within our current platform, they can have a few applications at (inaudible) data and all flash array, while other applications that are more cost sensitive can act as if they're dealing with a hybrid flash array. That we think will only enhance our competitiveness. So I'd summarize by saying even in the all flash category, ***our win rates have been as strong as against incumbents and not much has changed in that regard either***.

288. Vasudevan's statements about Nimble's "win rates"—that Nimble's "win rates have continued to remain very consistent," that Nimble had "managed to maintain a very healthy win rate," that Nimble's "win rates remain as healthy as they've ever been," and that Nimble's "win rates have been as strong as against incumbents and not much has changed in that regard either"—were false and misleading because the commercial and enterprise pipelines would have indicated that Nimble's commercial pipeline had dried up and that the Company had failed to penetrate the enterprise segment. Indeed, in 2Q16, Nimble used its backlog to make up for the gap between revenue (for at least one region) and guidance for the quarter, and there was no more backlog to use for 3Q16. Cloud 9 would have indicated several months before the end of the quarter that Nimble would not make guidance due to the lack of bookings in the commercial pipeline, which required approximately 90 days to close, as well as the failure to meaningfully penetrate the enterprise segment, in which deals tended to take even longer to close.

289. On the same earnings call, Defendant Vasudevan continued to make statements regarding Nimble's win rates:

> **Alex Kurtz - Sterne, Agee & Leach, Inc. - Analyst**
>
> Yes, thanks for taking the questions.
>
> Suresh, just back to the flash strategy. When you look at your deals historically, how relevant is it when you run into all flash arrays relative to what you have on your portfolio right now and the all flash shelf? Is this like a 10% of the time scenario across both incumbent and emerging vendors where you feel like you need to have a broader portfolio there? Or is the hybrid market still so much bigger than you can just go forward for the next couple years with what you have for your flash technologies?

> **Suresh Vasudevan - Nimble Storage Inc. - CEO**
>
> I'm happy to address that. I'd start off by saying if I look at the propensity to compete against all flash, when we engage in the marketplace a year ago I talked about it as being low single digits. Now I would say it's getting to very close to being almost 10%. And so, the frequency is broader than it was a year ago.
>
> I'd also say year ago, we would often see maybe one vendor predominantly. Now we're starting to see HP Pure net app EMCs, extreme IO. So it's broader base than just any one vendor in terms of how frequently we're seeing all flash competition.
>
> As I mentioned, for us, even as that has happened, ***our win rates have stayed just as healthy against ASA [adaptive security appliance] competition as incumbents***. In some quarters, even ahead of that. And so, we continue to do really well and frankly, the functionality that we've just introduced with all flash service levels, will only strengthen our competitive ability against all flash arrays.
>
> If I step back, I would still make the argument that today, the hybrid flash array market is somewhere between eight times larger than all flash arrays. And even if we look out three years, the hybrid flash array market is likely to be somewhere within three to four times larger than the all flash array market. It is our intention to compete aggressively in both those segments and our solution scope will continue to increase as you'll see over time. But we feel we are covering both of those segments really well and that's what defines our long-term opportunity.

290. Vasudevan's statement that Nimble's "win rates have stayed just as healthy against ASA [adaptive security appliance] competition as incumbents" was false and misleading because the commercial and enterprise pipelines would have indicated by the first day of 3Q16 that Nimble's commercial pipeline had dried up and that the Company had failed to penetrate the enterprise segment. Indeed, in 2Q16, Nimble used its backlog to make up for the gap between revenue (for at least one region) and guidance for the quarter, and there was no more backlog to use for 3Q16. Cloud 9 would have indicated several months before the end of the quarter that the Company would not make guidance due to the lack of bookings in the commercial pipeline, which required approximately 90 days to close, as well as the failure to meaningfully penetrate the enterprise segment, in which deals tended to take even longer to close.

291. Defendant Vasudevan continued to make statements concerning Nimble's win rates:

**Steven Fox - Cross Research - Analyst**

Can I just pushback a little bit on some of the comments you made about competition? And obviously, your comments are supported by the gross margins you put up. You have one large well-entrenched competitor who has talked about this counting and like you mentioned. And then you have an IPO that's been filed where you have a company that's basically said they're in the last quarter are spending about $1.15 on OpEx for every $1 of revenues they generate. Is there something that you're doing to side step some of these plays, especially as there's more entrants that are probably using a similar approach as this recent IPO? If you can just delve into the strategy besides just the mix issues that you brought up and obviously the—

**Suresh Vasudevan - Nimble Storage Inc. - CEO**

Indeed. I want to be clear about my answer as well, Steven. So it's not that we're not seeing competitor intensity. In my 15 years in storage, this is about as intense as it has ever been. And I would say that has been true for the last four to five quarters now at least, as large companies are seeing not just double digit declines in product revenue, they are seeing 25% decline in product revenues.

Most of the incumbents are seeing year-over-year product revenue declines. So its been very very intensely competitive. As you called out, younger companies are also spending at a phenomenal pace to gain share. My comments were not so much to characterize the environment as not competitive. My comment was simply that even as we are seeing that kind of competitive intensity, two things are actually so true of our business. One, ***our win rates have been unchanged***. Two, our gross margins have held steady.

292. Vasudevan's statement that Nimble's "win rates have been unchanged" was false and misleading because the commercial and enterprise pipelines would have indicated by the first day of 3Q16 that Nimble's commercial pipeline had dried up and that the Company had failed to penetrate the enterprise segment. Indeed, in 2Q16, Nimble used its backlog to make up for the gap between revenue (for at least one region) and guidance for the quarter, and there was no more backlog to use for 3Q16. Cloud 9 would have indicated several months before the end of the quarter that the Company would not make guidance due to the lack of bookings in the commercial pipeline, which required approximately 90 days to close, as well as the failure to meaningfully penetrate the enterprise segment, in which deals tended to take even longer to close.

293. Defendant Vasudevan also made statements during this earnings call regarding bookings within the Global 5000 and the contribution of Fibre Channel to Nimble's momentum in the enterprise segment:

> ***Our bookings over the last 12 months within the global 5,000 and the cloud service provider segment compared to the previous 12-month period were up by more than 80% in each segment.*** In just the global 500, we now have 70 customers as part of our install base. ***Fibre Channel remains a key contributor to our enterprise momentum.***

294. Vasudevan's statement that Nimble's "bookings over the last 12 months within the global 5,000 and the cloud service provider segment compared to the previous 12-month period were up by more than 80% in each segment" was false and misleading because Nimble was struggling to gain traction and grow its Global 5000 enterprise customers. Fibre Channel was not sufficient for Nimble to meaningfully penetrate or grow the enterprise market. Nimble was still lacking an all-flash array, and its products aimed at enterprise customers lacked important features and functionalities including deduplication and CIFS/NFS, among others, that enterprise clients required. Moreover, Defendant Vasudevan failed to disclose that Nimble was misleading the market as to enterprise growth by improperly relabeling commercial customers as enterprise customers. Vasudevan's statement that "Fibre Channel remains a key contributor to our enterprise momentum" was false and misleading because Fibre Channel was not driving enterprise momentum. Fibre Channel was not being adopted by the enterprise market because the product lacked features enterprise customers required such as an all-flash array, deduplication, and CIFS/NFS.

