1 SUSAN S. MUCK (CSB No. 126930)
smuck@fenwick.com
2 MICHAEL DICKE (CSB No. 158187)
mdicke@fenwick.com
3 DIANA CHANG (CSB No. 287624)
dchang@fenwick.com
4 FENWICK & WEST LLP
555 California Street, 12th Floor
5 San Francisco, CA  94104
Telephone:     415.875.2300
6 Facsimile:     415.281.1350

7 FELIX S. LEE (CSB No. 197084)
flee@fenwick.com
8 MICHAEL DAVIS-WILSON (CSB No. 259790)
mdaviswilson@fenwick.com
9 AVERY L. BROWN (CSB No. 313478)
avery.brown@fenwick.com
10 FENWICK & WEST LLP
Silicon Valley Center
11 801 California Street
Mountain View, CA  94041
12 Telephone:     650.988.8500
Facsimile:     650.938.5200
13

14 Attorneys for Defendants
Nimble Storage, Inc., Suresh Vasudevan,
15 Anup V. Singh, Daniel Leary, and Varun Mehta

16

17                  UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19

20 IN RE NIMBLE STORAGE, INC.                    Case No.: 4:15-cv-05803-YGR
   SECURITIES LITIGATION
21                                               **DEFENDANTS' NOTICE OF MOTION
                                                 AND MOTION TO DISMISS
22                                               CORRECTED THIRD AMENDED
                                                 CONSOLIDATED CLASS ACTION
23                                               COMPLAINT AND MEMORANDUM
                                                 OF POINTS AND AUTHORITIES IN
24                                               SUPPORT THEREOF**

25                                               Date:     September 26, 2017
                                                 Time:     2:00 p.m.
26                                               Judge: Hon. Yvonne Gonzalez Rogers

27                                               Date Action Filed: December 17, 2015

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................. 3

    A.  The Parties........................................................................................... 3

    B.  Events of the Class Period................................................................... 3

        1.  Nimble's Growth and Related Disclosures During the Class Period.......... 3

        2.  Announcement of Third Quarter FY2016 Results ..................................... 4

    C.  The Litigation....................................................................................... 5

        1.  Initial Complaints................................................................................. 5

        2.  The Third Amended Complaint. ............................................................ 6

III. PLAINTIFF HAS FAILED TO PLEAD WITH PARTICULARITY ANY
STATEMENTS WERE FALSE AND MISLEADING WHEN MADE........................... 6

    A.  Nimble's Statements Regarding Penetration of the Enterprise Space
Are Not Actionable. ............................................................................ 6

        1.  Plaintiff Still Cannot Dispute the Accuracy of Nimble's
Disclosures Regarding the Number of Its G5000 Customers. .................... 7

        2.  Plaintiff's Allegations Regarding Reclassification of
Commercial to Enterprise Customers Still Do Not State
a Claim For Securities Fraud................................................................. 7

    B.  Nimble's Statements Regarding Its "Win Rates" Are Not Actionable.................. 9

    C.  Nimble's Statements Regarding Its Plans to Move Toward Non-GAAP

Operating Income Break-even Are Not Actionable.......................................... 10

    D.  The TAC Still Fails to Plead Sufficient Facts to State a Claim Regarding
Nimble's Commercial Segment. ........................................................... 11

        1.  No Actionable Misstatements Regarding the Commercial
Segment Were Made During Q3FY16, The Only Period
Where the Court Granted Leave to Amend Plaintiff's Commercial
Allegations. ........................................................................................ 11

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

2.    Plaintiff's Allegations Regarding Nimble's Backlog Cannot Salvage Its Commercial Claims. ................................. 12

IV.    CERTAIN ALLEGEDLY MISLEADING STATEMENTS ARE FORWARD-LOOKING AND PROTECTED BY THE REFORM ACT SAFE HARBOR ................................................................ 14

A.    Nimble's Financial Guidance For Q3FY16 Is Protected by the Safe Harbor. ................................................................ 15

B.    Statements Regarding Break-Even Are Protected by the Safe Harbor. ............... 17

V.    NO STRONG INFERENCE OF SCIENTER HAS BEEN PLED ................................. 17

A.    The Confidential Witness Allegations Fail to Establish Scienter. ....................... 17

1.    The Confidential Witnesses Lack Personal Knowledge. .......................... 18

2.    The Confidential Witnesses' Allegations Fail to Set Forth Particularized Facts Raising a Strong Inference of Scienter. ................... 20

a.    CW Allegations Do Not Establish Internal Reports Contradicted Defendants' Public Statements. ................................... 20

b.    CW Allegations Do Not Establish Required Contemporaneous Knowledge of Falsity of Q3FY16 and Break-Even Guidance ................... 21

c.    CW Allegations Do Not Establish Any Reclassification Was Improper and Incorporated into Public Disclosures ............ 22

3.    Plaintiff Fails to Establish Corporate Scienter ......................................... 22

B.    Plaintiff's Insider Trading Allegations Do Not Support a Strong Inference of Scienter. ................................................................ 23

1.    Defendants' Trading Negates an Inference of Scienter. .......................... 23

2.    Plaintiff's Trading Model Fails to Raise a Strong Inference of Scienter. ................................................................ 24

VI.    PLAINTIFF'S CONTROL PERSON CLAIMS FAIL ................................................... 25

VII.    CONCLUSION ................................................................ 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ................................................................................................23

*Berson v. Applied Signal Technology, Inc.*,
  527 F.3d 982 (9th Cir. 2008)..........................................................................13

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...........................................................19

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................23, 24, 25

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004).....................................................................14, 16

*ESG Capital Partners, LP v. Stratos*,
  828 F.3d 1023 (9th Cir. 2016)...................................................................17, 21, 22

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016).....................................................9

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989)........................................................................23

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) .............................................................20

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015)...........................................................................22

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) .............................................................10

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010)....................................................................15, 16

*In re Dot Hill Sys. Corp. Sec. Litig.*,
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) ............................................................18

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).....................................................19

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*In re Foundry Networks, Inc. Sec. Litig.*,
    2003 WL 22077729 (N.D. Cal. Aug. 29, 2003)............................................................13

*In re Fusion-io Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ..............................................................16

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 726791 (D. Ariz., Jan. 25, 2006) ................................................................18

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d (N.D. Cal. 2007) .......................................................................15, 17

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ...................................................................8

*In re NorthPoint Commc'ns Grp., Inc. Sec. Litig.*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ........................................................................18

*In re Nvidia Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010)...........................................................24

*In re Sipex Corp. Sec. Litig.*,
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005).........................................................13

*In re Skechers U.S.A., Inc. Sec. Litig.*,
    273 F. App'x 626 (9th Cir. 2008) .............................................................................23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .........................................................11

*In re VeriFone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ............................................................7, 8, 10, 12

*In re Verity, Inc. Sec. Litig.*,
    2000 WL 1175580 (N.D. Cal. Aug. 11, 2000)..........................................................22

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...............................................................10, 14

*In re Zumiez Inc. Sec. Litig.*,
    2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .......................................................14

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).......................................................................................10

*Karpov v. Insight Enters., Inc.*,
    2010 WL 4867634 (D. Ariz. Nov. 16, 2010),
    *aff'd*, 471 F. App'x 607 (9th Cir. 2012)...................................................................19

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
 540 F.3d 1049 (9th Cir. 2008)..............................................................24

*Nordstrom, Inc. v. Chubb & Son, Inc.,*
 54 F.3d 1424 (9th Cir. 1995)................................................................22

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
 380 F.3d 1226 (9th Cir. 2004)..............................................................20

*Paracor Fin., Inc. v. General Elec. Capital Corp.,*
 96 F.3d 1151 (9th Cir. 1996)................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
 2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd,* 759 F.3d 1051
 (9th Cir. 2014)......................................................................................16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
 2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd,* 759 F.3d 1051
 (9th Cir. 2014)......................................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
 759 F.3d 1051 (9th Cir. 2014).........................................................16, 23

*Shankar v. Imperva, Inc., et. al.,*
 2016 WL 2851859 (N.D. Cal. May 16, 2016) ...................................9, 10

*Shurkin v. Golden State Vintners Inc.,*
 471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd,* 303 F. App'x 431 (9th Cir. 2008) ...................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007)..............................................................................21

*Tripp v. IndyMac Fin. Inc.,*
 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)......................................23

*Turocy v. El Pollo Loco Holdings Inc.,*
 2017 WL 1102767 (N.D. Cal. Mar. 20, 2017).......................................20

*Zucco Partners, LLC v. Digimarc Corp.,*
 552 F.3d 981 (9th Cir. 2009).........................................................*passim*

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)....................................................................25

