**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE NIMBLE STORAGE SECURITIES LITIGATION

CASE NO. 15-cv-05803-YGR

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 141

Plaintiff Arkansas Teacher Retirement System, as lead plaintiff, brings this consolidated third amended complaint against defendants Nimble Storage, Inc. ("Nimble"), Suresh Vasudevan, Anup Singh, Varun Mehta, and Dan Leary for alleged violations of the federal securities laws. (Dkt. No. 139, "TAC.") Specifically, plaintiff claims that all defendants violated section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder for allegedly making fraudulent statements regarding Nimble's prospects and financial condition between November 24, 2014 and November 19, 2015 (the "Class Period"). Additionally, plaintiff brings control person claims against defendants Vasudevan and Singh under section 20 of the Exchange Act.

The Court has twice dismissed plaintiff's complaints.[1] In its order dismissing plaintiff's second amended complaint, the Court found that plaintiff had failed to allege adequately that defendants misled the public by: (a) failing to inform investors that Nimble's commercial segment was weakening throughout the Class Period; (b) suggesting that Nimble's enterprise segment was growing while simultaneously misclassifying commercial clients as enterprise clients; and (c) informing the public that Nimble remained on-track to "breakeven" while knowing that its commercial and enterprise segments were struggling. The Court dismissed with prejudice plaintiff's claims relating to defendants' statements about Nimble's commercial segment prior to August 25, 2015, and gave leave to amend as to the remaining claims. Specifically, with respect

---

[1] Plaintiff's first complaint focused on allegations that defendants misled the public by failing to disclose Nimble's: (i) limiting its investments in Sales and Marketing ("S/M"); (ii) diversion of investments from its commercial segment to its enterprise segment; and (iii) failure to penetrate clients for its enterprise segment in a meaningful fashion.

to statements regarding the enterprise segment, the Court gave leave to amend to the extent that plaintiff could adequately allege that defendants' reclassifications of certain clients were both fraudulent and disclosed to the public.[2]

Now before the Court is defendants' motion to dismiss the TAC.[3] Having carefully reviewed the pleadings, the papers and exhibits submitted on this motion, and oral arguments heard on September 26, 2017, and for the reasons set forth more fully below, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's TAC.[4]

## I. DISCUSSION

### A. SECTION 10(B) AND RULE 10B-5 CLAIM

Defendants raise the following grounds upon which they argue plaintiff's claims should be dismissed: (i) plaintiff has failed to plead with particularity any false or misleading statements; (ii) certain statements are forward-looking and protected by the Private Securities Litigation Reform Act's (the "PSLRAs") safe harbor; and (iii) plaintiff has failed to plead a strong inference of scienter. Because the Court finds that plaintiff has yet again failed to plead with particularity that any of the alleged statements are false or misleading, the Court need not address specifically

---

[2] With regard to statements indicating that Nimble was "on track" to meet certain goals, the Court found that whether such statements were actionable would rise and fall with the first two categories of statements regarding the commercial and enterprise segments.

[3] The Court adopts the background section and discussion of general legal standards in its order granting defendants' motion to dismiss the first amended complaint, and includes additional facts and allegations as necessary herein. (*See* Dkt. No. 113.)

[4] In connection with their motion to dismiss, defendants submitted a request for judicial notice ("RJN") for the following documents (Dkt. No. 143): (i) Exhibit A, excerpts of Nimble's Form 8-Ks filed with the Securities and Exchange Commission ("SEC"), dated November 25, 2014, February 26, 2015, May 26, 2015, August 25, 2015, and November 19, 2015; (ii) Exhibit B, excerpts of Nimble's Form 10-K filed with the SEC, for period ending January 31, 2015; (iii) Exhibit C, excerpts of Nimble's earnings calls, dated November 25, 2014, February 26, 2015, May 26, 2015, and August 25, 2015; (iv) Exhibit D, excerpts of Nimble's Form 10-Qs filed with the SEC, for the quarters ended July 31, 2014, April 30, 2015, and July 31, 2015; (v) Exhibit E, Daniel Leary Forms 4s between March 11, 2014 and October 21, 2015; (vi) Exhibit F, Varun Mehta Forms 4s between March 11, 2014 and September 11, 2015; (vii) Exhibit G, Anup V. Singh Forms 4s between February 28, 2014 and December 1, 2015; and (vii) Exhibit H, Suresh Vasudevan Forms 4s between March 11, 2014 and December 11, 2015. Plaintiff does not oppose defendants' RJN. The Court previously took judicial notice of these same documents in its prior orders granting defendants' prior motions to dismiss. (Dkt. No. 113 at 1–2 n.1; Dkt. No. 134 at 2 n.2.) For the same reasons stated therein, the Court **GRANTS** defendants' RJN here.