295. Defendant Singh also provided guidance during this call for the following quarter:

> Moving on to guidance for Q3. ***In Q3, we expect our revenue to be in the range of $86 million to $88 million*** and operating losses between $5 million and $6 million. This translates into a non-GAAP loss of $0.08 to $0.09 per share, which is based on approximately 80 million shares outstanding. ***We remain on track to achieve our goal of breakeven in non-GAAP operating income at the end of FY16.***

296. This guidance statement was false and misleading for three reasons. First, the guidance statement was false and misleading when made because on August 25, 2015, the commercial pipeline had dried up and the enterprise segment was failing. Nimble had already used its backlog in 2Q16 to make up for the gap between revenue (for at least one region) and guidance for the quarter, and there was no backlog left to bolster 3Q16. Thus, financial guidance for 3Q16, which was nearly $9 million greater than guidance for 2Q16 (which Nimble had trouble meeting due to the weakened pipeline), was not achievable. Moreover, Defendant Singh did not hold the belief that Nimble's financial guidance for total 3Q16 revenue was $86.0 million to $88.0 million given that Cloud 9 data would have indicated that Nimble would not make guidance for the quarter due to the lack of bookings in the commercial and enterprise pipelines, and given Defendant Singh's visibility into Cloud 9 metrics. Second, the guidance statement was false and misleading because the statement that Defendant Singh supplied in support of Nimble's financial guidance—that Nimble "remain[ed] on track to achieve [its] goal of breakeven in non-GAAP operating income at the end of FY16"—was itself false and misleading because "breakeven" was tied to the growth of the enterprise segment, which Nimble failed to penetrate, and because Cloud 9 data would have made evident that the shift in resources had caused Nimble's commercial pipeline to dry up. Third, the guidance statement was false and misleading because Defendant Singh failed to disclose the adverse facts—known to or recklessly disregarded by them—which go to the basis of the guidance statement, and whose omission makes the guidance statement at issue misleading to a reasonable person reading the guidance statement fairly and in context. The adverse facts known to or recklessly disregarded by Defendant Singh were that (1) the commercial pipeline was suffering due to the shift in resources from the commercial to the enterprise segments; (2) Nimble was failing to penetrate the enterprise segment; (3) Nimble used its backlog to cover the gap between revenue in at least one region and guidance for 2Q16, and did not have remaining backlog for the next quarter, 3Q16; (4) the commercial and enterprise pipelines would have indicated to Defendants that Nimble would not achieve its guidance for 3Q16; (5) Cloud 9 data would have indicated that Nimble would not make 3Q16 guidance due to the lack of bookings in the commercial

pipeline, which required approximately 90 days to close; and (6) Cloud 9 would have indicated Nimble's failure to meaningfully penetrate the enterprise segment.

297. The statement about remaining "on track to achieve…break-even" was false and misleading because "breakeven" was tied to the Company's continued success in the commercial segment and Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not. This statement was also false because a shift in resources from commercial to enterprise had caused weakness in the commercial segment apparent in 3Q16.

298. During this conference call, Defendant Singh repeated that Nimble was on track for breakeven in 4Q16:

> **George Iwanyc -Oppenheimer & Co. - Analyst**
>
> Congratulations on the quarter and thank you for taking my question. Looking at the spending level that you have right now, the increase from April to July, is that something that we should see continue as we look towards the end of the fiscal year into calendar 2016?
>
> **Anup Singh -Nimble Storage Inc. - CFO**
>
> Yes, I'll take that.
>
> During -- if you look at the increase in the OpEx quarter-over-quarter, I think it's consistent largely with the investment plans. But we have for Q3 and Q4, we've talked about the fact that each quarter we add between 60 to 80 heads a quarter. We did that in Q2, and we intend to do that again in Q3 and Q4. So absolutely, in the OpEx that you saw this quarter, we would expect that trend to continue, even as ***we stay on track for breakeven in Q4***.

299. Singh's statement that "we stay on track for breakeven in Q4" was false and misleading because "breakeven" was tied to the Company's continued success in the commercial segment and Nimble's penetration and growth of the enterprise market. At the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a

meaningful manner. Nimble's products did not have the features that enterprise clients required, and, in order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not. This statement was also false because a shift in resources from commercial to enterprise was causing weakness in the commercial segment apparent in 3Q16.

300. The next trading day, August 26, 2015, Nimble's common stock surged more than 12%, closing up $2.89 to close at $26.72 a share, based on Nimble's positive statements.

301. The market continued to be misled about Nimble's enterprise penetrations. UBS Global Research noted on August 26, 2015 that "Nimble continues to nibble at the edges of the storage market in SMB and **now is making headway in large enterprises**." It concluded that "Nimble is executing as planned with reasonable balance of sustained 40% plus revenue growth and profitability in sight."

**Q. September 22, 2015 – Meeting With Wells Fargo Securities**

302. According to a Wells Fargo Securities Equity Research report published on September 22, 2015, Wells Fargo had recently met with Defendants Singh and Mehta and discussed Nimble's growth strategy with them.

303. Acting as a conduit for Defendants Singh and Mehta, Wells Fargo reported:

> ***Our sense is the growth story is still on track***, **following a recent meeting with NMBL's Founder/VP of Engineering, Varun Mehta, and CFO Anup Singh**, and that NMBL has additional options to address cloud data management if the market were to accelerate. The Avnet distribution addition in the pan-EMEA region and the recent Federal Information Processing Standard (FIPS) 140-2 certification should help continue to grow its market opportunity. ***NMBL also continues to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth (FQ4 tends to be the strongest seasonally).***

304. Mehta's and Singh's statement in the Wells Fargo analyst report that the "growth story is still on track" and that Nimble had "confidence" in its ability to breakeven by 4Q16 were false and misleading because the Company's growth and "breakeven" was tied to the Company's continued success in the commercial segment and Nimble's penetration and growth of the enterprise market. At the time the statement was made, Cloud 9's tracking of the commercial

and enterprise pipelines would have indicated that Nimble would not achieve its guidance for 3Q16 due to the lack of bookings in the commercial pipeline, which required approximately 90 days to close, as well as the failure to meaningfully penetrate the enterprise segment, in which deals tended to take longer to close. Further, Nimble's former Vice President, East stated that Nimble had to use all of its 1Q16 backlog cushion from booked orders that hadn't yet shipped to make up for the 2Q16 booking shortfall in the East in order to make its 2Q16 guidance. The former Vice President, East explained that while the East made up a portion of the 2Q16 booking shortfall, it certainly was not all of it—meaning there were booking shortfalls at Nimble outside of the East. The former Vice President, East explained that, by 3Q16, there was no more backlog to use.

305. Cloud 9 would have indicated that the "growth story" was not on track; instead of growth, Nimble was actually "on track" to miss its guidance because bookings did not support its revenue projections. Moreover, one former employee stated that the consistently updated Salesforce information gave Nimble the ability to project by the end of the first month of a quarter whether or not quarterly goals would be met. Further, at the time the statement was made, Nimble was not penetrating or growing the enterprise segment in a meaningful manner. Nimble's products did not have the features that enterprise clients required. In order to hide this fact, Nimble was improperly relabeling commercial accounts as enterprise accounts to make it seem as if the Company was growing the enterprise base when in reality it was not.