15 U.S.C. § 78u-4(b)(2)(A).............................................................17, 21

15 U.S.C. § 78u-5(i)(1)(A)....................................................................15

15 U.S.C. § 78u-5(c)(1)(A)(i)...........................................................14, 15

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

15 U.S.C. § 78u-5(c)(1)(B)(i) ............................................................................14, 16

Private Securities Litigation Reform Act of 1995................................................ *passim*

Securities Exchange Act of 1934 ......................................................................5, 25

**OTHER AUTHORITIES**

SEC Rule 10b-5 ...............................................................................................5

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on September 26, 2017, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers, U.S. District Court, Northern District of California, Defendants Nimble Storage, Inc. ("Nimble" or the "Company"), Suresh Vasudevan, Anup V. Singh, Daniel Leary, and Varun Mehta will, and hereby do, move to dismiss with prejudice all claims asserted against them in Plaintiff's Corrected Third Amended Consolidated Class Action Complaint (the "TAC").  Defendants move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("Reform Act") on the grounds that Plaintiff fails to state a claim for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").  This motion is based upon this Notice of Motion and Motion; the following Memorandum of Points and Authorities; Defendants' Request for Judicial Notice ("RJN"); the Declaration of Felix S. Lee ("Lee Decl.") and exhibits thereto ("Ex."); the [Proposed] Order; the pleadings and records on file herein; the argument of counsel; and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

1.       The Reform Act imposes stringent requirements for pleading of securities fraud actions under Section 10(b), requiring that a plaintiff plead particularized facts demonstrating both falsity of alleged misstatements and a "strong inference" of scienter by defendants.  Should Plaintiff's Section 10(b) claim be dismissed on grounds that the TAC fails to plead particularized facts showing: 1) the existence of any actionable misstatements or omissions; or 2) a strong inference of scienter on behalf of any defendant?

2.       Should Plaintiff's Section 20(a) claim be dismissed on grounds that the TAC fails to plead a predicate violation of Section 10(b)?

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Over the eighteen months that Plaintiff has pressed its suit, the critical facts underlying the

4   case have yet to be disputed.  Nimble experienced spectacular growth from the time of its IPO

5   and throughout the class period, and Plaintiff does not challenge any of the Company's published

6   financial results.  But because Nimble narrowly missed analyst estimates in Q3FY16 – while still

7   posting a record quarter – Plaintiff has tried to argue in classic "fraud by hindsight" fashion that

8   virtually every positive statement made by Company during the class period was fraudulent.  The

9   Court has rejected these claims twice – giving Plaintiff only narrow grounds to amend – but the

10  TAC fails to cure the pleading defects identified in the Court's Order dismissing Plaintiff's

11  Second Amended Complaint (the "SAC Order").

12      In its SAC Order, the Court gave clear directives to Plaintiff about what it needed to do to

13  salvage what remained of its allegations, *i.e.*, plead particularized facts adequately alleging: 1)

14  false or misleading statements regarding Nimble's commercial business during the third quarter

15  of fiscal 2016 (the commercial allegations as to prior periods were dismissed with prejudice), or

16  2) that Nimble fraudulently reclassified commercial customers as enterprise customers ***and*** that

17  those reclassifications were disclosed to the public.  Plaintiff has failed to do either.

18      Plaintiff has instead repleaded in essentially unchanged form all the allegations of the

19  SAC not expressly dismissed with prejudice.  Despite adding another four confidential witnesses,

20  the TAC adds virtually no substance to its allegations.  The new confidential witnesses mostly

21  reiterate previous allegations, focusing largely on the claim that Nimble's internal forecasting

22  tools such as Cloud 9 and Salesforce "would have" had the ability to inform management about

23  purported lack of demand, but never asserting that those systems ***actually did*** state such a thing.

24      Similarly, Plaintiff adds virtually nothing to its allegations regarding Nimble's enterprise

25  segment, aside from allegations by one confidential witness – who had no connection with

26  Nimble's finance group or responsibilities over financial reporting – that clients classified as

27  enterprise clients "would have" been reported to the market as a "win."  Again, Plaintiff proffers

28  no witness alleging that any purportedly misclassified customer ***actually was*** reported to the

Fenwick & West LLP
Attorneys at Law
Mountain View

1  market, as required by the SAC Order.

2      Plaintiff also advances a new allegation that Nimble used "backlog" in one region to

3  "close the gap" between revenue and guidance for Q2FY16. The TAC does not plead, however,

4  required particularized facts regarding the alleged "backlog," nor does the CW making such

5  allegation have a credible basis for his claims. And even more fundamentally, Plaintiff never

6  establishes how these backlog allegations rendered any statement by Nimble false or misleading.

7      Finally, the TAC adds new categories of alleged misstatements – *i.e.*, Nimble's financial

8  guidance for Q3FY16, and statements about Nimble's "win rates" against competitors – which

9  have both routinely been dismissed by Courts as inactionable. Financial guidance is by definition

10  forward-looking, and in these circumstances is protected by the Reform Act Safe Harbor. And

11  generically positive statements about "win rates" have also been deemed by Courts to be too

12  vague to state a claim or otherwise inactionable "puffery," and the same result is warranted here.

13      Plaintiff's allegations must also be dismissed for the independent reason that the TAC

14  fails to plead facts raising a strong inference of scienter. Plaintiff purports to have gathered

15  information from fifteen confidential witnesses, but none of them assert that Nimble committed

16  fraud, and none set forth specific facts suggesting Defendants believed the statements they were

17  making were untrue. To the contrary, the bulk of allegations made by the CWs are devoted to

18  describing the accuracy of Nimble's forecasting systems, but at no point do they assert – much

19  less provide specifics to show – that they generated forecasts or reports inconsistent with

20  Nimble's public statements. The fact that Plaintiff has purportedly spoken to fifteen witnesses

21  and not one can provide this required information strongly ***rebuts*** any inference of scienter.

22      Plaintiff's insider trading allegations are equally faulty. Using the analytical methods

23  prescribed by governing law, Defendants' stock sales are not suspicious in timing or amount, and

24  thus cannot support the required "strong inference" of scienter. In apparent recognition of that

25  fact, Plaintiff resorts to using an alternative model to analyze these trades, an attempt that should

26  be rejected given that such model has never been accepted by any court in determining scienter, is

27  not described with sufficient factual particularity, and is methodologically flawed in any event.

28      In sum, enough is enough – Plaintiff has had eighteen months to investigate its claims, has

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

purported to interview fifteen Nimble employees, and has attempted three times to plead claims that meet the exacting standards for a securities fraud complaint.  It has not done so, and it cannot. For the foregoing reasons and those set forth below, the TAC should be dismissed with prejudice.

## II.    STATEMENT OF FACTS

### A.    The Parties.

Nimble is a Delaware corporation headquartered in San Jose, California, which manufactures and sells hardware, software, and services in the data storage market.  TAC ¶¶ 2, 29.  It was founded in 2007, and became a public company in December 2013.  *Id.*

Suresh Vasudevan is the Chief Executive Officer of the Company, and has been since March 2011.  TAC ¶ 31.  Anup Singh is Nimble's Chief Financial Officer, and has served in that capacity since November 2011.  *Id.*, ¶ 32.  Varun Mehta has been the Company's Vice President of Engineering since March 2011, and prior to that was the Company's Chief Executive Officer. *Id.*, ¶ 33.  Daniel Leary has been the Company's Vice President of Corporate Development, Solutions and Alliances since October 2015, and prior to that was the Company's Vice President of Marketing.  *Id.*, ¶ 34.  Messrs. Vasudevan, Singh, Mehta, and Leary are, collectively, the "Individual Defendants," and, together with Nimble, the "Defendants."

Plaintiff Arkansas Teacher Retirement System is a pension plan established by the state of Arkansas to provide retirement benefits for state education employees.  *See* TAC ¶ 28.

### B.    Events of the Class Period.

#### 1.    Nimble's Growth and Related Disclosures During the Class Period.

**Third Quarter FY2015 Results.**  On November 25, 2014, the first day of the class period, Nimble released its results for the third quarter of fiscal 2015.  It announced record revenues of $59.1 million – its ninth consecutive quarter of revenue growth since its IPO – and non-GAAP operating loss of 9.7 million, or 16% of revenue.  Lee Decl., Ex. A (3Q15 8-K filed Nov. 25, 2014) at 5.  The Company indicated that it remained "on track to achieve break-even on a non-GAAP basis around the end of our next fiscal year (FY16)."  *Id.* at 9.  Nimble also highlighted the introduction of new storage arrays supporting the Fibre Channel protocol, noting that Fibre Channel could quadruple Nimble's Total Addressable Market ("TAM").  *Id.* at 5.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1      **Fourth Quarter FY2015 Results.**  On February 26, 2015, Nimble released its results for

2 the fourth quarter of fiscal 2015, announcing record revenues of $68.3 million, and non-GAAP

3 operating loss of 8.5 million, or 12.4% of revenue.  Lee Decl., Ex. A (4Q15 8-K filed Feb. 26,

4 2015) at 15-16.  It again stated that it was "on track to achieve our goal of non-GAAP P&L

5 break-even by the end of FY16."  *Id*. at 18.