2

defendants' arguments related to the PSLRA safe harbor or scienter, and proceeds with the analysis below only as to their first ground for dismissal.

In response to the Court's order dismissing plaintiff's second amended complaint, plaintiff has, generally, alleged that defendants misled the public with regard to statements about the strength of (i) its enterprise business generally and (ii) its commercial business and enterprise business, limited to the third quarter of 2016 ("3Q16").[5] The Court considers whether the new allegations in the TAC are now sufficient, in light of the Court's guidance in its previous orders dismissing plaintiff's claims.[6]

### *1. Statements Regarding Nimble's Enterprise Segment*

In its prior order dismissing plaintiff's claims pertaining to statements about Nimble's enterprise segment, the Court granted leave to amend "only to the extent that plaintiff can adequately allege that the reclassifications were fraudulent and such fraudulent reclassifications were disclosed to the public." (Dkt. No. 134 at 8.) Specifically, the Court found persuasive that, amidst defendants' general statements regarding the strength of the enterprise segment, defendants also provided to the market specific numbers detailing how many clients they had within the Global 5000, defined as the largest 5000 enterprises at any given time, and plaintiff failed to allege that any such numbers were inaccurate. (*Id.* at 6–7.) Sales and profit data, "when accurately reported, [are] rarely subject to misinterpretation, even if the disclosure is accompanied by generally optimistic statements about the future by corporate officers." *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal 1992) (further stating that "[p]rofessional investors, and

---

[5] As described in its order on defendants' motion to dismiss the First Amended Complaint, Nimble's fiscal year ends on January 31 of each year. Relevant to the claims here, its 2015 fiscal year ended on January 31, 2015, with each of its quarters (Q1, Q2, Q3, and Q4) ending on the last day of April, July, and October 2014, and January 2015, respectively. Nimble's 2016 fiscal year ended on January 31, 2016, and similarly, each quarter ending on the last day of April, July, and October 2015, and January 2016, respectively. Thus, 3Q16 would have ended on October 31, 2015.

[6] Plaintiff also alleges that certain statements regarding Nimble's "win rates" and its goal to breakeven by the end of 4Q16 were misleading because they implied that Nimble's commercial and enterprise segments were growing and strong. The Court addresses such statements as appropriate within the context of defendants' statements regarding its commercial and enterprise businesses.

3

most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company").

Plaintiff, again, does not plead that any of the disclosed numbers were inaccurate. Rather, plaintiff offers Confidential Witness ("CW") 14,[7] who corroborates that Nimble was reclassifying "its top end commercial accounts as enterprise accounts" and avers that "if a Commercial account was reclassified as an enterprise account, that account would have been counted as a 'win' during that quarter and announced to the market as such." (TAC ¶ 202.) Plaintiff does not allege particularized facts demonstrating how these "wins" were announced to the market, other than defendants' general statements touting the success and growth of the enterprise segment. Plaintiff argues that the Court should infer falsehood based upon CW 14's declarations regarding reporting reclassifications as wins, in addition to statements from CW 3 and CW 8 reporting that reclassifications were occurring in their areas to make it appear that the enterprise segment was thriving. (*Id.* at ¶¶ 202, 204, 207.)