306. Wells Fargo also reported that Mehta criticized all-flash arrays as being inferior to Nimble's hybrid arrays:

> Mr. Mehta believes that data management will be a key differentiator in the industry and ***sees issues with 1) the all-flash only array market as it tends to be silos that don't integrate as well with other arrays, has capacity limitations because of dedupe, an inability to move data, and high costs per MIPS (million instructions per second).***

307. Mehta's statement was false and misleading because while being critical of an all-flash array, he failed to disclose to the market that a lack of an all-flash array and capabilities such as deduplication were negatively affecting the Company's ability to grow in the enterprise

market. Mehta failed to tell the market that Nimble's potential enterprise customers were not adopting the hybrid arrays with Fibre Channel because they still lacked critical features or preferred an all-flash array.

308. As the quarter progressed, analysts' reaction was unchanged. Parroting the same language about win rates that Vasudevan communicated to the market on August 25, 2015, Oppenheimer wrote on October 5, 2015:

> It's our impression the overall market is behaving largely as Nimble expected. Tough competition, aggressive pricing, and careful spending remain the norm, but we believe Nimble's traditional strengths (CASL/InfoSight/hybrid), newer product additions (F[ibre]C[hannel], all-flash shelf[23]), and its strong Cisco partnership are **driving steady win rates/gains** vs. the competition and **with larger customers**."

309. On October 9, 2015, UBS wrote that "[o]ur sense is that management thinks multiple years of high growth lie ahead if it invests in sales teams, especially overseas and for the enterprise. The model works as shown by US commercial, which already is close to the long-term margin goal."

## VIII. CORRECTIVE DISCLOSURE – THE TRUTH IS REVEALED

310. On November 19, 2015, Nimble announced **for the first time** since going public that it failed to meet quarterly guidance, falling short by almost $8 million, an enormous shortfall.

311. During the Nimble 3Q16 earnings call on November 19, 2015, Defendants admitted that enterprise revenue was not as significant a source of revenue as they had touted to the market it would be during the Class Period. Defendant Vasudevan conceded that "**[l]arge deals and large enterprises were not as significant a contributor as we had modeled, and we pulled investment from commercial to make that happen, which reflected in not enough in the commercial side.**"

[23] The all-flash shelf was a different product than an all-flash array; the shelf was part of the hybrid array that Nimble sold.

312. Revenues for 3Q16 were a mere $80.7 million, just $600 thousand higher than the prior quarter. In a Form 8-K enclosing a Shareholder Letter issued after the close of the market on November 19, 2015, Nimble explained:

> **The shift in investment from our commercial business to enterprise business impacted our growth**. We have been managing our total sales and marketing investments in light of our goal of achieving non-GAAP breakeven operating income in Q4FY16. Within this overall investment envelope, **we increased our investments in the large enterprise business <u>at the expense</u> of investments in our commercial business**. At the time when the storage market remains very competitive, this led to lower growth in our commercial business than we believe we could have achieved by maintaining our prior pace of investment in that segment of the market. [First emphasis in original]

313. During a conference call with analysts that also took place after the close of the market on November 19, Defendant Vasudevan announced that Nimble's "Q3 FY16 results fell short of our expectations." He explained:

> **[W]e shifted investments from our commercial segment to the large enterprise segment**. **This decreased investment** affected areas such as the number of commercial teams and inside sales teams, demand generation programs, and channel incentives. We believe that **this decreased investment led to slower growth than we would have seen, had we maintained our previous pace of investment**.

314. Responding to an analyst inquiry regarding growth prospects, Defendant Vasudevan further admitted that "as we shifted some investment towards going after both large enterprises and larger deployments across our customer base, that's come at the cost of investments in our traditional midsize enterprise customer base."

315. In response to an inquiry from an analyst asking "what exactly did stop investing [*sic*] on the commercial side that is hurting you," Defendant Singh admitted that "when we look at a mix of teams that we have brought on board, **<u>over half</u> of the teams in the last four quarters have been non-commercial teams, named account teams**. So number of sales teams we are adding [for the last four quarters] is lower in the commercial segment than traditionally has been true. That is the first thing." He also conceded that "**we pulled investments from both marketing and channel**, or **shifted investment toward larger enterprise wins rather than commercial wins**."

316. Defendant Singh, discussing the financial results in more detail, admitted that "our slower than expected growth in revenues was due to the investments in our enterprise segment taking longer to pay off. While, at the same time, the shifting mix of our investment strategy between enterprise and the commercial business resulted in **not enough investment being made in the commercial segment**."

317. Defendants acknowledged several times that Nimble had abandoned its core business to the detriment of the Company. Defendant Vasudevan conceded that Nimble would need "to make some key investments to drive growth" and that Nimble's "**first priority is to increase the investment in our core commercial business**." In response to an analyst inquiry regarding growth prospects, Defendant Vasudevan admitted that "**one of <u>our corrective actions</u> [is] being focused on reinvesting in commercial, that's really aimed at making sure we get the midsize customers back**…."

318. Defendant Vasudevan further discussed the need for **<u>corrective actions</u>**. Responding to an analyst's inquiry regarding growth during the next year, he stated that:

> **[A]s you think about our corrective actions** besides sort of strengthening our competitive position in the large enterprise segment by **broadening our platform**, investing in commercial over the next first two quarters of next year is really what we are doing. Which, I think, will translate into growth again.

319. Defendants acknowledged that in addition to investing in commercial, they would also need to "broaden their platform"[24] to strengthen their position in the enterprise market. This was an admission that they would need to go beyond Fibre Channel, and the next logical step was an "all flash" array.

---

[24] Defendants repeatedly referred to its iSCSI and Fibre Channel products as "platforms." For example, during the November 25, 2014 earnings call, Vasudevan stated, "I think the first wave of customers that we are really anticipating being adopted as a **Fibre Channel platform** are what I would characterize as the Global 1000 to Global 5000 type of customers, rather than the Fortune 500 customer base, if you will." As he stated during the same call, "When you look at the increase in Q3, it was simply because the **platform we had built with iSCSI** as the protocol was that much more capable from a performance standpoint, was that much more capable from a capacity standpoint."

320. Although the market understood as late as the last day of the Class Period that, as an RBC Capital Markets analyst wrote, "All flash-arrays is the next product on the horizon impact to [Nimble's] TAM and margins," Nimble did not officially announce its All-Flash platform until after the Class Period, in a press release dated February 23, 2016.

321. Defendants further **admitted** that they knew **throughout** the past three months (including when they met with Wells Fargo in late September) that 3Q16 would see poor results. Asked by an analyst when the Company "started to see the weakness emerge," Defendant Vasudevan admitted that "**[i]t was really pressure that we saw throughout** Q3…. for us this quarter, throughout, we noticed that there was more competitive intensity, and certainly that carried on through month three."