6      **First and Second Quarter FY2016 Results.**  The Company's growth continued in the

7 next two fiscal quarters.  On May 26, 2015, Nimble released its first quarter of fiscal 2016 results,

8 announcing that revenues had increased to $71.3 million, and non-GAAP operating loss of $7.9

9 million, or 11% of revenue.  Lee Decl., Ex. A (1Q16 8-K filed May 26, 2015) at 22-23.

10      On August 25, 2015, Nimble released its results for the second quarter of fiscal 2016,

11 announcing revenue of $80.1 million, and non-GAAP operating loss of $7.2 million, or 9% of

12 revenue. Lee Decl., Ex. A (2Q16 8-K filed Aug. 25, 2015) at 29.

13      **Financial Guidance for Third Quarter FY16.**  Also on August 25, 2015, mere weeks

14 after closing another record quarter for revenue, Nimble issued financial guidance for the third

15 quarter of fiscal 2016 of $86 to $88 million in revenue, non-GAAP operating loss of $5 to $6

16 million, and non-GAAP net loss of $0.08 to $0.09 per share.  Lee Decl., Ex. A (2Q16 8-K filed

17 Aug. 25, 2015) at 32.

18        **2.**    **Announcement of Third Quarter FY2016 Results**.

19      On November 19, 2015, Nimble released its results for the third quarter of fiscal 2016.

20 The Company's revenues grew to $80.7 million, but fell roughly 6% short of the previous

21 quarter's revenue guidance.  As a result, the Company had non-GAAP operating loss of $10.8

22 million, or 13% of revenue.  This growth in operating loss was due entirely to the revenue

23 shortfall; the company's operating expenses continued to decline as a percentage of revenue as

24 expected.  Lee Decl., Ex. A (3Q16 8-K filed Nov. 19, 2015) at 41-42.  Nimble explained to the

25 market that there were two primary factors that impacted the Company's financial results.

26      First, as the Company had previously disclosed, Nimble had made "significant

27 investments aimed at accelerating large global enterprise customer growth," and while those

28 investments had allowed the Company to "grow [its] enterprise business, the competitive

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

intensity in the market [wa]s causing [its] enterprise investments to take longer than expected to achieve full productivity."  Lee Decl., Ex. A at 38.  Nimble was still experiencing impressive growth in its base of large enterprise customers, disclosing that it had "over 400 global enterprise[]" customers − a 53% increase from the beginning of the class period − but overall enterprise growth was not at the rate which it had previously anticipated.  *Id.*

Second, as also previously disclosed, the Company noted its decision to "shift in investment from our commercial business to enterprise business" and that "[a]t the time when the storage market remains very competitive, this [shift in resources] led to lower growth in our commercial business than we believe we could have achieved by maintaining our prior pace of investment in that segment of the market."  Lee Decl., Ex. A at 38.

Nimble's guidance miss was the first in the Company's history, and the Company's stock price fell as a result (TAC ¶ 20), with class action lawsuits following shortly thereafter.

## C.  The Litigation.

### 1.  Initial Complaints.

Between December 17, 2015 and February 5, 2016, three substantially similar class action complaints were filed in this Court alleging claims under sections 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.  Dkt. 1.  On March 22, 2016, the actions were consolidated, and on July 15, 2016, Plaintiff filed its Corrected Consolidated Class Action Complaint ("CAC").  Dkt. 97.  On December 9, 2016, the Court granted Defendants' motion to dismiss the CAC, ruling that Plaintiff "ha[d] not adequately pled any false or misleading statements or omissions."  Order Granting Motion to Dismiss, Dec. 9, 2016 [Dkt. 113] at 7, 17.

On January 20, 2017, Plaintiffs filed the SAC.  After briefing, on May 10, 2017, the Court dismissed the SAC, ruling that Plaintiff "ha[d] not adequately pled any false or misleading statements or omissions."  SAC Order at 2.  The Court explained that Plaintiff's allegations that demand for both Nimble's commercial and enterprise products was weakening throughout the Class Period could not be reconciled with Nimble's record revenues throughout that same period, and consequently dismissed Plaintiff's commercial allegations for all periods prior to Q3FY16 with prejudice, and dismissed such claims during that quarter without prejudice.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

The Court also dismissed Plaintiff's enterprise allegations on grounds that it had not pled that customers allegedly reclassified as enterprise had been incorporated into the financial numbers disclosed to the investing public.  The Court granted leave to amend the enterprise claims "only to the extent that plaintiff can adequately allege that the reclassifications were fraudulent and such fraudulent reclassifications were disclosed to the public."  SAC Order at 5-8.

Finally, the Court dismissed Plaintiff's allegations regarding Nimble's efforts to reach break-even because, standing alone, statements that a company is "on track" to meet a goal are inactionable puffery.  The allegations were dismissed with leave to amend.  SAC Order at 8, n.8.

### 2.      The Third Amended Complaint.

On June 12, 2017, Plaintiff filed the first version of its TAC, and the corrected version was filed on June 29, 2017.  The alleged misstatements in the TAC could be grouped into three categories: 1) positive statements regarding Nimble's progress in the enterprise market; 2) statements regarding Nimble's projected plan to reach break-even in non-GAAP operating income by the fourth quarter of fiscal 2016; and 3) statements regarding Nimble's "win rates." TAC ¶¶ 224-307.  Plaintiff claimed these statements were false and misleading because:

- Nimble was allegedly not growing its base of large enterprise customers in a meaningful manner.  *See*, *e.g.*, TAC ¶¶ 224-307.
- Nimble's products allegedly lacked product features that large enterprise customers desired.  *See*, *e.g.*, *id.*, ¶¶ 224-307.
- Nimble allegedly improperly reclassified commercial customers as large enterprise customers.  *See*, *e.g.*, *id.*, ¶¶ 224-307.
- Nimble allegedly used its "backlog" to close the gap between revenue and guidance in 2Q16.  *See*, *e.g.*, *id.*, ¶¶ 278-307.
- Nimble's allocation of additional resources to sales teams focused on large enterprise customers allegedly caused weakness in the commercial segment during the second and third quarter of fiscal 2016. *See*, *e.g.*, *id.*, ¶¶ 278-307.

### III.      PLAINTIFF HAS FAILED TO PLEAD WITH PARTICULARITY ANY STATEMENTS WERE FALSE AND MISLEADING WHEN MADE

#### A.      Nimble's Statements Regarding Penetration of the Enterprise Space Are Not Actionable.

The Court has twice dismissed Plaintiff's allegations regarding Nimble's enterprise business after identifying fundamental defects in their pleading. The SAC Order gives Plaintiff leave to amend these claims *only* "to the extent that plaintiff can adequately allege that the

reclassifications were fraudulent and such fraudulent reclassifications were disclosed to the public." SAC Order at 8. Faced with this directive, Plaintiff has essentially capitulated, with the enterprise allegations in the TAC remaining fundamentally unchanged from those that were dismissed in the SAC.

### 1. Plaintiff Still Cannot Dispute the Accuracy of Nimble's Disclosures Regarding the Number of Its G5000 Customers.

The Court observed in its SAC Order that "throughout the Class Period, defendants provided to the public updates on the growth of its Global 5000 customer base," and focused on the fact that "[p]laintiff has not alleged that such numbers that were disclosed to the public were false." SAC Order at 6. As a consequence, the Court dismissed the enterprise claims on grounds that "[b]ased on such numbers, the market and investors can assess for themselves defendants' statements regarding Nimble's penetration of the enterprise segment." *Id.* at 7.

The TAC does not cure this deficiency. Plaintiff *still* does not challenge the veracity of Nimble's G5000 numbers – in particular the fact that they *grew by at least 53%* during the class period (from 260 to over 400) – as Plaintiff has no good faith basis for doing so. *See*, *e.g.*, TAC ¶ 211 n.20; Lee Decl., Ex. A. (3Q15 8-K filed Nov. 25, 2014) at 7; Ex. A. (3Q16 8-K filed Nov. 19, 2015) at 40. The fact that Plaintiff cannot dispute these concrete G5000 enterprise customer numbers – even after the Court specifically singled them out in its SAC Order – is by itself sufficient to warrant dismissal of these enterprise claims. *See* SAC Order at 7, *citing In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) ("[Sales and profit data], when accurately reported, [are] rarely subject to misinterpretation, even if the disclosure is accompanied by generally optimistic statements about the future by corporate officers.").