However, plaintiff's theory as to how such "wins" were reported to the market are based on announcements Nimble made generally about the strength of the enterprise segment, which were often accompanied with disclosures regarding the actual numbers of Global 5000 or Global 500 companies Nimble had added to its roster. As the Court has previously found, in light of defendants' disclosure of the actual numbers of Global 5000 clients they were acquiring throughout the Class Period, defendants' more general statements of growth are not actionable. *See In re Verifone Sec. Litig.*, 784 F. Supp. at 1481. The Court previously dismissed these claims for that very reason, explaining that plaintiff must allege that the actual numbers disclosed by defendants were false. As in its second amended complaint, plaintiff stops just short of alleging the falsity of the numbers disclosed. For instance, in an August 25, 2015 shareholder letter, plaintiff quoted the following language, and indicated in bold and italics the parts which plaintiff considered false and misleading: "***Continued Enterprise momentum. Our penetration of Global 5000 enterprises continues to scale*** and we now have more than 70 customers within the Global

---

[7] CW 14 worked as a field marketing manager in several regions from 2011 through January 2017, including in California, Hawaii, Arizona, Nevada, and South Carolina.

4

500." (TAC ¶ 281.) Accordingly, the Court finds that plaintiff has failed to allege any false or misleading statements regarding Nimble's enterprise segment, and that further amendment with respect to the same would be futile.

Accordingly, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's claims relating to defendants' statements about the growth of the enterprise segment prior to 3Q16.[8]

Plaintiff, however, raises a new claim that statements made in 3Q16 regarding enterprise momentum had to have been false because, as plaintiff alleges, defendants must have known by the first day of that quarter how the quarter would end, including how both commercial and enterprise deals were progressing. (*Id.* at ¶¶ 281, 293.) Defendants argue that this new theory is in violation of the exceedingly narrow grounds for amendment the Court granted plaintiff with respect to defendants' statements about the enterprise segment. The Court agrees. Nevertheless, as articulated in its prior order, claims arising out of defendants' statements in 3Q16, at least with respect to the commercial segment, could have been possible in light of the large revenue miss and Vasudevan's subsequent concession that Nimble faced pressure throughout the third quarter. For the same reasons, the claims arising out of defendants' statements in 3Q16 with regard to Nimble's enterprise segment may have also existed. The Court will thus address defendants' statements in 3Q16 with regard to the enterprise segment together with its statements with regard to the commercial segment because they raise substantially similar issues.

### 2. *Statements Regarding Nimble's Business in 3Q16*

Given the Court's narrowing of the issues in this litigation and the fact that the Class Period ends on November 19, 2015 after corrective disclosures were given to the investing public, the relevant statements that remain are contained only in the following: (i) a shareholder letter released by defendants on August 25, 2015 (*see* TAC ¶¶ 278, 281, 283, 285); (ii) an earnings call

---

[8] Similarly, the Court finds that allegations related to defendants' statements prior to 3Q16 predicting that Nimble would breakeven by the end of the fiscal year are also **DISMISSED WITH PREJUDICE**, as the Court previously found that whether these statements would be actionable rise and fall with statements regarding the enterprise and commercial segments.

5

on August 25, 2015 (*id.* at ¶¶ 287, 289, 291, 293, 295, 298); and (iii) a Wells Fargo Report, published on September 22, 2015 (*id.* at ¶¶ 303, 306).[9]

These statements fall broadly under the following categories: First, there are statements that relate specifically to Nimble's enterprise segment during 3Q16. (*See id.* at ¶ 281 ("Continued Enterprise momentum. Our penetration of Global 5000 continues to scale . . . ."); ¶ 283 ("Rapid growth in Global 5000 Enterprises . . . . These product enhancements and sales investments are yielding strong bookings growth from Global 5000 enterprise."); *see also id.* at ¶¶ 285, 293,

---

[9] Defendants argue that that the Wells Fargo Report, which documents and opines on an analyst meeting with Mehta and Singh, cannot give rise to actionable statements. "A defendant may be held liable for 'ma[king] false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.'" *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1105 (N.D. Cal. 2013) (citations omitted). "When statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable even if they are not exact quotations." *Id.* (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004)). Here, there are essentially three statements at issue in the Wells Fargo report: (i) "Our sense is the growth story is still on track"; (ii) a conclusion that Nimble "continues to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth"; and (iii) a description of Mehta's belief regarding flaws he sees in all-flash array systems. While the latter two appear sufficiently to be attributable to Mehta and Singh, the analyst's opinion regarding their "sense" of Nimble's growth story is not actionable because it explicitly provides the analyst's view or impression of the situation, rather than merely describing what Singh or Mehta actually said. Thus, the Court **DISMISSES WITH PREJUDICE** plaintiff's claims as to the analyst's "sense" of Nimble's growth story.