322. Asked by an analyst for William Blair & Company if not having an all-flash array had an impact on the quarter, Defendant Vasudevan responded that it was one of the factors that quarter:

> **Jason Ader - William Blair & Company - Analyst**
>
> Okay, not having all flash probably had an impact too?
>
> **Suresh Vasudevan - Nimble Storage Inc. - CEO**
>
> I would say in our competitive engagements, pricing action by the large vendors is by far the most dominant factor that impacted us. All flash just this last quarter went over double-digit percentage in terms of how frequently we compete against all flash arrays. So while it's been increasing every quarter, it's not the most material factor that impacted us, Jason.

323. Nimble's stock collapsed as a result of these disclosures. Shares lost more than 50% of their value, falling $10.34 to close at $10.05 a share on volume of over 16 million shares.

324. The market was shocked. Reuters reported on November 20, 2015 that "[a]bout [three-quarters] of the covering analysts . . . cut their ratings on and price targets for Nimble Storage following" the announcements. Analysts' comments that day paint the picture of a misled investing public.

325. Wunderlich Securities wrote that Nimble "missed F3Q16 **without warning** and management has shifted goals to a much lengthier period of aggressive spending relative to revenue volume, implying a different level of scale required to achieve a sustainable role in the industry." It concluded that Nimble was "**Off track.** Management lost the execution recipe, focusing on large accounts and the now-revised F4Q16 profitability goal" (emphasis in original). It also noted that "management feels the company underinvested in smaller/commercial account channels."

326. Wells Fargo also downgraded Nimble. For the first time since the start of the Class Period, Wells Fargo changed its investment thesis on Nimble. It wrote that:

> [M]ost of the weakness in the quarter and guide is being chalked up to elongated enterprise sales due to competition from incumbents and misexecution in directing the focus away from the commercial market, **our expectation had been that it would have to be a combination of commercial growth along with new opportunities in enterprise afforded by the introduction of [F]ibre [C]hannel into the portfolio that would continue to drive accelerated growth.**

It further noted that "the growth opportunity in the enterprise may be more muted (or lumpy, at best) and expect it to take some time for the commercial business to recover." Wells Fargo's revised investment thesis noted a "lack of visibility as to whether its commercial strategy will reinvigorate revenue."

327. Oppenheimer downgraded its Stock Rating of Nimble on November 19, 2015, noting that Nimble reported poor results blaming in part "**collateral damage to its commercial customer base from the enterprise shift**. We're stepping to the sidelines reflecting (1) the need for greater sales investment and an unknown execution time-frame required to drive stronger growth in both enterprise/commercial...."

328. Barclays heralded a "Major Thesis Change Drives Downgrade," noting that "we have seen this movie before, and it can be difficult to get to a positive outcome." Barclays was concerned management would not be able to successfully execute the turnaround strategy announced on the earnings call.

329. Fox Business News wrote that the Company admitted "its commercial revenue growth [was] being negatively affected by the company's shift in investment from its commercial business to its enterprise business."

330. On November 20, 2015, *The Register*, an internet publication focusing on IT, commented on the lack of all-flash array stating: "trying to penetrate mainstream storage incumbent's large enterprise customer bases with a hot hybrid [disk drive and flash] box isn't enough; it needs a hot all-flash box, and it doesn't have one."

331. A few weeks later, on December 4, 2015, Oppenheimer reported that it "hosted investor meetings with Nimble's management." Oppenheimer noted that "[a]s Nimble shifted focus to enterprise, its commercial pipeline slowly dried out."

332. On December 9, 2015, in the context of asking a question to Defendant Vasudevan regarding Defendants' corrective disclosure of the truth, Mark Moskowitz, an analyst for Barclays Capital, noted that "I know since the earnings call [on November 19] investors have suddenly shifted where they just feel the story is going to hell in a bucket."

## IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

333. At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above. Each of the Individual Defendants had actual knowledge that the statements and omissions made by him were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements and omissions. Each of the Individual Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above.

### A. Individual Defendants' Trading

334. Each of the Individual Defendants sold Nimble stock during the Class Period in a manner that was highly suspicious and dramatically out of line with their trading practices both before and after the Class Period. This insider trading activity raises a strong and compelling inference of scienter for five independent reasons.

335. *First*, the Individual Defendants' insider stock sales during the Class Period, both individually and collectively, generated highly abnormal profits compared to their transactions for a Control Period.

336. *Second*, each of the Individual Defendants entered into or amended Rule 10b5-1 trading plans in close proximity to each other in March 2015, in the middle of the Class Period, during which time they had access to material nonpublic information regarding the fraud as alleged herein.

337. *Third*, Vasudevan and Mehta sold a large amount of Nimble stock during the Class Period on the open market and **not** pursuant to a Rule 10b5-1 Trading Plan, and the sales were dramatically out of line with their trading practices both before and after the Class Period.

338. *Fourth*, each of the Individual Defendants sold a significant amount of Nimble stock in September and October 2015. This is important for two reasons: the sales took place just weeks before Defendants announced the full truth of the fraud alleged herein to the market, and most of the trades were themselves pursuant to the very Plans that were suspiciously entered into or amended during the Class Period.

339. *Fifth*, the Individual Defendants have significantly curtailed their sales of Nimble stock in the one year since the end of the Class Period, during which time Nimble's stock has never recovered from its freefall after Defendants' revelation of the full truth regarding their fraud.

340. As a result of their Class Period insider trades, the Individual Defendants profited from the artificial inflation embedded in the trading price of Nimble stock caused by their false and misleading statements and omissions.

341. To analyze and evaluate the Individual Defendants' insider sales of Nimble stock, Lead Plaintiff engaged an expert in insider trading who used the publicly-available trading data that the Individual Defendants were required to report on Form 4 to the SEC which was obtained from Thomson Reuters. Lead Plaintiff's expert analyzed the Individual Defendants' trading during the Class Period (360 days; November 25, 2014 to November 19, 2015, inclusive) and during a Control Period equal in length to the Class Period (360 days; November 30, 2013 to

November 24, 2014, inclusive). Lead Plaintiff has also analyzed the trading in the year since the Class Period ended (360 days; November 20, 2015 to November 13, 2016, inclusive). The Form 4s filed during the Class Period, Control Period, and post-Class Period are hereby incorporated by reference.

**1. The Individual Defendants' Class Period Sales of Nimble Stock Generated Highly Abnormal Profits**

342. Lead Plaintiff's expert also analyzed whether the Individual Defendants' sales of Nimble stock during the Class Period generated abnormal (above-average) profits as compared to the Control Period. As shown below, the Individual Defendants did generate abnormal profits from their stock sales during the Class Period, further suggesting suspicious trading activity that raises a strong inference of scienter.