### 2. Plaintiff's Allegations Regarding Reclassification of Commercial to Enterprise Customers Still Do Not State a Claim For Securities Fraud.

Equally fruitless is Plaintiff's attempt to rehabilitate its allegations regarding supposed reclassification of commercial customers as enterprise. The only new fact pled in support of these claims is a statement by CW14 that "the way that Nimble's internal Salesforce and Cloud 9 systems worked, if a Commercial account was reclassified as an enterprise account, that account would have been counted as a 'win' during that quarter and announced to the market as such."

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

TAC ¶ 202.  This assertion cannot remotely salvage Plaintiff's enterprise claims.

*First*, not even Plaintiff believes that CW14's averments provide sufficient basis to dispute the accuracy of Nimble's G5000 disclosures – *e.g.*, that the G5000 customer base grew from 260 to over 400 during the class period – which as noted fatally impairs these claims.  SAC Order at 6-7 (dismissing enterprise claims on grounds that "plaintiff's complaint lacks allegations connecting such reclassifications to any numbers actually disclosed by defendants"); *VeriFone*, 784 F. Supp. at 1481.  **Second**, CW14 does not claim he witnessed or otherwise had direct knowledge of any improperly relabeled commercial customer being included in Nimble's financial disclosures.  TAC ¶ 202.  The most CW14 can say is that in the abstract Nimble's systems would have recorded a reclassified account as a "win" – without explaining what this means – but on its face this assertion is entirely hypothetical.  At no point does CW14 assert that this ***actually happened***.  *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("[t]he Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'").  And even more fundamentally, CW14 makes no claim that an ***improperly reclassified*** commercial customer was included in Nimble's numbers as a G5000 or enterprise customer.  TAC ¶ 202.  **Third**, even if one were to pretend that CW14 did make such assertion, he has no credible basis of knowledge for such claim, as CW14 was a ***marketing*** employee, who is not alleged to have any role in financial reporting, or any direct knowledge of what customers were included in Nimble's published G5000 results. TAC ¶ 202; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (CW allegation must include specific facts to show they were "positioned to know the information alleged").  Consequently, CW14's statements are insufficient to cure the defects in Plaintiff's pleading of its enterprise business claims.[1]

Plaintiff makes no other material changes to the reclassification arguments the Court dismissed from the SAC. Since the Court only gave Plaintiff leave to amend its enterprise

---

[1] The TAC makes a number of other allegations regarding reclassifications that were carried over from the SAC, but the Court has already ruled that these allegations do not pass muster under the Reform Act.  SAC Order at 6-8.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

allegations to the extent new facts were pled regarding reclassification and related disclosure (SAC Order at 8), the enterprise allegations should be dismissed with prejudice.

**B.     Nimble's Statements Regarding Its "Win Rates" Are Not Actionable.**

Plaintiff fares no better with its newly-minted assertion that Nimble's statements regarding its win rates against competitors were misleading. TAC ¶¶ 287-92. Each of these innocuous pronouncements – *e.g.*, that Nimble's win rates against its competition were "very healthy," "strong" and "very consistent" – were made during Nimble's August 25, 2015 earnings call, which has been heavily scrutinized by Plaintiff for more than a year and half without any accusation that these statements were misleading. *Id.* Faced with the prospect of dismissal, however, Plaintiff now makes the belated assertion that these statements were fraudulent. *Id.* This attempt to manufacture a claim fails for multiple reasons.

As a threshold matter, Courts have routinely rejected as inactionable generically positive statements about win rates – statements virtually identical to those at issue here. *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *8 (N.D. Cal. Nov. 14, 2016) (ruling that a statement that "win rates are very high" is a "typical example[] of non-actionable statements of corporate optimism.") (citation omitted); *Shankar v. Imperva, Inc., et. al.*, 2016 WL 2851859, at *4-5 (N.D. Cal. May 16, 2016) (holding that a Company statement that its "win-loss ratio 'remained very strong'" is "too vague to be actionable."). This fact by itself is sufficient to warrant dismissal of these "win rate" claims.

Even if one were to disregard case law directly on point, Plaintiff still fails to plead required particularized facts in support of this claim. ***First***, not a single confidential witness says ***anything*** about Nimble's win rates, much less asserts that the Company's statements about them were false. ***Second***, the TAC makes no claim as to what Nimble's win rates actually were, and indeed, does not directly assert that they changed, much less cite any facts demonstrating that they did. TAC ¶¶ 287-92. The only support cited in the TAC is that the commercial and enterprise divisions were supposedly suffering lack of demand, claims that have been rejected repeatedly by this Court and remain defective in the TAC. *Id.*; *see also* Section III.A, *supra*; Section III.D, *infra*. ***Third***, even if one were to accept for sake of argument that the enterprise

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

and commercial sectors were suffering lack of demand, it does not logically follow that Nimble's *win rates* must have changed – Nimble could have been winning the same percentage of the time against its competitors, but on a smaller number of deals given the supposed lack of demand, and Plaintiff pleads no facts to the contrary. **Finally**, the TAC never addresses the issue of timing, *i.e.*, all of the "win rate" statements Plaintiff challenges were made on August 25, 2015. TAC ¶¶ 287-92. No facts are pled showing that win rates had changed *as of that date*, just three and a half weeks after Nimble reported a record quarter. *Id.*; *Zucco*, 552 F.3d at 990 (Plaintiff must plead particularized facts showing a statement was misleading at the time it was made.). For these reasons, the win rate statements are inactionable and should be dismissed.

### C.   Nimble's Statements Regarding Its Plans to Move Toward Non-GAAP Operating Income Break-even Are Not Actionable.

As the Court recognized in its Order dismissing the SAC, statements that a company is "on track" to break-even are "puffery" and inactionable as a matter of law. SAC Order at 8 n.8; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167-68 (C.D. Cal. 2007) (statement that a company was "on track to deliver improved financial performance in the fall" is inactionable as "mere corporate puffery"); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (same).[2] Plaintiff has made no material changes to its break-even allegations, and they should therefore be dismissed on the same basis.

Even if the SAC Order was disregarded, there was nothing misleading about Nimble's statements that it was "on track" to break-even by the end of FY2016, as the Company accurately substantiated Nimble's historical progress toward that goal. Nimble publicly disclosed its operating losses as a percentage of total revenue, and those figures demonstrated progress towards break-even at the pace that management planned and communicated to the market. *VeriFone*, 784 F. Supp. at 1481 (noting when a company provides "hard information" to

---

[2] In addition to being puffery, Nimble's break-even statements were predictions about what would occur in the future (at the end of that fiscal year), and are therefore quintessential forward-looking statements protected by the Reform Act Safe Harbor. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) (defendants' statements that the company was "on track" to reach its financial projections "does not transform the statements, or any part of them, into non-forward-looking assertions"). *See* Section IV.B, *infra*.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS CORR.
THIRD AMENDED COMPLAINT AND MPA IN SUPPORT
THEREOF

10

CASE NO.  4:15-cv-05803-YGR

investors, such information "when accurately reported, is rarely subject to misinterpretation.").

The TAC itself utilizes "operating loss as a percentage of total revenue" as the metric to measure Nimble's progress towards break-even (TAC ¶ 107-08), and those publically disclosed numbers were as follows:

|  | FY13 | FY14 | Q3FY15 | Q4FY15 | Q1FY16 | Q2FY16 |
|---|---|---|---|---|---|---|
| Revenue ($K) | $53,840 | $125,733 | $59,096 | $68,269 | $71,288 | $80,109 |
| Non-GAAP Operating Income ($K) | -$25,160 **(-47% of revenue)** | -$33,420 **(-27% of revenue)** | -$9,722 **(-16% of revenue)** | -$8,458 **(-12.4% of revenue)** | -$7,933 **(-11% of revenue)** | -$7,182 **(-9% of revenue)** |

*See* TAC ¶¶ 107-08; Lee Decl., Ex. A.

This is exactly what Nimble predicted would happen. During the Q4FY15 earnings call, Mr. Singh said that Nimble's expected operating losses would be relatively flat in the first half of fiscal 2016, then decline toward break-even by the end of the year. Lee Decl., Ex. C (Q4 2015 transcript) at 10. That is precisely what occurred until Q3FY16's unexpected revenue shortfall, dispelling any claim that the Company was mischaracterizing its progress to date.