Additionally, plaintiff alleges the following statement in paragraph 306 is misleading: "Mr. Mehta believes that data management will be a key differentiator in the industry and ***sees issues with 1) the all-flash only array market as it tends to be silos that don't integrate as well with other arrays, has capacity limitations because of dedupe, an inability to move data, and high costs per MIPS (million instructions per second).***" Plaintiff claims that this is misleading because Nimble's fibre channel also contained imperfections, Nimble was not growing its base of large enterprise in a meaningful manner, and Nimble was relabeling commercial accounts as enterprise accounts to hide this fact. However, as discussed in a previous order, the market was well-aware of fibre channel's missing features, and an analyst even commented that these product deficiencies could slow Nimble's entry into the enterprise market. (Dkt. No. 113 at 14 (citing *Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96-CV-20711-SW, 1997 WL 514993, at *4 (N.D. Cal. Aug. 14, 1997) (finding that defendants need not have disclosed certain product features and consumer preferences because "information about consumer preferences is indeed available to the investing public . . . and [d]efendants cannot be held liable for failing to educate the public about [the] potential impact on [the] company of publicly known facts'"). Mehta's statement here merely provides his opinions regarding faults he identifies in competing all-flash array systems. Plaintiff does not adequately explain how such statements are false or misleading, nor does plaintiff contend that Mehta's statements about competing all-flash array systems are untrue. Thus, the Court also **DISMISSES WITH PREJUDICE** claims as to that statement.

6

306.)[10] Second, many of the statements tout the success of Nimble's business generally, including its commercial segment. (*See id.* at ¶ 278 (providing revenue guidance of $86 to $88 million); *see also id.* at ¶ 295.) And third, many statements indicate that Nimble is on track to breakeven, which plaintiff claims must be premised on Nimble's supposed success in its commercial and enterprise segments. (*See id.* at ¶¶ 278 ("[W]e remain on track to achieve our goal of non-GAAP operating income break-even by the end of the current fiscal year."), 303 ("NBML also continued to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth (FQ4 tends to be the strongest seasonally)"); *see also id.* at ¶¶ 295, 298.)

Previously, the Court found that plaintiff's claims for statements made in 3Q16 could be actionable, in light of Nimble's own acknowledgement that it experienced a decline in both its commercial and enterprise segments during 3Q16, resulting in the missed revenue guidance. (Dkt. No. 134 at 4.) However, the Court dismissed such claims because plaintiff had failed to plead adequately that the statements were false or misleading at the time they were made.

Now, plaintiff offers in its TAC additional allegations from four new CWs, which it claims are sufficient to satisfy its pleading requirements under the PSLRA, at least as to the statements made in 3Q16. The additional CWs offer the following:

- CW 12, the former director of internal audit throughout the Class Period, avers that "Nimble knew months in advance that they were going to miss 3Q16 guidance," explaining that Nimble "expected to hit 20% of their quarterly forecast in the first month of the quarter (August 2015), 30% in the second month of the quarter (September 2015), and 50% in the final month of the quarter (October 2015)," but that in the months leading up to the 3Q16 miss (announced in November 2015),

---

[10] Plaintiff also alleges that defendants' statements about certain "win rates" are false and misleading, because at the time those statements were made, Nimble's commercial and enterprise pipelines were already weakening. (*See, e.g.*, TAC ¶¶ 287 ("[O]ur win rates have continued to remain very consistent . . . ."); 289 ("[O]ur win rates have been as strong against [adaptive security appliance] competition as incumbents."); 291 ("[O]ur win rates have been unchanged."); *see also id.* at ¶¶ 288, 290, 292.) As an initial matter, the Court rejects defendants' arguments that the statements at issue here are mere puffery. Unlike vague statements touting the strength of its win rates generally, the statements at issue here are more comparative and concrete, and susceptible to verification. *See Shankar v. Imperva, Inc.*, No. 14-CV-1680-PJH, 2016 WL 2851859, at *4–5 (N.D. Cal. May 16, 2016) (finding vague statements such as "very strong" to be puffery but finding actionable claims that defendant would "win four out of five times"). However, for the same reasons discussed herein as to the other statements made during this time period, plaintiff has failed to plead particularized facts demonstrating that these statements were false or misleading when made.