343. Lead Plaintiff's expert evaluated abnormal profits by using an event study methodology called the "market-adjusted model method," which computed cumulative shareholder returns not explained by the market. To consider a simple example of the analysis, assume that the sensitivity of Nimble stock to market index is one (beta is one). In that case, if an insider buys a share of Nimble stock, which then increases in price from $100 to $120 (20%), and the market index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%. Similarly, if a company's stock price declines subsequent to a sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline. This methodology is widely-accepted, having been used extensively in academic literature *See, e.g.*, Joanne Horton & George Serafeim, *Market Reaction To And Valuation Of IFRS Reconciliation Adjustments: First Evidence From The UK*, 15 REV. ACCT. STUD. 725, 732 (2010); James W. Kolari & Seppo Pynnonen, *Event Study Testing With Cross-Sectional Correlation Of Abnormal Returns*, 23 REV. FIN. STUD. 3996 (2010); Khamis H. Al-Yahyaee et al., *The Information Content of Cash Dividend Announcements in a Unique Environment*, 35 J. BANKING & FIN. 606 (2011).

344. To give a numerical example, assume that insiders sell stock and the stock price declines subsequently by 11% (from $100 to $89) while the overall stock market itself declines

by 1%; once again, insiders will have positive abnormal profits by avoiding subsequent losses. In this example, insiders' gross profit is 11%. Since 1% of the 11% is due to market conditions, insiders' abnormal profit equals only 10%. Abnormal profits were calculated using a value-weight index of NYSE, NYSE MKT, and NASDAQ stocks as the market index during the Control Period and Class Period.

345. To determine whether insiders made abnormal profits and whether these abnormal profits were the result of random chance, Lead Plaintiff's expert used equally-weighted prediction errors from the market-adjusted model method for the 250 trading days before (approximately one year) and the 250 trading days after the day of the each insider trade, and then equally averaged these prediction errors across event days for each Individual Defendant and then summed them. These prediction errors were also used to compute t-statistics to infer the probability that the observed cumulative abnormal profits were due to random chance.

346. The cumulative abnormal returns generated by the event study are plotted in Figures 1 to 5. By definition, the cumulative abnormal return equals zero on the insider trading day (Day zero in the graph). If insiders are able to avoid subsequent losses by selling their stock in advance, then the graph will show a positive abnormal profit (rising line). The graph also shows what happens before the insider trading day (days -250 to day -1) to explore whether price movements following the insider trading are unusual compared to price movements prior to the insider trading day.

347. Applying this methodology, it is clear that nothing significant was going on prior to the insider trading days as the cumulative average abnormal profit is flat around zero. After the insider trading day, however the abnormal profit line rises sharply for insider trades during the Class Period and remains flat for insider trades during the Control Period. Based on these graphs, it is clear that the Individual Defendants each generated extremely large abnormal profits on their transactions in Nimble stock during the Class Period, particularly when compared to their trading behavior during the Control Period, as reflected in the following charts:


Abnormal Profitability of Trading by Vasudevan in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Singh in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Mehta in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
1.4
1.3
1.2
1.1
1
0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
0.1
0
-0.1
-0.2
-0.3
-0.4
-250 -225 -200 -175 -150 -125 -100 -75 -50 -25 0 25 50 75 100 125 150 175 200 225 250
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)


Abnormal Profitability of Trading by Leary in NMBL
No Tax Related Sales
Cumulative Average Abnormal Profit
1.4
1.3
1.2
1.1
1
0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
0.1
0
-0.1
-0.2
-0.3
-0.4
-250 -225 -200 -175 -150 -125 -100 -75 -50 -25 0 25 50 75 100 125 150 175 200 225 250
"Class-Period"
Control Period
Event Days Relative to the Insider Trading Day (0)




348. As shown above, based on the timing of the Individual Defendants' Class Period trades, (i) Defendant Vasudevan generated abnormal annual returns that exceeded **100%** after about one year; (ii) Defendant Singh's profits exceeded the benchmark by more than **100%** after about one year; (iii) Defendant Mehta's trades delivered abnormal annual profits of **100%** after about one year; and (iv) Defendant Leary generated average abnormal annual profits that exceeded **100%** after about one year. Further, using the market-adjusted model method described above, it is clear that the possibility that these abnormal profits result from random chance is close to zero: the probability of these profits occurring randomly is less than one percent for each Individual Defendant. The results are therefore strongly statistically significant.

349. Collectively, each of the Individual Defendants' trades delivered abnormal profits in excess of **100%** after about one year. The timing and extent of these abnormal profits, as well as the contrast between Control Period and Class Period trades, are reflected graphically in the charts above. Again, the charts compare the trades for the Control Period and Class Period for the Individual Defendants, and depicts cumulative abnormal profit (or loss) on all trades

occurring during each period, calculated daily for one to 250 trading days (one calendar year) following the day of trade. As reflected in the chart above, trades during the Class Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-timed and therefore highly suspicious, particularly when compared to the complete lack of abnormal profits generated during the Control Period.

350. Similarly, excluding Plan Trades, abnormal profitability for each Individual Defendant individually and collectively in aggregate reaches over 100%. Each of these is statistically significant at the 1% level. None of the four Individual Defendants' Control Period insider trading shows any abnormal profitability.

**2. The Individual Defendants Entered Into, Amended, and Traded Pursuant To Rule 10b5-1 Trading Plans in a Highly Suspicious and Coordinated Manner**

351. Rule 10b5-1, 17 C.F.R. § 240.10b5-1, provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans," "Trading Plans," or "Plans"). *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "[b]efore becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

352. Furthermore, "[a] purchase or sale is not 'pursuant to a contract, instruction, or plan' if, among other things, the person who entered into the contract, instruction, or plan altered or deviated from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or entered into or altered a corresponding or hedging transaction or position with respect to those securities." 17 C.F.R. § 240.10b5-1(c)(1)(C).

353. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson West, CORPORATE COUNSEL'S GUIDE TO INSIDER TRADING AND REPORTING § 12:26 (2015). Conversely, the adoption or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

354. The Individual Defendants' sales of stock during the Class Period were suspiciously timed because they all entered into and/or amended their Trading Plans after March 9, 2015, and sold a large number of shares after March 9, 2015, many pursuant to the very Plans that were entered into or amended on or after March 9, 2015.

355. Defendant Vasudevan sold Nimble stock pursuant to five Trading Plans during the Class Period. Three of these Plans are highly suspicious because even though two were adopted before the Class Period on September 30, 2014 and October 1, 2014, they were amended **during** the Class Period on March 20, 2015. A third Plan was also **adopted** on March 20, 2015.

356. Defendant Singh sold Nimble stock pursuant to five Trading Plans during the Class Period. Two of these Plans are highly suspicious because the one that was entered into on March 12, 2014 was amended during the Class Period on March 9, 2015 and a second plan that was also entered into on March 12, 2014 was also amended on March 10, 2015. Singh amended these plans just a week and a half before Vasudevan modified and entered into his Trading Plans on March 20, 2015.

357. Defendant Mehta sold Nimble stock pursuant to four Trading Plans during the Class Period, three of which were adopted before the Class Period, and a fourth adopted on March 13, 2015. This fourth Plan was entered into just three days after Singh's Trading Plans were modified, and one week before Vasudevan amended his Trading Plans.

358. Defendant Leary entered into and amended four of his six Trading Plans before the Class Period. But as with the other Individual Defendants, he had significant Plan activity in March 2015. Leary entered into two Trading Plans on March 30, 2015—just ten days after Vasudevan amended his Plans, and a few weeks after Defendants Singh and Mehta entered into

and amended several of their Plans. One of the two was subsequently amended on June 25, 2015—and Leary sold shares later in the Class Period pursuant to that very Plan.