For all of these reasons, Plaintiff's allegations regarding break-even fail to state a claim.[3]

**D.   The TAC Still Fails to Plead Sufficient Facts to State a Claim Regarding Nimble's Commercial Segment.**

**1.   No Actionable Misstatements Regarding the Commercial Segment Were Made During Q3FY16, The Only Period Where the Court Granted Leave to Amend Plaintiff's Commercial Allegations.**

Plaintiff's allegations regarding Nimble's commercial business have been dismissed with

---

[3] The alleged "break-even" misstatement on September 22, 2015 fails for the additional reason that it was a statement by a Wells Fargo analyst after a purported conversation with Messrs. Singh and Mehta. TAC ¶ 303. Statements made by analysts can only give rise to liability if particularized facts are plead showing a defendant: (1) "provide[d] false or misleading information to the security analyst" or (2) "expressly or impliedly adopt[ed] or endorse[d] an analysts' misleading or false statements." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *17 (N.D. Cal. Sept. 29, 2000) (internal citations omitted). Neither prong is met by Plaintiff – the TAC does not cite any false information that Messrs. Singh and Mehta provided to Wells Fargo, nor are any facts pled to show how they "endorsed" the analyst's statement. Indeed, the statement itself declares the statement to be the ***opinion of the analyst***, beginning by stating that "***[o]ur sense*** is the growth story is still on track…" TAC ¶ 303 (emphasis added).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   prejudice, except for any "actionable statements" that are made during "that short window during

2   Q3 2015 [beginning on August 1, 2015] prior to the corrective disclosures on November 19,

3   2015." SAC Order at 4-5. The TAC, however, identifies no specific misstatements regarding

4   Nimble's commercial segment during this period. *See* TAC ¶¶ 278-309. The alleged

5   misstatements during period relate to only the following topics: 1) the Company's enterprise

6   business and its win rates against enterprise competitors in the all-flash market (TAC ¶¶ 281-94;

7   306-09); 2) whether the Company was on track to break-even by the end of the year (*id.* ¶¶ 278-

8   79; 295-99; 303-05); and 3) Nimble's financial guidance for the upcoming Q3FY16 (*id.* ¶¶ 278-

9   79; 295-97). As noted above, Plaintiff's allegations regarding "win rates"[4] and break-even are

10   defective for multiple reasons. *See* Sections III.B-C., *supra*; Section IV.B., *infra*. Nimble's

11   financial guidance for Q3FY16 is also inactionable given that it is by definition forward-looking

12   and protected by the Reform Act Safe Harbor, as set forth below. *See* Section IV.A., *infra*. Thus,

13   the lack of any actionable statement regarding the commercial segment during Q3FY16 mandates

14   dismissal of these claims.[5] *See* SAC Order at 5 (to survive dismissal Plaintiff's commercial

15   allegations must "adequately allege…actionable statements" during Q3FY16).

### 2. Plaintiff's Allegations Regarding Nimble's Backlog Cannot Salvage Its Commercial Claims.

17          Equally meritless is Plaintiff's attempt to salvage its commercial claims with allegations

18   regarding Nimble's product backlog – which is the only even arguably new allegation pled in the

19   TAC regarding the commercial space. Under this theory, Nimble allegedly used "all of its 1Q16

20   backlog cushion from booked orders that hadn't yet shipped to make up for the 2Q16 booking

21

22   [4] Further compounding the infirmities in Plaintiff's "win rate" argument is the fact that the win
rates discussed were only in "all-flash" market (*see* TAC ¶¶ 281-94; 306-09), which as Plaintiff
23   acknowledges was an enterprise and not commercial product. *Id.*, ¶ 2 ("commercial customers …
preferred Nimble's hybrid storage products … [to] the cutting-edge all-flash technology."). Thus
24   the win rate statements have no connection to Plaintiff's commercial claims.

25   [5] The TAC makes glancing reference to Nimble's statement that it was "systematically expanding
our customer base across the mid-sized enterprise, large enterprise and cloud service provider
26   segments of the market…" TAC ¶ 285. Not only is this averment not focused on commercial (as
well as lacking supporting particularized facts), any claim of falsity about "expanding the
27   customer base" is rebutted by the fact that Nimble added **690 new customers** in the period in
question, which Plaintiff does not contest. *Id.*, ¶ 281; *VeriFone*, 784 F. Supp. at 1481.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    shortfall in the East." TAC ¶ 161.  This theory cannot remotely state a claim under the PLSRA,

2    and is also rife with logical inconsistencies.

3           As an initial matter, Plaintiff does not argue Nimble made false statements to the market

4    about its backlog, or that the Company's financial figures were misstated because of backlog-

5    related issues.  *See* TAC ¶ 161.  Indeed, Nimble made express disclosures regarding backlog:

6           Product backlog includes orders confirmed for products scheduled to be shipped
            generally within two weeks to customers.  Because of the generally short cycle
7           between order and shipment and occasional customer changes in delivery schedules,
            we do believe that our product backlog, as of any particular date, is not necessarily
8           indicative of actual product revenue for any future period.

9    Lee Decl., Ex. B at 4.  Put another way, Nimble's backlog was so insubstantial that it did not

10   warrant disclosure of its specific dollar amount, nor was it expected to be indicative of product

11   revenue in future periods.[6]  *Id.*; *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 987 (9th

12   Cir. 2008) (finding no requirement to discuss backlog in public filings).  Plaintiff does not

13   challenge the truth of these disclosures, which fatally impairs any attempt to argue that Nimble's

14   backlog calls into question its statements regarding its commercial business.

15          Plaintiff's backlog theory also fails to pass muster because it is not supported by required

16   particularized facts.  No specifics are offered regarding the ***size*** of the backlog, its ***composition***

17   (*e.g.*, commercial versus enterprise deals), or the ***magnitude of its impact*** on Nimble's published

18   financial numbers (if any).  TAC ¶ 161; *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL

19   22077729, at *7 (N.D. Cal. Aug. 29, 2003) (dismissing backlog allegations as inadequate for

20   failing to plead, *inter alia*, "with the requisite particularity their new allegation regarding the

21   amount of revenue implicated by the alleged early shipments.").

22          This debilitating lack of specifics is not surprising given its source.  Only one of

23   Plaintiff's fifteen CWs – CW13 – says anything about Nimble's backlog, and his knowledge is

24   limited in scope to just his region, the "East." TAC ¶ 161.  Attempts to stretch CW13's

25   knowledge to other regions must be dismissed as speculation.  *Id.*; *Zucco*, 552 F.3d at 996.  In

---

26

27   [6] Courts have routinely recognized that "[t]here is nothing wrong per se with sending a
     backlogged product to a customer ahead of the expected schedule." *In re Sipex Corp. Sec. Litig.*,
28   2005 WL 3096178, at *3 (N.D. Cal. Nov. 17, 2005).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

fact, the TAC acknowledges the East backlog was insufficient to make up for the supposed

shortfall and speculates that they must have used backlog in other regions.  TAC ¶ 175.  Since

CW13 cannot speak, however, with personal knowledge as to other regions, his backlog

assertions cannot be imputed to the entire Company, especially since his speculation about other

regions is based on hearsay.  *Id.*; *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at *8 (W.D.

Wash. Mar. 30, 2009) (finding CW statements unreliable when "allegations are made without

setting forth the basis for the opinions or providing any facts to suggest that the witnesses were

positioned to accurately assess the Company's performance on such a broad scale. Several of the

allegations are explicitly based on unreliable hearsay.").[7]

Finally, the fact that Nimble allegedly had exhausted its backlog by Q3FY16 only has

relevance to the extent that Plaintiff establishes the Company needed backlog to meet its guidance

for Q3FY16 – the only quarter for which the commercial claims have survived.  SAC Order at 5.

The TAC lays no such foundation, much less provide particularized facts in support.

Consequently, Plaintiff's backlog allegations cannot rescue its deficient commercial claims.

## IV.    CERTAIN ALLEGEDLY MISLEADING STATEMENTS ARE FORWARD-LOOKING AND PROTECTED BY THE REFORM ACT SAFE HARBOR

Plaintiff's list of allegedly false and misleading statements includes a variety of forward-

looking statements protected by the Reform Act's Safe Harbor.  The Safe Harbor establishes two

independent bases upon which a court must dismiss claims based on forward-looking statements:

- ***First***, forward-looking statements are immunized from liability if they are accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133-34 (9th Cir. 2004).  Cautionary language may accompany the statements themselves, ***or*** it may be set forth in referenced documents, such as SEC filings.  *Id.*; *Wet Seal*, 518 F. Supp. 2d at 1148.

- ***Second***, even if forward-looking statements are unaccompanied by cautionary language, they cannot form a basis for liability unless they are made with ***actual knowledge*** of their falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i); *Clorox*, 353 F.3d at 1134.