7

"nothing was hitting targets." (TAC ¶ 172.) CW 12 further recalled a growing concern among the executive management "in the months leading up to the guidance miss when it became clear that the Company would not reach its guidance." (*Id.* at ¶ 174.)

- CW 13, the Vice President for the "East" region from January 2015 through May 2016, avers that his region encountered a slow first two months in 3Q16, *i.e.*, in August and September 2016. (*Id.* at ¶ 175.) Additionally, CW 13 states that Nimble had to use backlog from 1Q16 to make up for 2Q16 booking shortfalls in the East to make guidance for that quarter.

- CW 14, the director and then the senior director of Worldwide Channels GTM Strategy and Marketing throughout the Class Period, avers that Nimble encountered challenges in trying to penetrate the enterprise space, and corroborated that Nimble would reclassify its "top end commercial accounts as enterprise accounts," and that such reclassification would be "counted as a 'win'" in Nimble's "internal Salesforce and Cloud 9 systems." (*Id.* at ¶ 202.)

- CW 15, a field marketing manager throughout the Class Period, averred that Nimble's analytical tools would have indicated that Nimble was going to miss its guidance.

Additionally, each of the CWs above, as well as others listed in previous versions of the complaint, alleged that Nimble utilized highly advanced predictive technology, reviewed frequently by defendants, which would have demonstrated to defendants, at least by the end of the first month of the quarter what deals would close and whether defendants would meet their revenue guidance.[11]

The Court finds that the additional allegations provided by the four confidential witnesses are insufficient to save plaintiff's complaint, for the following reasons:

First, for the same reasons the Court found that CW 14's allegations were insufficient in the context of plaintiff's claims relating to the enterprise segment, the Court also finds that CW 14's allegations do not support claims for statements made in 3Q16. Additionally, CW 14 does not aver that the reclassifications were in any way improper.

---

[11] The TAC continues to contain vague, and at times conflicting, statements regarding when Nimble's predictive technology *would* have shown that Nimble would fail to meet the revenue guidance announced at the beginning of 3Q16. (*See* TAC ¶¶ 169 (CW 2 averring that it was "clear to everyone at Nimble before that last month" which deals would close); 170 (CW 10 averring that Nimble knew it would "miss guidance for 3Q16 from the beginning of the year"); 172 (CW 12 averring that defendants knew "months in advance" that they would miss 3Q16 guidance); 179 (CW 3 averring that the technology allowed Nimble to "project by the end of the first month of a quarter whether or not quarterly goals would be met").)

8

Second, CW 12's allegations provide no specificity as to when it became apparent that weaknesses in the commercial and enterprise segments would significantly impact Nimble's guidance on revenue and its projections for breakeven. CW 12 only asserts that "in the months leading up to the 3Q16 miss, nothing was hitting targets" and at some point, the Nimble executives knew it would be "impossible to achieve guidance for 3Q16." (*Id.* at ¶ 172.) However, given that the only two dates in 3Q16 on which statements were given were August 25, 2015 and September 22, 2015, greater specificity is necessary to determine whether the statements were false or misleading at the time they were made. Furthermore, as discussed above, the only actionable statement with regard to the September 22, 2015 analyst report pertained to whether Nimble would breakeven by the end of 4Q16, and the analyst acknowledged that the fourth quarter tended to be the strongest seasonally. (*Id.* at ¶ 303.) Thus, even if defendants knew by September 22, 2015 that it would be impossible for Nimble to meet its revenue guidance, no such statements were made on September 22, 2015, and there exist no particularized facts suggesting that Nimble would also fail to breakeven by the end of 4Q16.[12]