359. In addition to the highly suspicious and coordinated nature of this activity, most of the Individual Defendants' Class Period sales of Nimble stock were pursuant to these suspiciously adopted and modified Plans:

| **Rule 10b5-1 Trading Plans Modified During Class Period By Individual Defendants** | | | |
|---|---|---|---|
| **Defendant** | **Plan Entered Into** | **Class Period Amendments**[25] | **Sales Pursuant to Plan** |
| Vasudevan | Sept. 30, 2014 | March 20, 2015 | $78,183.84 |
| Vasudevan | Oct. 1, 2014 | March 20, 2015 | $200,531.23 |
| | | | |
| Singh | March 12, 2014 | March 9, 2015 | $731,350.94 |
| Singh | March 12, 2014 | March 10, 2015 | $111,750.50 |

| **Rule 10b5-1 Trading Plans Adopted During Class Period By Individual Defendants** | | | |
|---|---|---|---|
| **Defendant** | **Plan Entered Into** | **Class Period Amendments** | **Sales Pursuant to Plan** |
| Vasudevan | March 20, 2015 | N/A | $2,621,442.74 |
| | | | |
| Mehta | March 13, 2015 | N/A | $518,670.62 |
| | | | |
| Leary | March 30, 2015 | N/A | $611,919.74 |
| Leary | March 30, 2015 | June 25, 2015 | $243,791.69 |

Sources: Form 4s

360. Finally, even if the Individual Defendants had entered into all their 10b5-1 Plans prior to the Class Period and traded within them consistently throughout the Class Period, and not amended them during the Class Period, such plans are under heavy SEC scrutiny. For example, a *Wall Street Journal* investigation found that insiders who were trading pursuant to

[25] Only amendments made during the Class Period are shown. Additional amendments prior to the Class Period, not relevant here, are omitted.

10b5-1 Plans were still trading at opportune times and reaping better-than-expected results. According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.[26] Also noteworthy is the fact that Joseph Nacchio, former CEO of Qwest Communications, was criminally convicted of illegal insider trading in 2007 notwithstanding the fact that certain of the transactions were made under 10b5-1 plans.[27]

### 3. Two Individual Defendants Sold Stock Outside Rule 10b5-1 Trading Plans in a Highly Suspicious Manner

361. Two of the Individual Defendants, Vasudevan and Mehta[28] dramatically increased their open market sales of Nimble stock not pursuant to any Trading Plan during the Class Period:

| Open Market Trades of Nimble Stock by Individual Defendants Not Made Pursuant to Rule 10b5-1 Trading Plans | | | | | | |
|---|---|---|---|---|---|---|
| | Pre-Class Period ("Control Period") | | Class Period | | | |
| **Defendant** | **Shares Sold** | **Net Proceeds** | **Shares Sold** | **Increase Over Control Period** | **Net Proceeds** | **Increase Over Control Period** |
| Vasudevan | 0 | $0 | 24,247 | 24,247 | $610,095 | $610,095 |
| Mehta | 0 | $0 | 11,086 | 11,086 | $276,039 | $276,039 |
| **Totals** | **0** | **$0** | **35,333** | **35,333** | **$886,134** | **$886,134** |

Sources: Form 4s

[26] *See* Taylan Mavruk & H. Nejat Seyhun, *Do SEC's 10b5-1 Safe Harbor Rules Need to be Rewritten*, 1 COLUMBIA BUS. L. REV. 133 (2016).

[27] *See, e.g.*, Dan Frosch, *Ex-Chief at Qwest Found Guilty of Insider Trading*, N.Y. TIMES, Apr. 20, 2007, http://www.nytimes.com/2007/04/20/technology/20qwest.html?_r=1; Peter J. Henning, *The Fine Line Between Legal, and Illegal, Insider Trading*, N.Y. TIMES, Dec. 10, 2012, http://dealbook.nytimes.com/2012/12/10/the-fine-line-between-legal-and-illegal-insider-trading/?_r=0; *Corporate Governance*, Monday, Aug. 3, 2007, 2007 WLNR 14910004; *Not So Taxing?*, CFO MAG., June 1, 2007, http://ww2.cfo.com/2007/06/not-so-taxing/.

[28] For the other two Defendants, Leary and Singh, non-plan sales declined slightly during the Class Period.

### 4. The Individual Defendants Each Sold Stock Near the End of The Class Period in a Highly Suspicious and Coordinated Manner

362. The Individual Defendants also suspiciously sold a vast number of shares in September and October 2015, when they already knew or recklessly disregarded, among other things, (1) that Nimble used its backlog to make up for the gap between revenue in at least one region and guidance for 2Q16; (2) that by 3Q16, there was no more backlog remaining; and (3) that Nimble would not achieve the guidance they had issued for 3Q16 on August 25, 2015.

363. On September 3, 4 and 11, 2015, Defendant Vasudevan sold 74,247 shares that pocketed him $1,842,448.10. On September 3, 4, and 14, and October 1, 2015, Defendant Vasudevan sold 61,394 shares for $1,511,068.31 all pursuant to the Plans he entered into or modified on March 20, 2015.

364. Defendant Singh sold 31,921 shares between June 15, 2015 and October 1, 2015 for a value of $843,100.16 pursuant to the Plans he modified on March 9 and 10, 2015.

365. Defendant Mehta sold 11,086 shares on September 3 and 11, 2015 for $276,039.11, none of which were pursuant to a Plan. Mehta also sold 19,467 shares for $518,670.62 between July 22, 2015 and September 8, 2015 pursuant to the Plan he adopted on March 13, 2015. Notably, 5,633 of those shares were sold for $144,710.34 on August 26, 2015 and September 8, 2015—just one day and two weeks (respectively) after Nimble issued the 3Q16 guidance it would not be able to meet.

366. Between September 3, 2015 and October 19, 2015, Defendant Leary sold 35,811 shares for a total of $855,711.43 pursuant to Plans adopted on March 30, 2015, one of which was amended on June 25, 2015.

### 5. The Individual Defendants Have Significantly Curtailed Their Sale of Nimble Stock Since Their Full Disclosure of the Truth and the Collapse of Nimble's Stock

367. Since the end of the Class Period and the associated collapse in stock price that occurred as a result of Defendants' false and misleading statements and omissions, the Individual Defendants have largely and suspiciously cut back on their sale of Nimble stock. During the year following the end of the Class Period (from November 20, 2015 to November 13, 2016),

Leary sold zero shares. Defendant Vasudevan has sold 55,338 shares for a total of $416,167.18. Defendant Singh has sold a mere 40,323 shares for $314,844.79. Mehta has sold only 29,078 shares for $220,661.69.

368. In total, the Individual Defendants reduced their selling in Nimble stock by approximately 97% since the end of the Class Period, from over $33 million to just $951,673.66.

369. These facts further corroborate the inference that the Individual Defendants' Class Period sales were motivated by a desire to take advantage of the artificially high price of Nimble stock during the Class Period.