There are two categories of forward-looking statements Plaintiff has alleged are false or

---

[7] It also bears noting that Plaintiff never reconciles the fundamental illogic of its theory that
Nimble was depleting backlog to make up for a deficit in commercial demand while
***simultaneously*** relabeling commercial customers as enterprise.  *See e.g.*, TAC ¶¶ 270, 279-80.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

misleading: (i) Nimble's financial guidance for Q3FY16 (TAC ¶¶ 278, 295); and (ii) statements regarding Defendants' plans to reach break-even in non-GAAP operating income terms by the end of FY2016 (*see*, *e.g.*, TAC ¶¶ 229, 239, 251-55).  Each category reflects the Company's financial projections or future management plans, and is intrinsically forward-looking.  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d at 1033, 1045-46 (N.D. Cal. 2007).

**A.      Nimble's Financial Guidance For Q3FY16 Is Protected by the Safe Harbor.**

A company's financial guidance is forward-looking by definition, as codified in the Safe Harbor statute itself. 15 U.S.C. § 78u-5(i)(1)(A) (forward-looking statements include "projection[s] of revenues, income (including income loss), earnings (including earnings loss) per share …"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (holding that earnings projections are forward-looking "by definition").  Each allegedly misleading statement pertaining to Nimble's Q3FY16 financial guidance was made in Nimble's shareholder letter for the previous quarter or in the quarterly earnings conference call held the same day the shareholder letter was released.  TAC ¶¶ 278, 295.  As shown below, each statement was accompanied by appropriate cautionary language, and thus is not actionable.  *Cutera*, 610 F.3d at 1111.

Nimble's shareholder letter specifically states that "[f]orward-looking statements include all statements … concerning our future financial results."  Lee Decl., Ex. A (2Q16 8-K filed Aug. 25, 2015) at 33-34.  It proceeds to disclose a litany of financial guidance related risk factors, including "our ability to continue to expand our business and manage our growth"; "our ability to attract and retain customers"; and "the effectiveness of our channel partners and sales team"; and directing readers to the Company's SEC filings for more detailed discussion of those risks.  *Id.*

During the earnings call, listeners were similarly told that the Company would make "forward-looking statements involv[ing] risks and uncertainties," described in that quarter's SEC filings.  Lee Decl., Ex. C at 6-7, 13, 15-16.  Among the risk factors identified were "our ability to attract and retain new channel partners and end-customers"; "competition from larger competitors that traditionally target larger enterprises"; "limited visibility into future sales"; "failure or inability…to design products or enhancements that meet end-customers' increasing demands"; the fact that "large enterprises typically have longer implementation cycles, [and] require greater

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  product functionality"; and that "[f]ailure to adequately expand our sales force will impede our

2  growth." *Id.*, Ex. B at 6-8, 12-13.  The presence of this cautionary language is itself sufficient to

3  immunize from liability any accompanying forward-looking statements.  15 U.S.C. § 78u-

4  5(c)(1)(A)(i); *Clorox*, 353 F.3d at 1133-34.  Lee Decl., Ex. C at 4-5; Ex. D at 3-20.

5          Plaintiff also attempts to argue that the cautionary language was not sufficiently specific

6  to be meaningful.  However, the Ninth Circuit has repeatedly held that a simple disclaimer before

7  an earnings call warning that management's remarks contain forward-looking statements and that

8  results could vary is sufficient to invoke the Safe Harbor.  *Police Ret. Sys. of St. Louis v. Intuitive*

9  *Surgical, Inc.*, 759 F.3d 1051, 1059-60 (9th Cir. 2014); *Cutera*, 610 F.3d at 1112.  When the

10  language from Nimble's earnings calls cited by Plaintiff as inadequate –

> [D]uring the course of this call we will make forward-looking statements,
> including statements regarding our revenue and earnings per share guidance for
> our fiscal third quarter. These forward-looking statements involve risks and
> uncertainties, some of which are beyond our control, which could cause actual
> results to differ materially from those anticipated by these statements. For a more
> detailed description of these risks, refer to our earnings press release issued today
> and our form 10-Q filed with the SEC. (TAC ¶ 390)

15  – is compared to the language found by the Ninth Circuit to be sufficient in *Intuitive Surgical* –

> Before we begin, I would like to inform you that comments mentioned on today's
> call may be deemed to contain forward-looking statements. Actual results may
> differ materially from those expressed or implied, as a result of certain risks and
> uncertainties. These risks and uncertainties are described in detail in the company's
> [SEC] filings. (*Intuitive Surgical*, 759 F.3d at 1059)

19  – the adequacy of Nimble's cautionary language is unmistakable.  *See also In re Fusion-io Sec.*

20  *Litig.*, 2015 WL 661869, at *13 (N.D. Cal. Feb. 12, 2015) ("These cautionary statements are

21  virtually identical to language approved by the Ninth Circuit in instances in which forward-

22  looking statements were immunized by the PSLRA Safe Harbor."), *citing Intuitive Surgical*, 759,

23  F.3d at 1059-60, and *Cutera*, 610 F.3d at 1112.

24          Even if that cautionary language were ineffective, however, the statements at issue are still

25  not actionable under the Reform Act unless Plaintiff adequately pleads that Defendants had actual

26  knowledge of falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i); *Clorox*, 353 F.3d at 1134.  As set forth

27  below, Plaintiff fails to plead particularized facts demonstrating scienter on behalf of any

28  Defendant, much less facts sufficient to support the even higher showing of actual knowledge of

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    falsity.  *See* Section V.A.2., *infra*.

2        **B.    Statements Regarding Break-Even Are Protected by the Safe Harbor.**

3        Each of the alleged misstatements at issue regarding Nimble's break-even plans were

4    made during one of the Company's quarterly earnings conference calls or in its quarterly

5    shareholder letter (TAC ¶¶ 251, 253, 255, 273, 278, 295, 298).  As discussed, these statements

6    were accompanied by appropriate cautionary language, and are therefore not actionable.

7        In the case of the four forward-looking statements made outside the context of an earnings

8    announcement (TAC ¶¶ 229, 239, 264, 303), the statements at issue are still not actionable unless

9    Plaintiff adequately pleads actual knowledge of falsity.  This would require particularized facts

10   showing that Defendants **knew** that Nimble would not break-even by the end of the fiscal year in

11   January 2016 – which for some statements was more than a year away.  *See, e.g.*, TAC ¶¶ 229,

12   239. No such facts are pled, and thus the allegations should be dismissed.  *See* Section V, *supra*.[8]

13   **V.    NO STRONG INFERENCE OF SCIENTER HAS BEEN PLED**

14       To avoid dismissal, Plaintiff is required to plead "with particularity both the facts

15   constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention

16   to deceive, manipulate, or defraud."  *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1032

17   (9th Cir. 2016).  In evaluating a motion to dismiss, the Court must determine whether these facts

18   give rise to a strong inference of scienter − for each defendant − while contemplating "competing

19   nonfraudulent inferences."  *Id.* at 1032-33; 15 U.S.C. § 78u-4(b)(2)(A).

20       **A.    The Confidential Witness Allegations Fail to Establish Scienter.**

21       Despite having allegedly garnered information from fifteen confidential witnesses, the

22   TAC fails to plead a strong inference of scienter, and indeed, as set forth below the CW

23   allegations placed in context – as they must be – actually **rebut** any claims of scienter.

---

24   [8] The TAC claims, incorrectly, that the safe harbor for forward-looking statements does not apply

25   to statements that "relate to historical facts or existing conditions."  TAC ¶ 385.  Statements
     pertaining to present or historical fact can, in fact, "be forward-looking if they are presented as

26   factors underlying a projection."  *LeapFrog*, 527 F. Supp. 2d at 1046.  Thus, to the extent that one
     were to construe Nimble's statements that the Company was "on track" to achieve break-even as

27   statements about current operating income, they are a factor underlying Nimble's projections for
     the end of fiscal 2016, and are thus forward-looking.  *See, e.g.*, TAC ¶¶ 228, 250, 252.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

### 1.   The Confidential Witnesses Lack Personal Knowledge.

Statements from confidential witnesses can only be relied upon if they are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Zucco*, 552 F.3d at 995.  Here, despite adding statements from three additional CWs, Plaintiff still cannot show that any CW has the required personal knowledge of any Defendant's mental state.  Specifically, more than half of the confidential witnesses (CWs 2-4, 8, 10-11, 13, and 15) do not allege they had *any* direct interaction with *any* Individual Defendant.[9]  Thus, as a matter of law, the statements from these CWs cannot be relied upon and any attempt to draw inferences about Defendants' state of mind from their broad, unsupported statements is inappropriate.[10]

Even considering the remaining CWs who do claim to have interacted with the Individual Defendants, Plaintiff's averments fall far short of establishing that they were in a position to have insight into Defendants' mental states.  Each of these CWs only claims at best an attenuated interaction with an Individual Defendant:

- CW7 only participated in quarterly "Company-wide web conferences" that Messrs.