Third, CW 13's allegation that Nimble utilized backlog bookings from 1Q16 to supplement 2Q16's shortfall in his region says nothing about whether booking shortfalls existed in other regions during that quarter, how much backlog had to be utilized, and whether other regions still had backlog after 2Q16. Nor does a booking shortfall in 2Q16 necessarily indicate weakness entering 3Q16. Such lack of specificity is insufficient for purposes of the PSLRA. *See In re Foundry Networks, Inc. Sec. Litig.*, No. 00-CV-4823-MMC, 2003 WL 22077729, at *7 (N.D. Cal. Aug. 29, 2003) (dismissing claims related to use of shipping backlogs because plaintiffs failed to allege with particularity the "amount of revenue implicated," explaining that plaintiffs failed to "provide any facts about the source of such information, stating only, and generally, that 'the early shipments depleted the order backlog for Foundry's product in the fourth quarter of 2000 by approximately $5.2 million'").

---

[12] Additionally, CW 12 indicated that defendants expected 50% of 3Q16's revenue to be gained during October 2015. (TAC ¶ 172.) Thus, even accepting that Nimble encountered a weak August and September in 2015, defendants could still have expected to make up the difference in October, especially in light of CW 12's averment.

9

Fourth, and finally, CW 15's corroboration of the seemingly uncontroversial fact that Nimble employed highly predictive technology, which defendants most likely reviewed routinely, simply does not allege enough. Not one of the CWs alleges that any of these reports forecasted for defendants that they would miss their guidance, and, if any did provide such forecasts, when these reports began doing so.[13] This is particularly telling in light of the fact that certain CWs averred that they themselves used the predictive technology and received daily reports. (*See, e.g.*, TAC ¶ 125.) Given the limited number of statements provided in 3Q16 and the lack of any statements during the last month of that quarter, specificity as to when defendants' statements became "false and misleading" is necessary to state a claim under the PSLRA. To support plaintiff's theory, the Court would have to make inference upon inference without any particularized facts demonstrating what information the reports actually contained. The Court cannot do so under the demanding standards set forth by the PSLRA.

Accordingly, the Court **GRANTS** defendants' motion to dismiss. Given that this is plaintiff's third attempt at amending its complaint after over a year and a half of litigating this action, the Court finds that there exists no indication that plaintiff would be able to amend to cure the deficiencies described herein, or in the Court's prior orders dismissing plaintiff's complaints. Thus, the Court **DISMISSES WITH PREJUDICE** plaintiff's remaining claims under Section 10(b) and Rule10-b5 promulgated thereunder.

---

[13] Additionally, assuming *arguendo* that plaintiff could have satisfied its pleading burden in this regard, the lack of specificity as to what the reports actually showed, and when, undermine the TAC's ability to allege a strong inference of scienter, given that none of plaintiff's fifteen CWs is willing to allege such facts, and other circumstances—such as defendants' retention of a high percentage of their stock—also do not support such an inference. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (plaintiffs' allegations must raise a "strong inference that the defendant acted with an intent to deceive, manipulate, or defraud") (citing 15 U.S.C. § 78u–4(b)(2) and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007) ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."); *see also Applestein v. Medivation, Inc.*, No. 10-CV-998-EMC, 2011 WL 3651149, at \*8 (N.D. Cal. Aug. 18, 2011) (finding the fact that defendants "maintained more stock than they sold" during the class period "strongly rebuts an inference of scienter"). However, because plaintiff has failed to allege adequately any false or misleading statements, the Court need not reach that issue here.

B. **SECTION 20(A) CLAIM**

Defendants do not contest that Vasudevan and Singh are "controlling" individuals under the statute. Thus, the Section 20(a) claims against the same are dependent on whether plaintiff's claims under Section 10(b) and Rule 10b-5 survive. The Court has found that plaintiff has failed to plead adequately any claims under Section 10(b) and Rule 10b-5, and dismissed the same with prejudice. Accordingly, the Court **GRANTS** defendants' motion in this regard and **DISMISSES WITH PREJUDICE** plaintiff's section 20(a) claim.

II. **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's TAC.

This Order terminates Docket Number 141.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: October 2, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**