## X. CLASS ACTION ALLEGATIONS

370. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from November 25, 2014 through November 19, 2015, inclusive (the "Class Period"), purchased the publicly traded common stock of Nimble and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nimble during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nimble's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

371. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Nimble had between 77 million to 79 million shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "NMBL." While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Nimble or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

372. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

373. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

374. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;
- whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;
- whether and to what extent the market price of Nimble's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;
- whether Defendants acted with the requisite level of scienter;
- whether the Individual Defendants were controlling persons of Nimble;
- whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and
- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

375. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. LOSS CAUSATION

376. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nimble common stock and operated as a fraud or deceit on Class Period purchasers of Nimble common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Nimble common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

377. As a result of their purchases of Nimble common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Nimble common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $31.60 per share at the close of the market on June 17, 2015.

378. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Nimble's business and prospects. When the truth about the Company was revealed to the market, the price of Nimble common stock fell significantly. This decline removed the inflation from the price of Nimble common stock, causing real economic loss to investors who had purchased Nimble common stock and exchange-traded options on such common stock during the Class Period.

379. The decline in the price of Nimble common stock after the corrective disclosure on November 19, 2015 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in Nimble common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market

conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

380. During the Class Period, the price of Nimble stock declined as the true state of Nimble's operations was revealed to the investing public.

381. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Nimble common stock and the subsequent significant decline in the value of Nimble common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

382. On November 19, 2015, Defendants disclosed the full truth regarding the drying up of Nimble's pipeline and its failure to meaningfully penetrate the enterprise segment. *See supra* ¶¶ 310-332. As a result, on November 20, 2015, Nimble's stock fell $10.34 to close at $10.05 a share on volume of over 16 million shares.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

383. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

384. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

- Nimble's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.
- Nimble's common stock traded at high weekly volumes during the Class Period.
- As a regulated issuer, Nimble filed periodic public reports with the SEC.
- Nimble regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of

press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

- The market reacted promptly to public information disseminated by Nimble.

- Nimble's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote reports on Nimble during the Class Period included, but are not necessarily limited to, the following: BMO Capital, Bank of Montreal, Barclays, Buy Sell Signals, Credit Suisse, Cross Research, Directors Deals, FBN Securities, Goldman Sachs, Jefferies & Co., Key Banc Capital, Longbow Research, Macquarie Research Equities, MarketLine, Maxim Group, Monness, Crespi, Hardt & Co., Morgan Stanley, Needham & Company, Oppenheimer & Co., Pacific Crest Securities, Piper Jaffray, RBC Capital Markets, Raymond James & Associates, Inc., Roth Capital Partners, Sterne, Agee & Leach, Stifel Nicolaus, Susquehanna International Group, UBS, ValuEngine, Vermilion Technical Research, WR Hambrecht Summit Research, Wells Fargo Securities, William Blair & Co., Wright Investors' Service, and Wunderlich Securities, Inc.

- The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nimble's common stock.

- Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Nimble's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XIII. NO SAFE HARBOR

385. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading

statements alleged in this Complaint. *First*, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. The Majority of Defendants' False and Misleading Statements Were Not Forward-Looking

386. The false and misleading statements in, *e.g.*, ¶¶ 226, 229, 232, 234, 236, 238-39, 241, 243, 245, 247, 249, 251, 253, 257, 259, 261, 264, 266, 268, 270, 273, 275, 278, 281, 283, 285, 287, 289, 291, 293, 295, 298, 303, and 306 (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to Nimble's current business strategy (*see, e.g.*, ¶¶ 243, 247, 253, 261, 273, 303); growth in the enterprise segment (*see, e.g.*, ¶¶ 226, 234, 245, 257, 275, 293), and the health of the commercial segment in 3Q16 (*see, e.g.*, ¶¶ 287, 289, 291, 303).

387. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

### B. Several False and Misleading Statements are Not Properly Identified as "Forward-Looking"

388. The PSLRA imposes an additional burden on "oral" forward looking statements, requiring defendants to include a cautionary statement that the **particular** oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward looking and failed to include the language

required by the PSLRA. The following oral statements made by Defendants Vasudevan, Leary, Mehta, and Singh were neither identified as forward-looking pursuant to the PSLRA nor accompanied by *any* cautionary language, and thus, to the extent that any such statements may be considered forward-looking, they are not afforded any immunity by the PSLRA:

- the statements of Defendant Vasudevan at the December 2, 2014 Credit Suisse Technology Conference (¶¶ 229-32).
- the statements of Defendant Leary at the December 8, 2014 Raymond James Conference (¶¶ 233-40).
- the statements of Defendant Vasudevan at the December 9, 2014 Barclays Global Technology Conference (¶¶ 241-42).
- the statements of Defendant Leary during an April 21, 2015 interview with Enterprise Strategy Group (¶¶ 266-67).
- the statements of Defendants Singh and Mehta during a September 22, 2015 meeting with Wells Fargo (¶¶ 302-07).

**C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language**

389. None of Defendants' statements were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected. To be meaningful, cautionary language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. Cautionary statements can only be meaningful if they discredit the alleged misrepresentations so obviously that the risk of real deception dropped to zero. In other words, cautionary language must be extensive and directly related to the alleged misrepresentation and must disclose the specific risks and their magnitude. Defendants' purported cautionary language does not meet this standard. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested.

390. The cautionary language that accompanied the oral statements made during the August 25, 2015 earning conference call was inadequate to trigger protection of any forward-looking statements made therein, including Nimble's 3Q16 financial forecast. Defendants failed to sufficiently identify the forward-looking statements and failed to identify a readily available written document (or portion thereof) that contained the purportedly meaningful cautionary language, which would provide information concerning facts that would cause results to be materially different. Defendants' vague reference during the August 25, 2015 earning conference call to boilerplate risks set forth in Nimble's quarterly report on Form 10-Q for the fiscal quarter ended July 31, 2015 was inadequate to satisfy the safe harbor's requirements:

> Thank you for joining today's conference call to discuss second-quarter FY16 results for Nimble Storage. This is Edelita Tichepco, Nimble Storage Investor Relations. Joining me are Suresh Vasudevan, Chief Executive Officer and Anup Singh, Chief Financial Officer. After the market closed today, Nimble Storage issued a press release and shareholder letter announcing the financial results for the second quarter. Shareholder letter, earnings press release and a live webcast of this session are available on the Investor Relations page of our website at nimblestorage.com. As a reminder, during the course of this call we will make forward-looking statements, including statements regarding our revenue and earnings per share guidance for our fiscal third quarter. These forward-looking statements involve risks and uncertainties, some of which are beyond our control, which could cause actual results to differ materially from those anticipated by these statements. For a more detailed description of these risks, refer to our earnings press release issued today and our form 10-Q filed with the SEC. During this call we will discuss GAAP and non-GAAP financial measures. A reconciliation of GAAP to non-GAAP measures is available on our shareholder letter and earnings press release available on our investor relations website.