---

[9] CW9's allegations cannot be deemed reliable because Plaintiff has not provided his exact title, territory and dates of employment, and the names of the persons to whom he reported, which are necessary to establish a basis for his alleged knowledge.  *In re NorthPoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001) (witness identified as "Account Manager," without description of "the specific duties of *[that individual]*" could not be relied upon to support an inference of scienter); *In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *5 (D. Ariz., Jan. 25, 2006) ("Allegations made by confidential witnesses cannot support an inference of scienter if the plaintiff fails to plead the requisite detail regarding the job description and duties of *that* confidential witness") (emphasis added).  Plaintiff cannot cure this defect by submitting information in camera. *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1162 (S.D. Cal. 2008) ("The Court has found no precedent in the law of federal securities fraud allowing in camera review of details about confidential witnesses (as plaintiffs propose) instead of pleading those details within the complaint.").

[10] By way of example, CW4 alleges without *any* specifics that Messrs. Vasudevan and Singh were "intimately involved in the daily functions of the business," while CW3 claims that Mr. Vasudevan "had his hand and finger on everything."  TAC ¶¶ 130, 204. CW11 offers the vague assertion that Messrs. Vasudevan and Singh had "visibility into the forecasting machine" and CW13 concludes that "executives had a daily grasp of how Nimble was doing," but neither presents facts establishing that he had interactions with Messrs. Vasudevan, Singh, or any Individual Defendant sufficient to warrant his conclusion. *Id.*, ¶¶ 137, 176.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Vasudevan and Singh attended (but are not alleged to have said anything); TAC ¶ 191

- CW12 only participated in Mr. Singh's "weekly CFO staff meetings"; *id.*, ¶ 173

- CW9 was only copied along with certain Individual Defendants on "Win Notes" emails for deals that closed; *id.*, ¶ 155

- CW6 claims only that he was aware of Mr. Vasudevan "receiv[ing] regular Cloud 9 reports"; *id.*, ¶ 133

- CW5 claims that during "engineering sessions and kickoffs" Mr. Vasudevan would "ask for feedback . . . on how to improve the Company's chance of closing deals," but the only such feedback was that certain product features should be added; *id.*, ¶ 188

- CW14 reported to Mr. Leary at an undisclosed period during his tenure at Nimble (and does not specify whether this was during the Class Period), and CW14 does not allege any facts related to Mr. Leary in this capacity; *id.*, ¶ 202

- CW1 claims Mr. Vasudevan "often call[ed] him . . . to discuss channel and pipeline metrics" but makes no specific, factual allegations based on these interaction that Mr. Vasudevan knew any of the statements alleged in the TAC were false; *id.*, ¶ 127.

Collectively, not one CW claims that any Individual Defendant knew that any of the statements alleged in the TAC were false and misleading, which defeats any claim of scienter. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (noting that where witnesses failed to attest that they "actually communicated with any of the Individual Defendants, let alone when any such communication occurred or what the contents of such communications were," there was "little, if any, reliable basis from which to infer scienter."), *aff'd*, 759 F.3d 1051 (9th Cir. 2014); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1117-18 (N.D. Cal. 2009) (same).[11]

Finally, no CW claims to have had a relationship with Messrs. Mehta or Leary (other than CW14, who allegedly reported to Mr. Leary but says nothing about him), nor do they claim that

---

[11] Further undermining the CWs' reliability is the fact that more than half of them were not employed by the Company during the entire class period. *See Karpov v. Insight Enters., Inc.*, 2010 WL 4867634, at *7 (D. Ariz. Nov. 16, 2010) ("the limited overlap between the employment of CWs … and the class period reduces the likelihood that these individuals have relevant personal knowledge about the individual Defendants' state of mind"), *aff'd*, 471 F. App'x 607 (9th Cir. 2012); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

either had scienter, a fact that by itself warrants dismissal of the claims against them.[12]

### 2. The Confidential Witnesses' Allegations Fail to Set Forth Particularized Facts Raising a Strong Inference of Scienter.

#### a. CW Allegations Do Not Establish Internal Reports Contradicted Defendants' Public Statements.

Even assuming Plaintiff had established that the confidential witnesses had personal knowledge into Defendants' mental state (they did not), their statements fail to support a strong inference of scienter.  Most notably, the bulk of the TAC's allegations regarding scienter are spent describing what Nimble's forecasting tools (Cloud 9, Clari, and Salesforce systems) ***could*** predict rather than what these systems ***actually predicted***.  *See, e.g.*, TAC ¶¶ 138, 176, 177.  More importantly, none of the fifteen CWs asserts that any Individual Defendant ***saw a single internal report that contradicted*** any statement made or guidance issued for Q3FY16 to the market—a fact which ***rebuts*** scienter. *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (mere access to internal reports without facts "about the contents of the reports or about how the contents contracted defendants' public statements" do not support scienter). The addition of four CWs to the TAC does not change this fact.  CW13 merely alleges that with forecasting tools Nimble "***was able to*** identify variances . . . to predict sales," could "predict if [it] ***could*** achieve its quotas and sales goals," and "***could see*** the percentage chance of closing for each deal." TAC ¶¶ 138, 176, 177 (emphasis added).  CW15 merely alleges that Nimble "used many internal analytical tools which ***would have*** indicated to anyone at Nimble that they were going to miss guidance," and CW12 only alleges that Vasudevan and Singh "logged onto Cloud 9 at least daily" and that Singh "constantly reference[d] the numbers he was seeing in Cloud 9 at every meeting." TAC ¶¶ 173, 178 (emphasis added).  Allegations of mere access to reports without a single fact about if or how the reports contradicted any public statement are insufficient to plead scienter. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (explaining that allegations are "insufficient to plead scienter under the [Reform Act]" where, "although plaintiffs refer[ed] to the existence of [certain] data and [made] a general

---

[12] CW9 mentions that he was copied on emails with Messrs. Mehta and Leary (TAC ¶¶ 155, 168, n.14), but as discussed CW9 cannot be relied upon. *See supra* VI.A.1, n.7.  Regardless, the TAC fails to substantiate how CW9's innocuous allegations can support a strong inference of scienter.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

assertion about *what they think the data show[ed]*, they had *no hard numbers* or other specific information.") (internal quotations omitted) (emphasis added); *Turocy v. El Pollo Loco Holdings Inc.*, 2017 WL 1102767, at *10 (N.D. Cal. Mar. 20, 2017) (disregarding CW statement as unreliable on grounds that allegations of mere access to a corporate dashboard is insufficient in absence of facts detailing the data it contained.).  In sum, the fact that Plaintiff canvassed fifteen confidential witnesses and not one of them is willing to say that Nimble's internal reports actually contradicted its public statements *rebuts* an inference of scienter, as courts are required to examine "plausible contrary inferences" in evaluating scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).[13]

      **b.**     **CW Allegations Do Not Establish Required Contemporaneous Knowledge of Falsity of Q3FY16 and Break-Even Guidance.**

As noted, forward-looking statements of guidance are inactionable under the Reform Act Safe Harbor unless they are made with actual knowledge of their falsity, and Plaintiff has failed to meet that pleading burden. The CW allegations regarding Nimble's guidance for Q3FY16, for instance, fail to support scienter (much less actual knowledge) because they are devoid of particularized facts demonstrating any Individual Defendant was aware of information making the Q3FY16 guidance issued on August 25, 2015 false or misleading when made. *Zucco*, 552 F.3d at 991.  For example, CW5 claims Nimble knew it would miss its Q3FY16 guidance "by the end of the first month of the quarter," but Nimble had not reached the end of the first month when it issued its Q3FY16 guidance. TAC ¶ 179.  More fundamentally, CW5 never makes the critical allegation that Nimble *knew* it would miss its guidance *before it was issued*. *Id*.  Similarly, CW9 believed that Nimble knew it would miss its guidance "by the middle of Q3 2016," an allegation that *rebuts* scienter because this was *after* the guidance was issued. *Id.*, ¶ 182.  CW12's allegations are even more vague, as according to CW12, Nimble knew it would miss its guidance simply "months in advance." *Id.*, ¶ 172.  Plaintiff's scienter allegations are even weaker with regard to its break-even allegations.  Not one CW asserts or otherwise provides facts to support a

---

[13] The same holds true for the CW allegations regarding Nimble's win rate. TAC ¶¶ 125, 138.  No CW says anything about Nimble's win rates (*see* Section III.B, *supra*), much less that Defendants did not believe the truth of their win rate statements when made.