391. Similarly, the cautionary language that accompanied the written statements made by Defendants Vasudevan and Singh in the August 25, 2015 Shareholder Letter was inadequate to trigger protection for any forward-looking statements made therein, including Nimble's 3Q16 financial forecast. Defendants failed to sufficiently identify the forward-looking statements and failed to use meaningful cautionary language providing information concerning facts that would cause results to be materially different. Defendants' vague reference to boilerplate risks are inadequate to satisfy the safe harbor's requirements:

> Forward-looking statements are subject to known and unknown risks, uncertainties, assumptions and other factors including, but not limited to, **those related to our future financial performance which is inherently uncertain, unforeseen delays in product**

> **development or introduction, uncertainty around market acceptance of our solutions, our ability to increase sales of our solutions, our ability to attract and retain customers and to selling additional solutions to our existing customers, our ability to develop new solutions and bring them to market in a timely manner, pricing pressure (as a result of competition or otherwise), introduction of new technologies and products by other companies, our ability to maintain, protect and enhance our brand and intellectual property, the effectiveness of our channel partners and sales team, our ability to recruit new or keep our existing key talent, global economic conditions and fluctuations in foreign currency rates and our ability to continue to expand our business and manage our growth**. Moreover, we operate in very competitive and rapidly changing environments, and new risks may emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Further information on these and other factors that could affect our financial results are included in our filings with the Securities and Exchange Commission, and may cause our actual results, performance or achievements to differ materially and adversely from those anticipated or implied by our forward-looking statements.

392. Even assuming that Defendants sufficiently identified their forward-looking statements and directed investors to the appropriate meaningful risk factors, which they did not, the cautionary language found within the Company's August 25, 2015 Shareholder Letter was inadequate to invoke the safe harbor protection for forward-looking statements concerning guidance made in the Shareholder Letter. The risk warnings that can be read to address risks regarding Nimble's ability to accurately forecast financial results were not sufficient to meaningfully or adequately address the Defendants' misrepresentations.

### D. Defendants Knew that the Risks They Warned of Had Already Come to Pass

393. To the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason as to what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by an executive officer of Nimble who actually knew that each such statement was false and/or misleading when made.

394. As detailed above, Defendants failed to disclose to the market in 3Q16 that the commercial segment had dried up significantly, and failed to disclose that, throughout the Class Period, Nimble was not actually penetrating the enterprise segment in a meaningful way and was instead improperly relabeling commercial accounts to enterprise accounts to make it look like the enterprise segment was growing.

**COUNT I**

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

395. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

396. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

397. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Nimble common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Nimble common stock and options on such common stock at artificially inflated prices.

398. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

399. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Nimble common stock and exchange traded options on such common stock during the Class Period.

400. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nimble common stock and exchange traded options on such common stock, Lead Plaintiff and other members of the Class purchased Nimble common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Nimble common stock and exchange traded options on such common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Nimble common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Nimble common stock and exchange traded options on such common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

401. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act Against Defendants Vasudevan and Singh

402. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

403. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Vasudevan and Singh.[29]

404. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Nimble's common stock and options on such common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus Nimble is primarily liable under Section 10(b) of the Exchange Act.

405. As set forth above, Defendants Vasudevan and Singh were controlling persons of Nimble during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including Nimble's sales force.

406. By virtue of the foregoing, Defendants Vasudevan and Singh each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nimble, including the content of its public statements with respect to the Company's investments, the success (or lack thereof) of its enterprise and commercial segments, and the growth of the business.

407. Defendants Vasudevan and Singh acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Nimble common stock and exchange traded options on such common stock during the Class Period.

[29] Lead Plaintiff excludes Defendants Leary and Mehta from Count II at this time because it does not have information leading it to believe that either was a controlling person of Nimble during the Class Period. Lead Plaintiff reserves the right to further amend this pleading to add either Defendant Leary or Mehta, or both, as defendants in Count II should it come to light that either was in fact a controlling person of Nimble during the Class Period.

408. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Nimble common stock and exchange traded options on such common stock, Lead Plaintiff and other members of the Class purchased Nimble common stock and exchange traded options on such common stock at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Nimble common stock and exchange traded options on such common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Nimble common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Nimble common stock and exchange traded options on such common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

409. By reason of the foregoing, Defendants Vasudevan and Singh are liable to Lead Plaintiff and the members of the Class as controlling persons of Nimble in violation of Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: June 29, 2017

**LABATON SUCHAROW LLP**

By: */s/ Jonathan Gardner*
Jonathan Gardner

Carol C. Villegas
Roger W. Yamada
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
cvillegas@labaton.com
ryamada@labaton.com

***Lead Counsel for the Class***

Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Tel. (415) 433-3200
Fax (415) 433-6382
Email: nlavallee@bermandevalerio.com
cpoppler@bermandevalerio.com

***Liaison Counsel***

## CERTIFICATE OF SERVICE

I, the undersigned, state that I am employed in the City and County of New York, State of New York, that I am over the age of eighteen (18) years and not a party to the within action, that I am employed at Labaton Sucharow LLP, 140 Broadway, New York, New York 10005, and that on June 29, 2017, I served a copy of the attached:

**CORRECTED THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

to the parties listed on the attached Service List by the following means of service:

[X] BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record registered with the Court's electronic filing system.

[X] BY U.S. MAIL: I served the attorneys who are not on the ECF list to receive e-mail notices for this case by U.S. Mail.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on the 29th day of June, 2017.

*/s/ Jonathan Gardner*
JONATHAN GARDNER

## SERVICE LIST

**4:15-cv-05803-YGR**

***Desai Vikramkumar v. Nimble Storage, Inc. et al***

**Electronic Mail Notice List**
The following are those who are currently on the list to receive e-mail notices for this case.

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com
- **Avery Lee Brown**
  avery.brown@fenwick.com
- **Nair Diana Chang**
  dchang@fenwick.com
- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com
- **Michael M Davis-Wilson**
  mdaviswilson@fenwick.com,vpieretti@fenwick.com
- **Michael Scott Dicke**
  mdicke@fenwick.com
- **Jonathan Gardner**
  jgardner@labaton.com,cvillegas@labaton.com,ryamada@labaton.com,acoquin@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,agreenbaum@labaton.com
- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com
- **Joseph Alexander Hood , II**
  ahood@pomlaw.com
- **Christopher J. Keller**
  ckeller@labaton.com,drogers@labaton.com,electroniccasefiling@labaton.com
- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Felix Shih-Young Lee**
  flee@fenwick.com,tmartin@fenwick.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com
- **Francis P McConville**
  fmcconville@labaton.com,sjessee@labaton.com
- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,recordsecf@fenwick.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Matthew David-Craig Pearson**
  mpearson@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Aidan Chowning Poppler**
  cpoppler@bermandevalerio.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Michael Walter Stocker**
  mstocker@labaton.com,ravan@labaton.com,ElectronicCaseFiling@labaton.com,lmehringer@labaton.com
- **Carol C. Villegas**
  cvillegas@labaton.com,jchristie@labaton.com,lmehringer@labaton.com,acoquin@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com
- **Roger W Yamada**
  ryamada@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).

**Peretz Bronstein**
Bronstein Gewirtz & Grossman, LLC
60 East 42nd Street, Suite 4600
New York, NY 10154

**Marc Gorrie**
Pomerantz, LLP
600 Third Avenue, 20th Floor
New York, NY 10016