1   claim that Defendants believed that they would not achieve break-even by the end of the year.

2       In sum, none of Plaintiff's CW allegations establish that the Individual Defendants or the

3   Company believed that their Q3FY16 or break-even guidance was false **when made**, and thus

4   they cannot support a strong inference of scienter. § 78u-4(b)(2)(A); *ESG Capital Partners, LP*,

5   828 F.3d at 1033.[14]

6           **c.      CW Allegations Do Not Establish Any Reclassification Was
                       Improper and Incorporated into Public Disclosures**

7       The CW allegations regarding the allegedly improper reclassification of accounts from

8   commercial to enterprise also fail to support any inference of scienter. No CW asserts any

9   Individual Defendant was responsible for any reclassification decision, or was informed of such.

10  *See*, *e.g.*, TAC ¶¶ 202-210.  Nor do they claim that the Individual Defendants knew the

11  classification status, or the propriety of such status, for the customers named in the TAC that

12  allegedly were improperly reclassified.  *Id.*  And no CW asserts – or is in a position to assert –

13  that any Individual Defendant knew that an improperly reclassified commercial customer had

14  been included in the Company's published G5000 numbers, as required by the Court's SAC

15  Order.  SAC Order at 6-7.  In sum, generic allegations of involvement in the sales process cannot

16  substitute for particularized facts showing requisite state of mind, and therefore Plaintiff has

17  failed to plead scienter with regard to its reclassification claims.  *Zucco*, 552 F.3d at 996.

18          **3.      Plaintiff Fails to Establish Corporate Scienter**

19      Finally, in the absence of detailed, well-pled allegations regarding the requisite mental

20  state of the Individual Defendants, it is impossible for Plaintiff to impute scienter to Nimble itself.

21  *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[W]e see no way

22  that [plaintiff] could show that the corporation, but not any individual defendants, had the

23  requisite intent to defraud.  Thus, any direct corporate liability would be derivative of, or

24  concurrent with, D & O liability.").  Because a corporation "'can only act through its employees

25  ──────────────
    [14] To the extent the CWs claim Defendants saw Cloud 9 or other forecasting reports contradicting

26  Nimble's stated guidance for Q3FY16 *after* the guidance was issued, it does not support scienter
    given that there is no obligation to disclose or update financial results in the middle of a quarter.

27  *In re Verity, Inc. Sec. Litig.*, 2000 WL 1175580, at *4 (N.D. Cal. Aug. 11, 2000) ("It is
    undisputed that the reporting obligations imposed by the SEC and the stock exchanges did not

28  create a duty upon defendants to immediately disclose the results of the quarter.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

and agents' and can likewise only have scienter through them," allegations regarding the scienter of the Individual Defendants are a fundamental prerequisite to establishing any corporate liability on behalf of Nimble. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). Plaintiff has failed to lay that foundation, and thus no scienter can be imputed to Nimble.

**B.     Plaintiff's Insider Trading Allegations Do Not Support a Strong Inference of Scienter.**

Trading of stock is suspicious for purposes of scienter only if it is "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  In determining whether sales are suspicious, courts consider: (1) the amount and percentage of shares sold; (2) the timing of sales; and (3) consistency with prior trading history.  *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).

### 1.     Defendants' Trading Negates an Inference of Scienter.

Plaintiff's argument that Defendants' stock sales were suspicious is rebutted by the fact that Defendants collectively and individually retained an overwhelming portion of their shares. Specifically, Messrs. Vasudevan, Singh, Mehta, and Leary in total sold approximately 5%, 16%, 9%, and 46% of their respective holdings during the class period, amounts which do not approach levels that courts have found to be indicative of scienter.  Lee Decl., Exs. E-H; *In re Skechers U.S.A., Inc. Sec. Litig.*, 273 F. App'x 626, 628 (9th Cir. 2008) (finding sales of 17% and 42% were not suspicious).  Indeed, these high retention percentages − in particular those of the Company's CEO (Mr. Vasudevan, who retained 95% of his shares) and CFO (Mr. Singh, who retained 84% of his shares) − serve to ***rebut*** an inference of scienter.  *Tripp v. IndyMac Fin. Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) (the "inference of scienter is functionally negated" by retention of a large percentage of stock); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012) (sales of $22 million not indicative of fraud where defendants retained the vast bulk of their holdings), *aff'd*, 561 F. App'x 598 (9th Cir. 2014).

Furthermore, Plaintiff does not adequately allege facts regarding the Defendants' historical trading, which courts have routinely required in order to analyze prior trading history. *Intuitive Surgical*, 759 F.3d at 1064 (rejecting scienter argument based on insider trading on

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

grounds that "the complaint contains no allegations regarding the defendants' prior trading history, which are necessary to determine whether the sales during the Class Period were 'out of line with' historical practices."); *Zucco*, 552 F.3d at 1005 (same).  Defendants' trading history negates any inference of scienter: Messrs. Vasudevan and Singh each sold *twice as many* shares during the comparable period prior to the class period—319,931 and 168,730, respectively—than they sold during the class period—145,504 and 68,492, respectively.  Lee Decl., Exs. G-H.

While Messrs. Mehta and Leary's sales of stock increased during the class period, their sales (excluding nondiscretionary trades required for tax withholding purposes and employee stock plans),[15] were *pre-determined* sales pursuant to 10b5-1 plans.  Lee Decl., Exs. E-F.  Sales of stock pursuant to trading plans negate scienter as they provide an "innocent, alternative explanation" for the trades.  *City of Royal Oak*, 880 F. Supp. 2d at 1069 (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008)).  Plaintiff's observation that Defendants entered into and amended some of their existing trading plans during the class period (TAC ¶¶ 351-58) does not alter this conclusion.  *In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) (holding there is no inference of scienter even if the defendant amended his 10b5-1 plan during the class period when he also retained the vast majority of his holdings).[16]

### 2.    Plaintiff's Trading Model Fails to Raise a Strong Inference of Scienter.

Unable to demonstrate scienter based on methods recognized by governing law, Plaintiff attempts to manufacture the appearance of scienter through use of a "market-adjusted model method."  TAC ¶¶ 342-350.  This model, however, was not developed to detect fraud or suspicious stock trades (Plaintiff makes no such claim), and Defendants are unaware of any

---

[15] Plaintiff mischaracterizes a subset of trades by Messrs. Vasudevan and Mehta as "open market sales" (TAC ¶ 361), when these were sales of stock *required* to cover tax withholding obligations in connection with the vesting of restricted stock units, and "[did] not represent a discretionary trade by the reporting person."  *See, e.g.*, Lee Decl., Ex. H (Form 4 filed Sep. 4, 2015 at n.1).

[16] Although Plaintiff alleges that "most of the Individual Defendants' Class Period sales … were pursuant to these suspiciously adopted and modified Plans" (TAC ¶ 359), the reverse is true – less than 10% of Messrs. Mehta and Leary's class period sales occurred pursuant to these amended plans.  Lee Decl., Exs. E-F.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

instance where it has been accepted by a court as a reliable method for determining scienter.

Plaintiff's model should be rejected for two additional reasons. First, under the Reform Act any allegations of scienter must be accompanied by "*all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Here, while the TAC purports to disclose the *results* of its trading model, the specific inputs, calculations and other aspects of the analysis are omitted, providing no opportunity for the reader to review the details and test the accuracy of the model. TAC ¶¶ 344-352. Consequently, this analysis has not been pled with the factual particularity required by the Reform Act and must therefore be rejected.

Second, the rationale behind this model is fundamentally flawed in its focus on allegedly abnormal "profits" realized. TAC ¶ 344. Under Plaintiff's model, a defendant "profits" when he or she sells stock in advance of a decline in the stock price "by avoiding subsequent losses." *Id.* Given that *every* securities class action, however, involves a decline in a company's stock price, this methodology is effectively rigged to *always* generate an inference of abnormal "profits." *Id.* This is precisely the reason why courts analyzing insider trading focus on *number of shares sold* as opposed to supposed "profits," and as a consequence this analysis should be disallowed as a method for testing for suspicious insider trades. *City of Royal Oak*, 880 F. Supp. 2d at 1069.

## VI.   PLAINTIFF'S CONTROL PERSON CLAIMS FAIL

Absent an underlying violation of the 1934 Act, there can be no control person liability under Section 20(a). *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiff cannot plead a predicate violation of Section 10(b), the control person claim must also be dismissed. *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008).

## VII.   CONCLUSION

For the foregoing reasons, this motion to dismiss should be granted with prejudice.

Dated:   July 24, 2017                    FENWICK & WEST LLP

By: */s/ Felix S. Lee*
    Felix S. Lee

    Attorneys for Defendants

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW